## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**HEARING DATE: July 10, 2020, 10:30 am**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| John Varvatos Enterprises, Inc. *et al.*, | : | Case No. 20-11043 (MFW) |
| Debtors. | : | (Joint Administration) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Tessa Knox, individually and as the Certified
Representative of the Class of Judgment
Creditors,

                       Plaintiff,

         v.

Lion/Hendrix Cayman Limited,

                  Defendant.

Adv. Proc. 20-50623 (MFW)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPPOSITION OF PLAINTIFF TO DEFENDANT'S
## MOTION TO DISMISS THE COMPLAINT

Mark Billion (DE Bar No. 5263)
Billion Law
1073 S. Governors Ave.
Dover, DE 19904
Telephone: (302) 428-9400
Email: markbillion@billionlaw.com

-and-

William Dunnegan (NY Bar No. 1927763)
(*pro hac vice*)
Dunnegan & Scileppi LLC
350 Fifth Avenue, 76th Floor
New York, New York 10118
Telephone: (212) 332-8300
Email: wd@dunnegan.com

## Table of Contents

Table of Authorities .................................................................................................... iii

Preliminary Statement ..................................................................................................1

Statement of Facts .........................................................................................................2

     A.     The Debtor's Intentionally Discriminatory Clothing Allowance Policy ................2

     B.     The Sex Discrimination Class Action And The Judgment Against The Debtor .....4

     C.     The Filing Of The Debtor's Petition .....................................................................7

     D.     Lion's Proposed Credit Bid ...................................................................................8

     E.     Lion's Encouragement And Facilitation Of The
           Debtor's Intentional And Illegal Sex Discrimination ...............................................8

Argument ...................................................................................................................10

     I.     THE STANDARD ON A MOTION TO DISMISS IS
         WHETHER PLAINTIFF HAS ALLEGED FACTS
         THAT STATE A PLAUSIBLE CLAIM FOR RELIEF.......................................10

     II.    THE COMPLAINT MORE THAN PLAUSIBLY ALLEGES
         THAT LION'S CLAIM SHOULD BE EQUITABLY
         SUBORDINATED BECAUSE LION ENCOURAGED AND
         FACILITATED THE DEBTOR'S DISCRIMINATION AGAINST
         THE CLASS OF JUDGMENT CREDITORS, AND BECAUSE LION
         WOULD OTHERWISE PROFIT FROM THAT DISCRIMINATION ...............11

          A.     Lion Engaged In Inequitable Conduct By Encouraging
              And Facilitating The Debtor To Continue Its Intentional
              And Illegal Sex Discrimination From 2013 Until March 2020 .................12

              1.     The Debtor Engaged In Intentional
                    And Illegal Sex Discrimination ....................................................13

              2.     Lion Encouraged And Facilitated The Debtor's
                    Intentional And Illegal Sex Discrimination ...................................14

          B.     Lion's Inequitable Conduct Directly Injured The Class
               Of Judgment Creditors And Unjustly Enriched Lion ...............................16

               1.     The Intentional And Illegal Discrimination
                    That Lion Encouraged And Facilitated Directly
                    Damaged The Class Of Judgment Creditors.................................17

i

2.    Absent Equitable Subordination, The Intentional
And Illegal Discrimination That Lion Encouraged
And Facilitated Will Directly Enrich Lion ....................................17

C.    Equitable Subordination Would
Not Conflict With The Bankruptcy Code ..................................................20

III.    THIS COURT HAS PREVIOUSLY DENIED MOTIONS TO DISMISS
COMPLAINTS FOR EQUITABLE SUBORDINATION IN CASES
FAR LESS COMPELLING THAN THE PRESENT CASE...............................20

A.    *In re Advance Nanotech, Inc.*......................................................................21

B.    *In re Am. Bus. Fin. Servs., Inc.* .................................................................22

C.    *In re OODC, LLC* .....................................................................................22

IV.    IF THE COURT DISMISSES THE COMPLAINT,
THE COURT SHOULD GRANT LEAVE TO AMEND....................................24

Conclusion ........................................................................................................................25

## Table of Authorities

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................. 10

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
160 F.3d 982 (3d Cir. 1998) ...................................................................... 11, 19, 20

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
323 F.3d 228 (3d Cir. 2003) ................................................................................. 11

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) ................................................................................. 10

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ............................................................................................. 16

*In re Advance Nanotech, Inc.*,
2014 WL 1320145 (Bankr. D. Del. Apr. 2, 2014) ...................................... 12-13, 21, 24

*In re AFA Inv., Inc.*,
2012 WL 6544945 (Bankr. D. Del. Dec. 14, 2012) .................................................. 24

*In re Am. Bus. Fin. Servs., Inc.*,
362 B.R. 149 (Bankr. D. Del. 2007) ................................................................. 11, 22

*In re Autobacs Strauss, Inc.*,
473 B.R. 525 (Bankr. D. Del. 2012) .................................................................. 10, 12

*In re Boomerang Sys., Inc.*,
2017 WL 4221095 (Bankr. D. Del. Sept. 21, 2017) ................................................ 10

*In re CRC Parent Corp.*,
2013 WL 781603 (Bankr. D. Del. Mar. 1, 2013) ..................................................... 10

*In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) ........................................................................... 19, 20

*In re Fuller Cleaning & Dyeing Co.*,
118 F.2d 978 (6th Cir. 1941) ................................................................................ 19

*In re Mid–American Waste Systems, Inc.*,
284 B.R. 53 (Bankr. D. Del. 2002) ........................................................................ 12

*In re OODC, LLC*,
321 B.R. 128 (Bankr. D. Del. 2005) ................................................................ 11, 22, 23

*In re Racing Services, Inc.*,
340 B.R. 73 (BAP 8th Cir. 2006) ............................................................................. 17

*In re Washington Mut., Inc.*,
2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ...................................................... 24

*Knox v. John Varvatos Enterprises, Inc.*,
17-cv-772 (GWG) (S.D.N.Y.) ....................................................................... 1, 3, 14, 15

*Santiago v. Warminster Twp.*,
629 F.3d 121 (3d Cir. 2010) ...................................................................................... 10

