# EXHIBIT A

**February 24, 2020 Transcript [Dist. Ct. Docket No. 338]**

K2OAAKNO1                        Jury Trial

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    TESSA KNOX, et al.

 4                    Plaintiffs,           New York, N.Y.

 5            v.                            17 Civ. 772 (GWG)

 6    JOHN VARVATOS ENTERPRISES,
      INC.,
 7
                      Defendant.
 8
      ------------------------------x
 9
                                            February 24, 2020
10                                          9:00 a.m.

11    Before:

12                    HON. GABRIEL W. GORENSTEIN,

13                                          Magistrate Judge

14

15                         APPEARANCES

16

17    DUNNEGAN & SCILEPPI, LLC
           Attorneys for Plaintiffs
18    BY:  WILLIAM I. DUNNEGAN
           RICHARD WEISS
19

20    HUGHES HUBBARD & REED, LLP
           Attorneys for Defendant
21    BY:  NED H. BASSEN
           AMINA HASSAN
22         JOANNE LIU

23

24

25
```

1           (Case called)

2                MR. DUNNEGAN:  Your Honor, I am Bill Dunnegan, for the

3      plaintiffs, Tessa Knox, thirteen opt-in plaintiffs and a class.

4                MR. WEISS:  Your Honor, I am Richard Weiss, also for

5      the plaintiffs Tessa Knox and thirteen opt-ins.

6                MS. HASSAN:  Your Honor, I am Amina Hassan, for the

7      defendant John Varvatos.

8                MS. LIU:  Hi.  I'm Joanne Liu, for defendant Varvatos.

9                MR. BASSEN:  I am Ned Bassen, for the defendant.

10     We're all for the defendant.

11               THE COURT:  I think my first order of business is were

12     there any comments on the questions I planned it to ask the

13     jurors?

14               MR. DUNNEGAN:  No, your Honor.

15               MS. HASSAN:  None, your Honor.

16               THE COURT:  OK.  So we'll end up printing out those

17     and supplying them to the jurors.

18               We talked about the trial day.

19               (Pause)

20               THE COURT:  I was thinking how long I should tell the

21     jurors the case will last.  I always like to err on the side of

22     it being longer because then they get a pleasant surprise when

23     it's shorter.  It's much worse the other way.

24               My plan was to tell them that it would end at the

25     latest, I was going to say Wednesday of next week unless you

 1    think that's way too much.

 2              What do you think?

 3              MR. DUNNEGAN:  I think there's probably an 80 percent

 4    chance that that's going to be more than enough.

 5              THE COURT:  I was hoping it was a hundred percent

 6    chance.

 7              MR. DUNNEGAN:  There's never a hundred percent chance.

 8              THE COURT:  Ninety-nine?

 9              What's your feeling?

10              MS. HASSAN:  I'll go with the 90 percent chance, your

11    Honor.  I think Wednesday is fair.

12              THE COURT:  All right. so I'm going to tell them

13    Wednesday.

14              I got your e-mail about how to describe the case.  At

15    some point I want to tell them that "sales professional" means

16    a salesperson because they may not understand what that word

17    means.  But I'll figure out a plan if we should do that.

18              When you have objections I ask that you just say

19    "objection" and then a word or a phrase, "hearsay", "Rule 403",

20    something.  If you feel it's important to have a side bar, you

21    can ask for a side bar.  I like to avoid them as much possible.

22    I think we did a lot of work in advance so, hopefully, there

23    won't be too many problems but I don't want to have a problem

24    in front of the jury.  So a brief phrase and then if you need a

25    side bar, you can ask for one.

1          So, we need to have a ruling about excluding witnesses

2     from the courtroom.

3          MR. DUNNEGAN:  I don't think we need to exclude

4     witnesses but if they want to, it's their right.

5          MS. HASSAN:  No, your Honor.  That's fine with us too.

6          THE COURT:  OK.  So, no exhibit is in evidence and it

7     is actually offered on the record.  So, I want you to keep that

8     in mind.  If there are exhibits to which there were no

9     objection you could theoretically do it at the beginning of the

10    case.  It's up to you.  There needs to be a physical exhibit.

11    So, I assume you are each responsible for having those physical

12    exhibits.  Did you pre-mark it with a sticker?

13         MR. DUNNEGAN:  Yes, your Honor.

14         MS. HASSAN:  Yes, your Honor.

15         THE COURT:  OK.  So, we'll probably put a little check

16    on them or something when they're admitted into evidence.

17         I already talked to you about the jury selection

18    process.  Any questions on that?

19         MR. DUNNEGAN:  When we talk about numbers of jurors,

20    would it be first row closest to you one and two, then three,

21    then four, then five, six, seven, eight, nine, ten and then --

22         THE COURT:  Then 11 through 16.  Actually, six seats

23    in the back will be up there and then it's 17 through 25 we'll

24    put in the front row.

25         I am going to ask spectators actually to not sit in

Case 7:20-cv-00772-MFW   Doc 10-1   Filed 07/07/20   Page 6 of 59
Case 1:17-cv-00772-GWG   Document 335   Filed 03/05/2019   Page 9 of 58          5
K2OAAKNO1                    Jury Trial

 1    the front row.  You don't have to move right now.  We'll be
 2    taking a break but just keep that in mind.
 3            Do you want me to introduce anyone's client from the
 4    plaintiff's side to the jury?
 5            MR. DUNNEGAN:  No.
 6            THE COURT:  From your side?
 7            MS. HASSAN:  Yes, we do, your Honor.
 8            THE COURT:  OK.  Who?
 9            MS. HASSAN:  Your Honor, we have Olga Yalkut,
10    Y-a-l-k-u-t, vice president of human resources at John Varbatos
11    Enterprises Inc.
12            THE COURT:  Anyone else?
13            MS. HASSAN:  No.  Thank you, your Honor.
14            THE COURT:  Ms. Yalkut is going to sit in the audience
15    or you can have her behind you if you want.
16            MS. HASSAN:  We can have her behind us.  That would be
17    helpful.
18            THE COURT:  I think I'm done with my business.  So the
19    next thing is for the jury to show up and we'll start our
20    process.  I am probably going to go to chambers now.
21            MR. DUNNEGAN:  Your Honor, I have two issues.  When we
22    start examining the witness can we put the --
23            THE COURT:  Oh, you know what, it occurs to me, you
24    can examine from the table if you want but we have a lectern
25    that we can plug in that has a mic that goes right,

1   essentially, next to where you are so that the lawyer can face

2   the witness and not block the jury.  So that's an option.  If

3   you want to do it from your table, I don't mind.

4        MR. DUNNEGAN:  OK.  I'll probably move it over at some

5   length before we start.

6        THE COURT:  Actually, we'll do it.  Not now.

7        MR. DUNNEGAN:  But when we start, we pretty much know

8   which exhibits we are going to use with the witness.  Can we

9   just put those up in a manila folder to save time walking back

10   and forth.

11        As your Honor may recall, at the end of the day last

12   Friday the counsel for the defendant announced that they were

13   going to be substituting Mr. Steven Sheara for Mr. Mayorga and

14   I said -- and you looked surprised -- and I said don't worry

15   about it.  That's fine.  We'll consent.  So, later on Friday I

16   e-mailed counsel for the defendant and said, will you agree to

17   eliminate some of your objections to the deposition,

18   depositions of Mr. Mayorga.

19        THE COURT:  He's the one who is not testifying?

20        MR. DUNNEGAN:  He is the one who is not testifying.

21        Now, we put into our pretrial order -- and if your

22   Honor wants to look, it's at docket page 20 of 27 of the final

23   pretrial order.

24        THE COURT:  Hold on.  Let me look at it.

25        MR. DUNNEGAN:  I believe it's 350, your Honor.

1           THE COURT:  Got it.

2           MR. DUNNEGAN:  We wrote:

3           Plaintiff's intend to rely upon the following portions

4    of the Rule 30(b)(1) deposition of Gerard Mayorga taken on

5    August 25, 2017, if he does not testify live at trial.

6           The parties went through and we designated and they

7    counter-designated an objective.  Now they're saying they are

8    going to choose not to call Mr. Mayorga and they object to me

9    reading portions of his deposition.  I don't think that's

10   kosher after we went through this procedure of

11   counter-designating if he does not testify.

12          MS. HASSAN:  Your Honor, couple of things.  One, we're

13   not substituting Mr. Shears for Mr. Mayorga in the sense that

14   Mr. Shears and Mr. Mayorga were both on our witness list.  On

15   the February 7 conference we thought that Mr. Mayorga would be

16   testifying but we changed that and we told the Court that

17   Mr. Shears will be testifying.

18          Now, I don't believe that Mr. Dunnegan can simply use

19   deposition testimony when the witness isn't actually

20   unavailable.

21          THE COURT:  Will you make him available for him to

22   call?

23          MR. DUNNEGAN:  I'll call him live.

24          THE COURT:  Either you make him available for him to

25   call or if he can rely on this as it says in the pretrial

1    order.

2              MS. HASSAN:  Your Honor, my understanding was that the

3    witness actually had to be subpoenaed and if that witness is

4    unavailable then you can use the deposition testimony.

5              THE COURT:  Well, my problem is there's this sentence

6    in the pretrial order which you agreed to and you didn't object

7    to the concept which plaintiffs intend to rely on this

8    deposition if he does not testify live at trial.  That sentence

9    to me suggests that you were not objecting to the use of the

10   deposition testimony.  You weren't going to require him to be

11   subpoenaed.

12             MS. HASSAN:  Your Honor, I agree.  But honestly, my

13   understanding of that sentence was that it would be consistent

14   with Rule 32 that we weren't agreeing to anything beyond the

15   scope of Rule 32.

16             THE COURT:  Where is this guy?  He doesn't work for