*Shane v. Fauver*,
213 F.3d 113 (3d Cir.2000) ....................................................................................... 24

*U.S. v. Noland*,
517 U.S. 535 (1996) ............................................................................................. 11-12

*United States v. State St. Bank & Tr. Co.*,
520 B.R. 29 (Bankr. D. Del. 2014) ............................................................................ 12

## Rules

Fed. R. Br. P. 7008 ................................................................................................... 10

Fed. R. Br. P. 7012 ................................................................................................ 1, 10

Fed. R. Civ. P. 12 ................................................................................................ 1, 2, 10

Fed. R. Civ. P. 15 ...................................................................................................... 24

Fed. R. Civ. P. 23 ........................................................................................................ 4

## Statutes

11 U.S.C. § 101 ........................................................................................................ 12

11 U.S.C. § 510 ........................................................................................................ 11

29 U.S.C. § 216 .......................................................................................................... 4

N.Y. Exec. Law § 296 ............................................................................................... 16

Tessa Knox ("Knox"), individually and as the representative of the class that the district court certified in the civil action entitled *Knox* v. *John Varvatos Enterprises, Inc.*, 17-cv-772 (GWG) (S.D.N.Y.) ("Class of Judgment Creditors"), respectfully submits this opposition to the motion of defendant Lion/Hendrix Cayman Limited ("Lion") to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Ba. P. 7012, for failure to state a claim for equitable subordination.

### Preliminary Statement

1.      The Court should equitably subordinate Lion's claim against the Debtor John Varvatos Enterprises, Inc. ("Debtor") to the claim of the Class of Judgment Creditors.  Lion engaged in inequitable conduct by encouraging and facilitating the Debtor's intentional and illegal sex discrimination against the Class of Judgment Creditors.  As a result, Lion contributed to the damage that the Class of Judgment Creditors has sustained.  In addition, absent equitable subordination, Lion will profit from its own wrongdoing, by acquiring – for the same fixed amount of debt – more assets of the Debtor than Lion would have acquired if the Debtor had provided the Class of Judgment Creditors with equal pay for equal work.

2.      The complaint alleges, and we expect that the evidence will prove, the following.

•       The Debtor engaged in intentional and illegal sex discrimination by, under its written policy, providing its men sales professionals with a $12,000 per year clothing allowance without providing its women sales professionals with a comparable benefit ("Clothing Allowance policy").  After the filing of a lawsuit on February 1, 2017, the Class of Judgment Creditors obtained a judgment against the Debtor for $3,516,051.23 and moved under the applicable fee-shifting statutes for an additional $1,744,589.71 in attorneys' fees from the Debtor.

- Lion not only encouraged the Debtor to continue its discriminatory Clothing Allowance policy during three years of litigation, but facilitated the continuation of that discriminatory policy by offering the women sales professionals a 50 percent discount at AllSaints ("AllSaints Discount"), another store in Lion's Fund III portfolio.  While palmed off as a benefit to the women, the AllSaints Discount provided camouflage for the discriminatory Clothing Allowance policy, and ultimately benefited no one other than Lion.

- As the owner and a lender to the Debtor, Lion profited from the Debtor's intentional and illegal sex discrimination.  In addition to the increased sales at AllSaints, every dollar the Debtor saved as a result of refusing to provide the Class of Judgment Creditors with equal pay for equal work represented an additional dollar of value for Lion.  Lion now seeks to acquire the assets of the Debtor free and clear of the liability for the intentional and illegal sex discrimination that Lion encouraged and facilitated.

**Statement of Facts**

3.      Under Fed. R. Civ. P. 12(6), the Court should accept as true the well-pled allegations of the complaint.  We summarize them below.

**A.      The Debtor's Intentionally Discriminatory Clothing Allowance Policy.**

4.      The claim of the Class of Judgment Creditors results from the fact that the Debtor engaged in intentional and illegal sex discrimination in violation of Federal and New York State laws from at least 2013 to March 2020. (Dkt. 1 at ¶ 4)

2

5.      The Debtor sold its brand name "John Varvatos" clothes, which it marketed toward men, in its stores throughout the United States.  At these stores, the Debtor employed both men and women as sales professionals. (Dkt. 1 at ¶ 5)

6.      The jobs of men and women sales professionals were substantially equal, except for their dress codes.  The Debtor required men sales professionals to wear three pieces of "John Varvatos" clothes, and under its Clothing Allowance policy provided each of the men sales professionals $12,000 each year in free "John Varvatos" clothes.  The men would pick out $3,000 of clothes each quarter, or $12,000 each year, from the Debtor's stores, and would own the clothes that they picked out.  While the Debtor gave the men $12,000 per year in free clothes, the Debtor did not give the women a comparable benefit. (Dkt. 1 at ¶ 6)

7.      By giving the men sales professionals $12,000 a year in free clothes, the Debtor paid the men sales professionals more than the women sales professionals for jobs that were substantially equal. (Dkt. 1 at ¶ 7)

8.      Although the Clothing Allowance policy provided that men would be paid more than women for the same job, the Debtor never obtained any written legal opinion, from any lawyer, at any time, concerning the legality of its Clothing Allowance policy.[1] (Dkt. 1 at ¶ 8)

---

[1] Lion's argument that "… JVE received legal advice that the Clothing Policy violated no laws…" (Dkt. 5 at 9/26) is at least misleading.  Without providing any discovery that the Class of Judgment Creditors sought concerning the legal advice that the Debtor received concerning the Clothing Allowance policy, Ann Byron ("Byron"), the Debtor's former Vice President of Human Resources, testified at trial that the Debtor received an "oral opinion" from a lawyer concerning the Clothing Allowance policy.  The chance that actually happened is remote.  Byron failed to offer any testimony concerning (a) the identity of the lawyer, (b) the identity of the lawyer's firm, (c) the lawyer's employment law expertise, (d) the facts the Debtor disclosed to the lawyer, or (e) the research that the lawyer conducted before giving this supposed oral opinion. (*Knox,* Dkt. 346 at 610:1-611:19)  The fact that the Jury found that the Debtor intentionally violated the sex discrimination laws and that the Debtor should pay punitive damages (Dkt. 1 at ¶ 14) suggests that the Jury did not credit Byron's testimony.