17   you?

18             MS. HASSAN:  He does work for us.

19             THE COURT:  Well, where is he?  Is he in New York?

20             MS. HASSAN:  Yes, he is in New York.  I'm not sure --

21             THE COURT:  Don't make me blow my stack.  Just get him

22   here.  What's the problem?

23             MS. HASSAN:  May I just confer with the client?

24             THE COURT:  Sure.  You now know your choice.  Either

25   you bring him here or use the deposition testimony.

 1          MS. HASSAN:  Understood.

 2          THE COURT:  OK.  Anything else?

 3          MR. DUNNEGAN:  Can they advise us pretty soon?

 4          THE COURT:  Tell him in the next ten minutes.

 5          MR. DUNNEGAN:  Is they say deposition, we are going to

 6  have to go through a handful of objections that they made.

 7          THE COURT:  I understand.  Does it have to happen day?

 8  We'll have a break before it happens.

 9          MR. DUNNEGAN:  It's OK at the end of day today but if

10  we are going to be required nt put in deposition transcripts

11  before we say "rest", we're probably going to rest tomorrow.

12          THE COURT:  OK.  We'll do it today.

13          (Recess)

14          (A jury of eight jurors was impaneled and sworn)

15          THE COURT:  Members of the jury, now that you have

16  taken other oath you are ready to serve as jurors.  To assist

17  you in your task I am going nt tell you something about the way

18  this trial will be conducted.  I will also briefly explain some

19  of the law that you need to know.

20          First, let me remind you what this case is about.  As

21  I told you, the plaintiffs here are females who now work or

22  have worked as sales professionals, that is salespeople in

23  Varvatos stores.  In this lawsuit they're claiming that male

24  sales professionals had substantially similar jobs but received

25  more compensation than the female sales professionals did.

1    They say the compensation came in the form of a particular

2    amount of free clothing that the men got each year and that the

3    men had to wear at work.

4         Varvatos denies that it has unlawfully discriminated.

5    Varvatos says that the jobs of males and female professionals

6    at Varvatos are not substantially similar because Varvatos'

7    requirements for male and female sales professionals are

8    different and impose different monetary and nonmonetary costs

9    on sales professionals, that Varvatos also provides female

10   sales professionals with clothing benefits and that the

11   difference in Varvatos's requirements for male and female sales

12   professionals is tied directly to Varvatos being a menswear

13   brand.

14        I will give you detailed instructions later as to what

15   you are being asked to determine which will come after you have

16   heard the evidence in the case.  For now I just wanted you to

17   get a sense of what that case is about.  Just remember that the

18   key issue in this case is whether male sales professionals were

19   unlawfully given more compensation than the female sales

20   professionals.

21        As an initial matter, I want you to know that you are

22   all jurors in this case.  In the federal civil system we do not

23   have alternate jurors.  Thus, all eight of you re equal members

24   of this jury and every one of you will be called upon to

25   deliberate in order to reach a verdict.

1              The case will start with the lawyers being given the

2      opportunity to make opening statements to you.  These

3      statements are not evidence.  They serve no purpose other than

4      to give you an idea in advance of the evidence that the lawyers

5      expect you to hear from the witnesses.  These statements permit

6      the lawyers to tell you a little bit of what the case is all

7      about.  But remember the only evidence comes from the witnesses

8      and the exhibits and any other materials that I tell you are

9      evidence.

10             After the opening statements, if they're made, you

11     will hear the testimony of the witnesses and other evidence

12     first presented by the plaintiffs and then by the defendant.

13     If there's a witness on the stand, the witness will give what's

14     called "direct testimony".  Then he or she may be

15     cross-examined by the other side.  Sometimes the parties will

16     conduct one or more additional rounds of questioning of the

17     witness.  After all of the evidence has been received the

18     lawyers have an opportunity to give what we call summations or

19     closing statements.  They will review the evidence and make

20     arguments to you as to what conclusions they think you should

21     or should not draw from the evidence.  Remember that these

22     summations, just like the opening statements, are not evidence.

23             After the summations I will instruct you on the law to

24     apply in this case.  Following my instructions you will go into

25     the jury room, review all the evidence, review the exhibits

 1     which have been received in evidence and discuss the evidence

 2     among yourselves.  Based on that evidence and your discussions,

 3     you will determine your verdict.

 4             As I've told you previously, it is your function in

 5     this case to decide the issues of fact.  Your decision on the

 6     issues of fact is to be based solely on the evidence in this

 7     courtroom.  The evidence from which will you find the facts

 8     will consist of the testimony of the witnesses, the documents

 9     and other things received into evidence, any facts the lawyer's

10     agree or stipulate to or any other items that I tell are you in

11     evidence.

12             Certain things are not in evidence and must not be

13     considered by you.  For example, statements, arguments and

14     questions by the lawyers are not evidence.  Objections to

15     questions are not evidence.  Nothing I say is evidence.

16             Let me tell you one thing about objections.  The

17     lawyers have an obligation to their clients to make an

18     objection when they believe evidence that is being offered is

19     improper under our rules of evidence.  Do not hold it against

20     the lawyers if they make such an objection.  Also, you should

21     not be influenced by the objection or by my ruling on it.  If

22     the objection is sustained, you should ignore the question.  If

23     it is overruled, you should treat it like any other question.

24     Testimony that I exclude or tell you to disregard is not

25     evidence and you must not consider it.  Anything that you may

 1    have seen or heard outside of the courtroom is not evidence and
 2    again you must not consider it.  Because you must base your
 3    verdict solely on the evidence presented in the courtroom at
 4    trial, you may not do any research or investigation on your
 5    own.  This is very important.  Rather, you have to decide the
 6    case based solely on the evidence presented within the four
 7    walls of this courtroom.  This means that during the trial you
 8    must not conduct any independent research about the case, the
 9    matters on the case, the attorneys trying the case, places
10    mentioned in the case, the people or corporations or witnesses
11    mentioned in the case.

12              Do not go home an Google anybody.  OK?

13              You should not consult other individuals either or any
14    reference sources to the help you obtain any information about
15    the case or to help you decide the case.  Obviously, this
16    includes anything on the web.  Obviously, you can't ask someone
17    else to do research for you.  In short, you must not do any
18    research or investigation on any aspect of this case of any
19    kind.  And you should not allow yourselves to receive any
20    information.  If someone tries to give it to you, and for that
21    reason it's sometimes a good idea not to tell people anything
22    about the case while you're on trial, OK, because the
23    temptation will be for them to say something to you about it.
24    Say you're a juror in a civil case and wait until the case is
25    over and you can discuss it all you want.

1          When you hear testimony from witnesses, how will you

2    decide what to believe and what not to believe?  You should

3    listen to the witnesses and observe them.  Then you should

4    decide whether you believe them, the same way you decide such a

5    question in your ordinary life.  Everyday in your own lives you

6    make decisions about whether people are telling you the truth

7    or something less than the truth.  Use the same test that you

8    use in your everyday life to weigh the testimony you hear in

9    this courtroom.

10         You may wish to consider a number of factors including

11   the witness's ability to see or hear or know the things the

12   witness testified to, the quality of the witness' memory, the

13   witness' manner while testifying, any interest the witness may

14   have in the outcome of the case or any motive, bias or

15   prejudice.  Also, any contradiction of the witness by anything

16   the witness said or wrote before trial or by other evidence.

17   You can consider the reasonableness of the witness' testimony

18   when considered in the light of other evidence that you

19   believe.  Was the witness candid, honest, open and truthful?

20   Did the witness have a reason to falsify, exaggerate or distort

21   his or her testimony?  Use your common sense and good judgment

22   to evaluate the testimony you hear based on all the

23   circumstance.  It is very important that you keep an open mind

24   throughout this case.  Do not form any opinions or judgments

25   until the evidence is in and I give you the case for your

K2OAAKNO1                      Jury Trial

1    deliberations.

2            Remember, evidence comes in step-by-step.  A witness

3    is first examined by an attorney for the party that called the

4    witness.  The other side has a right to cross-examine.  One

5    side presents evidence and we'll hear the other side present

6    evidence.  Remember, there may be two sides to every story.

7    You will not be in a position to form a judgment about what

8    happened until you have heard all the evidence in the case and

9    I've instructed you about the law.