9.      Beginning in about 2014, the Debtor began offering women sales professionals the AllSaints Discount, the ability to purchase clothing from another store in Lion's Fund III portfolio, AllSaints, at a 50 percent discount. (Dkt. 1 at ¶ 28)  While the AllSaints Discount was in fact worthless to the women sales professionals (Dkt. 1 at ¶ 29), the AllSaints Discount provided a degree of camouflage for the Debtor's otherwise blatantly discriminatory policy.

**B.      The Sex Discrimination Class Action And The Judgment Against The Debtor.**

10.      Knox, a former sales professional of the Debtor, filed a sex discrimination class action on February 1, 2017, in the United States District Court for the Southern District of New York ("Sex Discrimination Class Action").  Knox's complaint alleged that the Debtor's Clothing Allowance policy violated the Federal Equal Pay Act ("Federal EPA"), the New York Equal Pay Act ("NY EPA"), and the New York Human Rights Law ("NY HRL").  On August 29, 2017, after receiving a right-to-sue letter from the Equal Employment Opportunity Commission, Knox filed a second amended complaint, adding a claim that the Debtor's Clothing Allowance policy violated Title VII of the Civil Rights Act of 1964 ("Title VII"). (Dkt. 1 at ¶ 9)

11.      On October 17, 2017, over the Debtor's objection, the District Court conditionally certified Knox's Federal EPA claim as a collective action under 29 U.S.C. § 216(b).  Ultimately, 13 additional (then present or former) women sales professionals joined the collective action as Opt-In plaintiffs. (Dkt. 1 at ¶ 10)

12.      On February 22, 2018, over the Debtor's objection, the District Court certified a class pursuant to Fed. R. Civ. P. 23 consisting of women sales professionals with claims under the NY EPA, the NY HRL, and Title VII, and certified Knox as the class representative, and Dunnegan & Scileppi LLC as class counsel.  The class consisted of 69 (then present or former) women sales professionals of the Debtor. (Dkt. 1 at ¶ 11)

13.     Beginning on February 24, 2020, the District Court held a jury trial in the Sex

Discrimination Class Action.  The main issues were (a) whether the Debtor engaged in intentional

and illegal sex discrimination in violation of Federal and New York State laws by having a written

Clothing Allowance policy – beginning as far back as 2013 – that gave its men sales professionals

$12,000 per year in free clothes without giving its women sales professionals a comparable

benefit, and (b) the amount of damage that resulted from the Debtor's sex discrimination. (Dkt. 1

at ¶ 12)

14.     The evidence presented to the jury demonstrated that the Debtor intentionally and

illegally discriminated against the Class of Judgment Creditors because "**someone**" overruled the

Human Resources department of the Debtor and decided that it was not "financially feasible" to

comply with the legal requirement of equal pay for equal work. (Dkt. 1 at ¶ 13)  Based upon the

evidence, counsel for the Class of Judgment Creditors argued to the jury – without objection from

the Debtor – in closing at Phase I of the trial:

> "While Varvatos is telling its employees it complies with all federal and state
> antidiscrimination laws, **Varvatos knew that it was doing something that was illegal
> discrimination or at least took the risk that its actions would be illegal
> discrimination**.
>
> Basic facts.  In 2014 Varvatos opens the store in London, England.  At the
> London store Varvatos has both men and women sales professionals.  Varvatos gives the
> men a clothing allowance.  Not surprising.  But Varvatos also gives the women in
> England a clothing allowance.  As we learned from Exhibit 16 in your books, Varvatos
> decided that those women in London needed a clothing allowance to 'make them whole.'
> Now, the story continues in New York.  In connection with the opening of the store in
> London, it occurred to the people in Varvatos' human resources department in New York
> that it would be appropriate to give a clothing allowance in some form to the women
> sales professionals in the United States.  **Ann Byron, the vice-president of human
> resources at the time, decided that a clothing allowance for women sales
> professionals in the United States was a good idea**.  Nicole Chang told you that. Ann
> Byron didn't deny it when she testified when called by Varvatos.
>
> Now, it is fair to say that there was a proposal from Ann Byron some time around
> early 2014 that women sales professionals in the United States receive a clothing

allowance, but then **this proposal for a women's clothing allowance stopped dead** in its tracks. It stopped **in its tracks when someone decided that it was not in the words of Nicole Chang 'financially feasible.**' No one really makes an effort to flesh out what this women's clothing allowance would be because it was not in any form financially feasible.

*   *   *   *   *

**The bottom line Varvatos didn't want to pay for any women's clothing allowance for sales professionals in the United States. Varvatos just didn't want to spend the money**." (Emphasis added.) (Dkt. 1 at ¶ 13)

15.     Phase I of the trial concluded on February 28, 2020, with a jury verdict that (i) the Debtor violated the Federal EPA, the NY EPA, Title VII, and the NY HRL, (ii) women sales professionals should be compensated $3,000 for each $3,000 of clothes the men sales professionals received, (iii) the Debtor violated the Federal EPA and the NY EPA willfully, and (iv) the Debtor should pay punitive damages under Title VII.  The Jury's verdict sheet provided in part:

Wilfulness (Equal Pay Act)
      6.  If you answered "no" to either question 1 or 2, go to Question 8.  Otherwise, answer the following question:
      Was Varvatos's violation of the Equal Pay Act in good faith?
      _____ Yes            __X__ No
If you answered Question 6 "Yes," go to Question 8.  If you answered Question 6 "No," answer Question 7 next.

      7. Did Varvatos wilfully violate the Equal Pay Act?
      __X__ Yes            _____ No
Go to Question 8.

Punitive Damages
      8.  If you answered "no" to either question 3 or 4, the foreperson should sign the form on the last page.  Otherwise, answer the following question
      __X__    Does the jury exercise its discretion to award punitive damages to the plaintiffs?
      __X__ Yes            ____ No
You have answered all questions.  The foreperson should sign the form on the last page.