10           So let me emphasize again, from the moment up until

11   now until the time you deliberate on your verdict, it is your

12   duty not to discuss this case amongst yourselves or with others

13   and not to permit anyone else to speak to you about this case

14   and not to remain in the presence of other people who may try

15   to discuss this case.  This includes members of your family and

16   your friends.  As I say, you can tell them you're a juror in a

17   civil case but don't tell them anything else about it until I

18   discharge you.

19           You may not even discuss this case with your fellow

20   jurors.  You're allowed to discuss it only after you've heard

21   the evidence and I instruct you to start deliberating on the

22   case.  I know that's hard because it's the only thing you have

23   in common right now.  But you can try asking yourselves the

24   questions on the questionnaire and find out more about each

25   other.  The reason for this is simple.  It's very important

1   that you all keep an open mind until all the evidence is in.

2   If you were to discuss the case before that time, you might

3   take a position one way or another and it could be difficult

4   for you to change your mind.  So to avoid that, you must wait

5   until all the evidence is in and you've heard the summations of

6   counsel and my instructions on the law.

7           Obviously, the ban on discussions of the case applies

8   not only to oral discussions with other people and other jurors

9   but discussions by any other means.  I know you all have smart

10  phones, laptops, tablets and so forth.  You must be sure not to

11  reveal anything to anyone about this case or your service on

12  the case by any means whether it's a conversation, e-mail, text

13  message, status post on Facebook, Twitter, Instagram, anything

14  else.

15          Do not write, talk or otherwise reveal anything about

16  the case through a telephone call, e-mails websites posts and

17  so forth.  Don't use the Internet to do researches as I already

18  said.  Any kind of investigation of the case is completely

19  prohibited until I discharge you.  After that you can do all

20  the research you want.

21          I don't have reason to believe this case will be

22  reported in the news media but I say this in all cases.  If it

23  is, you must not read any stories or listen to any radio or

24  watch any televised reports about the case.  You can't look at

25  any social media about the case such as posts on Facebook or

1    Instagram and if such a story comes to your attention, stop

2    reading it and tell me about it the next time you are in court.

3         Included among those with whom you can't discuss the

4    case, of course, are the lawyers and witnesses and other

5    participants in the case.  It is their obligation to leave the

6    jury alone.  I mention this because I don't want you to get a

7    mistaken idea if a lawyer seems unfriendly to you and doesn't

8    say hello to you in the hallway, they are not behaving

9    improperly.  They're simply following my instruction to have no

10   contact with you, other than connection with the proceedings in

11   this courtroom.

12        If any person should attempt to communicate with you

13   or talk to you about this case -- and I have no reason to

14   believe someone would -- do not talk about it with any other

15   juror and report it directly to me as soon as you have a

16   chance.  If anything should happen involving any juror which is

17   of an unusual nature or which you think is something I should

18   be told about, do not discuss it with any other jurors.  Simply

19   give the clerk a note to the effect that you want to speak with

20   me about it and I will then hear what it is and what you have

21   to say.  I make these remarks without expecting anything

22   unusual or improper to happen.  It is just safer to take the

23   precaution of alerting you in advance.

24        Please be sure that none of your friends or relatives

25   is present in the courtroom without my knowledge.  It is

1    particularly important that you do not hear from them or anyone

2    else what happened during the times when you're not in the

3    courtroom, and also that you do not discuss with them what

4    happened when you were present.  If at any time you see a

5    friend or relative, just send me a note through the clerk or

6    tell one of us at the first opportunity.

7              This is a civil case, not a criminal case.  Generally,

8    the party asserting the claim, which here is the plaintiffs,

9    has the burden of proving that claim by what is called the

10   "preponderance of the evidence".  That means that the party has

11   to produce evidence which considered in the light of all the

12   facts leads you to believe that the party advancing the claim

13   asserts -- I'm sorry -- leads you to believe that what the

14   party advancing the claim asserts -- in this case the

15   plaintiff -- is more likely true than not.  If the plaintiff

16   fails to meet this burden, the verdict on that claim must be

17   for the defendant.

18             Those of you who have heard or sat on criminal cases

19   will have heard of proof beyond a reasonable doubt.  That

20   requirement does not apply to the civil case and you should

21   keep it out of your mind.  At the conclusion of the trial I

22   will tell you in detail what the plaintiffs must prove by a

23   preponderance of the evidence in order to establish their claim

24   for damages.

25             If you wish to take notes during the trial, you may.

1    After the opening statements, the clerk will provide you with

2    pads and pencils.  Leave the notebooks and pencils on your

3    chairs when you leave at the end of the day.  Remember that

4    these notes are for your own personal use and are not to be

5    given to anyone else or read to anyone else.  You will be

6    allowed to take your notebooks with you into the jury room when

7    you deliberate and you can use those notes to refresh your

8    recollection.  But remember, what governs is not the notes but

9    the recollection of the jury.

10            In this trial we are using a procedure you may not

11   have seen or heard before.  As members of the jury, I am going

12   to permit you to submit questions for a witness after the

13   lawyers have finished questioning the witness.  Here is how the

14   procedure works.

15            After each witness has testified and the lawyers have

16   asked all of their questions, I will turn to the jury to see if

17   anyone has any additional questions.  If you have a question

18   you will have written it down on a page in your notebook and

19   you would at that point tear out the page or half the page and

20   give it to the clerk.  You may submit a question for the

21   witness to clarify or help you understand the evidence.  Our

22   experience with jurors' questions indicates that most jurors

23   will have no questions for a witness and rarely will jurors

24   have more than a few questions for a witness but I want to give

25   you the opportunity to have questions if you want to.

1          If you submit a question, the court staff will provide

2     it to me and I will share the question with the lawyers in the

3     case.  If your question is permitted under the rules of

4     evidence and other applicable rules, I will read it to the

5     witness so the witness may answer it.  In some instances I may

6     modify the form or phrasing of the question so that it is

7     proper under the rules of evidence.  Sometimes I may not ask

8     the witness your question at all.  Either because the question

9     cannot be asked under the law or because another witness is in

10    a better position to answer the question.  Of course if I

11    cannot allow the witness to answer a question, you should not

12    draw any conclusions from the fact or speculate on what the

13    answer might be.

14         So, here are several important things to keep in mind

15    about your questions for the witnesses.

16         First, all the questions have to be in writing.

17         Second, witnesses will not be brought back to the

18    witness stand for additional questions.  So, if you have a

19    question for a particular witness you have to do it at the end

20    of that witness's testimony.

21         Finally, you need to remain neutral and open

22    throughout the trial.  So you should always phrase any

23    questions in a neutral way that does not express an opinion

24    about the case or the witness' testimony.  Remember, at the end

25    of the trial you will be deciding that case and you have to

1    keep an open mind.

2          By the way, if in my efforts to move the trial along,

3    I ask that a witness step down from the witness box without

4    having first asked you if you have any questions, it will be

5    unintentional.  If that happens, just shout or raise your hand

6    and remind me and I will come and pick up your questions.

7          OK.  So generally, we're going to convene each day at

8    nine and we will continue until about five p.m. and we'll take

9    a break in the midmorning break for ten other 15 minutes and a

10   midafternoon break.  We'll also take a lunchtime break for

11   about an hour.  It's extremely important that you arrive on

12   time.  In fact, it would be best to arrive a few minutes early.

13   We'll open the jury room at 8:45.  Your goal should be to

14   arrive by nine a.m. understanding that there may be a few

15   minutes late coming in through security.  My goal is to start

16   at 9:15 on the dot or if you are all here before 9:15 to start

17   before then.  So, remember, if any one of you is late, I mean

18   after 9:15, we are all going to be sitting here in the

19   courtroom basically waiting for you, me, the lawyers, your

20   fellow jurors and the court reporter.  So, it's very important

21   you try to arrive as early as you can.

22          The trial will continue each weekday until it's

23   completed.  Sometimes we may have to take some breaks outside

24   of that schedule.  I'll try to warn you about that.  But the

25   attorneys and I do a lot of work before, during the breaks and

1    after trial and sometimes we have to eat into a little bit of

2    the trial day.  But it's upon possible that you're going to