(Dkt. 1 at ¶ 14)

6

16.     Through this verdict, the Jury awarded the Class of Judgment Creditors the precise relief they sought in Phase I of the trial. (Dkt. 1 at ¶ 15)

17.     Phase II of the trial, conducted on March 2, 2020, concluded with the Jury's verdict that the Class of Judgment Creditors should receive enhanced liquidated damages under the NY EPA, and punitive damages under Title VII, of $2,500 for each $3,000 of clothes the men sales professionals received. (Dkt. 1 at ¶ 16)

18.     The District Court then made a series of rulings to calculate an aggregate amount of damages for the Class of Judgment Creditors to recover. (Dkt. 1 at ¶ 17)

19.     On March 24, 2020, the Clerk entered a final judgment in favor of the Class of Judgment Creditors and against the Debtor for $3,516,051.23. (Dkt. 1 at ¶ 18)

20.     On April 2, 2020, the Class of Judgment Creditors filed a motion for costs and attorneys' fees of an additional $1,744,589.71 from the Debtor, which was *sub judice* at the time of the petition.  This brought the total claim of the Class of Judgment Creditors, as of the date of the petition, to $5,260,640.94. (Dkt. 1 at ¶ 19)

**C.**     **The Filing Of The Debtor's Petition.**

21.     On May 6, 2020, the day that the District Court in the Sex Discrimination Class Action required the Debtor to file papers in support of its motion for a continued stay of the execution of judgment, the Debtor filed its petition in this Court. (Dkt. 1 at ¶ 20)

22.     While the judgment in the Sex Discrimination Class Action may have played a role in the filing, the Debtor had been grossly undercapitalized for years. (Dkt. 1 at ¶ 21)

23.     Joseph Zorda ("Zorda"), the CFO of the Debtor, admitted at the trial of the Sex Discrimination Class Action on March 2, 2020, that the Debtor could not, for the last several years, pay its debts as they became due. (Dkt. 1 at ¶ 22)

24.    The Debtor's own balance sheet for the years 2016, 2017 and 2018 shows that the Debtor had (negative) shareholder's equity of ($60,225,771), ($74,567,206), and ($86,958,136), respectively. (Dkt. 1 at ¶ 23)

**D.    Lion's Proposed Credit Bid.**

25.    Lion, a private equity company with billions under management, owns the Debtor and has owned the Debtor since at least 2013.  Lion currently controls the Debtor's Board of Directors, and therefore controls the Debtor. (Dkt. 1 at ¶ 24)

26.    Lion has entered into a stalking horse asset purchase agreement with the Debtor. (Bankr. D. Del. 20-11043 (MFW), Dkt. 21-2)  Through that stalking horse asset purchase agreement, the Debtor seeks to sell substantially all of its assets to Lion, through Lion's credit bid of $76,000,000. (Dkt. 1 at ¶ 25)

27.    While the Debtor disclosed that its sale through Lion's proposed credit bid would all but extinguish the claims of the unsecured creditors of the Debtor, the Debtor never quite gets around to disclosing the role that Lion played in the Debtor's intentional and illegal sex discrimination. (Dkt. 1 at ¶ 26)

**E.    Lion's Encouragement And Facilitation Of The
        Debtor's Intentional And Illegal Sex Discrimination.**

28.    Since at least about 2013, Lion fully understood that the Debtor engaged in intentional and illegal sex discrimination through its Clothing Allowance policy, and Lion not only encouraged the Debtor to continue that sex discrimination, but facilitated it. (Dkt. 1 at ¶ 27)

29.    At the trial of the Sex Discrimination Class Action, Byron, the Debtor's former Vice President of Human Resources testified that the "**head of Lion**" had discussed the Clothing Allowance policy with Mr. John Varvatos in 2013 and that they agreed that women sales

professionals would be offered the AllSaints Discount, a 50 percent discount off the full retail price of certain clothes at another store in Lion's Fund III portfolio. (Dkt. 1 at ¶ 28)

30.    The Jury in the Sex Discrimination Class Action found in Phase I of the trial that the AllSaints Discount was worthless to the women sales professionals. (Dkt. 1 at ¶ 29)

31.    So, with full knowledge of the Debtor's intentional and illegal Clothing Allowance policy, Lion not only encouraged the Debtor to maintain that policy, but facilitated it by providing the camouflage of the AllSaints Discount.  In addition to saving the Debtor the cost of providing the Class of Judgment Creditors with equal pay for equal work, the AllSaints Discount created the mirage of a benefit for the women, and allowed another company in Lion's Fund III portfolio to make more money. (Dkt. 1 at ¶ 30)

32.    Lion's encouragement of the Debtor's intentional and illegal sex discrimination continued through the Sex Discrimination Class Action.  The Sex Discrimination Class Action, pending from February 1, 2017, to the filing of the petition, did not fall below Lion's radar.  In one year alone, the Debtor spent or incurred more than $1 million defending the Sex Discrimination Class Action.  As a result of the March 24, 2020, judgment in the Sex Discrimination Class Action, the Debtor's petition listed the Class of Judgment Creditors as the largest unsecured creditors of the Debtor. (Dkt. 1 at ¶ 31)

33.    The Debtor now asks this Court to approve Lion's credit bid to take substantially all of the assets of the Debtor, free and clear of all claims, and leave the Class of Judgment Creditors – whose damages Lion played a substantial role in causing – uncompensated. (Dkt. 1 at ¶ 32)  As explained below, unless the Court subordinates Lion's claim to the claims of the Class of Judgment Creditors, Lion will profit from its own wrongdoing.

## Argument

## I.

## THE STANDARD ON A MOTION TO DISMISS IS WHETHER PLAINTIFF HAS ALLEGED FACTS THAT STATE A PLAUSIBLE CLAIM FOR RELIEF

34.     Under Fed. R. Ba. P. 7012, Fed. R. Civ. P. 12 applies to motions to dismiss. *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 552 n. 64 (Bankr. D. Del. 2012)("Federal Rules of Civil Procedure 8(a) and 12(b)(6) are applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.").