3    find yourself waiting at some points in the jury room and since

4    they take your phones away, if you want to bring a book or a

5    newspaper, that might not be a bad idea.  Usually, it's not

6    very long but it's an option for you.

7            Finally, if there is anything we can do to make your

8    service as jurors more comfortable, please, feel free to talk

9    to me about it or talk to any of my clerks who are here.  This

10   is the deputy clerk, Ms. Chambers, and these are my law clerks

11   who are over here.

12           I'm ready to start with the opening statements unless

13   someone thinks we should take a break now for some reason.

14           Could we take a 15 minute break right now?

15           MR. DUNNEGAN:  I think that's what we had decided to

16   do.

17           THE COURT:  OK.  Good.  Ms. Chambers has reminded me

18   that when you come in in the morning, don't enter through that

19   door.  There's a door to the jury room which if you turn left

20   right after you walk in, that's the door you should use to go

21   into the jury room.

22           If everything worked out according to my plan there

23   should be some things to eat or drink in there.  Let's see if

24   that's true and I'll see you all in about 15 minutes.

25           (Jury not present)

 1                THE COURT:  How long is your opening?

 2                MR. DUNNEGAN:  Fifteen minutes, your Honor.

 3                MS. HASSAN:  Fifteen minutes, your Honor.

 4                THE COURT:  OK.  Does anyone want to call the witness

 5     today?

 6                MR. DUNNEGAN:  No.  But I'd like to get as many

 7     documents as I can in on consent and I would like to read the

 8     stipulation from the pretrial order.

 9                THE COURT:  OK.

10                MR. DUNNEGAN:  I think after that that's a day's work.

11                THE COURT:  OK.

12                MS. HASSAN:  That's fine.

13                Is that all right with you?

14                MS. HASSAN:  That's fine.

15                THE COURT:  OK.  So, see you in 15 minutes.

16                (Recess)

17                THE COURT:  We're going to bring the jury in.  We're

18     going to have opening statements.  We're going to hand out the

19     notebooks and then I'll turn to you and you can offer exhibits.

20                MR. DUNNEGAN:  I'll read a stipulation first and then

21     offer exhibits.

22                THE COURT:  OK.  You can bring the jury in.

23                (Jury present)

24                THE COURT:  Please be seated.

25                So, the notebooks I am going to ask you to put under

 1    your seats or to the side.  The reason is the opening

 2    statements are not evidence, so there's no reason to take any

 3    notes about the opening statement.  It'll only cause confusion

 4    later.  Once the opening statements are over, then you can pick

 5    up the notebooks, though I don't think we're going to have a

 6    witness today.  We're going to have some other evidence that I

 7    will explain to you.

 8            And they've already filled out the cards with their

 9    phone numbers?

10            COURTROOM DEPUTY:  They are about to.

11            THE COURT:  OK.  At some point before you leave you

12    are going to fill out a form with your phone number in case

13    something dramatic happens and we need to get in touch with

14    you.

15            All right.  So, I'm now going to turn to the

16    plaintiffs to start their case and I am going to ask

17    Mr. Dunnegan to make his opening statements.

18            MR. DUNNEGAN:  Good afternoon.

19            We represent a class of women.  They're present or

20    former sales professionals at a retail store called "John

21    Varvatos".  As the Court told you, this is a case about a

22    clothing allowance policy.  As you hear the evidence in its

23    entirety, I think you are going to see this is about a case

24    which is about more than a clothing allowance policy, something

25    much more basic.  Here is the basic story.

K2OAAKNO1                    Jury Trial

1          A man shows up at a John Varvatos store for his first

2    day of work as a sales professional.  Varvatos tells the man,

3    go into the store, pick out three thousand dollars worth of

4    clothes from the store.  Varvatos is giving you those three

5    thousand dollars of clothes for free.  In the next season which

6    is about three months later, Varvatos tells the man, go into

7    the store, pick out another three thousand dollars of clothes

8    and Varvatos is giving you those clothes for free.  It happens

9    each season.  There's four seasons in a year.  A man sales

10   professional at Varvatos gets $12,000 a year in free clothes.

11   He just has to wear those clothes while he's working at

12   Varvatos.

13          Contrast that to what happens with a woman when she

14   shows up for her first day of work at Varvatos.  Varvatos tells

15   the woman, here's the list of things that you can wear to work

16   and a list of things that you can't wear to work.  Go buy them

17   for yourself.  Here's a coupon to get a 50 percent discount off

18   of the full retail price at our sister store.

19          The evidence will show that Varvatos has a written

20   corporate policy that discriminates between men and women sales

21   professionals.  Men get $12,000 a year in free Varvatos

22   clothes.  Women don't get any free clothes.  Women don't get

23   any comparable benefit.

24          During the trial I am going to prove to you three

25   things.  First, I am going to prove to you that Varvatos

1  clothing allowance policy is unlawfully discriminating against

2  women.

3           Second, I am going to prove to you that Varvatos knows

4  that its clothing allowance policy unlawfully discriminates

5  against women.

6           Third, I am going to prove to you that Varvatos'

7  discrimination has caused substantial damage to all of the

8  women involved in this case.

9           Back to my first point, Varvatos unlawfully

10  discriminates against women.  Varvatos gives men $12,000 a year

11  in free Varvatos clothes and it doesn't give the women any free

12  clothes or any comparable benefit.

13           Here is some background.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. DUNNEGAN:  Varvatos designs and sells clothes.  It
2    is not a small company.  It has 26 retail stores throughout the
3    United States.  It has 200 employees.  They are in eight states
4    and in four other countries.  Most of Varvatos customers are
5    men.  Some Varvatos customers, however, are women who are
6    buying clothes for themselves.  Varvatos is happy to sell those
7    clothes to anybody.

8          Now, Varvatos has both men and women salespeople.
9    Calls them sales professionals.  The men and the women sales
10   professionals have substantially the same job.  They sell
11   Varvatos clothes to Varvatos customers side by side in the same
12   store under the same working conditions.  Varvatos has one job
13   description for sales professionals.  That job description does
14   not distinguish between men and women.  When it hires sales
15   professionals, it hires the best person for the job regardless
16   of whether it is a man or a woman.

17         Varvatos does have different dress codes for men and
18   women.  The men's dress code requires three pieces of Varvatos
19   clothes.  The women's dress code contains a very detailed
20   checklist of what the women can wear and cannot wear to work.

21         We're here because Varvatos clothing allowance policy
22   discriminates against women.  Varvatos gives men $12,000 a year
23   in free clothes to the men.  Varvatos doesn't give any free
24   clothes or comparable benefits to women.  As a result, Varvatos
25   provides men with all the clothes they need to wear to work but

1    Varvatos does not provide women with clothes or any clothes

2    they need to wear to work.  The women have to pay for the

3    clothes that they wear to work out of their own pockets.

4    Varvatos in its most basic premise is giving men a benefit that

5    they are not giving to women.

6            Now, Varvatos' defense in this case is it needs to

7    give $12,000 a year in free clothes to the men sales

8    professionals so that the men can wear them while they are

9    working.  well, that is not entirely true.  We're not bringing

10   this lawsuit because Varvatos wants the men to wear its

11   clothing.  We're bringing this lawsuit because Varvatos doesn't

12   provide equal pay to women doing substantially similar work.

13   Now, we're not saying the jobs are identical.  They aren't.

14   The only difference between them is the dress codes for the

15   male and the female sales professionals.  The evidence will

16   show that is not a meaningful difference.

17           Now, to do substantially the same job, Varvatos gives

18   men $12,000 a year in free clothes.  They own it.  Varvatos

19   doesn't give the women any free clothes or a comparable

20   benefit.  Varvatos does give the women a 50 percent discount

21   off of full retail price at a sister store called All Saints,

22   but that is a discount off of the full retail price and it is

23   not comparable to free clothes and All Saints isn't cheap.  To

24   get any benefit out of the discount, the women have to take

25   money out of their own pockets.  Even if Varvatos needs the

1    males sales professionals to wear the Varvatos clothes, that

2    doesn't justify the discrimination that is going on here.

3        Here is why:  Varvatos may need the men sales

4    professionals to wear its clothes but Varvatos does not need

5    them to own those clothes.  While it is not as good as giving

6    the women a comparable benefit from another store, Varvatos

7    could have eliminated the discrimination by lending the men the

8    clothes for the season and have the men return the clothes at

9    the end of the season or donate it to charity.  To run its

10   business with men dressed in Varvatos clothes, Varvatos doesn't

11   need to give away $12,000 a year to each of the men.  Giving

12   away the free clothes to the men results in Varvatos paying the

13   men more than the women.  That's discrimination.  That's the

14   first thing that the evidence will proof.

15       My second point is that the evidence will prove that