35.     "In weighing a motion to dismiss, the Court must undergo the three-part analysis outlined by the Third Circuit. First, the Court must take note of the elements needed for a plaintiff to state a claim. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). Second, the Court must separate the factual and legal elements of a claim, accepting all of the complaint's well-pled facts as true and disregarding any legal conclusions. *Id.; Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing [*Ashcroft v.*] *Iqbal*, 556 U.S. [662] at 679 [(2009)]).  Finally, the Court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Santiago*, 629 F.3d at 130." *In re Boomerang Sys., Inc.*, No. 15-11729 (MFW), 2017 WL 4221095, at *2 (Bankr. D. Del. Sept. 21, 2017).

36.     "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]." *In re CRC Parent Corp.*, No. 10-11567 (MFW), 2013 WL 781603, at *2 (Bankr. D. Del. Mar. 1, 2013).

## II.

## THE COMPLAINT MORE THAN PLAUSIBLY ALLEGES THAT LION'S CLAIM SHOULD BE EQUITABLY SUBORDINATED BECAUSE LION ENCOURAGED AND FACILITATED THE DEBTOR'S DISCRIMINATION AGAINST THE CLASS OF JUDGMENT CREDITORS, AND BECAUSE LION WOULD OTHERWISE PROFIT FROM THAT DISCRIMINATION

37.     11 U.S.C. § 510(c) provides that the Court may equitably subordinate one claim

to another.

> "(c)     Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1)     under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; …"

38.     Equitable subordination is remedial and is used to cure an inequity in a claim

against the bankruptcy estate that would produce unfair results. *See, e.g., Citicorp Venture*

*Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 234 (3d Cir.

2003) (finding additional subordination of claim warranted by insider's misconduct); *Citicorp*

*Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 988–90

(3d Cir. 1998) (holding that insider's claim should be subordinated as a result of its breach of

fiduciary duty)." *In re OODC, LLC*, 321 B.R. 128, 146 (Bankr. D. Del. 2005).

39.     A claim for equitable subordination under § 510(c) usually involves three

elements.  In *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,

160 F.3d 982, 986–87 (3d Cir. 1998), the Third Circuit stated:

> "Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code."

(citing *U.S. v. Noland*, 517 U.S. 535 (1996)). *See also In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 149, 164–65 (Bankr. D. Del. 2007)("For equitable subordination to be granted there need only be proof of inequitable conduct and a resulting injury to creditors or unfair advantage to the claimant.").

40.     "[C]ourts recognize that determining whether a creditor's claim should be subordinated is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss." *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 583 (Bankr. D. Del. 2012)(collecting cases).

**A.     Lion Engaged In Inequitable Conduct By Encouraging
        And Facilitating The Debtor To Continue Its Intentional
        And Illegal Sex Discrimination From 2013 Until March 2020.**

41.     Lion is the shareholder of the Debtor (Dkt. at ¶ 24), owning 100 percent of the Debtor and controlling its Board of Directors. (Dkt. 1 at ¶ 24)  Lion is a "person in control" of the Debtor under 11 U.S.C. § 101(31)(B)(3), and therefore an "insider" of the Debtor.

42.     The standard for finding inequitable conduct by an insider is lower than the standard for finding such conduct by a non-insider. *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 82 (Bankr. D. Del. 2014)("When the claimant is an insider, the standard for finding inequitable conduct is much lower.").  The Court in *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 81 (Bankr. D. Del. 2014), stated:

> "'Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.' [*In re*] *Mid–American Waste* [*Systems, Inc.*], 284 B.R. [53] at 70 [(Bankr. D. Del. 2002)]."

43.     Similarly, the standard for pleading a claim for inequitable conduct against an insider is lower than the standard for pleading such a claim against a non-insider. *In re Advance Nanotech, Inc.*, No. 11-10776 (MFW), 2014 WL 1320145, at *8 (Bankr. D. Del. Apr. 2,

2014)("Because the Court finds that Owlstone was an insider of AVNA, Owlstone's conduct must be rigorously scrutinized, and the Trustee need not plead inequitable conduct with the level of particularity required for an outsider.").

44.     Here, the complaint properly alleges that the Debtor engaged in intentional and illegal sex discrimination in violation of Federal and New York State laws, and that Lion, as an insider, encouraged and facilitated the Debtor's conduct that inflicted the damage on the Class of Judgment Creditors that now provides the basis for their claim against the Debtor.

### 1.     <u>The Debtor Engaged In Intentional And Illegal Sex Discrimination.</u>

45.     The Jury in the Sex Discrimination Class Action found that the Debtor engaged in intentional and illegal sex discrimination against the Class of Judgment Creditors.  The Jury specifically found that the actions of the Debtor were not in good faith, were willful, and merited an award of punitive damages. (Dkt. 1 at ¶ 14)  The Court entered judgment for $3,516,051.23. (Dkt. 1 at ¶ 18)

46.     The Debtor had a clear choice between (a) providing the Class of Judgment Creditors equal pay for equal work, or (b) ignoring the law and hoping that the Debtor could avoid ever being held accountable to the Class of Judgment Creditors, as a result of a bankruptcy proceeding or otherwise.  The Debtor chose the latter.

47.     While Lion notes that the Debtor has filed a notice of appeal from the judgment of the District Court and has sought other post-trial relief (Dkt. 5 at 11/26), Lion has not seriously contested that the Debtor engaged in intentional and illegal sex discrimination.

2. **Lion Encouraged And Facilitated The Debtor's Intentional And Illegal Sex Discrimination.**

48.     The complaint properly alleges that Lion encouraged and facilitated the Debtor in intentionally and illegally discriminating against the Class of Judgment Creditors. (Dkt. 1 at ¶¶ 27-32)

49.     Lion knew about the Debtor's discriminatory Clothing Allowance policy as early as 2013.  While Lion observes that the Debtor's discriminatory Clothing Allowance policy existed before Lion's involvement (Dkt. 5 at 17-18/26), the complaint does not allege, or even suggest, otherwise.  Rather, Lion caused or encouraged the Debtor to modify its existing Clothing Allowance policy (of providing men, but not women, with $12,000 per year in free clothes) to offer its women sales professionals only the AllSaints Discount, a 50 percent discount at another store in Lion's Fund III portfolio. (Dkt. 1 at ¶ 28).