16   Varvatos knows that its clothing allowance is discrimination.

17   To say that Varvatos knew that its policy was illegal

18   discrimination, you have to look at three documents that will

19   come into evidence which state Varvatos policies.  First

20   document, the Varvatos employee handbook.  It states that

21   Varvatos complies with all its legal obligations to provide

22   equal employment opportunities with out regard to sex and those

23   equal employment opportunities apply to all terms of employment

24   including compensation.

25       Second document, Varvatos' clothing allowance policy.

1    It proves by its own words that Varvatos' clothing allowance

2    policy discriminates between men and women sales professionals.

3    Men get $12,000 a year in free cloths.  Women don't.  Varvatos

4    pays for all the clothes that the men have to wear to work.

5    Women have to pay for their own clothes.

6          Third document, Varvatos' job description.  Varvatos

7    has one job description for sales professionals.  That job

8    description does not distinguish between the jobs of men and

9    the jobs of women.  Before this lawsuit started, Varvatos did

10   not have a single document whatsoever that even suggested that

11   the men and the women had different jobs; but although the job

12   descriptions are the same, the women make less in the work that

13   they do.  So when read together, these three written policies

14   shows that Varvatos actually knows that it's clothing allowance

15   policy is discriminatory.

16         There is more to this case than three written

17   policies.  We'll present evidence that proves that the key

18   employees of Varvatos actually understood that the clothing

19   allowance was illegal sex discrimination or at least they

20   understood the risk that it would be illegal sex

21   discrimination.  Here is the background.  In 2014 before this

22   lawsuit began, Varvatos opened up a store in London, England.

23   At the London store, Varvatos has men sales professionals and

24   women sales professionals.  Varvatos gives men in its London

25   store a clothing allowance.  Varvatos also gives women in its

1    London store a clothing allowance.

2          The experience of the London store made Varvatos

3    consider whether or not it should give the women sales

4    professionals in the United States a clothing allowance, but

5    Varvatos decided not to give the women in the United States a

6    clothing allowance for one reason.  The evidence will show that

7    Varvatos decided not to provide women with any type of clothing

8    allowance because in the words of the first witness you hear it

9    wasn't "financially feasible."  in other words, Varvatos didn't

10   want to spend the money.  Then the evidence will show that

11   Varvatos tried to keep its United States employees from

12   learning about the women's clothing allowance in London store.

13   Then when women sales professionals complained about the lack

14   of a clothing allowance, Varvatos stalled.  Varvatos

15   consistently said, We're working on it.  Varvatos has been

16   telling women sales professionals since 2015 that they were

17   working on it, but they weren't.

18         Varvatos still continues its clothing allowance policy

19   to this day.  The evidence will show that Varvatos didn't care

20   whether its clothing allowance was legal or illegal.  Varvatos

21   never even bothered to get a written legal opinion from a

22   lawyer on that issue.  Varvatos' intent to discriminate against

23   women is egregious.

24         My third point.  It Varvatos' illegal discrimination

25   has caused substantial damage to the women involved in this

1   case.  The men get $3,000 a quarter.  $122,000 a year in retail
2   value of free clothes.  To give the women an equal benefit,
3   they now need an amount of damage large enough to allow them to
4   go out and buy at retail the same dollar amount of free clothes
5   that the men got.  To be able to buy $3,000 worth of clothes at
6   retail, the evidence will show that the women need an award of
7   damages of $3,000.

8        Here is how we're going to present the evidence to
9   you.  After the openings, we'll present our case.  I will read
10  you the facts to which the parties have agreed.  Those are
11  called stipulated facts.  I am going to read you all the
12  stipulated facts regardless of whether they appear to help the
13  plaintiffs or the defendant.  These agreed facts tell only part
14  of the story.

15       Next, we're going to offer into evidence some
16  documents that both sides agree that you should see in order to
17  decide this case.  We'll give you some of those documents in
18  your own binders and you can keep them throughout the course of
19  the trial.  Then we'll call three witnesses.

20       The first witness is Nicole Chang.  She was the head
21  of human resources at Varvatos for a while.  She has Varvatos.
22  Usually when a party calls a witness, you go over the questions
23  with them in advance because they are friendly to you, but
24  Nicole Chang is represented by counsel for if Varvatos so we
25  cannot do that.  We haven't gone over the questions with her.

1    In a general sense, she's going to testify about Varvatos

2    clothing allowance policy and how it was implemented.

3          Our second witness is Ruby Romaro.  She worked as a

4    sales professional at John Varvatos store in Manhattan for

5    about two and a half years.  She joined this case as a

6    plaintiff after it started.  She is one of our clients.  So we

7    have gone over the questions that we're going to ask her.  In

8    general terms, she's going to tell you about her experiences

9    working at Varvatos.

10          Our third witness is Ben Harris.  He was the

11    vice-president of retail at Varvatos.  Now, he has Varvatos,

12    but like Nicole Chang he is represented by Varvatos lawyers so

13    we can't go over our questions with him.  In a general sense,

14    he will tell you about what he did at Varvatos, how the stores

15    operated and about the clothing allowance.

16          After we are done with our witnesses, Varvatos will

17    present its witnesses.  We'll cross-examine them and then I

18    will speak to you again in clothing.

19          Thank you.

20          THE COURT:  Thank you, Mr. Dunnegan.

21          Now I am going to turn to the defense to see if they

22    would like to make an opening statement.

23          MS. HASSAN:  Your Honor, may I request a side bar?  I

24    want to raise a quick issue and I am not sure whether I should

25    be raising it in front of the jurors.

1          (At the side bar)

2          MS. HASSAN:  Your Honor, Mr. Dunnegan raised the issue

3   OF the U.K. policy in the opening.  My request would be that a

4   limiting instruction should be given so that the jury doesn't

5   go with the openings thinking that the U.K. policy is more

6   relevant to all of these issues than it should be.

7          THE COURT:  Are you going to mention it?

8          MS. HASSAN:  I wasn't planning to.

9          THE COURT:  I don't mind giving a sentence just about

10  don't worry about U.K. law.  Unless you want to object to it.

11         MR. DUNNEGAN:  I didn't mention U.K. law.

12         THE COURT:  No, but you mentioned what was done for

13  them in the U.K.  The point of the limiting instruction applies

14  at this point.  I don't want them to be confused.  It will be

15  very mild.

16         Do you want me to do it now or after the statement?

17         MS. HASSAN:  Doing it before the statement will be

18  great.

19         THE COURT:  Let's go back.

20         (Continued on next page)

21

22

23

24

25

1          (In open court)

2          THE COURT:  Before the defendant gives its open

3   statement, I just wanted to mention that you heard a reference

4   to a clothing allowance policy in London, which of course is

5   not the United States.  It's the United Kingdom.  There is no

6   evidence nor will there be any evidence about what the laws are

7   in United kingdom in terms of what is required in terms of a

8   clothing allowance.  You should not assume anything about the

9   law of Unitive kingdom and whether something that is done there

10  should be done here or not.  That's not part of this case.

11         I will turn to the defendant for their opening

12  statement.

13         MS. HASSAN:  Thank you, your Honor.

14         Ladies and gentlemen of the jury, good afternoon.  My

15  name is Amina Hassan and I am here with my colleagues Ned

16  Bassen and and Joanne Liu.  Together we represent the

17  defendant, John Varvatos Enterprises, Inc.

18         Let me tell you a little bit about the defendant,

19  Varvatos.  Now, if you were to go on their website, but per the

20  Court's instructions you should not be doing this now, but had

21  you gone to their website before today, you would have seen

22  something along the lines of what you can see on the screen.

23  What we will be showing to you during the course of this trial

24  is that Varvatos is a menswear brand.  Varvatos designs,

25  markets and sells men's clothing.  It does not make women's

1    clothing.

2           Varvatos does hire both men and women as sales

3    professionals -- as sales people in its retail stores and its

4    outlet stores.  What the evidence will show you is that

5    Varvatos is an equal opportunity employer.the evidence will

6    show that whether a sales professional or whether an applicant

7    is male or female, has no role in Varvatos' decision to hire

8    them.  Varvatos uses a wage criteria and a commission criteria,

9    which is the same for all sales professionals regardless of

10   whether they are men or women.  In fact, the evidence will show

11   that a lot of female sales professionals have a higher base

12   rate than their male colleagues.

13          So why are we here then?  What is this case about?

14   This case is about plaintiffs, female sales professionals, who

15   either worked at Varvatos or some of whom still work at

16   Varvatos asking that Varvatos pay them thousands of dollars and

17   then some for clothing or uniforms that they were never

18   required to wear.  So let me break that down.  I would like to

19   talk to you about the different dress codes for male and female

20   sales professionals at Varvatos.