50.     Lion's argument that this testimony represents merely that the "'head of L[i]on Capital' spoke with John Varvatos about a discount at AllSaints for JVE's female sales associates and nothing more" (Dkt. 5 at 17/26) is incorrect.  Byron gave this testimony in response to the question "And how did [the AllSaints Discount] come to be put into place?" (Dkt. 5 at 16/26, quoting *Knox*, ECF No. 342 at 397:5)  According to Byron's testimony, the AllSaints Discount resulted from this conversation.  Mr. John Varvatos had no authority to instruct AllSaints, a different retailer, to offer the Debtor's female employees a discount.  Only Lion, the parent of both AllSaints and the Debtor, had that authority.

51.     Additionally, Lion's argument that "[t]his is not testimony that [Lion] knew about the Clothing Policy" (Dkt. 5 at 16/26) is incorrect.  Byron testified that the conversation was "about the possibility of wanting to provide our female associates with a benefit *since we did not produce any clothing for female associates*.")(Dkt. 5 at 16/26) (Emphasis added.).  The latter

portion of that testimony makes sense only if Lion understood the discriminatory Clothing Allowance policy.  In other words, the founder of the Debtor presented the discriminatory Clothing Allowance policy to the "head of Lion," and the "head of Lion" provided to the women a worthless discount that only enriched Lion.

52.     While the Jury found the AllSaints Discount was worthless to the women sales professionals, the AllSaints Discount facilitated the Debtor's discrimination by providing camouflage for the Debtor's otherwise blatantly discriminatory Clothing Allowance policy.  This camouflage was on full display during the Debtor's closing argument to the jury, where counsel for the Debtor mentioned the AllSaints Discount 15 times over 26 pages of transcript. *Knox*, Dkt. 346 at 562-79.

53.     In addition, as the controlling person of the Debtor, Lion knew about the Debtor's intentional and illegal discriminatory Clothing Allowance policy throughout the more than three years of the Sex Discrimination Class Action, and refused to stop it. (Dkt. 1 at ¶ 38)  Discovery may even reveal that the "**head of Lion**" was the "**someone**" who stopped a clothing allowance for women dead in its tracks because it was not "financially feasible."[2]

54.     The best case for Lion is that it willfully decided to blind its eyes from the intentional violations of Federal and New York State laws that were occurring under its nose. That type of willful blindness would be tantamount to knowledge. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)("Under this formulation, a willfully blind defendant is one

---

[2] While Byron did not identify the "head of Lion," Zorda, the CFO of the Debtor, previously identified Jeff Chang as the "the most senior manager of Lion Capital in the United States" during 2019. (Zorda Dep. 1/10/20 at 16:19-22)  In a filing on July 1, 2020, the Debtor disclosed that Jeff Chang had been an officer and director of the Debtor from April 29, 2012, to March 31, 2020. (20-11043, Dkt. 262 at 25/29)  The judgment in the Sex Discrimination Class Action had been entered on March 24, 2020. (Dkt. 1 at ¶ 18)

who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.").

55.     Lion's facilitation and encouragement of the Debtor's discriminatory Clothing Allowance policy likely violated the NY HRL, N.Y. Exec. Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.").

56.     Lion argues that it did not engage in inequitable conduct because the use of "Lion" is imprecise, as the complaint defines "Lion" as defendant Lion/Hendrix Cayman Limited (together with its affiliates, except the jointly administered debtors." (Dkt. 5 at 6, 10, 15, 17, 19, 20, 21, and 22/26)   While we understand Lion's argument that the web of Lion entities is complex, the complaint properly alleges that the shareholder and creditor of the Debtor engaged in the inequitable conduct, and profited from it.  These allegations, especially against an insider, more than meet the requirements of the Federal Rules.

57.     The Court should therefore find that the Class of Judgment Creditors has properly pled the first element of the claim for equitable subordination.

**B**.     **Lion's Inequitable Conduct Directly Injured The Class Of Judgment Creditors And Unjustly Enriched Lion.**

58.     While Lion argues "[t]here simply is no nexus between the alleged inequitable conduct and the Knox claims…" (Dkt. 5 at 9/26), the complaint properly alleges a direct connection between (a) the inequitable conduct of Lion, and (b) both (i) the injury to the Class of Judgment Creditors, and (ii) absent equitable subordination, Lion's ability to profit from its own inequitable conduct. (Dkt. 1 at ¶¶ 45-49)

1.    **The Intentional And Illegal Discrimination That Lion Encouraged
And Facilitated Directly Damaged The Class Of Judgment Creditors.**

59.    The intentional and illegal sex discrimination damaged the Class of Judgment

Creditors because, as women, they did not receive $12,000 a year in free clothes. (Dkt. 1 at ¶ 7)

60.    The Jury found that the damage that the women sales professionals sustained as a

result of not receiving a $12,000 per year Clothing Allowance was $12,000. (Dkt. 1 at ¶ 14)

61.    When one creditor acts with the debtor to injure another creditor, equitable

subordination is appropriate.  In *In re Racing Services, Inc.*, 340 B.R. 73 (BAP 8th Cir. 2006),

the Bankruptcy Court equitably subordinated the post-petition administrative debt of a landlord

(and owner of the debtor) to the other creditors of the estate on the ground that the landlord had

engaged in illegal pre-petition conduct with the debtor that had damaged the creditors of the

estate.  The Bankruptcy Appellate Panel affirmed, holding "the bankruptcy court did not err

when it held that the claimant's misconduct resulted in injury to the creditors of [the debtor] and

that equitable subordination is consistent with the Bankruptcy Code." *Id*. 340 B.R. at 74-75.

2.    **Absent Equitable Subordination, The
Intentional And Illegal Discrimination That Lion
Encouraged And Facilitated Will Directly Enrich Lion.**

62.    The intentional and illegal sex discrimination allowed the Debtor to avoid

providing equal pay for equal work, and therefore allowed the Debtor to save money.

63.    The money the Debtor saved by not providing equal pay for equal work enriched

not only the Debtor, but also Lion.

64.    Lion is the owner of the Debtor.  If Lion's equity investment in the Debtor ever

resulted in a positive return for Lion, every dollar that the Debtor saved by not providing equal

pay for equal work would increase the value of Lion's investment by that dollar.