21          The difference in the burden of complying with those

22   different obligations and the difference clothing benefits that

23   Varvatos provided to its male sales professionals and to its

24   female sales professionals.

25          I will start with the male sales professionals.  Now,

1    on day one, when a male sales professional starts working at

2    Varvatos, he needs to be wearing Varvatos only clothing while

3    he is at work.  It needs to be in season clothing.  So spring,

4    summer, fall, winter.  All male sales professionals also need

5    to follow the three-piece rule, which means in addition to

6    their pants, a shirt, a T-shirt or jeans, they need a third --

7    a jacket, a vest or a suit -- or a sweater.  Not a suit.

8    Sorry.

9         Now, the evidence will show you that the reason

10   Varvatos has this policy is because it essentially uses its

11   male sales professionals as live in-store models, walking

12   mannequins, walking billboards.  The purpose is to show the

13   clothes and to sale the clothes.  You will be hearing from

14   witnesses this is common industry practice to use sales

15   professionals and use and sales clothes.

16        Now, the issue Varvatos clothing is expensive.  It

17   just is.  So for instance a jacket can easily cost over a

18   thousand dollars, even $2,000 or more.  I pair of pants, a pair

19   of jeans typically costs hundreds of dollars.  The evidence

20   will show for an average sales professional to comply with the

21   quarterly changing dress code at Varvatos, it would require

22   thousands of dollars of expenditure each year.  For that

23   reason, ladies and gentlemen, for that reason Varvatos gives

24   its male sales professional a limited number of clothing each

25   quarter.  This is what we are referring to in this case as the

1  clothing allowance.

2           So how does the clothing allowance work?  Let me talk

3  to you about the retail stores.  Varvatos also has outlet

4  stores where the clothing is a little cheaper and a little bit

5  more affordable.  So focusing on the retail stores.  In the

6  retail stores at the start of each quarter, each male sales

7  professional is required to pull or take $3,000 worth of

8  clothing at full original price, which means essentially the

9  price that you or I or any customer walking into Varvatos would

10  pay for the in-season brand new clothes.  Over the course of a

11  year, given the four quarters the clothing allowance at a

12  retail store will end up being $12,000 worth of clothing for

13  full original price.  All of this is half at the outlet stores,

14  but we will cover that during the more detailed evidence as we

15  present that to you during the trial.

16           To clarify, there is no exchange of cash.  Male sales

17  professionals are not given cash to spend on clothes.  They are

18  given actual clothing.  Another point to clarify all male and

19  female professionals at Varvatos get a discount.  At retail

20  sales that is 65 percent.  At outlet stores that is 70 percent.

21  So if a male sales professional had to go and buy himself that

22  $12,000 worth of clothing, he would have to spend over $4,000

23  or $4,200 using his employee discount.  Same applies to a

24  female sales professional.  If she wants to buy the same set of

25  clothes that a male professional has pulled, she will not be

1   paying $12,000.  She will be paying $4,200.

2           Now, what does the clothing allowance actually mean in

3   terms of clothing?  The evidence will show you that a $3,000

4   clothing allowance in a retail store essentially translates

5   into one or two full pieces of -- so a full outfit.  Remember

6   the three-piece rule.  So one or two complete outfits and maybe

7   a few underpinnings like an extra pair of pants, an extra

8   shirt, maybe a set of boots.  The male sales professionals have

9   to wear essentially these same few pieces of clothing the

10  entire quarter.  Day in day out for the five or six day as a

11  week that they are working at Varvatos.

12          The evidence will show that as a result of the

13  constant wearing and washing and wearing and washing and

14  dry-cleaning because a lot of Varvatos clothes are

15  dry-cleaning, some of the clothing does take a beating and some

16  people end up with T-shirts with holes or pants with holes at

17  the end the quarter.  Now, it is correct at the end of the

18  quarter, male sales professionals keep their worn clothing.

19          You will also be hearing evidence that male sales

20  professionals routinely have to spend out of pocket over and

21  above the clothing allowance in order to supplement their very

22  limited clothing.  Remember, it is one or maybe two outfits

23  that they have that they have to wear for the entire quarter.

24  You will also be hearing evidence that male sales professionals

25  have to pay income tax on the clothing that they receive.  This

1    is not free clothing as the evidence will show.

2            So you will be hearing evidence that for instance for

3    an average male sales professionals at a retail store at

4    Varvatos, let's say he falls within the 25 percent federal

5    income tax bracket, the clothing allowance translates into at

6    least a $600 tax burden on him and this is not even considering

7    state taxes.  You will also hear that this is a mandatory

8    out-of-pocket expense.  They cannot decide not to just pull the

9    clothes and not pay the taxes because that is part of the job.

10   You will be hearing from at least one former male sales

11   professional who is a general manager that when he tried to get

12   out of paying the tax and saying I don't really like the

13   clothes that I have to wear to work, he was told that he could

14   not do this.  This was part of the job of a male sales

15   professional.  Ladies and gentlemen, that roughly is what the

16   male dress code is and what the benefit of the clothing

17   allowance they receive and what he will be presenting to you as

18   part of the evidence.

19           Now, moving on to female sales professionals.  Female

20   sales professionals are not required to wear the Varvatos

21   clothing because Varvatos does not make clothes for women.  It

22   is a menswear brand.  Instead, as the evidence will show,

23   Varvatos has created a broad dress code requirement for women,

24   which will not break the bank.  Essentially female sales

25   professionals are supposed to wear work-appropriate clothing.

1   They have restrictions such as maybe not too low a neckline or

2   not too short a hemline.  Those are ordinary work-appropriate

3   guidelines.  They are also supposed to comply with Varvatos'

4   neutral color pallet.  So blacks, whites, grays, navies,

5   browns.

6          You will hear evidence that Varvatos does not require

7   the female professionals to buy or wear clothes of any

8   particular brand from any particular store.  They can go and a

9   number of plaintiffs actually did this and shopped at places

10  like H  M, Gap all of which have lower price points than

11  Varvatos.  female sales professionals do not have to wear

12  in-season clothing.  So if I am a sales professional, I can

13  wear clothing from last season or last year or 10 years ago if

14  it is compliant with a neutral color pallet.

15         Now, the evidence will also show that a female sales

16  professional at Varvatos needs to spend less than a thousand

17  dollars.  In fact, significantly less than a thousand dollars

18  in order to comply with the Varvatos dress code policy.  For

19  instance, you will be seeing or hearing evidence that at least

20  once of the plaintiffs spent $600 on work clothes for the year

21  she was at Varvatos.  Another plaintiff spent 500 or $600 on

22  work clothes for the 10 months she worked at Varvatos.  Now, I

23  am sure you will hear evidence that a lot of female sales

24  professionals have spent thousands of dollars.  That is fine.

25  Everyone is free for spend as much as they want.  The question

1   is what are they required to spend.  What the male sales

2   professionals are required to spend to comply with their dress

3   code policy and what the sales professionals are required to

4   spend to comply with their dress code policy.

5            In addition to that, female sales professionals at

6   Varvatos get a 50 percent discount at All Saints.  It is a

7   sister company of Varvatos which makes both men and women's

8   clothing.  The evidence will show that a number of plaintiffs

9   have taken advantage of the All Saints discount.  Male sales

10  professional do not get this discount.

11           Ladies and gentlemen, to sum up during the next few

12  days we'll be presenting evidence which will show that female

13  sales professionals at Varvatos are not disadvantaged or

14  discriminated in any way as a result of legitimately different

15  dress code policy and clothing benefits that Varvatos has for

16  its male and female sales professionals.  The evidence will

17  also show that what the plaintiffs are seeking in thousands of

18  dollars is actually an unfair payout or windfall.

19           To end, I would ask that you keep an open mind.  Cases

20  of gender discrimination are very real.  I submit to you that

21  once we present you the evidence, you will be able to decide

22  that this is not one of those cases.

23           Thank you.

24           THE COURT:  Thank you.

25           So we've now heard both opening statements.  Remember,

K2O6VAR2                      Opening – Ms. Hassan

1   nothing you heard is evidence.  I am going to turn to the

2   plaintiffs attorneys to start their case.  As you heard, they

3   are going to start with reading stipulations.

4            Is that right, Mr. Dunnegan?

5            MR. DUNNEGAN:  That is correct, your Honor.

6            THE COURT:  Let me explain to you what stipulations

7   are.  Stipulations are agreed statements by the parties.  They

8   are evidence.  So what Mr. Dunnegan is going to read to you is

9   evidence in this case.  It can be considered by you.  If you

10  want to take notes on it, you are fine.

11           Let me say something about the notebooks.  Some people

12  listen better when they don't take notes.  Some people listen

13  better when they do take notes.  You are not required to take