65.     Lion is may also be a secured creditor of the Debtor.  As a secured creditor of the Debtor, every dollar that the Debtor saved by not providing equal pay for equal work would increase the amount of security for Lion's loans by that dollar.

66.     If Lion successfully purchases the Debtor's business at the auction in this case, through either a credit or a cash bid, Lion will profit from the intentional and illegal sex discrimination that Lion encouraged and facilitated.

67.     If Lion successfully makes a credit bid at the auction, Lion will purchase the Debtor's business for a fixed amount of Lion's debt.  With that fixed amount of debt, Lion will purchase assets that have been inflated because the Debtor unlawfully saved money by failing to provide the Class of Judgment Creditors with equal pay for equal work.  For example, if Lion used the fixed amount of its existing debt to purchase the Debtor's assets that were, in fact, worth $50,000,000, and if the Debtor had provided the Class of Judgment Creditors with equal pay for equal work, then the Debtor would have had millions less in assets for Lion to purchase with Lion's fixed amount of debt.

68.     If Lion successfully makes a cash bid at the auction, Lion will use its more than $76,000,000 of secured debt to take all of the remaining assets of the Debtor.  Those remaining assets will have been increased because the Debtor unlawfully saved money by failing to provide the Class of Judgment Creditors with equal pay for equal work.  The same is true even if another bidder wins the auction.

69.     Accordingly, under any outcome of the auction, Lion will benefit from its own inequitable conduct – absent equitable subordination.

70.     Given the Debtor's financial condition, Lion's strategy of encouraging the Debtor to save money by refusing to provide equal pay for equal work made financial sense – absent

equitable subordination.  Lion knew that if justice prevailed in the Sex Discrimination Class

Action, the Debtor could seek to avoid paying any judgment of the Class of Judgment Creditors

because the Debtor had been grossly undercapitalized.  For several years before the filing of the

petition, the Debtor could not pay its debts as they became due. (Dkt. 1 at ¶ 42)  Since at least

2016, the Debtor had a negative net worth of at least $60,000,000. (Dkt.1 at ¶ 43)  Lion

presumably expected that the Debtor's undercapitalization, coupled with Lion's secured loans,

would shield both the Debtor and Lion from compensating the Class of Judgment Creditors for

the damages that Lion played a substantial role in causing – absent equitable subordination.

71.     The Court should not allow Lion to profit from its own inequitable conduct. *In re*

*Fuller Cleaning & Dyeing Co.*, 118 F.2d 978, 979 (6th Cir. 1941)("It is a maxim of equity

adjudication that 'no one can take advantage of his own wrong'; and the Bankruptcy Court is a

court of equity. To permit one to profit by his own wrongdoing is to extend an open invitation to

wrongdoing. Equity abhors such conduct.").

72.     *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,

160 F.3d 982 (3d Cir. 1998), is instructive.  There, the Committee argued that "CVC, while a

fiduciary of [the debtor] secretly purchased millions of dollars of claims against [the debtor] at a

discount, seeking to control [the debtor's] assets and make a profit at the expense of [the

debtor's] other creditors." 160 F.3d at 984.  The Third Circuit affirmed the finding of the

Bankruptcy Court and the District Court that the defendant "CVC had acted inequitably and that

this behavior had injured creditors." 160 F.3d at 986.

73.     *In re First All. Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006), which Lion relies upon,

is inapposite.  That case was not decided on a motion to dismiss, but after a jury trial. *Id*. at 983.

The action also involved claims against a non-insider. *Id*. at 1006. ("Where non-insider, non-

fiduciary claims are involved, as is the case here, the level of pleading and proof is elevated: gross and egregious conduct will be required before a court will equitably subordinate a claim.").

74.    The Court should therefore find that the Class of Judgment Creditors has properly pled the second element of the claim for equitable subordination.

**C.    Equitable Subordination Would Not Conflict With The Bankruptcy Code.**

75.    Nothing in the Bankruptcy Code would conflict with this Court equitably subordinating the claim of Lion to the claim of the Class of Judgment Creditors, who were damaged by that inequitable conduct. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 990 (3d Cir. 1998)("Finally, a remedy of equitable subordination under § 510(c) must not be inconsistent with other provisions of the bankruptcy code. This requirement 'has been read as a 'reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable.'")(Citations omitted.).

76.    The Court should therefore find that the Class of Judgment Creditors has properly pled the third, and final, element of the claim for equitable subordination.

**III.**

**THIS COURT HAS PREVIOUSLY DENIED MOTIONS TO DISMISS COMPLAINTS FOR EQUITABLE SUBORDINATION IN CASES FAR LESS COMPELLING THAN THE PRESENT CASE**

77.    The facts of this case fall comfortably within the holding of three prior decisions of this Court.

A.    *In re Advance Nanotech, Inc.*

78.    In *In re Advance Nanotech, Inc.*, No. 11-10776 (MFW), 2014 WL 1320145 (Bankr. D. Del. Apr. 2, 2014), this Court held that a trustee successfully pled a claim for equitable subordination by alleging that officers of a subsidiary aided and abetted a breach of fiduciary duty.

79.    In that case, the debtor AVNA was the parent corporation of Owlstone and the primary source of Owlstone's funding.  To fund Owlstone, AVNA had issued $7.42 million of notes, which were secured by Owlstone stock.  The notes AVNA issued prevented AVNA from selling its own stock in Owlstone without the unanimous consent of the noteholders.  Later, AVNA fired its senior executives and hired Owlstone's CEO and CFO, Bader and Finn, as its own CEO and CFO.  As AVNA's and Owlstone's financial situation worsened, AVNA tasked Bader and Finn with obtaining financing.  Instead, Bader and Finn caused Owlstone to issue and sell its own stock, thereby diluting AVNA's equity in Owlstone.  After the sale of the stock, Bader and Finn resigned from AVNA but remained as CEO and CFO of Owlstone.  The trustee alleged that by participating in Baden and Finn's scheme, Owlstone had breached its fiduciary duty to its parent, AVNA, and aided and abetted the breach of Bader's and Finn's fiduciary duties to AVNA.