14  notes.  If you are the kind of person who is better at just

15  listening and digesting, you certainly are under no obligation.

16  If you do wish to do it, this is the time.

17           Mr. Dunnegan, you can read the stipulations whenever

18  you are ready.

19           MR. DUNNEGAN:  Thank you, your Honor.

20           THE COURT:  Let me point out one thing.  These are not

21  stipulations exclusively from one side or the other.  Both

22  sides agree that these are facts that the jury should consider.

23  So you can use them for either side.

24           MR. DUNNEGAN:  That is correct, your Honor.

25           For the record I am reading from Document 254-1

1    beginning at page 1 of 5.

2            Here is the stipulation:

3            Plaintiffs and defendant, John Varvatos Enterprises,

4    stipulate that the following facts are true:

5            Varvatos.

6            1.  Varvatos clothes are generally sold at high priced

7    points.  For example, a single pair of jeans typically costs

8    hundreds of dollars and a single jacket can cost more than a

9    thousand dollars.

10           2.  Varvatos currently has 26 stores in the United

11   States, which we'll call Varvatos stores.

12           3.  20 of the Varvatos stores are retail stores.  For

13   the purpose of this document, we will call them retail stores.

14   The other six are outlet stores, which we will refer to as

15   outlet stores.

16           4.  Varvatos outlet stores carry both discounted

17   out-of-season products that did not sale at the retail stores

18   as well as a line of Varvatos clothing designed specifically to

19   be sold at the outlet stores.  Varvatos headquarters control

20   Varvatos stores.

21           5.  Varvatos stores share a common corporate

22   headquarters, which I will call headquarters, and share a

23   common corporate human resources department.

24           The hiring and compensation of sales professionals.

25           6.  Varvatos hires both men and women to work as sales

 1    professionals

 2            7.  Sex plays no role in Varvatos' decision whether or

 3    not to hire an applicant for a sales professional position.

 4            8.  Sex also plays no role in the hourly wage rate and

 5    the commission structure that Varvatos sets for its sales

 6    professionals.

 7            The Varvatos discount.

 8            9.  All of Varvatos sales professionals receive a

 9    discount of 65 percent off the original retail price of

10    Varvatos clothes purchased at the retail stores.

11            10.  All of Varvatos sales professionals receive a

12    discount of 70 percent off the original retail price of

13    Varvatos clothes purchased at the outlet stores.

14            These discounts are documented at Plaintiff's

15    Exhibit 5 and Defendant's Exhibit D.

16            The Varvatos dress code.

17            12.  All sales professionals are required to comply

18    with the Varvatos dress code, which imposes different

19    requirements on male sales professionals and female sales

20    professionals.

21            13.  The employee dress code has been formerly

22    documented since at least March of 2013 in the John Varvatos

23    appearance and dress standards retail locations, which we'll

24    call the Varvatos dress code.  Four versions of the Varvatos

25    dress code issued in 2013 and revised in 2014, 2015 and 2016

K2O6VAR2                      Opening - Ms. Hassan

1   are included in Plaintiff's Exhibit 1 and Defendant's Exhibit

2   A.

3          15.   The Varvatos dress code Exhibit 1 states that

4   "All employees working in its retail locations or representing

5   the company at a special event must ensure that their

6   appearance is consistent with the brand.  This applies to both

7   the retail stores and the outlet stores."

8          Dress code for the male sales professional and the

9   clothing allowance.

10          16.   Varvatos dress code requires male sales

11   professionals to wear Varvatos clothing while they are at work.

12   The Varvatos dress code provides: "In the case of a male

13   employee, the employee should be dressed in John Varvatos and

14   adhere to the three-piece rule -- a jacket, shirt and pants or

15   sweater; shirt and pants, etc.  Since all male retail employees

16   receive a clothing allowance, it is essential that John

17   Varvatos clothes be worn every day and those worn represent the

18   current season."

19          17.   Once Varvatos clothing is out of season and no

20   longer being sold in Varvatos' stores, it does not comply with

21   Varvatos dress code for its male sales professionals.

22          18.   Each season, once a quarter, in conjunction with

23   Varvatos release of its new line of clothing, Varvatos requires

24   its male sales professionals to "pull" items from the new line

25   to be worn at work.  At the start of each season, a male sales

1    professional in a retail sail can pull up to $3,000 worth of

2    clothing at the items full retail price.  This is referred to

3    as Varvatos clothing allowance.

4            In outlet stores the male sales professionals can pull

5    up to $1,500 worth of clothing at the items full retail price

6    at the outlet store.

7            19.  Employees eligible for the clothing allowance can

8    not role over unused portions of their clothing allowance from

9    one quarter to another.

10           20.  Employees eligible for the clothing allowance can

11   only pull items against the clothing allowance that can be worn

12   on a sales floor.  For example, they cannot use the clothing

13   allowance for heavy outerwear.

14           21.  Varvatos headquarters determines: One, the amount

15   of clothing allowance; and two, the dates on which the Varvatos

16   stores distribute the clothing allowance.

17           22.  Female sales professionals at Varvatos do not

18   receive the clothing allowance.  They receive the All Saints

19   discount described below.

20           Dress code for female sales professionals and the all

21   Saints discount.

22           23.  Female sales professionals are not required to

23   wear Varvatos clothing at work.

24           24.  Female sales professionals are required to dress

25   in professional clothing that is representative of the brand

1   and consistent with the brand's color pallet and of appearance

2   and of appropriate fabric

3          25.  In particular, the 2013 Varvatos dress code

4   required that female sales professionals dress in "outfits that

5   should be appropriate for the work environment and

6   representative of the brand."  A revision to the Varvatos dress

7   code in July of 2014 added language explaining that the

8   appearance and attire a female employes "must be aligned with

9   brand aesthetics and color pallet dark and/or neutral colors.

10  For example, beige, black, gray, white, navy blue, et cetera."

11         In 2015 the color pallet of work clothes for female

12  sales professionals was updated to the current pallet of dark

13  and neutral clothes "black, white, beige, gray, navy, olive,

14  brown."

15         26.  The Varvatos dress code does not require female

16  sales professionals to wear clothes from the current season.

17  The Varvatos dress code does not require sales for the female

18  sales professionals to purchase clothes to wear to work from

19  any particular retail store.  Nor does it retail sales

20  professionals to wear clothes above any particular brand to

21  work.

22         A number of plaintiffs have represented that they

23  shopped for work clothing at stores like Zara, H & and M, GAP,

24  Forever 21, Unique Glow, Urban Outfitters, and American

25  Apparel.  A number of other plaintiffs represented that they

1  you shop for work clothes at stores such as Helmet Lang, Rag &

2  Bone, Vince, Theory, Kate Spade, and All Saints.

3         28.  Female sales professionals can wear clothing that

4  they own prior to working at Varvatos as long as it is

5  consistent with the Varvatos dress code.

6         29.  A number of plaintiffs have represented that they

7  have spent less than a thousand dollars annually on their work

8  clothes to comply with the Varvatos dress code.  Other

9  plaintiffs have represented that they have spent less than

10 $2,000 a year on work clothes while at Varvatos.

11        However, some of plaintiffs have represented that they

12 spent more than $4,000 a year on clothing to wear to work at

13 Varvatos.

14        30.  Female sales professionals receive a 50 percent

15 discount on women's clothes at All Saints a sister brand of

16 Varvatos, which we'll call the All Saints discount.

17        31.  Males sales professionals do not receive and All

18 Saints discount.

19        32.  The All Saints discount is described in

20 Plaintiff's Exhibit 6 and Defendant's Exhibit C.

21        Varvatos women's line.

22        33.  Around 2004 and 2005, Varvatos decided to market

23 a line of clothing for women.  During this time Varvatos

24 requires female sales professionals to dress in Varvatos'

25 clothing at work and gave females sales professionals a

1    clothing allowance.

2              Your Honor, that's the stipulation.

3              THE COURT:  Thank you, Mr. Dunnegan.

4              I understand next --

5              MS. HASSAN:  Your Honor, can we have two corrections.

6

7              THE COURT:  A word got missed.  Just read what you

8    think was missed.  I noticed one, but wasn't sure it mattered.

9              MR. DUNNEGAN:  I am going re-read paragraphs 31 and

10   and 33.

11             31.  Male employees do not receive an All Saints

12   discount.

13             33.  Around 2004 and 2005 Varvatos designed and

14   marketed a line of clothing for women.  During this time,

15   Varvatos required its female sales professionals to dress in

16   Varvatos' women's clothing at work and gave female sales

17   professionals a clothing allowance.

18             THE COURT:  I understand, Mr. Dunnegan, you want to

19   offer some exhibits into evidence that the parties have agreed

20   should be made part of the record in this case; is that right?

21             MR. DUNNEGAN:  That is correct, your Honor.

22             THE COURT:  Do you want to identify them for the

23   record?

24             MR. DUNNEGAN:  Yes.

25             THE COURT:  Take your time:

1          MR. DUNNEGAN:  Plaintiff's offer Exhibit 1, Exhibit 2,

2     Exhibit 2 A, Exhibit 2 B, Exhibit 3, Exhibit 4, Exhibit 5,

3     Exhibit 6, Exhibit 7, Exhibit 8, Exhibit 10, Exhibit 11,

4     Exhibit 12, Exhibit 13, Exhibit 14, Exhibit 15, Exhibit 16,

5     Exhibit 17, Exhibit 18, Exhibit 19, Exhibit 20 and then Exhibit

6     35, 35 A, 35 B and 35 C.

7          Your Honor, I believe these all come in either as a

8     result of the final pretrial order or of the rulings that the

9     Court made on February 7th or February 21st.

10          THE COURT:  Any objection to their admission?

11          MS. HASSAN:  Your Honor, can we just double check a

12     couple of these?

13          THE COURT:  Take your time.

14          MS. HASSAN:  Thank you.

15          THE COURT:  Do you want to fill out your phone slip

16     thing now this might be a good moment.

17          (Pause)

18          THE COURT:  Ms. Hassan, if you want to answer the

19     question in the morning, that is fine.

20          MS. HASSAN:  Your Honor, there are two applications.

21     For two of them I think they were going to be a limited

22     instruction for hearsay and for three of them there were going

23     to be certain limiting instructions.  I would look for the

24     Court's guidance whether I should be objecting to them at this

25     point or let them in.

 1              THE COURT:  We'll deal with them in the morning.

 2    We'll stay late after class today, but we'll deal with them in

 3    the morning.

 4              Is that it, Mr. Dunnegan?

 5              MR. DUNNEGAN:  Your Honor, what I would like to do is

 6    hand out the jury books of selected exhibits.

 7              THE COURT:  Let's wait for tomorrow.

 8              Anything else today?

 9              MR. DUNNEGAN:  I think we all agreed it didn't make

10    sense to call a witness today.

11              THE COURT:  Members of the jury, I am going to

12    discharge you for the day.  You should leave your juror

13    notebooks and pencil on your chairs.  They will be there

14    tomorrow when you show up.  When you show up, come into the

15    doorway and turn left and go into the jury room.  We'll open at

16    8:45.  I ask you to try to get here by 9:00.  If you are late

17    that's okay.  We'll start as soon as all eight of you are here.

18    I don't want to start any later than 9:15.  Let's aim for 9:00.

19              Do not discuss the case with anyone.  Do not form any

20    opinions about the case.  I think that's it.  I will just see

21    you tomorrow morning.  Thank you.

22              (Jury excused)

23              (Continued on next page)

24

25

 1          THE COURT:  So on the exhibits with the limiting

 2   instructions, I guess I should turn to Mr. Dunnegan and ask is

 3   there going to come a moment when that will be read to the jury

 4   before you get to summations?

 5          MR. DUNNEGAN:  Yes.  I think when a witness is on the

 6   stand, we'll be saying if you can please look at this exhibit

 7   and it says this, did you say that.  So it is going to be read

 8   in some form.

 9          THE COURT:  All of ones.

10          Why don't you figure that out and come to me tomorrow

11   morning and because my goal would be the following:  They are

12   not going to leafing through in my mind that exhibit book.

13   They will have it at a particular moment.  They will have it

14   and open it when an exhibit is discussed.  My preference would

15   be to wait until the exhibit is discussed and at that point to

16   give the limiting instruction.  If there is never going to be a

17   time when that happens and if you are just going bring it up in

18   summation, I will give the instruction at some point before the

19   summation unless someone wants me to proceed otherwise.

20          Is that all right?

21          MR. DUNNEGAN:  I think it's all right.

22          THE COURT:  We'll discuss it more tomorrow.

23          MR. DUNNEGAN:  Thank you.

24          THE COURT:  My hope is we'll all be here at 9:00.

25   We'll have a little time in case all the jurors are not here.

K2O6VAR2                    Opening - Ms. Hassan

 1    If they are not here, we'll deal with it at the break.

 2              I was going to talk about the jury charge; but if I am

 3    exhausted, you guys must be really exhausted.  Perhaps we'll

 4    wait until tomorrow.

 5              MR. DUNNEGAN:  There is the issue of the Mayorga

 6    deposition excepts.  I think we can wing it on that one because

 7    I think there is only two that are going to require your Honor

 8    to make a call.  Because for the ones where there was no

 9    counter-designation, for example, 1 through 3, they said they

10    would withdraw those objections.  When there was an objection,

11    they wanted it ruled upon.  And if it was not overruled, they

12    had an additional designation.  I think we had very limited

13    problems with their additional designations.

14              THE COURT:  Knowing that reading deposition testimony

15    is deadly, how long is the actual deposition testimony that is

16    going to come in?  Is it one page?  10 pages?

17              MR. DUNNEGAN:  I haven't added it up, your Honor.  I

18    thought we were using the procedure we would put it in a piece

19    of paper.

20              THE COURT:  If it was really short.

21              MR. DUNNEGAN:  I have been trying to pull out of the

22    defendants their designations for Pam Kassen.  It's been a

23    while.  I don't have it yet.  I want to follow the form they

24    are using so the jury has something which looks the same from

25    both sides.  I was going to black out everything except what is

1   going to be read.

2            THE COURT:  Again, it's not going to be read allowed.

3            MR. DUNNEGAN:  Read to them in silence.  Most likely

4   just used in summation.

5            MS. HASSAN:  Your Honor, just to clarify one thing.  I

6   think we still are trying to negotiation the Mayorga

7   designations, but I am sure we'll be able to reach a decision.

8            THE COURT:  Are your witnesses going to take up

9   tomorrow or spill in to Wednesday?

10           MR. DUNNEGAN:  I think it is highly likely that our

11   three witnesses will be done tomorrow.

12           THE COURT:  We can leave until Wednesday morning.

13           MS. HASSAN:  I think there may be a couple of things

14   and and an agreement we'll just try to resolve it tonight and

15   tomorrow we'll let you know.

16           THE COURT:  Let's hope it works out tonight.  If not,

17   tell me tomorrow.

18           MR. DUNNEGAN:  Tomorrow we have Chang.  My expectation

19   is Chang will take roughly three hours.  Then we will have Ruby

20   Romaro.

21           THE COURT:  You are including cross?

22           MR. DUNNEGAN:  Yeah.  Yeah.  We have Ruby Romaro.  I

23   don't know how much they will have on cross.  On direct we cut

24   it down from the hour we originally proposed.  Then Ben Harris

25   we have cut that down.  He can be as short as 45 minutes on

 1   direct.

 2              THE COURT:  May we need his deposition testimony then.

 3   You may be done.

 4              MR. DUNNEGAN:  Yes.  I think we did reach an

 5   agreement.  If we cannot kick it out in later in the trial, as

 6   long as we do it before the jury deliberates, that's all we

 7   really need.  I think they agreed to that.

 8              MS. HASSAN:  Yes, your Honor.  We're fine with that.

 9              THE COURT:  Are you going to have a witness available

10   tomorrow in case we need?

11              MS. HASSAN:  Your Honor, my understanding is after Mr.

12   Dunnegan rests, our witness will be Ms. Crouchen.

13              THE COURT:  She has been instructed to show up

14   tomorrow.

15              MR. DUNNEGAN:  She is telling me she is going to show

16   up tomorrow.

17              THE COURT:  Does she understand she might have to come

18   back on Wednesday?

19              MR. DUNNEGAN:  She didn't understand that.  I thought

20   we were going to be moving a lot faster than in fact what we

21   moved.

22              THE COURT:  We can take her out of order if you don't

23   mind.

24              MR. DUNNEGAN:  Let's do that.

25              THE COURT:  We'll wait until the end of the day.

1          MS. HASSAN:  Your Honor, we are just trying to figure

2    out our next witness would be Ms. Byron and we're trying to

3    figure out -- is the idea Ms. Crouchen will be the end of the

4    day tomorrow?

5          THE COURT:  I am worried if something went wrong.  If

6    he was still going, whether it would be worth interrupting your

7    case to put her in and finish.  If she is a difficult person to

8    find, it might be worth doing her tomorrow.

9          Do you have anyone else available for tomorrow?

10         MS. HASSAN:  Your Honor, that will leave Ms. Byron and

11   Ms. Shears, who we have been expecting would go Wednesday.

12         THE COURT:  It's not the end of the world if we end

13   early tomorrow.  Let's hope that Ms. Crouchen fits in and it

14   all works out somehow.

15         MR. DUNNEGAN:  Should we plan on just interrupting

16   whatever there is at 2:00 and put her on at 2:00?

17         THE COURT:  How long is her direct going to be?

18         MS. HASSAN:  For Ms. Crouchen, less than an hour.

19         THE COURT:  Your cross?

20         MR. DUNNEGAN:  Half an hour at most.

21         THE COURT:  Let's make sure after the midafternoon

22   break we put her on regardless of where it is.

23         MS. HASSAN:  Sure.

24         MR. DUNNEGAN:  The midafternoon break will be around

25   3:00.

```
 1              THE COURT:  Hold on.  3:35.  No, 3:20.  We come back
 2     at 3:35.  It depends where we are on witnesses.  3:20 is the
 3     break.
 4              MR. DUNNEGAN:  I will get her here at 3:35.
 5              THE COURT:  I would tell her --
 6              MR. DUNNEGAN:  I will till her 2:30.
 7              THE COURT:  Anything else for today?
 8              MS. HASSAN:  No.  Thank you.
 9              THE COURT:  Mr. Dunnegan.
10              MR. DUNNEGAN:  I can't think of anything, your Honor.
11     We'll get a ruling on the exhibits that I offered first thing
12     tomorrow.
13              THE COURT:  Hopefully you'll work it out.
14              Thank you.
15              (Adjourned to February 25, 2020 at 9:00 a.m.)
16
17
18
19
20
21
22
23
24
25
```