80.    The Court held that "(1) the Complaint supports an aiding and abetting claim against Owlstone; (2) the Complaint sufficiently alleges that the Owlstone transaction was not conducted at arm's length; and (3) the Complaint states a claim for breach of fiduciary duty by Owlstone against AVNA. Thus, the Court concludes that the complaint alleges sufficient facts to support equitable subordination of Owlstone's claim." *In re Advance Nanotech, Inc.*, No. 11-10776 (MFW), 2014 WL 1320145, at *8 (Bankr. D. Del. Apr. 2, 2014).

21

**B.** *In re Am. Bus. Fin. Servs., Inc.*

81.     In *In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 149 (Bankr. D. Del. 2007), this Court held that an unsecured creditor had properly stated a claim for equitable subordination based upon a creditor's failure to act.

82.     In that case, the debtor and its subsidiaries originated and serviced subprime mortgage loans.  To raise capital, the debtor sold pools of these loans to special purpose entities, which would repackage and resell them.  In exchange for the pools of loans, the debtor received cash, the right to receive future payments from the pools of loans ("I/O Strips"), and the right to receive a fee for servicing the I/O Strips.  After filing for bankruptcy, the debtor sold its rights to receive a fee for servicing the pools of loans to Ocwen.  Ocwen, however, deliberately failed to service the pool of loans, so that the cash flow and value of the I/O Strips would be depressed.  After depressing the value of the I/O Strips, Ocwen bought them at auction for a fraction of their value.

83.     This Court held that Ocwen's failure to properly service the loans provided a sufficient basis for a claim of equitable subordination. *In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 149, 165 (Bankr. D. Del. 2007)("Further, the Trustee has alleged throughout the Complaint that Ocwen engaged in inequitable conduct, such as failure to service the loan portfolios properly and breach of contract. (Complaint at ¶¶ 53–89.)  Accordingly, the Court concludes that the Trustee has stated a claim for equitable subordination.").

**C.**     *In re OODC, LLC*

84.     In *In re OODC, LLC*, 321 B.R. 128 (Bankr. D. Del. 2005), the Court held that an unsecured creditor successfully pled a claim for equitable subordination by alleging that a non-

insider creditors knew of the fraudulent activities of the management of the debtor and acquiesced in those fraudulent activities.

85.     In that case, the debtor had been formed to acquire companies in a leveraged buyout, or LBO.  The debtor borrowed the money for the LBO from the banks, and the banks secured the loans against all of the property of the companies that the debtor acquired in the LBO.  The seller became the largest preferred equity holder in the debtor's parent, and an officer and director of the selling companies became a director of the debtor and the sole voting member of the debtor's parent.

86.     The trustee alleged that the management of both the debtor and the seller of the companies inflated the value of the companies to increase the amount borrowed and the amount paid to the seller, and that the banks knew that the value of the companies was inflated.

87.     The Court held that the trustee's allegations qualified as inequitable conduct, even against the more stringent standard applicable to non-insiders.  The Court held "As noted above, we have already concluded that the Trustee has alleged sufficient facts to support claims against the Bank Group for actual and constructive fraud and aiding and abetting breach of fiduciary duty.  If proven, these allegations would provide the basis for a finding of egregious misconduct which could warrant the subordination of the Bank Group's claims under section 510(c)." *In re OODC, LLC*, 321 B.R. 128, 146 (Bankr. D. Del. 2005).

88.     The Court should therefore find that allowing the claim of the Class of Judgment Creditors to proceed is consistent with the precedent of this Court.

# IV.

## IF THE COURT DISMISSES THE COMPLAINT, THE
## COURT SHOULD GRANT LEAVE TO AMEND

89.    Courts should normally grant leave to amend unless the Court finds undue delay, prejudice, bad faith, or futility. *In re Advance Nanotech, Inc.*, No. 11-10776 (MFW), 2014 WL 1320145, at *8–9 (Bankr. D. Del. Apr. 2, 2014))("Normally, when granting a motion to dismiss, leave will be freely granted to amend the complaint. *See, e.g., Shane v. Fauver*, 213 F.3d 113, 115–16 (3d Cir.2000) (holding that the court should generally grant leave to amend a complaint dismissed for failure to state a claim)…In this case, the Court does not find the existence of bad faith, undue prejudice, or futility. The Court will, therefore, grant the Trustee thirty days to amend the Complaint."); *In re Washington Mut., Inc.*, No. 08-12229 (MFW), 2013 WL 3757330, at *6 (Bankr. D. Del. July 16, 2013)("Normally, when granting a motion to dismiss, leave to amend the complaint under Fed. R. Civ. P. 15(a) will be freely granted….Corcoran has not alleged any undue delay, bad faith, undue prejudice, or futility to amending the Complaint, and the Court finds none. The Court will, therefore, grant the Committee 30 days to amend the Complaint."); *In re AFA Inv., Inc.*, No. 12-11127 (MFW), 2012 WL 6544945, at *6 (Bankr. D. Del. Dec. 14, 2012)("Normally, when granting a motion to dismiss, leave will be freely granted to amend the complaint….In this case, the Court does not find bad faith, undue prejudice, or futility. The Court will, therefore, grant Sanchez 30 days to amend the Complaint.").

90.    If, for any reason, the Court finds the pleading inadequate, the Class of Judgment Creditors respectfully requests leave to file an amended complaint.

## Conclusion

91.     For the reasons set forth above, the Court should deny Lion's motion.  In any

event, the Class of Judgment Creditors consents to the entry of a final judgment by this Court.

Dated:  July 3, 2020

/s/ Mark Billion
Mark Billion (DE Bar No. 5263)
Billion Law
1073 S. Governors Ave.
Dover, DE 19904
Telephone: (302) 428-9400
Email: markbillion@billionlaw.com

-and-

/s/ William Dunnegan
William Dunnegan (NY Bar No. 1927763)
(*pro hac vice*)
Dunnegan & Scileppi LLC
350 Fifth Avenue, 76th Floor
New York, New York 10118
Telephone: (212) 332-8300
Email: wd@dunnegan.com