# EXHIBIT B

**February 25, 2020 Transcript [Dist. Ct. Docket No. 340]**

K2P6VAR1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| 3 | TESSA KNOX, *et al.* |
| 4 |               Plaintiffs,              New York, N.Y. |
| 5 |        v.                              17 Civ. 772 (GWG) |
| 6 | JOHN VARVATOS ENTERPRISES, |
| | INC., |
| 7 | |
| |               Defendant. |
| 8 | |
| | ------------------------------x |
| 9 | |
| |                                        February 25, 2020 |
| 10 |                                        9:05 a.m. |
| 11 | Before: |
| 12 |                HON. GABRIEL W. GORENSTEIN, |
| 13 |                                        Magistrate Judge |
| 14 | |
| 15 | |
| |                        APPEARANCES |
| 16 | |
| 17 | DUNNEGAN & SCILEPPI, LLC |
| |        Attorneys for Plaintiffs |
| 18 | BY:  WILLIAM I. DUNNEGAN |
| |        RICHARD WEISS |
| 19 | |
| 20 | HUGHES HUBBARD & REED, LLP |
| |        Attorneys for Defendant |
| 21 | BY:  NED H. BASSEN |
| |        AMINA HASSAN |
| 22 |        JOANNE LIU |
| 23 | |
| 24 | |
| 25 | |

K2L5knoC                        conference

 1              (Trial resumed)

 2              THE COURT:  We're back on the record.

 3              MR. DUNNEGAN:  Your Honor, when these are received,

 4     can we have the clerk mark them received or should we do that

 5     at the end of the day today?

 6              THE COURT:  I think you should hand any exhibits

 7     received into evidence to the clerk.  She will put whatever is

 8     the appropriate mark.

 9              MR. DUNNEGAN:  Can I do that right now?

10              THE COURT:  Sure.  Because you want to hand that to?

11              MR. DUNNEGAN:  The witness.

12              Your Honor, with respect to jury books, I have given

13     opposing counsel a copy.  I have two copies for your Honor.

14              THE COURT:  Give one to my clerks and I will take one.

15              MR. DUNNEGAN:  When these get moved to the jury,

16     should I give them to your clerk or should I hand them out?

17              THE COURT:  To the jury?

18              MR. DUNNEGAN:  Yes.

19              THE COURT:  You can hand them to the jury.  Give four

20     to one person and let them pass it along.

21              MR. DUNNEGAN:  Okay.

22              THE COURT:  To go back what I said, you do not need to

23     repeat the list from yesterday.  I am going to ask Ms. Hassan

24     if she is objecting and she will say, No objection except for

25     the limiting instruction, and then we can go into our witness.

1            MR. DUNNEGAN:  To our books and then to our witness.

2            THE COURT:  Handing out the books.

3            MR. DUNNEGAN:  Yes.

4            THE COURT:  When you hand out the books, I am going to

5   ask the jury to not look at the exhibits unless you are

6   pointing to a specific exhibit.

7            MR. DUNNEGAN:  That's fine.

8            So your Honor knows the schedule, we're going to do

9   Chang first.  The anticipation is that she will go through

10  about noon.  We have Ruby Romero coming thereafter.  She will

11  take us we assume into the afternoon.  We have Cheryl Crouchen

12  showing up at least by 3:20.  She has been asked to come

13  earlier.  Mr. Harris will start the day with tomorrow.

14           So maybe when we get to Ms. Crouchen because of

15  scheduling, we have to take a witness out of turn.  I did

16  promise the jury that we'll have three witnesses.

17           THE COURT:  That's fine.  Now that that whole witness

18  is out, I don't want you to stretch out Chang to fill time.  It

19  would be better if Crouchen came earlier.  I don't feel so

20  badly about letting the jury off for the day, but I do feel

21  badly if they are sitting around.

22           MR. DUNNEGAN:  She will probably be here at 2:00.

23           THE COURT:  Why don't you take this time to give a

24  phone or text.

25           MR. DUNNEGAN:  I can text her.

K2L5knoC                              conference

1                THE COURT:  Say that the judge asks that she come at

2      2:00.

3                (Pause)

4                THE COURT:  I understand the jury is ready so we'll

5      bring them out.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court; jury present)

 2                THE COURT:  Be seated.  Welcome, ladies and gentlemen.

 3            Thank you for being on time.  We're ready to go.  I

 4      gather that you got some refreshments this morning.  I hope

 5      they are still there when we have our break.  If not, let me

 6      know and I will see what we can do about it.  Unfortunately

 7      we're not allowed to buy you lunch.  So you will be off on your

 8      own for lunch, but hopefully you have been refreshed by

 9      whatever is there.

10            If you recall yesterday afternoon, Mr. Dunnegan

11      offered a series of exhibits into evidence.

12            That was on the record, yesterday, wasn't it?

13                MR. DUNNEGAN:  Yes, it was, your Honor.

14                THE COURT:  I will turn to the defendants if they have

15      any objections to the admission of those exhibits.

16                MS. HASSAN:  Your Honor, we don't have any objection.

17      We would like limiting instructions with respect to five of

18      them.

19                THE COURT:  7, 12, 14, 15, 16?

20                MS. HASSAN:  Correct.

21                THE COURT:  I will explain what that means later on.

22      I am admitting the exhibits into evidence subject to the

23      limiting instruction that I will explain later.

24            (Plaintiff's Exhibits 1, 2, 2A, 2B, 3-20, 35, 35 A, 35

25      B, 35 C received in evidence)
```

1          So, Mr. Dunnegan, I will turn to you for whatever is

2    next.

3          MR. DUNNEGAN:  Your Honor, the next order of business

4    is I would like to give to the jurors a book which has selected

5    exhibits in them that we will be referring to during the

6    examinations.

7          THE COURT:  You can give that to the jury.

8          Let me tell the jury something about exhibits in the

9    books.  The exhibit books are only for you to use in the

10   courtroom until deliberation starts.  As tempting as it is, and

11   you are doing it, do not leaf through.  The only way they are

12   to be used as follows:  If an exhibit is being discussed and if

13   either of the attorneys asks you to look at an exhibit, you can

14   then pull out of the notebook.  You might want to keep it under

15   your chairs.  It is up to you.  I don't want you to open it

16   unless the attorney asks you to pull out the exhibit and look

17   at it.  You should look at it and then put it down and then

18   we'll proceed.  We'll take a pause for you to look at it, but

19   it is very important that you not miss any witness testimony.

20   So what I don't want to have happen is you look at the exhibit

21   and then the witness starts testifying and you are still

22   looking through the exhibit.  Then you will lose concentration

23   and you may not hear everything the witness says.

24         Mr. Dunnegan.

25         MR. DUNNEGAN:  Your Honor, the next order of business

1    is to call the Nicole Chang.

2              THE COURT:  Please come up.

3              MR. DUNNEGAN:  Your Honor, may I move the exhibits to

4    the witness chair?

5              THE COURT:  Go ahead.

6              THE DEPUTY CLERK:  Raise your right hand, please.

7     NICOLE CHANG,

8         called as a witness by the Plaintiffs,

9         having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Please be seated.

11             THE COURT:  Ms. Chang, you will be asked some

12   questions by the attorneys.  Please listen carefully and take a

13   moment before you answer the question.  If you hear the

14   attorneys object, if you could just stop and wait for me to

15   tell you what to do.

16             Okay?

17             THE WITNESS:  All right.

18             THE COURT:  Mr. Dunnegan, whenever you are ready you

19   can start.

20   DIRECT EXAMINATION

21   BY MR. DUNNEGAN:

22   Q.  I am going to ask you some questions about your background;

23   okay?

24   A.  Okay.

25   Q.  Right no what do you do for a living?

1    A.   I am a human resources professional.

2    Q.   Where do you work?

3    A.   At a company called Zadig & Voltaire.

4    Q.   Could I just ask you if you could keep your voice up.  You

5    don't have a microphone.

6    A.   Sure.

7              THE COURT:   There used to be one there.  It

8    disappeared.

9    Q.   What does your company Zadig & Voltaire?

10   A.   They are a men and women's retailer.  They sell clothing

11   and footwear.

12   Q.   What does your job as a human resources specialist there

13   involve?

14   A.   Managing day-to-day HR operations.  Pretty much anything of

15   human resources.

16   Q.   Are you the senior human resources person at that

17   organization?

18   A.   Yes.

19   Q.   Did you ever work for Varvatos?

20   A.   Yes.

21   Q.   So that we have the time frame, when did you start working

22   for Varvatos?

23   A.   August 2012.

24   Q.   When did you stop working for Varvatos full-time?

25   A.   December 2017.  December 1st.

K2P6VAR1                        Chang - direct

1    Q.  So you were full-time at Varvatos for roughly five years;

2    is that correct?

3    A.  Yes.

4    Q.  When you worked at Varvatos, did you work in a specific

5    department?

6    A.  Yes.  I worked in the human resources department.

7    Q.  When you worked in the human resources department at

8    Varvatos, did you work with someone by the name of Ann Byron?

9    A.  Yes, I did.

10   Q.  What was Ann Byron's title while she worked there with you?

11   A.  Vice-president of human resources.

12   Q.  At some point in time did Ann Byron leave Varvatos?

13   A.  Yes, she did.

14   Q.  About when did Ann Byron leave Varvatos?

15   A.  Around May 2017.

16   Q.  Now, up until Ann Byron left Varvatos in May or so in 2017,

17   you reported directly to Ann Byron; right?

18   A.  Correct.

19   Q.  After Ann Byron left Varvatos in about May of 2017, who was

20   the most senior employee in the human resources department at

21   Varvatos?

22   A.  That was me.

23   Q.  At that time after Ann Byron left, who did you report to?

24   A.  John Varvatos himself and the president and CEO of the

25   company.

K2P6VAR1                      Chang - direct

1   Q.  So you reported directly to the top of the organization?

2   A.  Yes.

3   Q.  And after Ann Byron left were you in charge of all of

4   Varvatos HR functions?

5   A.  Yes.

6   Q.  After you ended your employment with Varvatos, your

7   full-time employment, did you work for Varvatos as a

8   consultant?

9   A.  I did on a part-time basis.

10  Q.  Did your work as a consultant for Varvatos at all involve

11  assisting Varvatos in a defense in this case?

12  A.  No.

13  Q.  Did you appear at a mediation in this case?

14  A.  Oh, yes.  Sorry.  I misspoke.  I did, yes.

15  Q.  Did Varvatos pay for the work that you did as a consultant?

16  A.  Wait.  I am sorry.  I am getting confused.  I didn't attend

17  a mediation for this case while I was consulting.

18  Q.  Do you remember attending a mediation in May of 2018?

19  A.  I remember attending a mediation, but I don't think it was

20  related to this case.

21  Q.  Did Varvatos pay you for the work you did as a consultant

22  after you left full-time work?

23  A.  Yes.

24  Q.  Is Varvatos still paying you as a consultant?

25  A.  No.

1    Q.   Now, Mr. Bassen, Ms. Hassan, and Liu and the team at Hughes

2    Hubbard & Reed are representing you in connection with your

3    tomorrow today?

4    A.   Yes.

5    Q.   Did you meet with them prior to this morning to prepare for

6    your testimony?

7    A.   Yes.

8    Q.   Did you meet with me or my team to prepare your testimony?

9    A.   No.

10   Q.   Isn't it correct that we brought you here today as a result

11   of serving a subpoena on you?

12   A.   Yes.

13   Q.   Now, you've worked in the human resources field for a

14   number of years; right?

15   A.   Yes.

16              THE COURT:   Speak up.

17              THE WITNESS:   Yes.

18   Q.   For about a year you were the chief human resources

19   professional at John Varvatos; right?

20   A.   I am sorry?

21   Q.   For about a year or so you were the chief human resources

22   professional at Varvatos?

23   A.   I was for about six and a half months, yes.

24   Q.   Now, before you left Varvatos, you knew that there were

25   laws that prevented certain types of sex discrimination;

K2P6VAR1                        Chang - direct

1    correct?

2    A.   Correct.

3    Q.   Before you left Varvatos, had you heard of a law called the

4    Equal Pay Act?

5    A.   Yes.

6    Q.   Did you have at least a basic understanding of what the

7    Equal Pay Act involved?

8    A.   Yes.

9    Q.   Before you left Varvatos, did you hear of a law called

10   Title VII?

11   A.   I don't think so.

12   Q.   Would it refresh your recollection if I said Title VII of

13   the Civil Rights Act of 1964?

14   A.   I don't actively remember exactly what that is related to

15   but...

16   Q.   Now we're going to go back and I am going to get some

17   general background about Varvatos; okay?

18   A.   Okay.

19   Q.   Now, Varvatos has its corporate headquarters in Manhattan,

20   right?

21   A.   Yes.

22   Q.   When you worked at Varvatos, you worked at the corporate

23   headquarters?

24   A.   Yes.

25   Q.   Varvatos designs and sells clothes?

K2P6VAR1                          Chang - direct

1    A.  Yes.

2    Q.  Varvatos clothes, you would agree, are generally expensive?

3    A.  Yeah.

4    Q.  Varvatos can sell shirts that cost a couple hundred bucks?

5    A.  I don't remember all of the price points for all of the

6    items, but it's pricy, yes.

7    Q.  If I told you that a Varvatos shirt sold for more than

8    $200, that wouldn't shock you, would it?

9    A.  No, it would not.

10   Q.  If I told you that a Varvatos pair of pants could sell for

11   $500, that wouldn't shock you either, would it?

12   A.  No.

13   Q.  Varvatos does sell some clothes online; correct?

14   A.  Yes.

15   Q.  Through the internet?

16   A.  Yes.

17   Q.  You can go to John Varvatos.com and buy Varvatos clothes

18   online; right?

19   A.  Yes.

20   Q.  But Varvatos sells most of its clothes through John

21   Varvatos stores; right?

22   A.  John Varvatos sells clothing through the website retail

23   stores and wholesale partners, yes.

24   Q.  But most of its clothes are sold through retail stores;

25   right?

K2P6VAR1                           Chang - direct

```
 1    A.  I don't know for sure.  I think so.
 2    Q.  Now, Varvatos has about 26 stores in the United States?
 3    A.  Yes.
 4    Q.  Outside of the United States, Varvatos has a store in
 5    Canada?
 6    A.  Yes.
 7    Q.  It has a store in Mexico?
 8    A.  Yes.
 9    Q.  It has a store in London, England?
10    A.  Yes.
11    Q.  It has a store in Abu Dhabi?
12    A.  I think so.  I guess that is new.  It must have opened
13    after I left the company.
14    Q.  In the United States Varvatos has some stores that are
15    called outlets where it sells lower priced clothes; right?
16    A.  Yes.
17    Q.  Some of the stores Varvatos sells higher priced clothes;
18    right?
19    A.  I am sorry.  What do you mean?
20    Q.  Varvatos has what I would call retail stores and outlet
21    stores.
22            Are you familiar with those terms?
23    A.  Yes.
24    Q.  The outlet stores generally contain lower priced
25    merchandise than the retail stores?
```

1    A.  Correct.

2    Q.  The retail stores and the outlet stores for the most part

3    have the same type of employees; right?

4    A.  Yes.

5    Q.  Like both the retail stores and outlet stores would have a

6    store manager?

7    A.  Yes.

8    Q.  It would have an assistant store manager?

9    A.  Yes.

10   Q.  Both the retail stores and outlet stores have sales

11   professionals; right?

12   A.  Yes.

13   Q.  So we have our terminology straight, sales professionals

14   were sometimes called in the past sales associates?

15   A.  Yes.

16   Q.  Sales associates kind of transcended into sales

17   professionals?

18   A.  It's another term, yes.

19   Q.  Sales professionals and sales associates are really the

20   same thing under a different name?

21   A.  Yes.

22   Q.  Now, I am going to ask you some questions about how

23   Varvatos hires its sales professionals; okay?

24   A.  Okay.

25   Q.  For a sales professional position, isn't it correct

Case 7:17-cv-50023-GWG   Document 340   Filed 03/05/209   Page 16 of 241          74

K2P6VAR1                         Chang - direct

 1    Varvatos hires the most qualified person for the position

 2    regardless of whether that person is a man or a woman?

 3    A.   Yes.

 4    Q.   Varvatos doesn't advertise for the position of male sales

 5    professionals; right?

 6    A.   Correct.

 7    Q.   Varvatos doesn't advertise for the position of women sales

 8    professionals; correct?

 9    A.   Correct.

10    Q.   Varvatos doesn't have any quota at any point in its

11    organization to make sure that there is a specific number of

12    men or a specific number of women employed as sales

13    professionals; correct?

14    A.   Correct.

15    Q.   As a result Varvatos has some stores where there were no

16    men sales professionals; right?

17    A.   Sorry?

18    Q.   Let me ask probably a better question.

19         Varvatos had some stores where there were no male

20    sales professionals; correct?

21    A.   I don't remember.  I think so.  I don't remember.

22    Q.   Do you remember Tessa Knox?

23    A.   I do.

24    Q.   Tessa Knox worked at the East Hampton store?

25    A.   Yes.

K2P6VAR1                          Chang - direct

1   Q.  Wasn't Tessa Knox the sole sales professional at the East

2   Hampton store while she worked there?

3   A.  Yes, she was.

4   Q.  So that is one example of a store where Varvatos had no men

5   sales professionals; correct?

6   A.  Yes.

7   Q.  Now, are there women sales professionals who sell more

8   Varvatos merchandise than men sales professionals at the same

9   store?

10  A.  Sure.

11  Q.  So when it comes to selling Varvatos clothes, Varvatos

12  really doesn't think that men are anymore valuable than women;

13  correct?

14          MR. BASSEN:  Objection.

15          THE COURT:  "Valuable" is a little bit vague.  Maybe

16  you can try another question, Mr. Dunnegan.

17  Q.  Do men sales professionals add anymore to the bottom line

18  at Varvatos than the women sales professionals?

19          THE COURT:  Generate more revenue.

20  Q.  Generate more revenue.

21  A.  From the point of selling merchandise?

22  Q.  Yes.

23  A.  Other than the male professionals have to wear articles of

24  clothing as a selling tool, no.

25  Q.  Now, sales professionals get paid in part on an hourly

K2P6VAR1                         Chang - direct

 1   basis; right?

 2   A.  Yes.

 3   Q.  So for each hour you are clocked in at Varvatos, you get a

 4   certain amount of money?

 5   A.  Yes.

 6   Q.  The hourly rate of pay depends on the specific individual

 7   sales professional; right?

 8   A.  Along with other factors, the geographical location, sure.

 9   Q.  It also depends on things like experience?

10   A.  Yes.

11   Q.  It may also depend on things like seniority?

12   A.  Sure.

13   Q.  But isn't it correct that gender, sex, is not a factor in

14   determining a sales professional's hourly rate of pay?

15   A.  Correct.

16   Q.  While you were working at Varvatos, you understood that for

17   jobs that were the same or substantially similar, it would be

18   illegal for Varvatos to pay a man a higher hourly rate than a

19   woman?

20           MR. BASSEN:  Objection.  Calls for a legal conclusion,

21   your Honor.

22           THE COURT:  I think her awareness of the law is an

23   issue for some of the case.  So I will overrule the objection.

24           You can answer the question.

25   A.  Can you reask the question?

K2P6VAR1                          Chang - direct

1   Q.  I could.

2   A.  Thanks.

3   Q.  While you were working at Varvatos, you understood that

4   jobs that were the same --

5            Let me start again.

6            While you were working at Varvatos, you understood

7   that for jobs that were the same or substantially similar, it

8   would be illegal for Varvatos to pay a man a higher hourly rate

9   than a woman; right?

10  A.  It would be illegal if the higher rate is based just

11  because he was a man, yes.

12  Q.  Now, in addition to the hourly pay, sales professionals get

13  a commission; right?

14  A.  Yes.

15  Q.  That obviously means that they get a percentage of the

16  sales that they actually make at the stores to customers;

17  right?

18  A.  Yes.

19  Q.  Men and women sales professionals have the same commission

20  rate; correct?

21  A.  Yes.

22  Q.  While you were working at Varvatos, you understood that for

23  the same or substantially similar job, it would be illegal to

24  give a man a higher commission rate than a woman because she

25  was a woman; right?

K2P6VAR1                        Chang - direct

1   A.  Yes.

2   Q.  Now, sitting here today, do you understand that the

3   obligation of male sales professionals to wear Varvatos clothes

4   while at work was the only difference between the jobs of men

5   and women sales professionals?

6   A.  No.  I mean, in addition to wearing the clothing, the

7   purpose of them wearing them is to help with advertising.  So

8   they are also responsible for modeling the clothing that they

9   were provided to wear.

10  Q.  Let's make sure we understand your answer.

11          I understand that you just testified that the purpose

12  of having the men wear the clothes was to allow the clothes to

13  be seen more visibly in stores; is that correct?

14          MR. BASSEN:  Objection.  That is not what she said,

15  your Honor.

16          THE COURT:  Well, instead of asking what she

17  testified, why don't you just ask her the question.

18          MR. DUNNEGAN:  Okay.

19  Q.  Don't you understand that the job of the male sales

20  professionals is to wear the Varvatos clothing and that the

21  purpose of having the men wear the Varvatos clothing --

22          THE COURT:  You have two parts to that question.

23  Break it down.

24          MR. DUNNEGAN:  Okay.

25  Q.  The purpose of having men wear the Varvatos clothing is to

1   make the clothing more visible to customers in the store;

2   correct?

3   A.  Yes.

4   Q.  The obligation of the man wearing the clothing is simply to

5   wear the clothing; correct?

6   A.  Yes.

7   Q.  I am going to ask you some more detailed questions about

8   the dress codes at Varvatos; okay?

9   A.  Okay.

10  Q.  Now, both men and women sales professionals have to comply

11  with a dress code; is that correct?

12  A.  Yes.

13  Q.  The dress code is different for men sales professionals

14  than it is for women sales professionals?

15  A.  Yes.

16  Q.  The men's dress code means that men sales professionals

17  have to wear three pieces of John Varvatos clothing from more

18  or less the current season; is that correct?

19  A.  Yes.

20  Q.  The three pieces would be a pair of pants, a shirt, and

21  either a sweater or a jacket?

22  A.  Or a vest, yes.

23  Q.  Or a vest.

24          The women's dress code is more complicated; right?

25  A.  What do you mean more complicated?

K2P6VAR1                          Chang - direct

1  Q.  Aren't there a lot more details that are required to comply

2  with the women's dress code?

3  A.  In my opinion, no.

4  Q.  Okay.  Well, Varvatos doesn't want women sales

5  professionals wearing Varvatos clothes; right?

6  A.  Yes.  Because it is a menswear brand.

7  Q.  Women aren't even allowed to wear Varvatos clothes while

8  they are on the floor; right?

9  A.  Correct.

10  Q.  Now, if I could just ask you to please pull out Exhibit 1

11  that is sitting on the corner.

12          THE COURT:  Folks, don't pull out your exhibit yet

13  until he asks you.

14  Q.  Now, Exhibit 1 is in evidence, Ms. Chang.

15          Can you tell us what Exhibit 1 is?

16  A.  It's a retail dress code from September 2015.

17  Q.  Have you seen this document before today?

18  A.  Yes.

19  Q.  At the top it says, *Appearance and Dress Standards - Retail*

20  *Locations.*

21          Do you see that?

22  A.  Yes.

23          MR. DUNNEGAN:  Now, I think at this point, your Honor,

24  you can direct the jurors to their books.

25          THE COURT:  At this time you can look at Exhibit 1.

K2P6VAR1                         Chang - direct

1    We'll be silent when you do that.  When Mr. Dunnegan has had

2    enough time to look at it, he will proceed with questioning the

3    witness.

4              (Pause)

5    Q.  Ms. Chang, if I could call --

6              THE COURT:  Hold on.  The way I want to do this is the

7    way I permit publication to a jury, which is they look at it,

8    put it down, and listen.  If you want them to close the book,

9    they will close it.  Or if you want to ask them to look at

10   certain things, that is fine.  I just don't want them to look

11   at it while she is being questioned.

12             MR. DUNNEGAN:  I am going to call their attention to

13   the fourth paragraph and I will call the witness's attention to

14   that as well.

15             THE COURT:  I will be a little flexible if you are

16   talking about a specific thing.

17             MR. DUNNEGAN:  Okay.

18             THE COURT:  I just don't want them to have two things

19   going on at once.

20             MR. DUNNEGAN:  We'll go through the checklist in the

21   fourth paragraph.

22             THE COURT:  That's fine.  We can keep it open while

23   you do that.

24             MR. DUNNEGAN:  Okay.

25   BY MR. DUNNEGAN:

1  Q.  Now, do you see the fourth paragraph that says, *The*

2  *following is not to be worn by any employee working on sales*

3  *floor*?

4  A.  Yes.

5  Q.  Now, most of the following restrictions -- take a minute to

6  look at them if you want to -- are for women and not men;

7  right?

8  A.  I mean, they can apply to both genders?

9  Q.  Okay.  Does John Varvatos sell shorts, cutoffs, and skorts?

10 A.  I believe he sells shorts.

11 Q.  Does John Varvatos sell culottes?

12 A.  No.

13 Q.  Does John Varvatos sell clothes with excessively short

14 hemlines?

15 A.  I don't think so, no.

16 Q.  Does John Varvatos sell clothes with revealing necklines

17 and mid drifts?

18 A.  Some of his tops have very deep V-necks.

19 Q.  Does John Varvatos sell clothes with backless tops and

20 dresses?

21 A.  No, I don't think so.

22 Q.  Does John Varvatos sell sheer fabrications?

23 A.  Some of the fabrics are sheer, yes.

24 Q.  Does John Varvatos sell clothes with bright colors?

25 A.  No, he does not.

K2P6VAR1                              Chang - direct

1    Q.  What about clothes with large prints and patterns?

2    A.  Not much.  I don't think so, no.

3    Q.  Does John Varvatos sell any branded clothing that is not

4    John Varvatos?

5    A.  I am sorry?

6    Q.  Does John Varvatos sell any clothing that is not branded

7    John Varvatos?

8    A.  No.  I don't think so.

9    Q.  So most of these restrictions apply only to women; correct?

10   A.  Some apply only to women and I think some of them apply to

11   both genders.

12   Q.  The women's dress code is complicated, you would agree?

13   A.  No, I don't agree with that.

14   Q.  Well, would you agree that women can't wear whatever they

15   want to work?

16   A.  Agree.  No one can whatever they want to work.

17   Q.  Now, I am going to ask you some questions about the

18   Varvatos clothing allowance and specifically whether it is

19   compensation.

20             THE COURT:  Should we close the notebooks?

21             MR. DUNNEGAN:  Yes.

22             THE COURT:  Close your notebooks and put them under

23   your chair or close somewhere.

24             Thank you.

25   Q.  Now, under Varvatos clothing policy, men sales

1   professionals get free clothes; correct?

2   A.  Yes.

3   Q.  Varvatos has given men sales professionals free clothes

4   since at least 2012; right?

5   A.  Yes.  They are provided clothing without having to pay for

6   it.

7   Q.  Free clothing, yes?

8            THE COURT:  Yes or no?

9            THE WITNESS:  Yes.

10  Q.  There is a written policy of Varvatos to give men sales

11  professionals free clothes; correct?

12  A.  Yes.

13  Q.  Now, if I could bring you back to Exhibit 1, which we just

14  had a moment ago --

15           THE COURT:  Should the jury open their books or not.

16           MR. DUNNEGAN:  Yes, they should, your Honor.

17           THE COURT:  Okay.

18  Q.  Now, if I may call your attention to Exhibit 1, the second

19  full paragraph the sentence that begins on third line of that

20  paragraph which says, *Since all male retail employees receive a*

21  *clothing allowance,* and the sentence continues, that is

22  Varvatos's written policy; correct?

23  A.  Yes.

24  Q.  Now, do women sales professionals in the United States get

25  any free clothes from Varvatos?

K2P6VAR1                        Chang - direct

1    A.  No.

2    Q.  Now, the Varvatos clothing allowance policy, which we just

3    read from the second paragraph of the Exhibit 1, except for the

4    amount of the clothing allowance applies in all Varvatos stores

5    in the United States, whether those stores are retail stores or

6    outlet stores; right?

7    A.  The clothing allowance?

8    Q.  Yeah.

9    A.  Yes.

10   Q.  So just to be clear if I am a male sales professional in an

11   outlet store in Southern California, I will get a clothing

12   allowance; correct?

13   A.  Yes.

14   Q.  If I am a male sales professional in a retail store in

15   Soho, I will get a clothing allowance?

16   A.  Yes.

17   Q.  If I am a female sales professional in either the outlet

18   store in California or the retail store in Soho, I will not get

19   a clothing allowance; right?

20   A.  Correct.

21   Q.  Now, the amount that the male sales professional gets in

22   the clothing allowance, depends on whether he is working at a

23   retail store or an outlet store; right?

24   A.  Among other factors, yes.

25   Q.  Since you have been with the company, sales professionals

1   working at retail stores get a quarterly pull; right?

2   A.  Yes.

3          THE COURT:  Can you tell the jury what a "pull" is?

4          MR. DUNNEGAN:  Yes.  Thank you.

5   Q.  Do you understand the term pull?

6   A.  Yes.

7   Q.  Can you explain what the pull means in this context?

8   A.  Sure.  When someone is given an annual amount for a

9   clothing allowance, it is usually broken up to quarterly

10  amounts, every three months or maybe every six months.  So that

11  when they pull their allowance at that time, that's what we

12  refer to as a pull.

13  Q.  Thank you.

14         Back to my question:  Men sales professionals working

15  at retail stores get $3,000 a quarter in retail clothes to

16  pull; right?

17  A.  Yes.

18         MR. DUNNEGAN:  Your Honor, I believe we can tell the

19  jury to put away the books if that helps.

20         THE COURT:  Yes, please.

21  Q.  There are four pulls during the course of the year;

22  correct?

23  A.  Yes.

24  Q.  For sales professionals at an outlet store, the amount of

25  the pull is half of what it is at a retail store; right?

1    A.  I don't actively remember the exact amount, but it is less

2    than a full price retail store from what I remember.

3    Q.  Okay.  So if a man shows up for work on day one as a sales

4    professional at a Varvatos retail store, he will get a clothing

5    allowance; correct?

6    A.  Yes.

7    Q.  The fact is is that those men starting as a sales

8    professional on day one can walk into the Varvatos store and

9    pick out $3,000 worth of clothes and walk out of the store with

10   them that day for free; correct?

11   A.  Yes.

12   Q.  Now, once they pick out those clothes from the store, they

13   own those clothes; right?

14   A.  Yes.

15   Q.  They have to wear the clothes while they are working at

16   Varvatos; right?

17   A.  Yes.

18   Q.  But the clothes are theirs to keep forever; right?

19   A.  Yes.

20   Q.  They never have to pay Varvatos anything for the $3,000 for

21   that pull of clothes; right?

22   A.  Right.  Yes.

23   Q.  They don't have to give the clothes back to Varvatos at any

24   point in time; right?

25   A.  No.

K2P6VAR1                    Chang - direct

1    Q.   Now, if a male sales professional shows up for his first

2    day at Varvatos and gets a $3,000 clothing pull and then

3    decides to go to a concert that night, he can wear the Varvatos

4    clothes that he just pulled out of the store; correct?

5    A.   Yes.

6    Q.   Now, women sales professionals don't get to do that; right?

7    A.   Right.

8    Q.   Now, I want to ask you some questions very briefly about

9    women wearing Varvatos clothes; okay?

10   A.   Okay.

11   Q.   Now, some women wear Varvatos clothes; right?

12            MR. BASSEN:  Objection.  Where and when?

13            THE COURT:  You mean some women in the world anywhere

14   wear Varvatos clothes?

15            MR. DUNNEGAN:  Yes.

16            THE COURT:  You can answer that question if you know.

17            THE WITNESS:  Sure.

18            THE COURT:  Okay.

19   A.   I don't know for sure but...

20   Q.   Have you ever worn anything that you personally purchased

21   at a Varvatos store?

22   A.   No.

23   Q.   Haven't you purchased a scarf?

24   A.   Yes.  That's an accessory.

25   Q.   You purchased something at a Varvatos store that you

1  personally have worn; right?

2  A.  Yes.

3  Q.  If a woman comes into Varvatos and says that she wants to

4  buy clothing for herself, Varvatos will sell it to her;

5  correct?

6  A.  Of course.

7  Q.  Varvatos is happy to have those sales?

8  A.  Yeah.

9  Q.  Women sales professionals don't get any cash compensation

10  to offset the fact that the males sales professionals get free

11  clothes; right?

12  A.  No, they don't.

13  Q.  They don't get cash compensation to offset the fact that

14  the male sales professionals get free clothes; right?

15  A.  Correct.

16  Q.  The only benefit that the female sales professionals -- the

17  women sales professionals get that the men don't get is a

18  discount at a store called All Saints?

19  A.  Yes.

20  Q.  Now, I want to ask you some questions about Varvatos All

21  Saints discount policy for women sales professionals; okay?

22  A.  Okay.

23  Q.  Now, you heard All Saints called a sister store to

24  Varvatos?

25  A.  Yes.

 1  Q.  When you've heard it called a sister store to Varvatos,
 2  what have you understood that to mean?
 3  A.  That All Saints and John Varvatos is owned by the same
 4  private equity company.
 5  Q.  Now, if I could please call your attention to Exhibit 6 to
 6  the pile in front of you.
 7          THE COURT:  The jury is not doing it yet?
 8          MR. DUNNEGAN:  I think the jury should probably look
 9  at it, your Honor.
10          THE COURT:  I will let you decide.
11          Take out the notebook and look at Exhibit 6, please.
12          (Pause)
13          MR. DUNNEGAN:  Your Honor, may I proceed?
14          THE COURT:  I was waiting for you.
15  Q.  Exhibit 6 is the John Varvatos policy concerning All Saints
16  50 percent discount; right?
17  A.  Yes.
18  Q.  Now, the All Saints discount entitles women sales
19  professionals to a 50 percent discount off of the full retail
20  price at the All Saints store; correct?
21  A.  Yes.
22  Q.  So if all Saints is running a sale at any given time that a
23  woman sales professional walks in, they can't use their
24  Varvatos discount to purchase items that are on sale at that
25  time; right?

K2P6VAR1                          Chang - direct

 1  A.  Yes.  Correct.

 2  Q.  Now, the All Saints discount is not free clothing; right?

 3  A.  Correct.  It's not for free.

 4  Q.  Now, the purpose of the discount is for female employees of

 5  Varvatos to have the option to wear apparel that is brand

 6  appropriate; correct?

 7  A.  Yes.

 8  Q.  That is what the policy says?

 9  A.  Where do you see that in the policy?

10  Q.  I am looking at the fourth full paragraph down in the

11  left-hand column which says, *Brand identity.*

12          Do you see where it says, *The purpose of the discount*

13  *privilege is for female employee John Varvatos Enterprise, Inc.*

14  *to have the option to wear apparel that is brand appropriate in*

15  *the work environment*?

16  A.  Yes.

17  Q.  That is the purpose of this discount policy?

18  A.  Yes.

19  Q.  Now, the All Saints discount policy is like a coupon;

20  right?

21  A.  Okay.

22  Q.  Women sales professionals who take advantage or use the All

23  Saints discount, don't have to pay tax on any difference

24  between the discount and the full retail price; right?

25  A.  I don't think so.

1   Q.  Now, the All Saints discount comes with more restrictions
2   on how it can be used; correct?
3            MR. BASSEN:  Objection.  More restrictions than what?
4            THE COURT:  I am a little confused.  Maybe you can
5   clarify.
6   Q.  Putting aside the restriction that it can only be used on
7   full price and not sales merchandise at All Saints, the All
8   Saints policy also restricts women sales professionals at
9   Varvatos from using the discount in certain other ways;
10  correct?
11  A.  What do you mean by "certain other ways".
12  Q.  For example, you have to use it in an All Saints brick and
13  mortar store; correct?
14  A.  Yes.
15  Q.  All Saints has a website; right?
16  A.  Yes.
17  Q.  And All Saints sells clothes at a website; right?
18  A.  Yes.
19  Q.  If you want to shop over the internet for your All Saints
20  clothes, your discount, your 50 percent discount isn't going to
21  be used; right?
22  A.  Yes.  The All Saints 50 percent discount was only
23  applicable at brick and mortar stores and not the website.
24  Q.  In any given city an All Saints store may be far away from
25  a Varvatos store; right?

1    A.   Could be, yeah.

2    Q.   A man sales professional can do a clothing pull where he

3    works; correct?

4    A.   Yes.

5    Q.   To take any advantage or make any use of the All Saints

6    discount, you are going to have to go to another store which

7    may be across town; right?

8    A.   Yeah.

9    Q.   Now, let's talk about time limits.

10        Do All Saints put time limits during the week on which

11   women sales professionals at Varvatos can use the discount?

12   A.   Generally it is encouraged to shop during off-peak hours.

13   Q.   Which means if the women sales professionals wants to shop

14   on a Saturday afternoon, that is either not allowed or strongly

15   discouraged; right?

16   A.   Correct.  But that woman is also probably scheduled to work

17   on a Saturday afternoon because it is a peak time for retail

18   sales.

19   Q.   All Saints puts limits on the time of year when the

20   discount cannot be used; correct?

21   A.   Yes.

22   Q.   Those are called blackout periods; right?

23   A.   Yes.

24   Q.   John Varvatos periodically makes announcements about when

25   there is going to be an All Saints blackout period?

Case 1:17-cv-50623-MFW   Doc 10-2   Filed 07/07/20   Page 37 of 242
Case 1:17-cv-50623-GWG   Document 340   Filed 03/05/20   Page 36 of 241          94
K2P6VAR1                          Chang - direct

1   A.  Yes.  The All Saints human resources team would send us a

2   note when their blackout period was coming so we can

3   communicate it to our people.

4   Q.  That could be weeks at a time; right?

5   A.  Yeah.

6   Q.  During the week when the new season of clothes comes in at

7   Varvatos, the males sales professionals can go through the

8   store and pull their clothing pretty much any time during that

9   week that the clothes come in; right?

10  A.  I am not exactly hundred percent sure how the timing in

11  particular with the clothing allowance worked.  So I don't

12  know.

13  Q.  Now, you know that All Saints has sales; right?

14  A.  Yes.

15  Q.  From time to time All Saints has sales which are more than

16  50 percent; right?

17  A.  Yes, I think so.

18  Q.  If a woman sales professional wants to use the All Saints

19  discount, the woman sales professional has to take money out of

20  their own pocket and pay half of the full retail price to All

21  Saints; correct?

22  A.  Yes.

23  Q.  The man sales professional doesn't have to take any money

24  out of his pocket in order to pull the clothing as a result of

25  the clothing allowance; correct?

K2P6VAR1                         Chang - direct

1  A.  Correct.

2  Q.  Are you aware of any fact that would prevent Varvatos from

3  going to the management of its sister store All Saints and

4  saying, We're going to send our women sales professionals to

5  your store.  You give them a certain dollar amount, which

6  Varvatos would set, of free clothes and sends us the bill and

7  we'll pay it?

8           MR. BASSEN:  Objection.  Lack of foundation for this

9  witness to be able to answer that question.

10           THE COURT:  Well, do you know the answer to the

11  question?

12           THE WITNESS:  I mean, no.

13           THE COURT:  Next question.

14  Q.  The management of All Saints communicates with the

15  management from Varvatos from time to time; correct?

16           MR. BASSEN:  Objection.

17           I withdraw that.

18           If she knows.

19           THE COURT:  If you know the answer say so.  If you

20  don't, say so.

21  A.  I don't know for sure.  I think so.

22  Q.  Well, is there anything which stops Varvatos from paying

23  All Saints for clothes that the female sales professionals

24  would go to All Saints and pick out?

25  A.  I don't think so.

 1   Q.  Varvatos never did that; correct?

 2   A.  I don't think so.

 3   Q.  Is there anything which prevented Varvatos from reimbursing

 4   the women sales professionals in cash for the cost of the

 5   clothing that they reasonably purchased to wear for work?

 6           MR. BASSEN:  Objection.  It assumes there is a reason

 7   that they need to get this clothing in order to be reimbursed.

 8           THE COURT:  I don't think we have to make that

 9   assumption.

10           Why don't you just answer the question as it was put

11   to you.

12   A.  Would you please repeat the question?

13           MR. DUNNEGAN:  Could I ask the court reporter to read

14   back, your Honor?

15           THE COURT:  Yes.

16           (Record read)

17   A.  No.

18   Q.  Does Varvatos have access to records which would show how

19   much the All Saints discount was used?

20   A.  No.  John Varvatos, the company, did not have direct access

21   to that information.

22   Q.  All Saints would have that information; correct?

23   A.  I would assume so, yes.

24   Q.  Do you have any reason to expect that if John Varvatos

25   asked All Saints for that information, that All Saints would

K2P6VAR1                          Chang - direct

 1   refuse to provide it?

 2           MR. BASSEN:  Objection, speculative.

 3           THE COURT:  I think the way it is phrased almost calls

 4   for speculation.  I think we need some more foundation.

 5   Q.  We're going to move onto a different topic.

 6           THE COURT:  Does the jury still have the document in

 7   front of them?

 8           MR. DUNNEGAN:  No.  We can close that, your Honor.

 9           THE COURT:  Let's do that.

10   Q.  Now, I would like to ask you some questions about the jobs

11   of sales professionals; okay?

12   A.  Okay.

13   Q.  Now, Varvatos has a job description for the job of sales

14   professional; right?

15   A.  Yes.

16   Q.  Can I please ask you to look at your book at Exhibit 35 A.

17           Not in the book, in the pile of exhibits in front of

18   you?

19           THE COURT:  This one is?

20           MR. DUNNEGAN:  35 A, your Honor.  I believe this would

21   be appropriate to ask the jurors to look at.

22           THE COURT:  Sorry folks.  Bring the books back out.

23           Give them a moment to look at it, Mr. Dunnegan, and

24   when you are ready start up.

25           MR. DUNNEGAN:  This is 35 A.  I believe the last one

K2P6VAR1                           Chang – direct

1    in the book.

2              (Pause)

3              MR. DUNNEGAN:  Your Honor, may I proceed?

4              THE COURT:  Yes.

5    Q.  Now, Exhibit 35 A is Varvatos job description for sales

6    professionals; right?

7    A.  Yes.

8    Q.  Probably a third of the way down on Exhibit A, do you see

9    the listing which says, *Job Responsibilities*?

10   A.  Yes.

11   Q.  There is a dozen or so bullet points there; right?

12   A.  Yes.

13   Q.  Now, do both men sales professionals and women sales

14   professionals have to perform all those job responsibilities

15   which are listed under heading job responsibilities?

16   A.  Yes.

17   Q.  Yes?

18             THE COURT:  She said yes.

19   Q.  Now, there is nothing in this job description for sales

20   professionals that talks about trying on clothing; right?

21   A.  No.

22   Q.  Now, Varvatos trains its sales professionals; correct?

23   A.  Yes.

24   Q.  Do men sales professionals get the same training as women

25   sales professionals?

1   A.  For the most part, yes.

2   Q.  Well, the only difference between the job of a man sales

3   professional and the job of a woman sales professional is that

4   the man has to comply with the men's dress code and the woman

5   has to comply with the women's dress code; fair statement?

6   A.  Okay.  Yeah.

7           THE COURT:  Is it a fair statement or is it not,

8   Ms. Chang?

9           THE WITNESS:  Yes.

10  Q.  Now, I am going ask you some questions about how Varvatos

11  employees learn about the dress code; okay?

12  A.  Okay.

13  Q.  Now, when Varvatos wants to hire a sales professional, it

14  may advertise the job in various places; right?

15  A.  Yes.

16  Q.  When Varvatos advertises for a job opening, Varvatos has

17  fairly standard language; right?

18  A.  Yes.

19  Q.  That fairly standard language that Varvatos uses to

20  advertise for sales professionals doesn't say anything about

21  any obligation to wear clothing; correct?

22  A.  Yes.  Correct.

23  Q.  Applicants for the position of sales professionals apply

24  for the job without knowing that they are going to have to wear

25  if they are men Varvatos clothing; correct?

1    MR. BASSEN:  Objection.  Knowing from the job
2    description or knowing from something else?
3    THE COURT:  Maybe specify.
4    MR. DUNNEGAN:  Okay.
5    Q.  So applicants for the position of sales professional at
6    Varvatos who are men apply for the job without knowing from the
7    job posting that they will have to wear the Varvatos clothing
8    while they are working; right?
9    A.  Yes.  It does not explicitly say in the job description
10   that they have to wear the clothing.
11   Q.  After someone applies for the job as a sales professional,
12   I guess Varvatos decides whether or not to interview the person
13   live; right?
14   A.  I am sorry.  Whether or not?
15   Q.  After Varvatos decides that they would like to pursue the
16   job of the applicant, Varvatos interviews the applicant; right?
17   A.  Yes.  We interview applicants that apply for the job.
18   Q.  Now, when Varvatos interviews the person applying for the
19   position of sales professional, Varvatos has a policy of what
20   it says and what it doesn't say in that interview; correct?
21   A.  I am sorry.  Can you repeat that?
22   Q.  When Varvatos interviews someone for the position of sales
23   professional, it has a policy about what it says and about what
24   it doesn't say during that interview; right?
25   A.  Yes.

K2P6VAR1                          Chang - direct

1   Q.  During the interview, Varvatos tells the applicant the

2   basics about the job of being a sales professional at Varvatos;

3   right?

4   A.  Yes.

5   Q.  During the interview Varvatos does not tell the person

6   about the obligation to wear the Varvatos clothing if the

7   person is a man; right?

8   A.  I don't know 100 percent what every interviewer does and

9   does not share about the job.

10  Q.  Do you remember having your deposition taken in this case;

11  right?

12  A.  A few times, yeah.

13  Q.  Three times to be precise; correct?

14  A.  Yes.

15          THE COURT:  Can you alert the page perhaps and line

16  number for opposing counsel's benefit.

17          MR. DUNNEGAN:  Sure.

18          I will be reading from October 28th, 2017, page 116

19  beginning at line 1.

20  Q.  Now, do you remember being asked the following questions

21  and giving the following answers:

22  "Q.  When are male sales associates first informed of their

23  obligation to wear JV clothing?

24  "A.  During the onboarding and new hire onboarding and

25  orientation.

1    "Q.  Practically speaking, is that --

2    "A.  Their first day."

3            Did you give that testimony?

4    A.  Yes.

5    Q.  Was that testimony true when you gave it?

6    A.  Yes.  That's -- I know that is the only time I know a

7    hundred percent for sure when a male sales employee is being

8    informed about the clothing allowance.  Again, I am not privy

9    to know what every single interviewer during an interview

10   process is and is not sharing about the position.

11   Q.  But the policy of Varvatos is to tell applicants or

12   actually new hires about the obligation to wear the Varvatos

13   clothing when they show up or after they show up on the first

14   day of the job?

15           MR. BASSEN:  Objection.  There is nothing about a

16   policy.

17           THE COURT:  Overruled.

18           You can answer the question.

19   A.  Can you please repeat the question?

20   Q.  Sure.

21   A.  Thank you.

22   Q.  As a matter of Varvatos policy, aren't males hired for the

23   position of sales professional told about the obligation to

24   wear Varvatos clothes when they show up for the first day of

25   work?

1           THE COURT:  Do you mean to the exclusion of any other
2   time, or are you asking is it their policy to tell them on the
3   first day of work?
4           MR. DUNNEGAN:  I really mean the exclusion of any
5   period of time.
6           THE COURT:  That is not clear.  If the question is is
7   it a policy to withhold the information about the obligation to
8   pull the clothing until the first day of work; is that what you
9   are trying to ask?
10          MR. DUNNEGAN:  Essentially.
11          MR. BASSEN:  Objection.  Asked and answered three
12  times.
13          THE COURT:  I am not sure it was, but let's try again.
14          I will ask it, Ms. Chang.  Was it the policy Varvatos
15  to not tell male sales associates about the clothing
16  requirement and the clothing pull until their first day of
17  work?
18          THE WITNESS:  No, your Honor, it was not.
19          THE COURT:  The answer was no if you couldn't hear it.
20  Q.  Now, Varvatos has an employee handbook; correct?
21  A.  Yes.
22  Q.  Isn't it fair to say that you were at least in part
23  responsible for updating the employee handbook at Varvatos
24  while you were there?
25  A.  Yes.

1   Q.  Now, if you could please pull out exhibit --

2           THE COURT:  Are we now turning away from 35 A?

3           MR. DUNNEGAN:  We are, your Honor.

4           THE COURT:  Should the jury keep their books open?

5           MR. DUNNEGAN:  We'll have a little bit of a break.

6           THE COURT:  Let's close it for the break.

7   Q.  Now, if you could please pull out from your pile of

8   documents the one marked Exhibit 2.

9           MR. DUNNEGAN:  This is not in the jury's book in its

10  entirety.

11          THE COURT:  But it is in evidence.

12          Go ahead.

13  Q.  This is the Varvatos employee handbook; right?

14  A.  Yes.

15  Q.  The employee handbook at Varvatos tells employees certain

16  things that they have to know about their job at Varvatos;

17  right?

18  A.  Yes.

19  Q.  The employee handbook generally tells employees the

20  important things about their job; right?

21          MR. BASSEN:  Objection.

22          THE COURT:  Overruled.

23          You can answer.

24  A.  Yes.  It goes over all important policies and procedural.

25  Q.  I didn't quite hear you.  It goes over --

Case 1:17-cv-50023-MFW   Doc 10-2  Filed 07/07/20  Page 48 of 242   105
Case 1:17-cv-50023-GWG   Document 340   Filed 03/05/20   Page 47 of 241
K2P6VAR1                      Chang - direct

1   A.  It goes over all different kinds of policies and
2   procedures.
3   Q.  Did you say "important policies" in your prior answer?
4            THE COURT:  She used the word important, yes.
5   Q.  Now, could you please now pull out Exhibit 2 B in the pile
6   of documents.
7   A.  2 B.
8   Q.  Is 2 B up there?
9   A.  2 A.
10  Q.  I apologize.  I withheld it.
11           MR. DUNNEGAN:  Can I approach witness, your Honor?
12           THE COURT:  Sure.
13           THE WITNESS:  Thank you.
14  Q.  Now, if I could call your attention to Exhibit 2 B.
15           Exhibit 2 B is the part of the employee handbook that
16  deals with the dress code and the grooming standards; right?
17  A.  Yes.
18  Q.  The obligation to wear the Varvatos clothes is not in the
19  employee handbook; correct?
20  A.  Correct.
21  Q.  We previously looked at 35 A, which was the job
22  description; right?
23  A.  Yes.
24  Q.  There is nothing in there about wearing the Varvatos
25  clothes; right?

K2P6VAR1                          Chang - direct

 1   A.  Correct.

 2   Q.  Now, after they have been hired, Varvatos has an

 3   orientation process for new professionals; right?

 4   A.  Yes.

 5   Q.  The term in your industry is called onboarding?

 6   A.  Yes.

 7   Q.  That is respectively orientation?

 8   A.  Yes.

 9   Q.  During the onboarding process, doesn't Varvatos routinely

10   tell male employees about having to wear the Varvatos clothing?

11   A.  Yes.

12   Q.  That essentially means that the sales professional is told

13   about the obligation to wear the clothing on their first day of

14   the job?

15   A.  Well, yes.

16           THE COURT:  Hold on.  It's confusing.  Do you mean to

17   the exclusion of any other time?

18           MR. DUNNEGAN:  No, that is not what I meant on that

19   question, your Honor.  Maybe I should reask it.

20           THE COURT:  Okay.

21   Q.  Regardless of what happened previously, hires who are men

22   are told on the first day of their job that they have to wear

23   the Varvatos clothing; right?

24   A.  Well, all employees on their first day through the

25   onboarding and orientation process, men and women, are given

K2P6VAR1                    Chang - direct

 1    information about what is required of them.  So in the case of
 2    male sales professionals, they are informed verbally in
 3    addition to being provided the retail specific dress code,
 4    which mentions the clothing allowance and their obligation to
 5    wear the apparel, yes.
 6    Q.  To your knowledge isn't it correct that no male has ever
 7    turned down a job as a sales professional because of being told
 8    that they have to wear the Varvatos clothes?
 9    A.  To my knowledge and recollection I don't think no position
10    has been turned down because of that.
11    Q.  Does it take anymore skill to wear three pieces of Varvatos
12    clothing than any other brand of clothing?
13    A.  Skill?
14    Q.  Skill.
15    A.  I don't understand the question.  What do you mean by
16    "skill"?
17    Q.  Okay.  Skill being expertise ability.
18    A.  To wear the three pieces -- there is a certain way to style
19    yourself when you are wearing John Varvatos clothing.
20    Q.  Is that something that is a skill; meaning, it is learned
21    rather than just instructed to be done?
22             MR. BASSEN:  Objection.  Calls for a legal conclusion.
23             THE COURT:  Well, you can define skill however you
24    want, but it doesn't mean it is the legal definition.  I will
25    accept how Mr. Dunnegan defined it for purposes of the

Case 7:17-cv-00772-GWG   Document 346   Filed 03/05/20   Page 51 of 241

K2P6VAR1                           Chang - direct

1    question.

2            If you can answer it, go ahead.

3    A.  Sorry.  Can you go back to skill.

4    Q.  Does it take anymore ability to wear three pieces of

5    Varvatos clothing than three pieces of any other brand of

6    clothing?

7    A.  No.  I don't think so.

8    Q.  Now, does it take anymore effort to wear three pieces of

9    Varvatos clothing than three pieces of any other brand of

10   clothing?

11   A.  Effort?

12           Well, I don't understand what you mean by effort.

13   Q.  Exertion of work.

14   A.  I think it is the same amount of energy that it would take

15   to put on three pieces of John Varvatos clothing compared to

16   three non-John Varvatos branded pieces of clothing.

17   Q.  Now, I want it call your attention to the use during this

18   case of the word "modeling."  Isn't it correct that the

19   obligation of modeling Varvatos clothes is the same as the

20   obligation to wear Varvatos clothes?

21   A.  Wearing and modeling, I think there is a difference, but I

22   don't think it is exactly the same.

23   Q.  Doesn't an employee at Varvatos fulfill any obligation to

24   model Varvatos clothing by wearing the Varvatos clothing?

25   A.  Yes.  They fulfill the obligation by wearing it.

1   Q.  You were at Varvatos for roughly five years?

2   A.  Yes.

3   Q.  All that time you were in human resources?

4   A.  Yes.

5   Q.  Now, can you identify a single document that states that

6   men sales professionals have a different job than women sales

7   professionals that was created before this lawsuit?

8   A.  Is there -- sorry.  Is there a separate document?

9   Q.  Let me try again.

10  A.  Thanks.

11  Q.  Before this lawsuit was filed, are you aware that there was

12  any specific document in Varvatos' files that stated that men

13  sales professionals have a different job than female

14  professionals?

15          MR. BASSEN:  Objection, 403.

16          THE COURT:  Do you mean a Varvatos created document?

17          MR. DUNNEGAN:  I do.

18          THE COURT:  Overruled.

19          You can answer.

20  A.  To my recollection, I don't think so.

21  Q.  Now, Varvatos has a lot of different job descriptions;

22  right?

23  A.  Yes.

24  Q.  If I could ask you to please look at Exhibit 35.

25          THE COURT:  Jurors are not to look at anything; right?

1          MR. DUNNEGAN:  That's correct.  I think we can get

2     through this without the jurors looking.

3          THE COURT:  When the time comes, we'll let you know.

4     Q.  Now, Exhibit 35, which is in evidence, is a list of

5     different job descriptions; correct?

6     A.  It's a list of different titles in the company, yes.

7     Q.  Let me just go through them.  There is a job description in

8     there for general manager of a store; right?

9          Actually, let me withdraw it.  I think if I went

10    through it in order, it could be easier for you and I can do it

11    faster?

12         THE COURT:  All right.

13    Q.  The first line of the second page the document is a job

14    description for part-time temporarily cashier and sales

15    assistant; right?

16    A.  Yes.

17    Q.  The second one is a job title for account

18    executive/collection; right?

19    A.  Yes.

20    Q.  The third one is an assistant general manager; right?

21    A.  Yes.

22    Q.  The fourth one is a buyer of tailored clothing?

23    A.  Footwear and accessories, yes.

24    Q.  The next one is a director of stores for the east coast;

25    right?

K2P6VAR1                          Chang - direct

1    A.  Yes.

2    Q.  So is it correct to say that John Varvatos has different

3    job descriptions for different jobs?

4    A.  Yes.

5    Q.  When there is a different job, John Varvatos has a

6    different job description?

7              MR. BASSEN:  Objection.

8              THE COURT:  Overruled.

9              You can answer it.

10             When there are two different jobs, does that

11   necessarily mean it is a different job description for those

12   different jobs?

13             THE WITNESS:  We didn't create a job description for

14   every single position in the company; but if and we needed to

15   create one to recruit for it, yes.

16   Q.  Now, before you left Varvatos, you thought the men of sales

17   professionals and women sales professionals were substantially

18   similar; right?

19             MR. BASSEN:  Objection.

20             THE COURT:  Overruled.

21             You can answer it.

22   A.  I think that the positions are similar but not exactly the

23   same.

24   Q.  Are they substantially similar?

25             THE COURT:  I think we're getting now into a legal

K2P6VAR1                        Chang - direct

1    question.

2    Q.  You told people in the industry that these jobs are

3    similar; right?  No dispute about that?

4               MR. BASSEN:  Objection.

5               THE COURT:  Overruled.

6               You can answer that question.

7    A.  I haven't had active conversations in the industry with my

8    other HR peers about John Varvatos sales professionals male and

9    women being similar.  I haven't had those conversations.

10   Q.  Well, if I could ask you to please look at Exhibit 16 in

11   the pile in front of you.

12              MR. DUNNEGAN:  Your Honor, for this one I think the

13   jurors should look at their books.

14              THE COURT:  Okay.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K2PAAKNO2                        Chang - Direct

1       MR. BASSEN:  Your Honor, there's I believe a limiting

2  instruction on this particular exhibit.

3       THE COURT:  And this goes -- is there a UK admission?

4       MR. DUNNEGAN:  Yes, there is, your Honor.  It is on

5  the page which is 1944 at the bottom.

6       THE COURT:  OK.  Are you going to get to that now?

7       MR. DUNNEGAN:  I was going to focus on the first

8  sentence of the e-mail on that page, your Honor.

9       THE COURT:  Are you going to get to it at all with

10  this witness?

11       MR. DUNNEGAN:  Yes.

12       THE COURT:  When we get to that point, I'll give the

13  instruction.

14       Folks, just look at whatever page he tells you and try

15  not to look at other pages.  We'll get to them eventually.

16       What page are we looking at?

17       MR. DUNNEGAN:  I just want to identify the e-mail

18  first.

19  BY MR. DUNNEGAN:

20  Q.  This is an e-mail chain that you were involved in, correct?

21  A.  Yes.

22  Q.  And it was initiated by an individual by the name of Gina

23  Rolls at a company called Marc Jacobs, correct?

24  A.  Yes.

25  Q.  And the time period of this exchange is June of 2016,

K2PAAKNO2                    Chang - Direct

1   correct?

2   A.  Yes.

3   Q.  Now, if we turn to the second page on this --

4           THE COURT:  There's a number at bottom right?

5           MR. DUNNEGAN:  Yes.  It's 1919, your Honor.

6           THE COURT:  Okay.

7   BY MR. DUNNEGAN:

8   Q.  This is an e-mail from Gina Rolls, correct?

9   A.  Yes.

10  Q.  To a lot of people.  One of which was you, correct?

11  A.  Yes.

12  Q.  And the other people on this you understand are H.R.

13  professionals, right?

14  A.  Yes.

15  Q.  OK.  And Gina Rolls is asking:

16          "Hi All:  Relating to your favorite

17  topic, clothing allowance, I have one quick

18  question for brands that sell predominantly for

19  one gender, either male or female, or do not sell

20  on RTW.  How do you manage the clothing allowance

21  for those who can't actually utilize the product;

22  i.e., male executives in the company that only

23  sells women's RTW"?

24          Do you see that?

25          THE COURT:  Can I just ask, what's RTW?

K2PAAKNO2                    Chang - Direct

1        THE WITNESS:  Ready to wear.

2        THE COURT:  Let the witness answer.

3        Go ahead.

4   BY MR. DUNNEGAN:

5   Q.  And then were a number of choices after that question,

6   right?

7   A.  Yes.

8   Q.  And you responded to that e-mail, correct?

9   A.  Yes, I did.

10  Q.  Okay.  And your e-mail on the next page, which has at the

11  bottom 1920, right?

12  A.  Yes.

13  Q.  And if we turn two more pages to the page 1922, this is an

14  e-mail from Gina Rolls directly to you, correct?

15  A.  Yes.

16  Q.  And Gina Rolls writes to you:

17          "Sorry, just a follow-up.  So if you

18  have two people in the same/similar position or

19  level, the male will receive a clothing allowance

20  and the female will not?"

21          Do you see that?

22  A.  I do.

23  Q.  And you responded to that question, correct?

24  A.  Yes.

25  Q.  Your response to that question is on the third page

 1   following that which says 1924 at the bottom, and you wrote,

 2   "Hi Gina, Correct.  Males will get an allowance.  Females in

 3   similar positions and level will not."

 4          That's what you wrote, correct?

 5   A.  Yes.

 6   Q.  So you referred to the position of male and female sales

 7   professionals as "similar" correct?

 8   A.  Yes.

 9          THE COURT:  I'm sorry, I turned away for one second.

10   The sentence you just read from was on 1922?

11          MR. DUNNEGAN:  1924 your Honor.

12          THE COURT:  Sorry, I was on the wrong page.  Okay.

13          Go ahead.

14   BY MR. DUNNEGAN:

15   Q.  You knew what page I was referring to, right?

16   A.  Yes.

17   Q.  Now, I am going to ask you some -- and we can put away the

18   books.

19          THE COURT:  We are not going to look at that paragraph

20   now?

21          MR. DUNNEGAN:  No.  It's coming later.

22          THE COURT:  Okay.  Put away the books.  Thanks.

23   BY MR. DUNNEGAN:

24   Q.  I want to ask you some questions about the Varvatos

25   clothing allowance, correct?

1    A.   Okay.

2    Q.   Now, when you started working for Varvatos in 2012,

3    Varvatos already had a clothing allowance for men, right?

4    A.   Yes, I believe so.

5    Q.   And before this lawsuit, did you know which person or

6    persons at Varvatos first made the decision to have a clothing

7    allowance policy that gave men and not women sales

8    professionals free clothes?

9            MR. BASSEN:  Objection, your Honor.  At what period of

10   time?  There's stipulated fact that at one time Varvatos did

11   have a clothing allowance for women when they had a women's

12   line.  So I think we need a timeframe on it.  Otherwise it's

13   confusing.

14           MR. DUNNEGAN:  I'll take Mr. Bassen's suggestion and

15   ask a different question.

16   BY MR. DUNNEGAN:

17   Q.   Before this lawsuit and after let's say 2010, do you know

18   which person or persons at Varvatos first made the decision to

19   have a clothing allowance policy that gave men and not women

20   sales professionals free clothes?

21   A.   I do not.  The clothing allowance is already a policy that

22   existed and was in place when I joined the company in 2012.

23   Q.   And you have been unable in your work to determine the

24   individual who made the decision or the people who made the

25   decision about instituting the clothing allowance policy for

1    men only, right?

2                MR. BASSEN:  Objection, your Honor.  There is no

3    evidence she ever tried to make a determination.

4                THE COURT:  Why don't you ask her if she ever made an

5    investigation.

6                MR. DUNNEGAN:  Okay.

7    BY MR. DUNNEGAN:

8    Q.  In the course of preparing for one of your depositions in

9    this case, did you make an effort to determine who made the

10   decision or what group of people made the decision after 2010

11   or so to have a policy that would give men free clothes but not

12   women?

13   A.  I don't believe I actively researched that information.

14   Q.  So, you personally don't know the original reason that

15   Varvatos decided to give a clothing allowance to men's sales

16   professionals and not to women?

17   A.  No.  I don't recall.

18   Q.  Well, in 2014 Varvatos opened up a store in London,

19   England, correct?

20   A.  Yes.

21   Q.  Now, the men's sales professionals in Varvatos' London

22   store got a clothing allowance?

23                MR. BASSEN:  Objection, your Honor.

24                THE COURT:  Do you want the limiting instruction or

25   what?

K2PAAKNO2                         Chang - Direct

1          MR. BASSEN:  I would ask that this entire line be not

2    allowed.  I don't know that a limiting instruction does it.

3          THE COURT:  I think there's already been a ruling that

4    something about what happens in London comes in, at least

5    insofar as it is in the e-mail.

6          MR. BASSEN:  It was supposed to be the state of mind.

7          THE COURT:  I'll give a limiting instruction.  Maybe

8    we could do this in the context of e-mail.  That would be

9    better.

10         MR. DUNNEGAN:  Well, it's really divorced from the

11   content of that e-mail, your Honor.

12         THE COURT:  Well, maybe I need to find out what the

13   plan is here.  Do you want to approach so I can figure out -- I

14   thought we were limited to e-mail on this, so if there is

15   something else I need to hear about it.

16         MR. DUNNEGAN:  This is a -- I'm happy to sidebar if

17   you want.

18         THE COURT:  Let's take one moment.

19         (Continued on next page.)

20

21

22

23

24

25

K2PAAKNO2                      Chang – Direct

 1              (Sidebar)

 2              THE COURT:  Okay.

 3              MR. DUNNEGAN:  My offer of proof would be that the

 4    opening of the store in London triggered a conversation between

 5    her and Ann Byron, who was the vice president of human

 6    resources, about whether or not there should be a clothing

 7    allowance for sales professionals in the United States.  And

 8    they had that conversation.

 9              THE COURT:  You are going to do this without talking

10    about what was done in England specifically?

11              MR. DUNNEGAN:  Yes.  The English store is just the

12    trigger of the conversation about the United States.

13              MR. BASSEN:  No objection to that.

14              MR. DUNNEGAN:  Okay.  (Reading:)

15    "Q.  And Ann Byron was the vice president of human resources

16    and Ann Byron was in favor of giving the women in United States

17    a clothing allowance.  Ann Byron told you in that conversation

18    she was in favor of giving women in the United States a

19    clothing allowance.  At the time you weren't opposed to giving

20    women in the United States a clothing allowance.

21              Then you were the -- you too were in the human

22    resources department.  There was an employee in Varvatos named

23    Wayne Meichner?"

24              THE COURT:  I haven't heard anything about UK in a

25    long time.  Is UK going to come up again?

K2PAAKNO2                          Chang - Direct

 1              MR. DUNNEGAN:  No.  I'm reading my script and I don't

 2      see any real reference to the UK going forward.  It's just the

 3      trigger of the conversation about the United States.

 4              THE COURT:  Okay.

 5              MR. BASSEN:  Well, no problem with the UK, but I have

 6      a different objection.  The different objection is what Ann

 7      Byron told them.  Ann Byron is going to be testifying in this

 8      case.  Why is --

 9              THE COURT:  Is she not a high-level Varvatos person?

10              MR. BASSEN:  Yes.

11              THE COURT:  Why isn't there a statement a party

12      opponent?

13              MR. BASSEN:  Well, first of all, I don't think it's

14      true that Ann Byron said it.

15              MR. DUNNEGAN:  Well, she testified to it.

16              THE COURT:  If that's your objection, let's go back in

17      there.  It is overruled.

18              (Continued on next page)

19

20

21

22

23

24

25

Case 1:17-cv-50623-MFW   Doc 10-2   Filed 07/07/20   Page 65 of 242
Case 1:17-cv-50072-GWG   Document 340   Filed 03/05/20   Page 64 of 241        122
K2PAAKNO2                          Chang - Direct

 1            (In Open Court)

 2            THE COURT:  We're close to the time we take our

 3    midmorning break.  The witness needs to use the ladies' room.

 4    Maybe some others need to use the ladies' room.

 5            Fifteen minutes.

 6            MR. DUNNEGAN:  Your Honor, can we ask counsel for

 7    defendant not to --

 8            THE COURT:  Witness and attorney should not speak

 9    during the break.

10            MR. BASSEN:  We weren't planning to.

11            THE COURT:  I don't think so.  Thanks, everyone.  So

12    return to your jury room in about 15 minutes.

13            (Recess)

14            THE COURT:  Ms.~Chang, you can come back on the stand.

15    We're going to pick up from there.

16            MR. DUNNEGAN:  Your Honor, I can go back one question

17    and create some context.

18            (Jury present)

19            THE COURT:  All right.  Everyone, if you recall

20    Ms. Chang was on the stand before our break, and she is still

21    of course under oath and Mr. Dunnegan is asking questions.  He

22    is going to repeat whatever the last question was so we have

23    the context.

24    BY MR. DUNNEGAN:

25    Q.  I believe my last question was you understood back in 2014

K2PAAKNO2                    Chang - Direct

1    that men's sales professionals in the London store got a

2    clothing allowance, right?

3    A.  Yes.

4    Q.  And back in the same time period, in 2014, would you please

5    tell the jury whether or not the women sales professionals in

6    the London office got a clothing allowance?

7            MR. BASSEN:  Objection, your Honor.  I thought we just

8    went over all this and it was supposed to respark the

9    conversation.

10           THE COURT:  Well, this question -- without getting

11   into anymore detail, you can answer that question.

12           THE WITNESS:  Could you repeat question, please?

13           MR. DUNNEGAN:  Can we have the court reporter read it,

14   your Honor?

15           THE COURT:  I'll just read it.  "Ms. Chang, did the

16   women's sales professionals in the London office get some sort

17   of clothing allowance?"

18           THE WITNESS:  Yes.

19   BY MR. DUNNEGAN:

20   Q.  Now, at about the time that Varvatos opened the store in

21   London in 2014 --

22           THE COURT:  I'm sorry.  This is the moment that I have

23   to instruct you on something.

24           What happened in London is not directly relevant to

25   anything here.  What's very important is that the law in

K2PAAKNO2                        Chang - Direct

1     London, which is part of the United Kingdom, is not United

2     States law.  And there is nothing in the record about what that

3     law is.

4            Nothing that happened in the United Kingdom in terms

5     of who did or did not get a clothing allowance has any bearing

6     about what would be required or appropriate in the United

7     States.

8            You are not to think about it for that purpose.  It

9     may be something entirely different.  The fact that there was

10    some different policy in the UK should not be used by you to

11    make any determination about whether Varvatos was required to

12    have a policy in the United States.  It's being provided to you

13    merely for background for what prompted a discussion following

14    that.

15           Go ahead, Mr. Dunnegan.

16    BY MR. DUNNEGAN:

17    Q.  Now, around the time that Varvatos opened the store in

18    London in 2014, you had a conversation with Ann Byron about the

19    John Varvatos clothing allowance, right?

20    A.  Yes.

21    Q.  And in that conversation you talked to Ann Byron about the

22    possibility that Varvatos would give women's sales

23    professionals in the United States a clothing allowance, right?

24    A.  Yes.

25    Q.  And at that time Ann Byron's title was vice president of

K2PAAKNO2                        Chang - Direct

1    human resources, right?

2    A.  Yes.

3    Q.  Was Ann Byron, at that time the vice president of human

4    resources, in favor of giving women's sales professionals in

5    the United States a clothing allowance?

6           MR. BASSEN:  Objection, unless there is evidence that

7    Ann Byron was the decision maker, and 403.

8           THE COURT:  Is this a hearsay objection?

9           MR. BASSEN:  No.  It's an objection.  It's lack of

10   foundation, lack of relevance.  Highly prejudicial.  Unless she

11   was a decision-maker on the policy, who cares?  And it's very

12   prejudicial.

13          THE COURT:  Hold on a second.  Let's just have a talk.

14   Sorry, folks, stay where you are.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

K2PAAKNO2                    Chang - Direct

1          (Sidebar)

2          THE COURT:  Okay.  So, I'm surprised we didn't deal

3     with this before, but now the objection is that this person is

4     not high up enough to -- try me again.  What is the objection?

5          MR. BASSEN:  That she is not the decision-maker.

6          THE COURT:  Why is that relevant?

7          MR. BASSEN:  Well, because it's, number one,

8     prejudicial, highly prejudicial.  Number two, the real question

9     here is whether they're required to do it, not whether

10    someone's in favor ever it.  Number three --

11         THE COURT:  Let me take them one at a time.  I expect

12    Mr. Dunnegan only to offer evidence that is prejudicial to you,

13    so that doesn't do much for me.

14         What was your second one just now?

15         MR. BASSEN:  The second one, the question here is

16    whether it's legally required.

17         THE COURT:  Oh, right.  But their knowledge under

18    Title VII is very important.  It's important for defenses and

19    whether people were acting intentionally.  So that's rejected.

20         What else do you have?

21         MR. BASSEN:  Well, you already said, your Honor, that

22    everything is prejudicial.  Then what's point of 403?

23         THE COURT:  No, that's a balance.  The mere fact

24    that's it's prejudicial can't be the first argument.  There has

25    to be a balancing problem.

1          MR. BASSEN:  The fact is that there is no evidence

2     that she is a decision-maker as to this policy, as to why they

3     have the policy, when it was implemented, whether anyone can --

4          THE COURT:  Is there going to be any foundation on

5     that, her being responsible for this?

6          MR. DUNNEGAN:  She is the vice president of human

7     resources.  She recommended it.  She talked about it with

8     somebody and the testimony has been -- it's been very clear

9     from the deposition, the policy was rejected because it was not

10    financially feasible.

11         THE COURT:  Okay.  But what was her involvement in the

12    policy?

13         MR. DUNNEGAN:  She was pushing it.  She was

14    recommending it.  She was in favor of it.

15         THE COURT:  So then she's recommending it to whom?

16         MR. DUNNEGAN:  That's not clear.

17         THE COURT:  She acts as if her recommendation had some

18    importance for the company in terms of its decision?

19         MR. DUNNEGAN:  Obviously.  She is vice president of

20    human resources.

21         MR. BASSEN:  Well, if it was obvious, then why didn't

22    they adopt her recommendation?

23         THE COURT:  No, no, that's enough.  So you've given me

24    enough to shows there's a foundation a testimony.  So as long

25    as that's coming out.

K2PAAKNO2                         Chang - Direct

1              MR. DUNNEGAN:  That's what I got.

2              THE COURT:  Let's go forward.  The objection is

3    overruled.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2PAAKNO2                          Chang - Direct

1            (In Open Court)

2            THE COURT:  We're going to continue.  Overruled the

3    objection.

4    BY MR. DUNNEGAN:

5    Q.  I believe my question was was Ann Byron, the vice president

6    of human resources at Varvatos, in favor of giving women in the

7    United States a clothing allowance?

8            MR. BASSEN:  Continuing objection.

9            THE COURT:  Go ahead.  You can answer.

10           THE WITNESS:  I'm not sure what her personal

11   sentiments and feelings were about the policy.  We were

12   discussing it from a more objective context and perspective.

13   BY MR. DUNNEGAN:

14   Q.  Now, you remember your deposition being taken on

15   October 16th of 2017, right?

16   A.  Yes.

17   Q.  Okay.  And I'd like to for the benefit of defense counsel

18   refer them to page 21, lines 13 through 15.

19           Were you asked the following question and did you give

20   the following answer?

21   "Q.  Was Ann Byron in favor of giving women a clothing

22   allowance in the U.S.?

23   "A.  Sure, yes."

24           Did you give that testimony?

25   A.  Yes.

1   Q.  Was that correct at the time you gave it?

2   A.  Yeah.

3   Q.  So Ann Byron told you in that conversation you had with her

4   in 2014 that she was in favor of giving women in the United

5   States a clothing allowance, right?

6   A.  She must have if that's how I answered.  It's been a while.

7   Q.  And in that timeframe you weren't opposed to giving women

8   in the United States a clothing allowance, right?

9   A.  In that timeframe, I wasn't opposed to it?

10  Q.  Correct.

11  A.  No.

12  Q.  Now, in 2014 Varvatos had an employee by the name of

13  Wayne -- and I may be in pronouncing this incorrectly --

14  Meichner?

15  A.  Wayne Meichner, yes.

16  Q.  What was the position of Mr. Meichner at Varvatos in the

17  2014 or so timeframe?

18  A.  His title was president of retail.

19  Q.  Did he leave the company at some point in time?

20  A.  He left the company shortly before Ann Byron did.

21  Q.  That would have been about when?

22  A.  Sometime in 2017.

23  Q.  And you understand that Ann Byron had a conversation with

24  Wayne Meichner that concerned whether women's sales

25  professionals in the United States should receive a clothing

K2PAAKNO2                              Chang - Direct

1    allowance, correct?

2    A.   Correct.

3    Q.   And you really don't know anything about that conversation

4    other than the fact that it happened, correct?

5    A.   Correct.

6    Q.   Now, other than the conversation that you had with Ann

7    Byron that you told us about a moment ago, and other than the

8    conversation that Ann Byron had with Wayne Meichner that you

9    told us happened, isn't it correct that you aren't aware of any

10   other conversation about whether women's sales professionals in

11   the United States should receive a clothing allowance?

12             MR. BASSEN:  Objection.

13             THE COURT:  Hold on.

14             Conversations with whom?  It's little unclear who you

15   are talking about.

16             MR. DUNNEGAN:  Okay.

17   BY MR. DUNNEGAN:

18   Q.   Among employees of Varvatos, other than the conversation

19   that you had with Ann Byron that you told us about a moment

20   ago, and other than the conversation that Ann Byron had with

21   Wayne Meichner that you told us about a moment ago, isn't it

22   correct that you're not aware of any other conversation among

23   employees at Varvatos about whether women's sales professionals

24   in the United States should receive a clothing allowance?

25             MR. BASSEN:  Objection.

K2PAAKNO2                    Chang - Direct

 1          THE COURT:  Overruled.  You can answer it.

 2          THE WITNESS:  I don't recall.

 3  BY MR. DUNNEGAN:

 4  Q.  You don't recall being aware of any other conversation?

 5  A.  About hearing of it, no.

 6  Q.  I didn't hear you?

 7  A.  I don't recall hearing about any other conversations, no.

 8  Q.  Now, obviously women's sales professionals in the United

 9  States never got a clothing allowance, right?

10  A.  During time that I was with the company, no.

11  Q.  Now, some person or group of people at Varvatos decided

12  that women's sales professionals in the United States shouldn't

13  get a clothing allowance, right?

14          THE COURT:  At what time period are you talking about?

15  Are you talking about some point in time in history?

16          MR. DUNNEGAN:  Before today.

17          THE COURT:  Okay.

18          MR. BASSEN:  Objection.  Asked and answered.

19          THE COURT:  I think you did ask it, but you can answer

20  it again.  It's all right.

21          THE WITNESS:  The question is the company actively

22  making a decision to not provide it to women?

23  BY MR. DUNNEGAN:

24  Q.  Well, somebody made a decision that they weren't going to

25  provide a clothing allowance to women.  That happened at some

1   point in time, correct?

2   A.  Yes.

3   Q.  Okay.  Isn't it true that Varvatos decided not to give

4   women's sales professionals in the United States a clothing

5   allowance because Varvatos decided that doing so would not be

6   financially feasible?

7          MR. BASSEN:  Objection.

8          THE COURT:  Overruled.

9          THE WITNESS:  Yeah, I'm sure financial feasibility is

10  one of the factors that were considered in making the decision.

11  BY MR. DUNNEGAN:

12  Q.  Well, didn't the financial feasibility put an end to the

13  clothing allowance for women discussion?

14         MR. BASSEN:  Objection.  How would me possibly know

15  that?

16         THE COURT:  I think we need a little bit in terms of

17  who she is talking to in terms of her giving an answer to that

18  question.  Is there something you can do on that?

19         MR. DUNNEGAN:  I can muddle through something like

20  that, your Honor.

21         THE COURT:  All right.

22  BY MR. DUNNEGAN:

23  Q.  Now, after you had the conversation with Ann Byron about a

24  clothing allowance for women's sales professionals in the

25  United States, you never talked about it with Ann Byron again,

1  right?

2  A.  Yes.

3  Q.  Correct?

4  A.  Correct.

5  Q.  Now, in that conversation that you had with Ann Byron, did

6  she tell you in any sort of detail what the clothing allowance

7  for women's sales professionals in the United States would

8  involve?

9  A.  What do you mean, "it would involve"?

10  Q.  What type of benefit would it be?

11  A.  No.  I don't recall.

12  Q.  She didn't tell you what kind of benefit it would be,

13  correct?

14  A.  What kind of benefit a clothing allowance would be?

15  Q.  Well, a clothing allowance benefit for the women's sales

16  professionals in the United States.  She hadn't fleshed that

17  out at all, had she?

18  A.  What do you mean by she hadn't fleshed that out?

19  Q.  She hadn't come up with any details about what type of

20  clothing allowance benefit could be offered to United States

21  sales professionals who were women?

22  A.  I don't recall us discussing it in that detail of how

23  women's sales professionals would be provided a men's wear

24  clothing allowance, no.

25  Q.  Isn't it true that when you had that conversation with Ann

K2PAAKNO2                    Chang - Direct

 1   Byron back in 2014 Ann Byron had realized that it wasn't

 2   financially feasible to provide any type of clothing allowance

 3   benefit for women's sales professionals, so at that moment it

 4   stopped right there?

 5           MR. BASSEN:  Objection.  How would she know what Ann

 6   Byron realized?

 7           THE COURT:  Yeah, the word "realize" struck me too.

 8   So maybe break it down a little bit in terms of are we talking

 9   about a specific conversation and what did she say.  That is

10   probably better.

11           MR. DUNNEGAN:  Okay.

12   BY MR. DUNNEGAN:

13   Q.  Now, let's go back and focus on that conversation that you

14   had with Ann Byron about the possibility of giving women sales

15   professionals in the United States some sort of clothing

16   allowance benefit.  Okay, are you with me?

17   A.  Yes.

18   Q.  Now, how long did that conversation last?

19   A.  I honestly don't remember.

20   Q.  Where did it take place?

21   A.  Probably in her office.

22   Q.  At the corporate headquarters?

23   A.  Yes.

24   Q.  And was anyone else there besides the two of you?

25   A.  I'm pretty sure it was just the two of us.

K2PAAKNO2                    Chang - Direct

1    Q.  Now, that's the conversation in which she told you that she

2    was in favor of giving a clothing allowance benefit to women as

3    sales professionals in the United States, right?

4              MR. BASSEN:  Objection; asked and answered several

5    times.

6              THE COURT:  Overruled.

7              Go ahead.

8              THE WITNESS:  Was that the conversation we had about

9    clothing allowances, yes.

10   BY MR. DUNNEGAN:

11   Q.  She told you she was in favor of giving women's sales

12   professionals in the United States a clothing allowance?

13             MR. BASSEN:  Objection; asked and answered yet again.

14             THE COURT:  Except the witness didn't quite answer it.

15             Did she in fact say that?

16             THE WITNESS:  I don't actively remember -- recall her

17   saying or remember from the conversation that it was based

18   because she was in favor of it, but yes, we had a conversation

19   about clothing allowances.

20   BY MR. DUNNEGAN:

21   Q.  I'm sorry, you just told us that you don't remember whether

22   she mentioned that she was in favor of it?

23   A.  I don't remember, yeah.

24   Q.  Well, you don't doubt that during this time period Ann

25   Byron was in favor of giving a clothing allowance to women

1    sales professionals, correct?

2              MR. BASSEN:  Objection.

3              THE COURT:  Overruled.  Do you know the answer to that

4    question?

5              THE WITNESS:  If Ann Byron was a favor of giving

6    clothing allowance to female sales associates?

7    Q.  That's the question.

8              THE COURT:  Do you know one way or the other?

9              MR. DUNNEGAN:  I don't know with one hundred percent

10   sure if she was in favor of it or not.

11   BY MR. DUNNEGAN:

12   Q.  Well, putting aside the hundred percent, isn't it your

13   understanding that Ann Byron was in favor of giving women a

14   clothing allowance in the United States when you had this

15   conversation with her?

16             THE COURT:  I think at this point you've gotten your

17   answer so let's go on.

18             MR. DUNNEGAN:  Okay.

19   BY MR. DUNNEGAN:

20   Q.  In that conversation did Ann Byron tell you in words or in

21   substance that the clothing allowance for female sales

22   associates in the United States was not financially feasible?

23   A.  Yes.  She may have mentioned that.

24   Q.  Do you have any doubt that she did?

25   A.  No, but I'm not a hundred percent sure of it either.

K2PAAKNO2                    Chang - Direct

1    Q.  And after Ann Byron had that conversation with you, you and

2    Ann Byron never -- at least before the filing of this

3    lawsuit -- never discussed the clothing allowance for women

4    sales professionals in the United States again, correct?

5            MR. BASSEN:  Objection; specifically asked and

6    answered.

7            THE COURT:  You can answer it.  Go ahead.

8            THE WITNESS:  No.

9            THE COURT:  You got your answer.  It was no.

10   BY MR. DUNNEGAN:

11   Q.  Didn't you understand that the reason that Varvatos decided

12   not to give women's sales professionals in the United States a

13   clothing allowance was specifically because it was not

14   financially feasible?

15           MR. BASSEN:  Objection.

16           THE COURT:  This was the thing I felt I wanted some

17   foundation for, I think, how she knows what Varvatos decided or

18   didn't decide.

19           MR. DUNNEGAN:  Well, let me, your Honor, if I may try

20   this.

21           THE COURT:  Okay.

22   BY MR. DUNNEGAN:

23   Q.  Didn't you understand that Varvatos -- didn't you

24   understand that at the time of that conversation with Ann Byron

25   back in 2014 that Varvatos had decided not to proceed with the

1   women's clothing allowance for sales professionals in the

2   United States because it was not financially feasible?

3            MR. BASSEN:  Objection.

4            THE COURT:  Are you asking based on that conversation

5   with Ann Byron?

6            MR. DUNNEGAN:  Yeah.

7            THE COURT:  Okay.  Did you have a reason to believe

8   Ann Byron was making the decision about whether there would a

9   clothing allowance or not.

10           THE WITNESS:  Solely because of financial feasible.

11           THE COURT:  No, no.  Just in general, was that a role

12  that she played about deciding whether to have a clothing

13  allowance or not?

14           THE WITNESS:  She wasn't a sole decision maker.

15           THE COURT:  Was she involved?

16           THE WITNESS:  She was involved with the decision

17  making.

18           THE COURT:  Okay.  So then the question is -- try the

19  question again with that background.

20           MR. DUNNEGAN:  Okay.

21  BY MR. DUNNEGAN:

22  Q.  Although other people may have been involved in the

23  decision not to have a women's clothing allowance for sales

24  professionals in the United States, didn't you understand at

25  the time of your conversation with Ann Byron based upon what

1   Ann Byron told you about it that the decision was made because
2   the women's clothing allowance for sales professionals in the
3   United States was not financially feasible?
4           MR. BASSEN:  Objection.
5           THE COURT:  The objection is?
6           MR. BASSEN:  The same that we have been going over.
7   There's no foundation that this was the decision of the company
8   based on something that Ann Byron said solely based on
9   financial feasibility, and the fact of Ann Byron mentioning
10  something about it means that that is the reason there was no
11  clothing allowance for women or that she would know anything
12  about that.
13          THE COURT:  I think it's better if we just make it
14  specific as to facts of her conversation with Ms. Byron.
15          So did the issue, Ms. Chang, of financial feasibility
16  come up in the conversation with Ms. Byron?
17          THE WITNESS:  That was one of the reasons, yeah.  It
18  came up.
19          THE COURT:  And it was expressed to you by Ms. Byron
20  that financial considerations were being used how?  What did
21  she say in terms of financial consideration.
22          THE WITNESS:  Financial considerations were a part of
23  the discussion to see if it was feasible, along with other
24  factors.
25          THE COURT:  Discussion between you and her, or she was

Case 1:17-cv-50623-MFW Doc 10-2 Filed 07/07/20 Page 84 of 242
Case 1:17-cv-00772-GWG Document 340 Filed 03/05/20 Page 84 of 241          141
K2PAAKNO2                    Chang - Direct

1   recounting a discussion between her and others?

2            THE WITNESS:  With others, not with me.

3            THE COURT:  Okay.  So she was recounting the

4   discussion she had with other people and she said that

5   financial feasibility was one of the issues?

6            THE WITNESS:  Yes.

7            MR. DUNNEGAN:  Okay.

8   BY MR. DUNNEGAN:

9   Q.  Didn't she tell you in that conversation that when it was

10  realized that it wasn't financially feasible for Varvatos to

11  have a clothing allowance for women's sales professionals, at

12  that moment it stopped right there?

13           MR. BASSEN:  Objection.

14           THE COURT:  Overruled.  Did she tell you that?

15           THE WITNESS:  I don't remember -- I don't think so.

16  You're asking if -- to the point that they got to the financial

17  part of the discussion and they just stopped talking about it?

18  BY MR. DUNNEGAN:

19  Q.  Essentially, yeah.

20  A.  Is that what you are asking -- I don't know.

21  Q.  Let me see if this refreshes your recollection.  I am going

22  to read from the October 26, 2017 deposition beginning, page

23  22, beginning at line six.

24           And the question was:

25  "Q.  And clothing allowance that Ann Byron was considering a

1   possibility of giving to women in the U.S., do you know

2   anything about what kind of form such a program would have

3   taken?"

4           Your answer?

5   "A.  No.  I honestly do not think that she thought that far

6   into it.  I think there were some initial discussions on

7   wanting to do it and can we do it.  And when it was realized

8   that it wasn't financially feasible for us to do it, at that

9   moment it stopped right there.  So I don't think she went ahead

10   and started thinking about what the structure of the allowance

11   would look like for women."

12          Do you remember being asked that question and giving

13   that answer?

14   A.  Now that you've read it back to me, I remember the question

15   and I remember answering what my personal thoughts and opinions

16   were on it, yes.

17   Q.  Well, when you gave that answer was that a truthful answer?

18   A.  Yes.

19   Q.  So to the best of your understanding at the time you had

20   that conversation with Ann Byron back in 2014, you understood

21   that Varvatos decided not to give women's sales professionals a

22   clothing allowance because Varvatos didn't think it was taking

23   in enough money to give women's sales professionals a clothing

24   allowance, right?

25          MR. BASSEN:  Objection.

1     THE COURT:  Hold on, Ms. Chang.

2           Overruled.  If you know the answer to that question,

3     you can answer it, and if you don't, you don't.

4           THE WITNESS:  I mean financially feasibility, I spoke

5     about it in broad terms.  I don't recall or remember saying

6     it's because they weren't bringing enough money.  I think

7     that's what you had said earlier.

8     BY MR. DUNNEGAN:

9     Q.  Well, when something -- in your understanding if something

10    is not financially feasible, doesn't that mean we don't want to

11    pay for it?

12    A.  Well, it could mean that we can't pay for it as opposed to

13    we don't want to pay for it, but thinking about things in

14    financial feasibility is just all businesses do that to make

15    sure that they can stay profitable.

16    Q.  Okay.  Now, if -- let me ask you this.  Do you know the

17    approximate number of women sales professionals that Varvatos

18    had or employed in the United States as of when you took over

19    the job from Ann Byron in the spring of 2017?

20    A.  No, I do not remember the approximate number of sales

21    professionals in the spring of 2017.

22    Q.  Can you give us your best estimate?

23    A.  I don't feel comfortable giving an estimate.

24    Q.  If I told you it was 25, would you think that that was way

25    out of line?

K2PAAKNO2                    Chang - Direct

1    A.  I'm not sure.  Over three years ago.

2    Q.  Back at the time of your conversation with Ann Byron about

3    the possibility of giving a women's clothing allowance to

4    women's sales professionals in the United States, did you have

5    any understanding of what kind of cash demand that would place

6    on Varvatos?

7    A.  No.

8    Q.  Did you do any calculation to try to figure it out?

9    A.  I did not do any mathematical calculation to try to figure

10   that out, no.

11   Q.  Do you know whether anybody at Varvatos did any

12   mathematical calculation to try to figure it out?

13   A.  I don't know for sure whether someone else did or did not.

14   I would think that someone did but I don't know for sure.

15   Q.  Do you have any understanding of the approximate amount of

16   money that it would take Varvatos to give female sales

17   professionals in the United States a $12,000 cash clothing

18   allowance back in the spring of 2017?

19            MR. BASSEN:  Objection; asked and answered.

20            THE COURT:  Overruled.  You can answer if you know.

21            THE WITNESS:  No.

22   BY MR. DUNNEGAN:

23   Q.  Well, I don't want to ask you to do arithmetic, but could

24   you agree with me if Varvatos had ten women's sales

25   professionals in the United States and it gave them a $12,000 a

K2PAAKNO2                    Chang - Direct

1    year cash clothing allowance, that would cost $120,000?

2              MR. BASSEN:  Objection; there is no cash clothing

3    allowance.

4              THE COURT:  I think what you want to do is save some

5    of this for argument.  Let's use this witness for her

6    knowledge.

7              MR. DUNNEGAN:  I think you're correct.  Excuse me for

8    one moment, your Honor.

9              THE COURT:  It's all right.

10             MR. DUNNEGAN:  Your Honor, may I approach the witness

11   for the purpose of handing her a document which may refresh her

12   recollection?

13             THE COURT:  As to what?

14             MR. DUNNEGAN:  The number of female sales associates

15   or sales professionals in the United States as of the spring of

16   2017.

17             THE COURT:  Okay.

18             MR. DUNNEGAN:  May I approach?

19             THE COURT:  Sure.

20             THE WITNESS:  Thank you.

21             THE COURT:  I think we're waiting for you,

22   Mr. Dunnegan.  I think you should, even though it's not in

23   evidence, just say or purpose of record what you're showing

24   her.

25             MR. DUNNEGAN:  For the purposes of the record, I have

 1    shown her what was previously marked as Exhibit 26, which is

 2    not in evidence.  I have put an A on it because I have put

 3    certain numbers to count on the document.

 4                THE COURT:  Okay.

 5                MR. BASSEN:  Well, it's not in evidence, your Honor.

 6                THE COURT:  I understand.  It's being used to refresh

 7    her recollection.  Okay.  Now that it's been identified, you

 8    were about to ask her a question.

 9    BY MR. DUNNEGAN:

10    Q.  Does that refresh your recollection?

11                THE COURT:  As to?

12    BY MR. DUNNEGAN:

13    Q.  As to the approximate number of sales professionals who are

14    women that Varvatos employed in the -- let's say March 1st of

15    2017 timeframe?

16    A.  Well, yes, this is apparently a list of all --

17                THE COURT:  Ms. Chang, if we are going to do this

18    technically you are supposed to now not look at it.  Think in

19    your brain if it now causes you to remember the number.  And if

20    it doesn't, then your answer is no.  If you need to look at in

21    in order to answer, then the answer is no, it doesn't refresh

22    your recollection.

23                If the only way you can answer is by using that

24    document, it's the answer, but if you remember it now then can

25    you tell him.

K2PAAKNO2                    Chang - Direct

1              THE WITNESS:  No.  I would have to look at the
2    document.
3    BY MR. DUNNEGAN:
4    Q.  Well, just to be clear, I wasn't asking you if it refreshed
5    your recollection as to a specific number.  I was asking if it
6    refreshed your recollection as to an approximate number or
7    range of female sales professionals employed in the spring of
8    2017.
9    A.  Just by glancing at the document?
10             THE COURT:  No, no.  Turn it over.  Don't look at it.
11   Search your memory.  Is your memory now refreshed as to the
12   approximate number of sales professionals?
13             THE WITNESS:  Unfortunately, no.
14             THE COURT:  Okay.  That's your answer.
15   BY MR. DUNNEGAN:
16   Q.  Now, I want to focus on sales professionals who asked you
17   about a women's clothing allowance.  Okay?
18   A.  Okay.
19   Q.  Now, some of those women's sales -- some women's
20   professionals at Varvatos have asked you, Nicole Chang,
21   personally if they got a clothing allowance, right?
22   A.  Yes.
23   Q.  Isn't it correct that between five and ten women while you
24   were still employed by Varvatos asked you whether or not they
25   got a clothing allowance?

K2PAAKNO2                    Chang - Direct

1    A.  I don't remember the number, but I know on more than one

2    occasion, yes, I have been asked.

3    Q.  And some of those sales associates have asked you in

4    person?

5    A.  Yes.

6    Q.  And some of those sales professionals have asked you by

7    e-mail?

8    A.  Yes.

9    Q.  Now, if I could call your attention to Exhibit 18 in your

10   book or in the pile in front of you.

11           MR. DUNNEGAN:  Your Honor, I think this would be an

12   appropriate time to ask the jurors to look at the exhibits.

13           THE COURT:  Okay.  Jurors, take your notebook out and

14   look at 18.  Do you want them to read it?

15           MR. DUNNEGAN:  I am going to move along, your Honor,

16   if that's okay with you.

17           THE COURT:  Yes.

18   BY MR. DUNNEGAN:

19   Q.  Now, Exhibit 18 is an e-mail chain between you and a woman

20   by the name of Laurentina Shaparo, correct?

21   A.  Correct.

22   Q.  You understood she is a sales professional at Varvatos,

23   correct?

24   A.  Yes.

25   Q.  And she wrote to you on September 1st of 2016, right?

1    A.   Yes.

2    Q.   Okay.  And part of what she said was --

3              THE COURT:  We're now looking at the page with the 25

4    at the bottom, OOOO25.  Second page?

5              MR. DUNNEGAN:  Yes.  Yes, your Honor.

6    BY MR. DUNNEGAN:

7    Q.   She writes:

8              "Hi, Nicole, I hope you are doing

9    great.  I wanted to follow up with you on the

10   women's clothing allowance that was discussed in

11   2015 during our onboarding that would take effect

12   in 2016.  The last I inquired, it would be in the

13   third quarter of 2016.  Can you let me know what

14   the status is?  I am trying to budget my fall

15   wardrobe."

16             Do you remember her writing that to you?

17   A.   Yes.

18   Q.   Okay.  You responded to that e-mail, correct?

19   A.   Yes.

20   Q.   And your response is on the first page of Exhibit 18,

21   right?

22   A.   Yep.  Yes.

23   Q.   And you wrote on the first page of 18:

24             "Hi, Laurentina, hope you are doing

25   just great [smiley face].  My apologies for the

K2PAAKNO2                    Chang - Direct

1    delayed reply.  It was my first day back from

2    vacation today."

3              Then you write:

4              "Unfortunately as of now we do not

5    have a clothing allowance program outside of the

6    50 percent discount from AllSaints.  We had hoped

7    to be able to roll something out this year.

8    However, it does not seem like we will until

9    2017."

10             Did you write that?

11   A.  Yes.

12   Q.  You told her to expect a clothing allowance sometime in

13   2017?

14             MR. BASSEN:  Objection.  This document speaks for

15   itself.

16             THE COURT:  Overruled.  You can answer it.

17             THE WITNESS:  I didn't --

18             THE COURT:  Just answer.  You told her --

19             THE WITNESS:  No.  I didn't say expected.  I meant

20   like it might happen, it might not.

21   BY MR. DUNNEGAN:

22   Q.  Now, let me ask you about -- well, in that e-mail you

23   stared the paragraph with the word "unfortunately."  Do you see

24   that?  Did you think what you were going to write was

25   unfortunate?

K2PAAKNO2                    Chang - Direct

```
 1   A.  No.

 2   Q.  Why did you use word unfortunately then?

 3   A.  I mean I knew she was probably expecting a different

 4   answer, like, yes, we do provide of clothing allowances to

 5   women, but we don't, so I think that's same when you say you're

 6   sorry when you're really not.

 7   Q.  Now, if we could move from Exhibit 18 to Exhibit 20.

 8           THE COURT:  You want the jurors to look at it?

 9           MR. DUNNEGAN:  Please.

10   BY MR. DUNNEGAN:

11   Q.  Now, Exhibit 20 is an e-mail chain?

12   A.  Yes.

13   Q.  And you had it with an individual by name of Tessa Knox?

14   A.  Yes.

15   Q.  And she is the individual who started this lawsuit?

16   A.  Yes.

17   Q.  And on the second page of the exhibit, which has 1936 at

18   the bottom right, that's an e-mail from Tessa Knox to the human

19   resources department at John Varvatos, right?

20   A.  Yes.

21   Q.  Okay.  And she says, "Hi, Daniel."  Skip the first

22   sentence -- well:

23           "Hope you enjoyed the holidays and

24   your 2017 time off.  2017 is off to a great start.

25   I wanted to reach out to clarify a company policy.
```

K2PAAKNO2                        Chang - Direct

 1   I was informed that all employees are to receive

 2   $6,000 worth of clothing for a wardrobe per year.

 3   Is this correct?  I spoke with my manager, but he

 4   didn't have a clear answer, although he informed

 5   me that he in fact does get this benefit.

 6              "If this is the case, I would like to

 7   receive mine, as I haven't gotten it yet.  Thanks

 8   so much and looking forward to your response."

 9              Do you remember receiving that?

10   A.  I remember Daniel forwarding that to me, yes.

11   Q.  And you ultimately received that because it was forwarded

12   to you, right?

13   A.  I just said that, yes.

14   Q.  Okay.  Now, page one of Exhibit 20 is your response to

15   Tessa Knox, right?

16   A.  Yes.

17   Q.  Now, in the third full paragraph you responded:

18              "Unfortunately at this time we do not

19   provide a clothing allowance for female employees.

20   You are eligible to receive a discount on John

21   Varvatos items as per the attached and a

22   50 percent discount with our sister company

23   AllSaints (see attached)."  You wrote that?

24   A.  Yes.

25   Q.  And I take it you are going to tell us that you used the

K2PAAKNO2                    Chang - Direct

1    word unfortunately because you wanted it to seem like you were

2    being sorry when you really weren't?

3    A.    That wasn't what I meant when I said that earlier, but.

4            THE COURT:   That's fine.   The question is confusing.

5    BY MR. DUNNEGAN:

6    Q.    Were you sorry that there wasn't a clothing allowance at

7    that period in time?

8    A.    No, I wasn't sorry.

9    Q.    Were you opposed to giving women a clothing allowance

10   during that period in time.

11   A.    No, I wasn't opposed to giving women a clothing allowance.

12   Q.    And do you remember that when your deposition was taken you

13   didn't know why you had used word unfortunately, correct?

14   A.    Correct.

15   Q.    Now, I'm not looking for a number.   I am just asking for a

16   yes or no answer to the following question.   Do you know how

17   much the most highly paid employee of Varvatos made in the 2017

18   or so time period?

19   A.    No.

20   Q.    No?   Now I am going to try to move a little bit faster.

21   Now, you understand that one of the purposes for the clothing

22   allowance policy is that so men can wear the Varvatos clothing

23   while we're on the sales floor, right?

24   A.    Yes.

25   Q.    Okay.   Now, sitting here today, do you see or understand

1   that there is any need far Varvatos to have the men's sales

2   professionals own the clothes that they're wearing on the sales

3   floor?

4   A.  See a need for it?  No.

5   Q.  And if a customer sees a Varvatos sales professional on the

6   retail floor, that customer can't tell whether or not the man

7   sales professional owns the clothes he's wearing or is just

8   using them as like a uniform, right?

9   A.  Correct.

10  Q.  And to your knowledge, no one has ever done any

11  investigation to determine whether Varvatos could lend the

12  clothes to men's sales professionals and take them back at end

13  of the season?

14          MR. BASSEN:  Objection.

15          THE COURT:  Overruled.  You can answer if you know the

16  answer.

17          THE WITNESS:  I don't believe there was an actual

18  assessment, but the whole intention of providing a clothing

19  allowance to the male sales associates, as has been said

20  earlier.  Is the fact that they're supposed to model the

21  merchandise and act as walking billboards, in a sense.

22          And the point of that is it's also a selling tool to

23  show customers when they're walking in to see our merchandise

24  on different body shapes, sizes, tall, short, et cetera.  So

25  these items typically have to be tailored or taken in.  The

K2PAAKNO2                    Chang - Direct

```
 1   hems might have to be shortened or let out a little bit, or may
 2   need to be taken in somewhere.  So we can't realistically take
 3   that back.  It's not something that we can resell to customers.
 4   Q.  But if you took it back, you could at least donate it to
 5   charity, right?
 6           THE COURT:  I think it's in the nature of argument,
 7   Mr. Dunnegan.
 8           MR. DUNNEGAN:  Thank you.
 9   BY MR. DUNNEGAN:
10   Q.  Now, I would like to go back to the employee handbook,
11   which is Exhibit 2.  I believe you have Exhibit 2-A.  I believe
12   that's going to be easier for us.
13           THE COURT:  Should the jury look at this?
14           MR. DUNNEGAN:  Yes, your Honor, the jury should look
15   at this.
16   BY MR. DUNNEGAN:
17   Q.  Exhibit 2-A is an excerpt from the employee handbook,
18   right, which is Exhibit 2?
19   A.  Yes.
20   Q.  Now, the second full paragraph of Exhibit 2-A has the
21   heading Equal Employment Opportunity.  Do you see that?
22   A.  Yes.
23   Q.  Okay.  And that says:
24           "The company provides equal employment
25   opportunities to all employees and applicants for
```

K2PAAKNO2                    Chang - Direct

```
 1   employment without regard to race or color,

 2   religion, sex, national origin, age, disability,

 3   genetic information or military or veteran status

 4   in accordance with applicable federal laws.

 5              "In addition the company complies with

 6   applicable state and local laws governing

 7   nondiscrimination in employment at every location

 8   in which the company has facilities.

 9              "This policy applies to all terms and

10   conditions of employment, including but not

11   limited to hiring, placement, promotion,

12   termination, transfer, leaves of absence,

13   compensation and training."

14              Do you see that?

15   A.  Yes.

16   Q.  That's what Varvatos represents to its employees, right?

17   A.  Yes.

18   Q.  And that representation was in effect as of February of

19   2017, when this case started, right?

20   A.  Yes.

21   Q.  To the best of your knowledge, does Varvatos have that

22   language in its employee handbook?

23   A.  In its employee handbook today?

24   Q.  Yeah.  Do you know?

25   A.  I don't know.
```

K2PAAKNO2                    Chang - Direct

1   Q.   Okay.  Now, do you have any understanding -- or better

2   question.  Back in 2017 did you have any understanding as to

3   whether or not plaintiff's claim that Varvatos was violating

4   the equal pay act because Varvatos was giving the clothing

5   allowance to sales professional who were men and not women was

6   discriminatory?

7        Let me withdraw the question.  Did you have an

8   understanding back in 2017 that Varvatos policy to give men a

9   clothing allowance but not women a clothing allowance was

10  discriminatory?

11       MR. BASSEN:  Objection.  Calls for a legal conclusion.

12  That's what we're here to decide.

13       THE COURT:  Well, you are not being asked whether it

14  was discriminatory or not.  You're being asked whether anyone

15  at Varvatos had a belief what they were doing was

16  discriminatory or against the law.

17       THE WITNESS:  No.

18  BY MR. DUNNEGAN:

19  Q.   You said no?

20  A.   No.

21  Q.   Well, apart from anyone at the firm of Hughes Hubbard &

22  Reed, which is defense counsel for Varvatos in this case, isn't

23  it true that Varvatos has never obtained a written legal

24  opinion as to whether or not the clothing allowance that gives

25  men but not women $12,0000 a year of free clothes is illegal

 1    discrimination --

 2              MR. BASSEN:  Objection; lack of foundation.

 3              THE COURT:  We need foundation whether she views --

 4    either move on or get a foundation.

 5              MR. DUNNEGAN:  Okay.  Let's get a foundation.

 6    BY MR. DUNNEGAN:

 7    Q.  You were responsible for updating the employee handbook, at

 8    least in part, correct?

 9    A.  Yes.

10    Q.  Okay.  And the employee handbook, as we just covered, said

11    that Varvatos was in compliance with all federal employment

12    statutes and laws, correct?

13    A.  Yes.

14    Q.  And it was in compliance with all local statutes and laws

15    wherever it had a place of business, correct?

16    A.  Yes.

17    Q.  And you were responsible at least in part for including

18    that language in the employee handbook, right?

19    A.  Yes.

20    Q.  Okay.  And you consulted with a lawyer at some point about

21    what to include in the employee handbook, right?

22    A.  Yes.

23    Q.  Okay.  And did Varvatos ever in connection with creating

24    its employee handbook get a written legal opinion from a lawyer

25    as to whether or not that the clothing allowance that gives men

1    but not women $12,000 a year in free clothes was illegal or not

2    illegal discrimination?

3          MR. BASSEN:  Objection; 403.  There's no requirement

4    to get a written legal opinion.  Prejudicial.

5          THE COURT:  Okay.  I'll overrule that objection.  You

6    can answer the question if you know whether they obtained a

7    legal opinion or not in writing.

8          THE WITNESS:  I do not know if there is a legal

9    opinion obtained in writing.

10   BY MR. DUNNEGAN:

11   Q.  You don't know of a legal opinion in writing, correct?

12   A.  Correct.

13         THE COURT:  She said she didn't know whether it

14   happened.  Anything else is argument.  Go ahead.  Next

15   question.

16   BY MR. DUNNEGAN:

17   Q.  Okay.  Now, after the filing of this lawsuit, to the best

18   of your knowledge, Varvatos has not changed its clothing

19   allowance policy, right?

20   A.  I don't know.  I don't work for the company.

21   Q.  You don't know at this point whether or not Varvatos still

22   has a clothing allowance that's bringing us here today?

23   A.  I'm sure they still have a clothing allowance program.

24   Q.  But you don't know whether or not Varvatos gives women

25   either clothes or another comparable benefit as of today?

```
 1           MR. BASSEN:  Objection, your Honor.

 2           THE COURT:  Yes.  Why don't we just make very simple.

 3           Ms. Chang, you knew what the policy was once,

 4    obviously.  Do you have any information about whether that

 5    policy has or has not changed?  Do you know one way or the

 6    other?

 7           THE WITNESS:  No, I don't know.

 8           MR. DUNNEGAN:  No further questions, your Honor, for

 9    this witness.

10           THE COURT:  Okay.  Do you want a couple minutes before

11    the cross?  I don't want to take a full break, but if you want

12    to take a couple of minutes before cross.  Whatever you want to

13    do.

14           MR. BASSEN:  Yes, your Honor.

15           THE COURT:  Let's take five minutes, then.  So,

16    jurors, you can go back to your room.  You can stay here.

17    Whatever you need to do.  And we'll just take five minutes.

18           (Jury not present)

19           (Continued on next page)

20

21

22

23

24

25
```

1          THE COURT:  Are you ready, Mr. Bassen?

2          MR. BASSEN:  Yes.

3          THE COURT:  Bring the jury in.

4          (In open court; jury present)

5          THE COURT:  The plaintiffs have finished questioning

6  Ms. Chang so now I will give the opportunity to defendants to

7  question Ms. Chang.

8          MR. BASSEN:  Your Honor, before we begin, can we just

9  make sure that the jury is able to hear the witness?

10          THE COURT:  Do you have any problems hearing

11  Ms. Chang.

12          Looks like we're good.

13          MR. BASSEN:  Thank you.

14  CROSS-EXAMINATION

15  BY MR. BASSEN:

16  Q.  Good afternoon, Ms. Chang.

17  A.  Oh, it's afternoon already.

18          Good afternoon.

19  Q.  You were asked questions about the male sales professionals

20  at Varvatos getting to own the clothes they were provided under

21  the closing allowance.

22          Do you remember that?

23  A.  Yes.

24  Q.  You gave an answer.

25          Do you know of all the factors, if any, that were

1    taken into consideration by the company in making a

2    determination as to whether the male sales professionals should

3    keep the clothing?

4           MR. DUNNEGAN:  Objection.

5           THE COURT:  Basis of the objection is?

6           MR. DUNNEGAN:  Foundation.

7           THE COURT:  I think it picks up from where you left

8    off.  I will overrule the objection.

9    A.  I don't know every single factor that came into play.

10   Q.  Do you know whether or not Varvatos considered having the

11   males professionals return the clothing and Varvatos donating

12   the clothing to charity?

13   A.  I don't recall.

14   Q.  You were asked about Ann Byron getting a legal opinion

15   regarding the clothing allowance; correct?

16   A.  Yes.

17   Q.  Do you know whether or not Ann Byron got a legal opinion?

18           MR. DUNNEGAN:  Objection.

19           THE COURT:  Objection is?

20           MR. DUNNEGAN:  Foundation.

21           THE COURT:  Overruled.

22           You can answer the question.

23           Do you know?

24           THE WITNESS:  Yes.  I believe she did get a response.

25   Q.  Do you know whether she got more than one legal opinion?

K2P6VAR3                         Chang - cross

 1   A.  I don't actively remember.

 2   Q.  Do you know what the legal opinion was that Ann Byron got?

 3           MR. DUNNEGAN:  Objection, 30(b)(6).

 4           THE COURT:  Mr. Bassen, do we need a side bar?  We're

 5   limited to the 30(b)(6) answers.  Are we going beyond that?  If

 6   so, we need to have a talk.

 7           MR. BASSEN:  I think we need to have a talk.

 8           (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (At the side bar)

2                   THE COURT:  What do you expect her answer to be?

3                   MR. BASSEN:  I expect her answer to be that she knows

4     that Ann Byron got a legal opinion and it was okay and she

5     doesn't have any further details about it.

6                   THE COURT:  That the policy was okay?

7                   MR. BASSEN:  Correct.

8                   MR. DUNNEGAN:  I am at 126 at the October 20 -- it

9     starts there.

10                  She says not on those terms.

11                  THE COURT:  She says, *I don't know about those terms.*

12                  MR. DUNNEGAN:  Exactly.

13                  THE COURT:  Meaning legal terms.  I know in

14    conversation we had she felt confident after speaking with

15    counsel that they were not violating any laws.

16                  MR. DUNNEGAN:  So in other words --

17                  THE COURT:  That has to do with discrimination by not

18    providing to females.

19                  MR. DUNNEGAN:  All she is testifying there is the

20    state of mind of Ann Byron, not the opinion that Byron got from

21    the lawyer.

22                  THE COURT:  Hold on.

23                  MR. DUNNEGAN:  She says after speaking to the lawyer,

24    she felt we were not violating.  The implication is that the

25    lawyer told her they were not violating laws.  I mean, that

K2P6VAR3                          Chang - cross

1   wasn't disclosed.  It could be they are not going to catch you.

2   These people are so transient, don't worry about it.

3            THE COURT:  Given the representation of the answer, I

4   am overruling your objection.

5            He can ask the question and we'll hear the answer.

6            MR. BASSEN:  I think I forgot the question.

7            MR. DUNNEGAN:  Can we have a limiting instruction that

8   it is not to the truth of whether or not there was a legal

9   opinion.

10            THE COURT:  You mean legal or not?

11            MR. DUNNEGAN:  No.  No.  We have three people here.

12   We have the lawyer, we have Ann Byron, and we have the witness

13   Nicole Chang.  Nicole Chang is testifying that Ann Byron got a

14   legal opinion from the lawyer.  That is hearsay if it is

15   offered for the truth.  If it is offered for the state of mind

16   of Ann Byron, maybe it can come.  It is not hearsay.  For the

17   lawyer gave a legal opinion, that is hearsay.

18            MR. BASSEN:  May I respond?

19            THE COURT:  Sure.

20            MR. BASSEN:  First of all, Mr. Dunnegan spent a great

21   deal of time harping on this.

22            THE COURT:  The problem is he is allowed to bring out

23   anything Ann Byron says because she is his party's opponent.

24   You cannot ask Chang about things that Ann Byron said because

25   that is hearsay and I don't know what the exception would be.

1        Go ahead.

2        MR. BASSEN:  Well, there is a good faith, there is an

3   exception to willfulness by law applicable here.  Part of that

4   exception is whether you sought legal advice on it and got it.

5   It doesn't even really matter to his point what the legal

6   advice was.  The question is what did the company do.  He has

7   represented the company didn't do anything.

8        THE COURT:  Well, if we want to just get the notion

9   that she sought advice from a legal opinion and then she got a

10  legal opinion, that's fine.  As long as you don't ask what the

11  content is.

12       MR. BASSEN:  This is where we started.  You saw the

13  testimony, your Honor, that it was Nicole Chang's understanding

14  that Ann Byron was comfortable that they were okay.

15       THE COURT:  The 30(b)(6) is not dispositive of the

16  hearsay question.  36 is the scope question.  You want on the

17  notion of this concept being within the scope.  He is raising a

18  different issue, which is that Chang cannot testify about

19  things Byron said to her.

20       As long as it is not for the truth.  So if you are not

21  offering it and I can give an instruction that it is not for

22  the truth that anything Byron says, then it will be okay.

23       MR. BASSEN:  We're okay with that.

24       MR. WEISS:  Ann Byron told Nicole Chang that she spoke

25  to an attorney.  That itself is hearsay.  Are we saying that

1   fact is not offered for the truth.  It is only going to go to

2   Nicole Chang's state of mind?

3          THE COURT:  Yes.  That fact cannot be offered for the

4   truth because it is coming out of Ann Byron's mouth.

5          MR. DUNNEGAN:  I think that's right.

6          MR. BASSEN:  All good.

7          MR. DUNNEGAN:  I predict that we'll be here another 10

8   minutes, but we're sailing.

9          THE COURT:  We're good for now.

10         Maybe that will be the last question.

11         (Continued on next page)

```
 1                (In open court)
 2                THE COURT:  I think you better repeat whatever the
 3      question is.
 4                (Record read)
 5                THE COURT:  That question I am overruling.  You are
 6      allowed to and you did ask whether she got a legal opinion.
 7      That was already asked.
 8                MR. BASSEN:  I believe so.
 9                THE COURT:  Next question.
10      BY MR. BASSEN:
11      Q.  Do you know what that legal opinion was?
12                MR. DUNNEGAN:  Objection, hearsay.
13                THE COURT:  Yes, the content of the legal opinion I am
14      not allowing because the only evidence for it is what came from
15      Ann Byron.
16                Next question.
17      Q.  Can you tell us whether or not you discussed with Ann Byron
18      the legality of the clothing allowance following Ann Byron's
19      discussion with you about getting a legal opinion?
20      A.  We're legally compliant.
21                MR. DUNNEGAN:  Objection, your Honor.  Move to strike.
22      It was a yes or no question.
23                THE COURT:  Hold on.  Let's start with answering the
24      question.
25                The question is:  Did you discuss with Ann Byron the
```

 1   legality of the clothing allowance after she had the discussion

 2   about getting the legal opinion?

 3            Just yes or no, did you discuss it with her?

 4            THE WITNESS:  Yes.

 5   Q.  What was your understanding in that discussion?

 6   A.  That we were legally compliant.

 7   Q.  You were asked questions about the financial feasibility of

 8   providing a clothing allowance to female sales professionals.

 9            Do you remember that?

10   A.  Yes.

11   Q.  You gave answers.

12            Am I correct that it is your testimony that the

13   financial feasibility of providing a clothing allowance to

14   female sales professionals was one of the factors in not

15   providing it to them?

16   A.  Yes.

17   Q.  Is it your understanding there were factors other than

18   financial feasibility?

19   A.  Yes.

20   Q.  Would you tell us what your understanding of the other

21   factors is?

22            MR. DUNNEGAN:  Objection, lack of foundation.

23            THE COURT:  I think you laid whatever foundation there

24   was and it was acceptable to me.  So I think this is just a

25   followup.

1          Overruled.

2   A.   One of the other major factors being considered is the fact

3   that the company is a menswear brand and only manufactures and

4   produces clothing for men and not women.  The conversation

5   in -- that is one of the other factors that was considered.

6   Q.   You were asked whether you were opposed to giving a

7   clothing allowance to female sales professionals and you said

8   you were not opposed; correct?

9   A.   Correct.

10  Q.   Why were you not opposed?

11  A.   I was not opposed because for female sales professionals

12  specifically I thought it would -- might be a good tool for

13  retention and to keep us competitive in the market when we're

14  recruiting and competing for talent with other brands that do

15  offer womenswear or unisex.

16  Q.   Can you tell us whether or not you are not being opposed to

17  giving a clothing allowance to female professionals had

18  anything to do with legal requirements?

19  A.   I am sorry.  Was I opposed?

20  Q.   You were not opposed and you explained why you were not

21  opposed --

22  A.   Yes.

23  Q.   -- just now.

24  A.   Yes.

25  Q.   I am asking you in your not being opposed were you

1   considering what the law required, or was it for the reason you
2   just said?
3   A.  It was for the reason that I just said.
4   Q.  You were asked about conversations with Ann Byron as to
5   whether Ann Byron was in favor of giving female sales
6   professionals a clothing allowance; correct?
7   A.  Yes.
8   Q.  You testified that Ann Byron told you that she was in favor
9   of giving female sales professionals a clothing allowance;
10  correct?
11  A.  Yes.
12  Q.  Did she tell you why she was in favor?
13          MR. DUNNEGAN:  Objection, hearsay.
14          THE COURT:  Just answer that question.
15          Did she tell you why?
16          THE WITNESS:  I am sure she did tell me why.  I don't
17  remember what specific reasons were.
18          THE COURT:  That solves our problem.
19          Next question.
20  Q.  Is it correct that you don't know what factors Ann Byron
21  was considering in being in favor of the clothing allowance?
22          MR. DUNNEGAN:  Objection.  It is the same problem.
23          THE COURT:  I will allow an answer to that question.
24          Is it correct that you don't know?
25          THE WITNESS:  It is correct.

 1  Q.  You were asked, Ms. Chang, whether you attended a mediation
 2  in this case; correct?
 3  A.  Yes.
 4  Q.  I believe that you said you did not think so; is that
 5  correct?
 6  A.  Correct.
 7  Q.  Do you know when the mediations in this case were held?
 8  A.  I do not.
 9  Q.  Do you know Olga Yalkut?
10  A.  I do.
11  Q.  Who is Olga Yalkut?
12  A.  She's the head of human resources currently at John
13  Varvatos Enterprises.
14  Q.  Can you tell us whether she is in the courtroom right now?
15  A.  She is.
16  Q.  Is that Olga Yalkut sitting over there?
17  A.  It is.
18  Q.  Do you know whether or not Olga Yalkut attended the
19  mediations in this case?
20  A.  I don't know for sure; but if there were, probably it would
21  be her.
22  Q.  Is it fair to say you and Olga Yalkut are not the same
23  person?
24  A.  Yes.
25  Q.  Is it fair to say you are both females?

1   A.  Yes.

2   Q.  You were asked about the male professionals wearing John

3   Varvatos clothing at work with respect to showing the

4   visibility of the clothing; is that correct?

5   A.  Yes.

6   Q.  Do you know whether John Varvatos requires male sales

7   professionals to wear its clothing at work to also show how the

8   clothing fits?

9   A.  Yes.

10  Q.  Could you explain about that?

11  A.  Well, I think I kind of touched upon it earlier; but the

12  fitting, the whole point is to show the product on different

13  body types, sizes.  It's also a way to convey how a scarf

14  should be tied or knotted around the neck and how to style John

15  Varvatos clothing on yourself.

16  Q.  Could you tell us whether or not there are any differences

17  between wearing clothes and modeling clothes?

18  A.  Yes.  There is a difference between wearing it and wearing

19  it the John Varvatos way.

20  Q.  Will you tell us what that means, please.

21  A.  Yeah.  The three-piece rule is kind of something that is

22  very specific to John Varvatos as a brand.  The clothing and I

23  think I mentioned the way a scarf should be worn or wrapped or

24  knotted, different types of jewelry.

25  Q.  Thank you.

K2P6VAR3                          Chang - cross

1        You were asked about job descriptions; correct?

2   A.   Yes.

3   Q.   Would you tell us whether or not job descriptions at John

4   Varvatos were meant to cover every single aspect of the job?

5   A.   No.

6   Q.   No, you can't tell us; or no, they are not?

7   A.   No, they are not meant to list -- be an exhaustive list of

8   every single thing ever person does in a specific position.

9   Q.   Do you still have before you Plaintiff's Exhibit 35 A?

10             THE COURT:  Do you want the jury to look at this,

11  Mr. Bassen, or not?

12             MR. BASSEN:  I don't think they need to look at this.

13             THE COURT:  This is the job description.

14             MR. BASSEN:  Just if the witness looks at it.

15  BY MR. BASSEN:

16  Q.   This is the job description for sales professionals; is

17  that not correct?

18  A.   Yes.

19  Q.   If you look under job responsibilities, the second bullet

20  from the bottom says, *Assist with stocking merchandise on*

21  *shelves as well as assisting with pricing merchandise and*

22  *maintaining a clean and organized appearance of the store.*

23             Do you see that?

24  A.   Yes.

25  Q.   Is it not true that certain stores have stock people who

Case 20-50623-MFW   Doc 10-2   Filed 07/07/20   Page 118 of 242     175

K2P6VAR3                        Chang - cross

1   work there?

2   A.   Yes.

3   Q.   So am I not correct that this assisting that I just read to

4   you would apply to certain sales professionals and not to

5   others depending upon the store where they are working?

6   A.   Correct.

7   Q.   So is it correct that not every single thing in this job

8   description of sales professionals applies to each and every

9   sales professional?

10  A.   Correct.

11  Q.   Now, I believe you asked and you answered that the

12  obligation or the requirement to wear the clothes at work for

13  the male sales professionals is not contained in the job

14  description; is that correct?

15  A.   Correct.

16  Q.   My question is:  Can you tell us whether or not the males

17  professionals are in fact required to wear John Varvatos

18  clothes while working?

19  A.   They are.

20  Q.   And they are whether or not it says so in the job

21  description?

22  A.   Correct.

23  Q.   I think you also were asked about the employee handbook and

24  is there anything in there that says that the male sales

25  professionals have to wear the clothes; correct?

1   A.  Correct.

2   Q.  You said, *No, there isn't*; correct?

3   A.  Correct.

4   Q.  Am I right that whether or not the employee handbook speaks

5   to male sales professionals having to wear the clothes, that

6   they are in fact required to wear the clothes while working?

7   A.  Yes, they are required.

8           MR. BASSEN:  Thank you, your Honor.  I would like the

9   members of the jury to possibly look at Exhibit 1 in the book.

10          THE COURT:  Let's do that.

11  Q.  You were asked questions about Exhibit 1, which consists of

12  various pages.

13          Do you see on these pages which relate to appearance

14  and dress standards - retail locations that there are dates on

15  the bottom right of the pages?

16  A.  Yes.

17  Q.  The first one says revised 2-01-05?

18  A.  Yes.

19  Q.  The second from the last, which is JVD 00080 says

20  March 2013 on the bottom; correct?

21  A.  Yes.

22  Q.  What does that mean, March 2013?

23  A.  Those are just the dates that whatever policy or procedure

24  was updated.

25  Q.  So is it not correct that throughout the time we're talking

1   here that this policy was revised and updated from time to

2   time?

3   A.  Yes, that's correct.

4   Q.  Is it not correct at the end the day it was not the same

5   policy that was in existence when you started, but it was

6   revised and updated from time to time?

7   A.  Yes, that's correct.

8   Q.  May I draw your attention, please, to the second page in

9   Exhibit 1., which has at the bottom JVU 00079.

10          Do you see a double asterisks at the bottom of that

11  page?

12  A.  I do.

13  Q.  That says, if I may, *Please contact the human resources*

14  *department to request accommodations based on disability,*

15  *gender identity and sincerely held religious beliefs.*

16          Do you know what the purpose of putting that in there

17  was?

18  A.  Yeah.  Just to make it more clear that if anybody needed an

19  accommodation made because of these things that are listed here

20  to reach out to HR.

21  Q.  We're talking here about an accommodation to the dress

22  code; is that not correct?

23  A.  Correct.

24  Q.  Would that also involve an accommodation to the clothing

25  allowance?

 1  A.  Yes.

 2  Q.  During your tenure, do you know whether any employee

 3  contacted HR for an accommodation?

 4  A.  For disability, gender identity and religious beliefs

 5  during my tenure, no.

 6  Q.  Since you don't work there, am I correct that you don't

 7  know whether after you stopped working there anyone has asked

 8  HR for an accommodation based on gender identity?

 9  A.  I recall hearing about it, but I don't know for sure; but I

10  believe there was a sales employee, sales professional that

11  joined the company as identifying as female and they

12  transitioned and approached the company about identifying as a

13  male.

14  Q.  Do you know what, if any, response was given?

15  A.  I am sorry?

16  Q.  How did the company respond if you know?

17  A.  The company viewed the company as a male by the request,

18  yeah.

19  Q.  Did that apply to the best of your knowledge to the dress

20  code?

21  A.  I would think so, yes.

22  Q.  Did it apply to the best of your knowledge as to the

23  clothing allowance?

24  A.  Yes.  If it is an individual that identifies as a male,

25  yes.

1    Q.  Thank you.

2            Now, you were asked about the All Saints discount.

3            Let's back up a second.

4            John Varvatos provides an All Saints discount to

5    female sales professionals; correct?

6    A.  Correct.

7    Q.  It does not provide an All Saints discount to male sales

8    professionals; is that correct?

9    A.  Correct.

10   Q.  You were asked whether female sales professionals could use

11   that All Saints discount online by the internet.

12           You said, *No*; correct?

13   A.  Correct.

14   Q.  My question is:  Can male sales professionals at John

15   Varvatos get the clothes from the clothing allowance by the

16   internet?

17   A.  No, they cannot.

18   Q.  Is it correct that they have to get it in the store?

19   A.  Yes.

20   Q.  By pulling it?

21   A.  Yes.  Usually from their home store, the store they work

22   in.

23   Q.  Now, you also were asked about the number of times that

24   female sales professionals can go to All Saints versus the

25   timing of male sales professionals pulling the clothing;

K2P6VAR3                         Chang - cross

1   correct?

2   A.  Correct.

3   Q.  Now, am I right that male sales professionals working at

4   John Varvatos are required to wear the seasonal clothes?

5   A.  Yes, correct.

6   Q.  So does that mean when the season changes, they have to

7   wear different clothes?

8   A.  Yes.  They have to wear the new season.

9   Q.  How many seasons are there?

10  A.  Four.

11  Q.  Thank you.

12          In terms of when a male sales professional would be

13  pulling or getting these clothes, is it not correct that the

14  male sales professional are required to wear them during the

15  entire time they are working at the store?

16  A.  Yes.

17  Q.  Is it correct then that the male sales professional would

18  have to pull or get the clothes on the first day that the

19  season changes assuming they are not out sick?

20  A.  As soon as possible, yes.

21  Q.  So they do not have the opportunity to pull or get clothes

22  whenever they want; correct?

23  A.  Correct.

24  Q.  Now, you were asked if a male sales professional could wear

25  the John Varvatos clothes after work to a concert; correct?

1   You said, *Yes*; correct?

2   A.  Yes.

3   Q.  Can you tell us whether or not a female sales professional

4   can wear the All Saints clothing at a concert?

5   A.  They can.

6   Q.  Now, the male sales professionals are required to wear the

7   Varvatos clothing at work; correct?

8   A.  Yes.

9   Q.  Can you tell us whether or not the female sales

10  professionals are required to wear All Saints clothing at work?

11  A.  They are not required.

12  Q.  Can you tell us whether or not female sales professionals

13  are required to wear any brand of clothing at work?

14  A.  They are not required.

15  Q.  So then is it correct that female sales professionals can

16  wear any brand of clothing they like at work?

17  A.  Yes.

18  Q.  As long as it is compliant with something; right?

19  A.  Yes.

20  Q.  What is the something that it needs to be compliant with?

21  A.  In A neutral color pallet -- blacks, grays, blues, olives.

22  And nothing that you would wear to a club.  So no excessively

23  short hemlines, no sheer fabrics, no low necklines.  Just

24  professional attire.  Something that you would wear to meet

25  your parents.

K2P6VAR3                          Chang - cross

1    Q.  Thank you.

2    A.  You're welcome.

3    Q.  Can you tell us whether or not a female sales professional

4    at John Varvatos was prohibited from wearing clothes in their

5    own wardrobe that they previously owned while working at John

6    Varvatos?

7    A.  No.

8    Q.  It is correct then that a female sales professional could

9    dress at work at John Varvatos 100 percent of the time without

10   purchasing any new clothes; correct?

11   A.  Correct.

12   Q.  Is it correct that if a female sales professionals chose to

13   purchase new clothes, that was their option?

14   A.  Correct.

15   Q.  Is it correct that that was their option whether those

16   clothes were at All Saints or somewhere else?

17   A.  Correct.

18   Q.  You were asked about the discount that female sales

19   professionals at All Saints and you were asked whether the

20   discount was off of the full retail price of All Saints;

21   correct?

22   A.  Correct.

23   Q.  And you said, *Yes, it was*; correct?

24   A.  Yes.

25   Q.  Now, the clothing allowance that the male sales

1    professionals got at John Varvatos was that not also off of

2    full retail value?

3    A.   Correct.

4    Q.   So when we say that they got $3,000 a pull, that means the

5    clothes that we're talking about sold at a retail value of

6    $12,000; correct?

7    A.   Yes.

8              MR. DUNNEGAN:  Objection.

9              THE COURT:  Hold on, Mr. Bassen.

10             $3,000.

11             MR. BASSEN:  I will withdraw the question.

12   Q.   Now, I may have touched on this already, but is it correct

13   that the male sales professionals at John Varvatos got only one

14   pull of clothing per season?

15   A.   It was typical, yes.  One pull, you mean one outfit?

16   Q.   Correct.

17   A.   Yes.

18   Q.   As contrasted to keep changing new clothing?

19   A.   Yeah.

20   Q.   Was the discount that as offered at All Saints to the

21   female sales professionals limited to use one per season?

22   A.   No.  They were able to use it -- well, yeah, one per

23   season.  All Saints has two seasons.  So twice a year.

24   Q.   So they could do that twice a year?

25   A.   Yeah.

K2P6VAR3                        Chang - cross

1    Q.  During the time of your tenure, did John Varvatos have any

2    so-called pop-up stores?

3    A.  Yes.

4    Q.  What is a pop-up store?

5    A.  Brick and mortar retail location that will be open for just

6    a short period of time usually to get rid of excess inventory.

7    Q.  Do you know whether a clothing allowance was provided to

8    anyone at any pop-up store ever?

9    A.  I believe we did provide allowances for a pop-up outlet in

10   Clarksburg.  I don't remember.

11   Q.  You don't remember?

12   A.  I don't remember.

13           THE COURT:  Mr. Bassen, how much longer do you think

14   you have?

15           MR. BASSEN:  Just a few minutes, your Honor.

16           THE COURT:  I am going to move our lunch break then

17   until you are finished.

18           MR. BASSEN:  Thank you very much.

19   Q.  You were asked about whether any of Varvatos stores had

20   only female sales professionals; correct?

21   A.  Yes.

22   Q.  You were asked specifically about the East Hampton store

23   where plaintiff Tessa Knox worked; correct?

24   A.  Yes.

25   Q.  You said that there were no male sales professionals at the

K2P6VAR3                      Chang - cross

1    East Hampton store when Tessa Knox worked there; right?

2    A.  Yes.

3    Q.  Is it not correct that there was a general manager of the

4    East Hampton store?

5    A.  Yes.

6    Q.  Was that person a male?

7    A.  Yes.

8    Q.  Is it not correct that there was also an assistant general

9    manager at the East Hampton store when Tessa Knox worked there?

10   A.  Yes.

11   Q.  Was that person a male?

12   A.  Yes.

13   Q.  Do you know whether the general manager at the East Hampton

14   store was required to wear/model Varvatos clothing?

15   A.  Yes.

16   Q.  Do you know whether that person got a clothing allowance?

17   A.  Yes.

18   Q.  Is the same thing true for the assistant general manager?

19   A.  Yes.

20   Q.  So notwithstanding the questions you were asked that there

21   was no male sales professional there, there were men working

22   there wearing and modeling the clothes; correct?

23   A.  Yes.

24   Q.  Tell us whether or not of course during your tenure all

25   male employees of John Varvatos got the clothing allowance?

K2P6VAR3                    Chang - cross

```
 1  A.  Every single male employee?

 2  Q.  Correct.

 3  A.  No.

 4  Q.  Okay.  Can you tell us your understanding of who got it?

 5  A.  All male employees that worked in a retail store and all --

 6  not all but corporate male employees that had a role that if

 7  they were in a position working directly with products or

 8  interfacing with a lot of external third-party vendors or

 9  sea-level executives, those are the individuals that would give

10  me the allowance.

11  Q.  Is it correct that any other people beyond of what you

12  said -- any other males beyond that did not get any clothing

13  allowance?

14  A.  Correct.  There were a lot of other male employees that

15  didn't get a clothing allowance.

16  Q.  So even though they were men, that was their sex, they did

17  not get a clothing allowance; correct?

18  A.  Correct.

19  Q.  So is it fair to say that getting a clothing allowance was

20  based on job responsibility?

21          MR. DUNNEGAN:  Objection to the form.

22          THE COURT:  You can answer.

23  A.  Correct.

24  Q.  Just wrapping up, were there any requirements for the sales

25  professionals, whether men or women, to keep the clothing they
```

1    were wearing at work in a certain condition?

2    A.  Yes.

3    Q.  What was that?

4    A.  To be clean, make sure all buttons are there, seams aren't

5    open.

6    Q.  Do you know whether employees complied with that?

7    A.  They did.

8    Q.  Do you know who you the male sales professionals complied

9    with that?

10   A.  Dry-cleaning.

11   Q.  Now, you say "dry-cleaning," why do you say dry-cleaning?

12   A.  John Varvatos doesn't produce a type of apparel that can be

13   easily machine washed.  A lot of it has to be sent to the

14   cleaners.

15   Q.  Does that cost money to have to dry clean clothing?

16   A.  It costs me more money to do dry cleaning than machine wash

17   my stuff.  So, yeah.

18   Q.  Did John Varvatos reimburse the employees for dry-cleaning?

19   A.  No.

20   Q.  You already said that the female sales professionals could

21   wear whatever they wanted as long as they complied with the

22   dress code; correct?

23   A.  Correct.

24   Q.  Do you know whether or not the female sales professionals

25   had to dry clean those clothes?

1   A.  I don't know for sure, but they weren't required to wear

2   clothing that were dry clean only.  They could wear whatever

3   they want so...

4           MR. BASSEN:  Nothing further.

5           THE COURT:  Mr. Dunnegan, if you have under five

6   minutes, I might just do it now.  If you thought not, what do

7   you want to do?

8           MR. DUNNEGAN:  I can rush it and do it under five

9   minutes.

10          THE COURT:  It is your choice.  Normally we break at

11  quarter of.  I can move everyone 15 minutes later.  I don't

12  want to do much more than that.  It is now 10 of.  You tell me.

13  What do you think?

14          MR. DUNNEGAN:  Look, I apologize to the witness to

15  having to keep her over the lunch hour, at the rate we're going

16  I probably have 10 minutes.

17          THE COURT:  Let's do it after the lunch break and

18  we'll go to the next witness.

19          MR. DUNNEGAN:  All right.

20          Ladies and gentlemen, I usually have you come back at

21  2:00.  Try to come back at 2:00 and we'll start on the dot at

22  2:05 assuming you are all here.  See you then.  Thank you.

23          Jurors you can come in and out as you like.  If you

24  want to hang around the jury room, you can stay there.  You can

25  take your lunch and bring it back to the jury room.

1              We'll collect you at 2:05.

2              (Jury excused)

3              (Luncheon recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1

 2                       AFTERNOON SESSION

 3                         2:05 p.m.

 4          THE COURT:  Are we ready to start up?  So let's bring

 5     the jury in.

 6          (Jury present)

 7          THE COURT:  You can be seated.

 8          If you recall, we're were in the middle of Ms. Chang's

 9     testimony.  Mr. Dunnegan now has an opportunity to question her

10     again.

11          Whenever you are ready.

12     REDIRECT EXAMINATION

13     BY MR. DUNNEGAN:

14     Q.  I am going to take about ten minutes to try to cover three

15     topics, OK?  The first one is the distinction, if any, between

16     wearing the clothes and modeling the clothes.

17          Do you remember that Mr. Bassen asked you some

18     questions about that?

19     A.  Yes.

20     Q.  OK.  Isn't it true, isn't it your testimony that the

21     obligation to wear the clothes is the same as the obligation to

22     model the clothes?

23     A.  Yes.

24     Q.  Do you remember your deposition being taken on June 29,

25     2017?

1    A.  Yes.

2    Q.  OK.  And I'm referring to page 89 beginning at line 23 of

3    that deposition.  Do you remember being asked the following

4    question and giving the following answer?

5    "Q.  Is the obligation to model John Varvatos clothing the same

6    as the obligation to wear John Varvatos clothing?

7    "A.  Yes.

8    Q.  Do you remember giving that testimony?

9    A.  Yes, because you read it to me.

10   Q.  Do you deny that you gave that testimony?

11   A.  No, I'm not denying.  It's June 2017.

12   Q.  Wasn't your memory of what was going on in Varvatos much

13   better in 2017 than it is in 2020?

14   A.  Yes.

15   Q.  Now, you talked about with Mr. Bassen the obligations of

16   the women under the women's dress code, correct?

17   A.  Yes.

18   Q.  OK.  Now, I want to ask you, is it your view that women

19   don't have any cost of complying with the women's dress code?

20   A.  Yes.

21   Q.  Now, did Varvatos ever do any investigation or any survey

22   to find out what women were actually paying for clothing that

23   they were wearing to work as sales associates or sales

24   professionals?

25            MR. BASSEN:  Objection; lack of foundation.

1          THE COURT:  I think given her position, you can ask if
2     she was aware of any investigation.
3          So, you can answer the question.
4     A.  No.
5     Q.  You're not aware of any investigation in that respect?
6     A.  Correct.
7     Q.  OK.  And third the area you talked with Mr. Bassen about
8     the reasons that John Varvatos did not adopt a clothing
9     allowance policy for women's sales professionals, right?
10    A.  Yes.
11    Q.  And you said that one of the considerations was that John
12    Varvatos was a mens clothing store.
13         Do you remember that testimony?
14    A.  Yes.
15    Q.  Now, regardless of the considerations that were being given
16    to factors including that John Varvatos is a mens clothing
17    store, isn't it your testimony that the discussion of that
18    issue stopped right at the moment that it was decided that a
19    women's clothing allowance was not financially feasible?
20         MR. BASSEN:  Objection.
21         THE COURT:  Overruled.
22         You can answer the question.
23    A.  Can you repeat the question.
24    Q.  Isn't it your understanding that although that there were
25    other factors that people may have considered or did consider

1  in determining whether or not to have a women's clothing
2  allowance for sales professionals, that the discussion or the
3  conversation or the consideration stopped once the
4  determination was made that it was not financially feasible?
5          MR. BASSEN:  Objection.
6          THE COURT:  You can answer that, is that correct or
7  not correct.
8  A.  No.
9  Q.  That's incorrect?
10 A.  No.
11 Q.  That's correct?
12 A.  It's incorrect, no.
13 Q.  It's incorrect.  OK.
14         Well, I want to take you back to your deposition in
15 October 26th of 2017 and I am looking at page 22 beginning at
16 line six.  Do you remember being asked the following question
17 and giving the following answer?
18 "Q.  And the clothing allowance that Ann Byron was considering
19 the possibility of giving to women in the U.S. do you know
20 anything about what kind of form such a program would have
21 taken?
22 "A.  No.  I honestly do not think that she thought that far
23 into it.  I think there were some initial discussions on
24 wanting to do it and can we do it?  And when it was realized
25 that it wasn't financially feasible for us to do it at that

1   moment it stopped right there.  So, I don't think that she went
2   ahead and started thinking about what kind of structure of the
3   allowance would look like for women."
4          Do you remember giving that testimony?
5   A.  I do.
6   Q.  Is that testimony truthful?
7   A.  Yes.
8          MR. DUNNEGAN:  Thank you.  No further questions.
9          THE COURT:  Mr. Bassen, anything?
10         MR. BASSEN:  Yes, I do, your Honor, very quickly.
11  Thank you.
12  RECROSS EXAMINATION
13  BY MR. BASSEN:
14  Q.  Good afternoon, Ms. Chang.
15         I'd like to ask you about industry practice.
16  A.  OK.
17  Q.  Would you tell us whether John Varvatos is the only
18  retailer in the fashion industry that you are aware of that has
19  a dress code?
20  A.  They are not the only retailers with a dress code.
21  Q.  Would you tell us whether or not John Varvatos is the only
22  retailer in the fashion industry that we are aware of that
23  gives a clothes allowance?
24  A.  They are not only the retailer to give a clothing
25  allowance.

1   Q.  Are you aware of other retails who gave a clothing

2   allowance to only one sex?

3   A.  Yes.

4   Q.  Can you tell us which?

5           MR. DUNNEGAN:  Objection; 402.

6           THE COURT:  Scope?  What is that?

7           MR. DUNNEGAN:  Relevance, your Honor.

8           THE COURT:  Pure relevance.  I thought that was 401.

9   Well, it's overruled.

10          Go ahead.

11  A.  The companies that I'm aware of is Oscar de la Renta and La

12  Perla, both are women's only retailers and they provide

13  clothing allowances only to women.

14  Q.  Do you know if men work at those companies?

15  A.  Men do work at both of those companies.

16          MR. BASSEN:  OK.  Thank you.  Last topic.

17  Q.  You were asked questions about compensation of men and

18  women and you were asked questions about the fact that there is

19  a base rate, an hourly rate and then a commission, correct?

20  A.  Correct.

21  Q.  Do you know whether there were when you were there any

22  female sales professionals at John Varvatos who earned more per

23  hour than male sales professionals?

24  A.  Yes.

25  Q.  Do you know of any examples?

K2PAAKNO4                    Chang - Recross

 1   A.  Yes.

 2   Q.  Could you tell us the examples?

 3   A.  The three individuals, the three females that made more

 4   than males by first an last name?

 5   Q.  Sure.

 6   A.  Joy fa sergeant owe was a sales associate in our last Vegas

 7   store.  We have another one Pam Kasin that was based in our

 8   West Hollywood store and Sheryl –– I can't pronounce her last

 9   name but I could spell it for you was based in our SoHo or

10   store.

11   Q.  Is Sheryl here in this courtroom right now?

12   A.  Yes.

13   Q.  Can you point her out?

14   A.  Yes.  She's sitting in the back row to my right.

15            MR. BASSEN:  Thank you.  Nothing further.

16            MR. DUNNEGAN:  Nothing further, your Honor.

17            THE COURT:  All right.  Do any of the members of the

18   jury have questions?  If so, raise your hand.  OK.  No

19   questions from the jury.

20            Ms. Chang, you can step down.

21            What's the plan now?

22            MR. WEISS:  Thank you, your Honor.

23            The plaintiffs would like to call Ruby Romero.

24            THE COURT:  You can step right up here and just stand

25   in front of the chair.

 1    RUBY ROMERO,

 2         called as a witness by the Plaintiff,

 3         having been duly sworn, testified as follows:

 4    DIRECT EXAMINATION

 5    BY MR. WEISS:

 6    Q.  Good afternoon.

 7         Where do you live?

 8    A.  I live in Brooklyn.

 9    Q.  Where do you work?

10    A.  I work at Brooklyn Prospect Charter School.

11    Q.  What is the Brooklyn Prospect Charter School?

12    A.  I run the after school programming there.  So, I work for

13    All Access which is a nonprofit based out of Brooklyn Prospect

14    Charter School.  It's a middle school.

15    Q.  Prior to working at the charter school, where did you work?

16    A.  Before that I worked at Bowery Hotel in SoHo or in Lower

17    East Side.

18    Q.  What did you do there?

19    A.  There I worked at the front desk as a front desk agent and

20    concierge.

21    Q.  Your job at the Bowery hotel, that was immediately prior to

22    the job you hold now?

23    A.  Yes.

24    Q.  Before you were at the Bowery Hotel, where did you work?

25    A.  Before I was there I worked for ASRR which is a commercial

1  real estate development company.

2  Q.  What did do you there?

3  A.  There I was the executive assistant to the CEO of the

4  company.

5  Q.  And at some point prior to that did you work at Varvatos?

6  A.  I did.  From 2012 to 2015.

7  Q.  And before you worked at Varvatos just by way of some

8  background, can you briefly tell us where else you worked?

9  A.  Right before Varvatos I worked at The Theory which is a

10  clothing store in midtown Manhattan in New York.  And then

11  before that I lived in California where I worked at Barneys New

12  York in Beverly Hills.

13  Q.  What does Barneys do?

14  A.  They're a clothing, they're a department store.

15  Q.  And what did do you at Barneys?

16  A.  I was I was the sale's associate at Helmut Lang specialist.

17  Q.  That means you sold clothes?

18  A.  Yes.

19  Q.  And at Theory you sold clothes, as well?

20  A.  Yes.

21  Q.  Going back to Varvatos, when you worked at Varvatos what

22  was your job?

23  A.  I was a sales professional.

24  Q.  When you were working as a sales professional at Varvatos,

25  which Varvatos store were you working at?

1   A.  I worked at a store in SoHo on Green Street.

2   Q.  And that's here in Manhattan?

3   A.  Yes.

4   Q.  I just want to ask you some questions about your role in

5   this lawsuit, OK?

6   A.  Um-hmm.

7   Q.  Did you start this lawsuit?

8   A.  No.

9   Q.  How did you learn that this lawsuit had started?

10  A.  I received an e-mail.

11  Q.  From who?

12  A.  I believe it was from your firm.

13  Q.  And in substance, what did the e-mail say, if you remember?

14  A.  That there was a class action lawsuit being filed against

15  John Varvatos and it was a gender discrimination lawsuit.

16  Q.  And after you received notice about this lawsuit in that

17  e-mail, what did you understand that you could do in regards to

18  the lawsuit?

19  A.  That I could opt-in by signing a piece of paper saying that

20  I agree that it is unfair that men are being paid more,

21  accommodated more than women.

22  Q.  Did you, in fact, join the lawsuit?

23  A.  I did.

24  Q.  You understand that you are now a plaintiff in this

25  lawsuit?

K2PAAKNO4                    Romero - Direct

1   A.  Yes.

2   Q.  Before we talk about the job of a sales professional, let

3   me just ask you some questions about who you worked with at the

4   Varvatos store in SoHo, OK?

5   A.  OK.

6   Q.  At the Varvatos store in SoHo where you worked, did you

7   work with other sales professionals?

8   A.  I did.

9   Q.  Did you work with both men and women sales professionals?

10  A.  Yes.

11  Q.  While you worked at Varvatos, do you remember about how

12  many men sales professionals you worked with?

13  A.  Throughout my entire time there or it fluctuated so I was

14  there for about two and a half years.

15  Q.  So, over the two and a half years you were there, do you

16  think you worked with more than ten over that time or less than

17  ten?

18  A.  More than ten.

19  Q.  Could you name some for me?

20  A.  When I first started working there there was Jerry Mayorga

21  Pasqual Ortiz, Michael Lucci.  Throughout my time there Rudy

22  Dontes, George Foy, Isaac Padilla, Daniel Adolfi, just to name

23  a few.

24  Q.  And over the time you worked at Varvatos, about how many

25  women sales professionals did you work with?

```
 1   A.  Five to ten.
 2   Q.  Could you name some of the women sales professionals you
 3   worked with?
 4   A.  There's Lala Hafmad, Yuwa Wang, Sheryl Crouchen -- who is
 5   last name, I don't remember.  Karen Horne.
 6   Q.  Did you see how other sales professionals performed their
 7   jobs?
 8   A.  Yes.
 9   Q.  Now, I want to ask you some actual questions about the job
10   of a sales professional at the Varvatos store, OK?
11   A.  All right.
12   Q.  Over there in your pile there is an Exhibit 35A.  If could
13   you take a look at it please.
14           Do you have it?
15   A.  Yes.
16   Q.  You see at the top line it says "job description" in the
17   second line it says "sales professional"?
18   A.  Yes.
19   Q.  Now, aside from preparing for your testimony today have you
20   seen Exhibit 35A before?
21   A.  Yes.  I believe this was in the new hire packet when I
22   first started at JB.
23   Q.  If you hadn't seen this specific document before, do you
24   think it's likely you've seen a similar document?
25           MR. BASSEN:  Objection.  She just said she saw it
```

K2PAAKNO4                        Romero - Direct

 1  before.

 2          THE COURT:  Yeah.  I think she said she saw it.

 3  Q.  Have you ever seen a Varvatos job description that was only

 4  for men's sales professionals?

 5  A.  No.

 6  Q.  Have you ever seen a Varvatos job description that was only

 7  for women's sales professionals?

 8  A.  No.

 9  Q.  In your understanding does this job description Exhibit 35A

10  apply both sales professionals who are mens sales professionals

11  or to women?

12  A.  Yes.

13          MR. WEISS:  Your Honor, I would ask if your Honor

14  could take a look at exhibits 35A in their books.

15          THE COURT:  OK.

16  Q.  Exhibit 35A, do you see a list of job responsibilities?

17  A.  Yes.

18  Q.  What is the first job responsibility you see on that list?

19  A.  Learning, referencing and applying product knowledge

20  information to recommend, select and obtain merchandise based

21  on customer's needs.

22  Q.  As a sales professional at Varvatos, did you do that?

23  A.  Yes.

24  Q.  Did other sales professionals who are women also do that?

25  A.  Yes.

K2PAAKNO4                         Romero - Direct

1  | Q.  Did sales professionals who are men also do that?

2  | A.  Yes.

3  | Q.  What's the next job responsibility on this list?

4  |         MR. BASSEN:  Objection, your Honor.  If he wants to

5  | ask questions about the responsibilities, fine, but to have her

6  | read what's in the document it says it in the document.

7  |         THE COURT:  Overruled.

8  | A.  Establishing, meeting and exceeding sales and performance

9  | goals, as well as setting and achieving sales.

10 | Q.  As a sales professionals at Varvatos, did you do that?

11 | A.  Yes.

12 | Q.  Other sales professionals who are women also do that?

13 | A.  Yes.

14 | Q.  Did sales professionals who are men also do that?

15 | A.  Yes.

16 | Q.  By my count there are about 11 other job responsibilities

17 | on that list.  I don't want to spend the time going through

18 | each one.  So, if could you take a moment or however long it

19 | takes and just look at each of those 11 job responsibilities.

20 | If I ask you the same three questions, did you do it?  Did you

21 | see other women sales professionals do it?  Did men sales

22 | professionals do it?  Would the answer you gave be the same,

23 | yes, yes, yes?

24 | A.  Yes.

25 | Q.  Is there anything in this Exhibit 35A that assigned a job

1  responsibility to a man sales professional but not to a woman

2  sales professional?

3  A.  No.

4  Q.  Putting aside what clothes they are required to wear to

5  work which we will get to in a minute, was there any difference

6  between the job mens sales professionals and women's sales

7  professionals?

8  A.  No.

9         MR. BASSEN:  Objection; leading question.

10        This is direct-examination.

11        THE COURT:  Overruled.  I don't think it's leading.

12 You can answer it.

13 A.  To my understanding, no.

14        MR. WEISS:  Your Honor, the jury can put away Exhibit

15 35A.

16        THE COURT:  Thank you, members of the jury.  Close

17 your books.

18 Q.  Now, I am going ask you some questions about the

19 clothing -- so that we're starting from the same place, what

20 did you understand John Varvatos' clothing allowance to be?

21 A.  I understood that male sales associates got three thousand

22 dollars worth of clothing per season.

23 Q.  And how many seasons are there in a year?

24 A.  Four.  We had four different pulls of clothing every

25 season.

1   Q.  So, in a year's worth of clothing allowance pulls what is
2   the amount of clothing that a man sales professionals would get
3   through clothing allowance?
4   A.  $12,000.  Could we clarify whether we're talking about
5   retail stores and outlets?  I'm sure it's in the record.
6   Q.  I am going to ask a similar question.  You worked at a
7   retail store, correct?
8   A.  Yes.
9   Q.  And at the retail store each pull of the clothing allowance
10  entitled the man to collect three thousand dollars worth of
11  clothing at the store, correct?
12  A.  Yes.
13  Q.  And over the course of a year there could be four seasons.
14  So, that would amount to four thousand dollars, correct?
15  A.  Yes.
16  Q.  Do you happen to know what the clothing allowance was at
17  outlet stores?
18  A.  I don't know that.
19  Q.  Did women's sales professionals get any free clothing from
20  Varvatos?
21  A.  No.
22  Q.  While you worked at Varvatos, did you get any free clothing
23  from Varvatos?
24  A.  No.
25  Q.  Did all of the men sales professionals at the store at

 1   which you worked receive a clothing allowance?

 2   A.  Yes.

 3   Q.  I am going to ask you some questions about the dress codes

 4   at Varvatos, OK.  Did the men sales professionals and women

 5   sales professionals have different dress codes?

 6   A.  Yes.

 7   Q.  So that we're starting from the same place, what is your

 8   understanding of men's dress code?

 9   A.  They had to wear in-season clothing, in-season John

10   Varvatos clothing.

11   Q.  Was there a specific amount of clothing that they had wear?

12   A.  And there was also the three-piece rule.

13   Q.  And what is the three-piece rule?

14   A.  They, I believe it applied to literally the waist up.  They

15   had to have three pieces on, a T-shirt, a vest and scarf or a

16   shirt, jacket, tie but something like that, three pieces.

17   Q.  And where did they receive the clothing they used to comply

18   with the male dress code?

19   A.  They would pull their clothing allowance from in-store

20   items from whatever store they worked at.

21   Q.  As far as you know did the clothing allowance cover the

22   costs for the men complying with the male dress code?

23   A.  I'm sorry.  Can you repeat that?

24   Q.  As far as you know did the clothing allowance cover the

25   costs to the male sales professional complying with the male

1   dress code?

2          MR. BASSEN:  Objection; lack of foundation.

3          How would she know that?

4          THE COURT:  There's been a little lack of foundation

5   problem.  Why do you work on that.

6   Q.  While you were working in the store you would have

7   witnessed clothing allowance pulls, correct?

8   A.  Yes.

9   Q.  And that means you would have seen the men pull clothing

10  that they would then wear to work?

11  A.  Yes.

12  Q.  You have heard discussions about -- I'm sorry.  Have you

13  heard discussions about what the male dress code is?

14  A.  Yes.

15  Q.  Have you ever heard any man sales professional complain to

16  you that the clothing allowance he received was insufficient to

17  comply with the male dress code?

18         MR. BASSEN:  Objection.

19         THE COURT:  That one I will allow.  You can answer

20  that.

21  A.  They never complained to me about it.

22  Q.  As someone who used to sell Varvatos clothing for a living,

23  do you think that if a man sales professional were given three

24  thousand dollars to spend at Varvatos, they could buy enough

25  clothes to comply with the male dress code?

K2PAAKNO4                    Romero - Direct

 1  A.  Yes, I do think so.

 2  Q.  Did having the men sales professionals wearing the Varvatos

 3  clothing help sell the Varvatos clothes?

 4  A.  I don't know that it did.  I didn't track that for me

 5  personally.

 6  Q.  For you, what was the effective, what was the most

 7  effective thing you did to sell the Varvatos clothes?

 8  A.  I think presented myself as an expert on the clothes,

 9  developing a rapport with someone helped.

10  Q.  Could you give me an example of how you did that to make a

11  sale?

12  A.  So, we would have -- there is a lot of foot traffic in

13  SoHo.  So, people would come in off the street.  Sometimes they

14  would be surprised at expensive the clothing is.  So, it would

15  be helpful to have details about finishing, the fabrics, where

16  it's constructed, things like that.  And really establishing

17  yourself as an authority right off the bat when you interact

18  with them.

19  Q.  Did Varvatos have a women's dress code?

20  A.  Yes.

21  Q.  If you could take a look at what has been marked as Exhibit

22  One in evidence.  It is in your pile, I believe.

23          It's in the jury books but the jury does not need no

24  look at it right now.

25          THE COURT:  OK.

K2PAAKNO4                    Romero - Direct

1    Q.  Do you recognize this document?

2    A.  Yes.

3    Q.  What is this document?

4    A.  It's the dress code for men and women.

5    Q.  Is it the dress code for men and women in the Varvatos

6    stores?

7    A.  It's for, it's appearance and dress standards retail

8    locations.

9    Q.  When did you first see this document?

10   A.  I believe I first saw it again in that new hire packet when

11   I was first hired.

12   Q.  Do you see in this document a list of the kind of cloths

13   that you were not allowed to wear to work?

14   A.  Yes.

15   Q.  Speaking generally, in your own words what did the female

16   dress code tell you to do?

17   A.  Generally speaking, look professional, wear things that are

18   similar to the brand esthetic.

19   Q.  Does the dress code restrict -- did the dress code while

20   you worked there restrict the color palette you could wear

21   clothes from?

22   A.  Yes.

23   Q.  And if you want to take a look at it, were there any

24   particular colors they told you that you should be wearing?

25   A.  Yes.  It says female sales

1   associates/professionals/cashiers may only wear black, midnight

2   blue or white denim.  I'm sorry.  It's denim only.  The color

3   palette says in the case of a female employee, it's black,

4   white, beige, umbrage, gray, navy, olive and brown.

5   Q.  Were there any restrictions on the kind of fabrics you

6   could wear?

7   A.  It just says fabric should be appropriate.  Then down here

8   it says sheer fabrications may not be worn.

9   Q.  And were you allowed to wear clothing with large prints or

10  patterns?

11  A.  It specifically says the following is not to be worn by any

12  employees working on the sale floor, bright, colors, large

13  prints and patterns.

14  Q.  While you were working at Varvatos did Varvatos give you

15  any of the clothing that you needed to wear to work?

16  A.  No.

17  Q.  So, we've just talked about different dress codes for men

18  and women.  Now I am going to ask you some questions to see if

19  the men had any job responsibilities that woman did not, OK?

20  Did Varvatos tell men sales professionals they had an

21  obligation as part of their job to try on Varvatos clothes for

22  customers?

23  A.  Not it's not an obligation or part of their job.

24  Q.  Did you ever see men sales professionals try on clothing

25  for customers?

1   A.  I have seen male associates try on jackets for example or

2   sweater or cardigan, something they can throw over what they're

3   already wearing for a customer.

4   Q.  How often did that happen?

5   A.  I saw it happening maybe a handful of time.

6   Q.  In the two and a half to three years that you worked at

7   Varvatos, did you ever ask a man sales professional to try on

8   Varvatos clothes for the benefit of a customer you were

9   helping?

10  A.  I did.

11  Q.  How many times do you recall you doing that?

12  A.  Not that often.  Maybe like a handful of times.

13  Q.  Can you describe what you remember of those instances?

14  A.  I remember around the holidays somebody coming in to shop

15  for either their son or their husband and they weren't sure

16  what size they were.  So, I think I asked somebody to like

17  throw on a jacket so they can figure out their sizing.

18  Q.  How long did it take a man sales professional to try on

19  that --

20  A.  No more than three or five minutes.

21  Q.  Did the male sales professional have to go to the dressing

22  room?

23  A.  No.  It would literally be like if somebody was standing

24  there.  I would ask my client, the female, is he about the size

25  of your son or husband and then I would then ask my colleague

K2PAAKNO4                    Romero - Direct

1   would you mind throwing this is on so she can get an idea for

2   the right fit.

3   Q.   Now earlier early you said you didn't know of any

4   obligation of men sales professional to try on clothing or

5   customers, right?

6   A.   Yes.

7   Q.   So, why do you think your male sales professional tried on

8   the clothing for you and that customer?

9   A.   They probably did that as a favor to me.

10  Q.   He was trying to help you make the sale?

11  A.   Um-hmm.

12       THE COURT:  "Yes" or "no" for the record.

13  A.   Yes.

14  Q.   So, if a male colleague had come in with a customer and

15  asked you to try on an item for a customer to help him make the

16  sale, would you have done it?

17  A.   Yes.

18  Q.   Did the SoHo store ever have storewide meetings?

19  A.   Yes.

20  Q.   And at some of these meetings did some mens sales

21  professionals try on items of new clothing that had just come

22  in?

23  A.   Yes.  If they were product knowledge meetings and we just

24  had a large shipment come in, then, yes, we would try things

25  on.

1    Q.  At these meetings did all the mens sales professionals try

2    on clothing?

3    A.  No, not everyone.

4    Q.  How was it determined which men sales professionals would

5    try on new clothing?

6    A.  It really would depend.  It would just be a matter of

7    having a rack of jackets or something like that already next to

8    them.  They would pick up a jacket and say is anyone this size?

9    Would you like to try this on?

10   Q.  So, it was voluntary for the man sales professional to try

11   on the jacket?

12   A.  Yes.

13   Q.  So, a sales professionals who did not want to try on a

14   jacket, he could just remain seated and not try on the jacket?

15   A.  Right.

16   Q.  Earlier you said that one of the mens sales professionals

17   you worked with was Jerry Mayorga; is that right?

18   A.  Yes.

19   Q.  Do you recall Jerry Mayorga ever trying on clothing at one

20   of those meetings?

21   A.  I think so, yes.

22   Q.  How often were these meetings?

23   A.  They were anywhere from one to two times a year.  Well, the

24   large meetings with like fires and people from corporate would

25   happen one to two times a year.

K2PAAKN04                      Romero - Direct

1    Q.  And how long would the meetings go?

2    A.  They were usually right before a store opening to maybe an

3    hour.

4    Q.  During the time that you worked at Varvatos, did you ever

5    hear anyone say something to the effect of Varvatos being

6    uncomfortable or hard to work in?

7    A.  Nobody ever complained to me about it.

8    Q.  In total, would you say that the jobs performed by men and

9    women sales professionals is substantially the same?

10            MR. BASSEN:  Objection.

11            THE COURT:  Sustained.

12   Q.  Let me ask you some questions about the clothes you wore

13   when you worked at Varvatos.

14   A.  OK.

15   Q.  When you started at Varvatos how much clothing did you have

16   that complied with Varvatos women's dress code?

17   A.  Well, when I had first, I had recently moved here from

18   California so I didn't -- and I sold a lot of my clothes in

19   California.  So, I really didn't have that much clothing in

20   general.  So, I would say I had a few pieces but not a whole

21   lot that also complied with the dress code.

22   Q.  Well, what little you had that complied what the dress code

23   at Varvatos, you would comply with the dress code at Varvatos?

24   A.  Yes.

25   Q.  Can you explain to the jury in your own words what kind of

1   clothing you thought you should wear to work at Varvatos.

2   A.  Well, I mean I understand the dress code which meant it was

3   muted tones.  I had to be professional.  So it will be like at

4   certain length, no low-cut necklines.  The whole brand's

5   esthetic is a lot of like leather.  So, I thought something

6   like a leather jacket, something along those lines.

7   Q.  Did you believe it was in your interest to dress in more

8   expensive clothing rather than cheaper clothing?

9   A.  Yes.

10  Q.  Why?

11  A.  Because I am selling very expensive clothing and I think

12  wearing expensive clothing to establish you as an authority

13  kind of gives you the confidence to sell something that's very

14  experience.

15  Q.  Now, while you worked at Barneys were you selling expensive

16  clothing?

17  A.  Yes.

18  Q.  Did your work at Barneys help form some of that experience

19  that made you believe that wearing more expensive clothing

20  would help you sale more expensive clothes?

21  A.  Definitely.

22  Q.  While you were working at Barneys, did you have to go out

23  and but clothes that you wore to work at Varvatos?

24          MR. BASSEN:  Objection, to the use of the word "have",

25  "have to go".

K2PAAKNO4                    Romero - Direct

1        THE COURT:  Maybe break it down.  I think there

2   already is testimony that you didn't have enough clothing,

3   right?

4        THE WITNESS:  Yes.

5        THE COURT:  Did you acquire additional clothes for the

6   purpose of working?

7        THE WITNESS:  Yes.

8        THE COURT:  All right.  Keep going.

9   Q.  Most of the clothing that you wore to work at Varvatos, did

10  you end up buying that clothes after you started at Varvatos?

11  A.  Yes.

12  Q.  After you started working at Varvatos, what kind of

13  clothing did you buy to work at Varvatos?

14  A.  Like what styles or?

15  Q.  Sure.

16  A.  I don't know.  Maybe like more work pants, like

17  professional looking work pants which I probably didn't have in

18  my wardrobe, or dresses that specifically fit the color palette

19  considering.

20  Q.  Did you buy more tailored clothing?

21  A.  Yes, I definitely bought blazers that I didn't own before.

22  Q.  What stores did you shop at to buy clothes to wear to work

23  at Varvatos?

24  A.  I shopped at Helmut Lang, Theory -- when he got the

25  AllSaints discount, I shopped at AllSaints.

1    Q.  And about how much did you spend each year on clothing that
2    you wore to work at Varvatos?
3    A.  I did the math monthly and I think it was like 350 a month.
4    Q.  I don't want to make you do the math but 350 a month times
5    12 is $4,000?
6    A.  Yes.
7    Q.  Could you have complied with the dress code by spending
8    that much money?
9            MR. BASSEN:  OK.
10           THE COURT:  Overruled.
11           You can answer that.
12   A.  Yes, I think it would have been possible.  However, it
13   would have taken me more time and more effort.
14   Q.  To find cheaper clothes that comply with the female dress
15   code?
16   A.  Yes.
17   Q.  Do you believe that had you found cheaper clothes that
18   complied with the female dress code and worn those to work in
19   Varvatos that your sales would have suffered?
20   A.  Yes.
21           MR. BASSEN:  Objection; leading question.
22           THE COURT:  There's been a lot of leading.  Try to do
23   this without leading.
24   A.  I don't know.
25           THE COURT:  No, no.  He is going to ask you another

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2PAAKNO4                    Romero - Direct

1   yes.  I am sorry.  I forgot to tell you at the beginning to

2   wait till I rule.  Now that I've ruled, Mr. Weiss is going to

3   ask you another question.

4            MR. WEISS:  Withdrawn.

5   Q.  Did you shop for clothing that you wore at Varvatos on your

6   own dime?

7   A.  Yes.

8   Q.  Did you Varvatos ever compensate you for the time you spent

9   to buy clothing to work at Varvatos?

10  A.  No.

11  Q.  Did Varvatos ever compensate you for the time that had

12  spent shopping for clothing that you wore to work at Varvatos?

13  A.  No.

14  Q.  While you were working at Varvatos did anyone from Varvatos

15  management ask you what you spent on clothing that you wore to

16  work?

17  A.  No.

18  Q.  Now, the clothing that you bought to wear at work at

19  Varvatos, is that the kind of clothing that you normally wear

20  outside of work?

21  A.  I'm really active outside of work so, no.

22  Q.  Now, the clothing that you wore to work at Varvatos, is

23  that the kind of clothing that you've worn to work at jobs

24  you've held since leaving Varvatos?

25  A.  A few of the times, yes.

1   Q.  But not most of the items?

2   A.  Yes.

3   Q.  For example, right now you work at a charter school, right?

4   A.  Yes.

5   Q.  I think you said it's a middle school?

6   A.  Yes.

7   Q.  Why wouldn't you wear the clothing that you wore to work at

8   Varvatos to your job at the middle school?

9   A.  It's too nice to wear around middle school children.

10  Q.  Before you worked at the charter school, I believe you

11  worked for a hotel?

12  A.  Yes.

13  Q.  I'm sorry.  Strike that.

14          After you worked at Varvatos and before you worked at

15  the charter school, I believe you said you were the executive

16  assistant to somebody who worked at a property management; is

17  that correct?

18  A.  Yes.

19  Q.  At the property management firm you were required to

20  dress -- I am sorry.  How were you required to dress at the

21  property management firm?

22  A.  The dress code was also like a professional dress code.

23  Q.  And at that organization, was it important to you to wear

24  expensive clothing?

25  A.  No.  I was mostly dressed mostly interfacing with my boss

1  and very few other people.

2  Q.  Earlier you mentioned that you bout clothes to wear to work

3  at AllSaints?

4  A.  Yes.

5  Q.  During the time that you worked at Varvatos, about items of

6  AllSaints clothing did you buy on the regular?

7  A.  A few, plus then, plus ten I would say.

8  Q.  Did you ever receive any free AllSaints clothing?

9  A.  No.

10  Q.  Did you receive a discount from AllSaints?

11  A.  Yes.  It was 50 percent off the full price clothing.

12  Q.  Now, did you always receive an AllSaints discount from the

13  time you worked at Varvatos?

14  A.  No.  That happened -- I am not sure when it happened, which

15  year that happened.  It happened when JP's parent company

16  emerged with AllSaints management company.  I think that

17  happened like half way into my time while working there.

18  Q.  You said JV is the parent company.  Does JV mean Varvatos?

19  A.  Yes.

20  Q.  You think it happened sometime through your tenure at

21  Varvatos; is that right?

22  A.  Yes.

23  Q.  So, if you started in 2012 and you ended in 2015, halfway

24  through your tenure would be somewhere in the 2013/2014

25  timeframe?

```
 1              MR. BASSEN:  Objection, a whole series of leading
 2    questions.  He's testifying.
 3              THE COURT:  Yeah or you can leave it for your argument
 4    and explain there since it's math.
 5    Q.  Can you take a look in your pile at Exhibit One.  Oh, I'm
 6    sorry.  Exhibit 6.  Have you ever seen Exhibit 6 before?
 7    A.  Yes.
 8    Q.  When have you seen Exhibit 6 before?
 9    A.  It's the JV AllSaints discount policy and they gave it to
10    us when the discount went into effect.
11    Q.  Is there a maximum amount of clothes that you could buy at
12    AllSaints using the discount?
13    A.  Yes.
14    Q.  What was the maximum?
15    A.  It says here the maximum you may purchase on your discount
16    is 2500 per season.
17    Q.  To use the AllSaints discount do you have to take money out
18    of your own pocket and spend it at AllSaints?
19    A.  Yes.
20    Q.  Could you use the AllSaints discount on clothes that
21    AllSaints had already marked down and priced and put on the
22    sales rack?
23              MR. BASSEN:  Objection; leading question.
24              THE COURT:  I'll allow that one.  You can answer it.
25    A.  No.  The discount is for 50 percent off the full price.  It
```

K2PAAKNO4                     Romero - Direct

 1  didn't apply to already discounted items.

 2  Q.  Were there any period of time when you were not allowed to

 3  use the AllSaints discount?

 4  A.  There were times when the entire store was on sale.  So,

 5  yes, you couldn't use your discount at all then.

 6  Q.  And around when was that?

 7  A.  Usually around the holidays or the end of the season.

 8  Q.  Where did you have to shop to use the AllSaints discount?

 9  A.  You had to go into an AllSaints brick and mortar store.

10  You couldn't use this online.

11  Q.  You couldn't use the Varvatos store which you worked; is

12  that correct?

13  A.  Correct.  You couldn't use it at the Varvatos store.

14  Q.  And when you went to work -- I'm sorry.  Strike that.

15          When you were using the AllSaints discount for

16  clothing that you wore to work at Varvatos, were you going

17  there to shop on your own personal time or on company time?

18  A.  I was on my own personal time.

19  Q.  At the time that you were working at Varvatos did you think

20  the AllSaints discount that you received was an equivalent

21  benefit to the clothing allowance a male sales professionals

22  received?

23  A.  No, because I was still spending my own money.

24  Q.  I'm going to ask you some questions about cleaning the

25  clothing that you were to wear at Varvatos?

1    A.  OK.

2    Q.  Did you spend money on cleaning the clothing that you would

3    have worn at Varvatos?

4    A.  Yes.  I spent money on clothing, all of my clothes.  So,

5    yes.

6    Q.  And about how much money, if you recall, did you spend

7    cleaning clothes you were to work in Varvatos in a typical

8    week?

9    A.  I don't really remember.  When I worked there I would have

10   to pay to do laundry because I didn't have a washer or dryer in

11   my building so maybe like ten dollars a week, 10 or $15 a week.

12   I really don't remember.

13   Q.  Going back to clothing allowance, did you ever complain to

14   anyone at Varvatos that you thought the clothing allowance was

15   unfair?

16   A.  I did.

17   Q.  Who did you complain to?

18   A.  I mean initially I think I complained to colleagues that I

19   was close with and I do remember complaining to one of the GMs

20   that was there when I first started.

21   Q.  I'm sorry.  What is a GM?

22   A.  One of the general managers of the store when I first

23   started there.

24   Q.  What is the general manager?

25   A.  They're the manager of the entire store so they oversee all

1  the employees and assistant managers and basically, everyone

2  who works in the store.

3  Q.  And who was the general manager that you complained to?

4  A.  When I first started it was Henaro --

5  Q.  In substance what was your complaint?

6  A.  I think I brought it up during one of the first times that

7  I witnessed all of the male employees pulling their clothing.

8  I just said something about oh, like this is unfair or is there

9  something equivalent for female employees?  And he was just

10  pretty dismissive about it.

11  Q.  What did he say?

12  A.  He, I think he just kind of like brushed me off like didn't

13  really say anything about it.

14  Q.  Did he tell you that there was going to be an equivalent

15  benefit for women?

16           MR. BASSEN:  Objection; leading question.

17           THE COURT:  If you could rephrase.

18  Q.  Did he give you any verbal response at all besides sort of

19  brushing you off?

20  A.  No, not really.

21  Q.  When you spoke to him did you think he was taking your

22  complaint seriously?

23  A.  No.  I mean he was, like I said he was like pretty

24  dismissive about it as if that is the end of the conversation.

25  Q.  At the time that you worked at Varvatos did you know that

 1   there was a Varvatos store in London in the UK?
 2   A.  That opened while I was working there, yes.  I believe a
 3   few of their associates came and trained at our store.  So,
 4   yes, I was aware of it.
 5   Q.  To your knowledge the Varvatos store in the UK sell the
 6   same products as the Varvatos store in the United States?
 7   A.  Yes.
 8   Q.  At any time while you were working at Varvatos did you know
 9   that Varvatos gave a clothing allowance to the London sales
10   professionals at the London store?
11           MR. BASSEN:  Objection.
12           THE COURT:  I don't see what relevance her knowledge
13   of that whether it's true or not is to the case.  So, it's
14   sustained.
15           Next question.
16           MR. WEISS:  No further questions at this time.
17           THE COURT:  OK.
18           MR. BASSEN:  May I just have two minutes?
19           We can stand and stretch while Mr. Bassen has two
20   minutes.
21           (Continued on next page)
22
23
24
25

```
 1              THE COURT:  If you hear someone say "objection," wait
 2     a moment and I will let you know whether or not to answer.
 3              Mr. Bassen, whenever you are ready.
 4     CROSS-EXAMINATION
 5     BY MR. BASSEN:
 6     Q.  Good afternoon, Ms. Romero.
 7     A.  Good afternoon.
 8     Q.  I believe you were asked a question and you gave an answer
 9     that you asked a co-employee to try on a jacket while you were
10     working at Varvatos?
11     A.  Yes.
12     Q.  Was that co-employee a male employee?
13     A.  Yes.
14     Q.  Why didn't you try on the jacket yourself?
15     A.  Because it was somebody's wife or mother she was shopping
16     for her son or her husband.  She wasn't sure which size he
17     wore.  John Varvatos has an Italian sizing, which was confusing
18     for her.  So I asked her to -- I asked a male employee who said
19     was about the same build as her son or husband to try on the
20     jacket.
21     Q.  You were not the same build as her son or her husband; is
22     that correct?
23     A.  Correct.
24     Q.  I believe you testified that when you testified from
25     California you sold clothes; correct?
```

1   A.  Correct.

2   Q.  Did you sell all your clothes?

3   A.  I didn't sell all of my clothes, but I sold a lot of them

4   because I was permanently moving from California to New York.

5   Literally packing up everything I owned so I wanted to get rid

6   of some things.

7   Q.  Were you planning to work when you moved from California to

8   New York?

9   A.  Yes.

10  Q.  Did you know in what capacity you would be working?

11  A.  I thought I would be working at Barneys in New York here.

12  Q.  You thought you would be working in retail; correct?

13  A.  Yes.

14  Q.  You would need to wear clothing in order to work at retail

15  in New York?

16  A.  Yes.

17  Q.  How would you have such clothing if you sold most of your

18  clothing in California?

19          MR. WEISS:  Objection, such clothing.  What clothing?

20          THE COURT:  I meant you meant the clothing she had to

21  wear in clothing retail?

22          MR. WEISS:  What kind of work did she have to wear in

23  retail?

24          THE COURT:  I think we're okay.

25          If you can answer the question.

K2P6VAR5                        Romero - cross

1   A.   I thought I would be working at Barneys in New York here
2   and their clothing -- their dress code was not very
3   restrictive.
4   Q.   But you sold most of your clothing.  What does that have to
5   do with what their dress code was?
6        Where would you get the clothing to wear as Barneys?
7   A.   I still had clothing to wear.
8   Q.   Even though you sold most your clothing?
9   A.   Yes.
10  Q.   So the clothing you didn't sell, you would wear every day
11  at Barneys?
12  A.   Yes.
13  Q.   Did anybody require you to purchase more clothing after you
14  moved to New York?
15       THE COURT:  Are you talking about an employer?
16       MR. BASSEN:  Yes, an employer.
17       THE COURT:  Including Varvatos or not including
18  Varvatos?
19  Q.   After you moved to New York, what was your first job?
20  A.   I worked at Theory, which is a clothing store.
21  Q.   Did Theory require you to buy clothing --
22  A.   No.
23  Q.   -- when to worked at Theory?
24  A.   No.  They give a clothing allowance.
25  Q.   Oh, they did?

K2P6VAR5                        Romero - cross

 1   A.  Yes.

 2   Q.  Did they have a dress code?

 3   A.  Yes.  It included wearing the Theory clothing.

 4   Q.  You worked at Theory with a dress code and allowance before

 5   you went to work at Varvatos; correct?

 6   A.  Yes.

 7   Q.  So before you went to work at Varvatos, you knew that there

 8   was such a thing as a dress code; correct?

 9   A.  Yes.

10   Q.  You knew there was such a thing as a clothing allowance;

11   correct?

12   A.  Yes.

13   Q.  Did any men work at Theory?

14   A.  Yes.

15   Q.  Did the men get a clothing allowance?

16   A.  Yes.

17   Q.  So Theory was your first job in New York and then Varvatos

18   followed that?

19   A.  Yes.

20   Q.  But when you were in California you worked at Barneys;

21   correct?

22   A.  Yes.

23   Q.  Did you work for any particular retailer at Barneys?

24   A.  No.  I was Helmut Lang, which is a clothing label.  I was

25   their specialist, but I worked for -- I could sell everything

1    on the floor.  I didn't specifically only sell their clothing.

2    Q.  When you worked at Barneys in California, were you subject

3    to a dress code?

4    A.  Yes.

5    Q.  When you worked at Barneys at California, did you get a

6    clothing allowance?

7    A.  No.  Helmut Lang did offer bonuses in the form of clothing.

8    In the form of clothing if you made your sales goal, but it

9    wasn't just free clothes.

10   Q.  What do you mean by "free clothes"?

11   A.  It wasn't just a -- they didn't just give you clothing for

12   working there.  You had to hit a sales goal and basically earn

13   it.

14   Q.  So when someone gets clothing for working there, that is

15   free clothes?

16   A.  If they just give you clothing for working there, then,

17   yes, I don't believe you have to earn it.

18   Q.  Well, if the person who gets the so-called free clothes has

19   to pay tax on the clothes, is it really free clothes?

20          MR. WEISS:  Objection, your Honor.

21          THE COURT:  I am not sure that this is within this

22   witness's competence.

23          MR. BASSEN:  Well, she keeps talking about free

24   clothes.

25          THE COURT:  That was in your question.

K2P6VAR5                          Romero - cross

 1    Q.  You already told us what you mean by free clothes.

 2              Do you know whether or not males salespersons at

 3    Varvatos had to pay tax on the clothes they got?

 4    A.  I don't.  But it is also my understanding that everyone

 5    pays taxes on all the clothes purchased.

 6              THE COURT:  I think we are getting into two different

 7    taxes and I don't know that this witness is the right person to

 8    talk about it.  Income tax and sales tax.

 9    Q.  I am asking you about income tax.

10    A.  I don't know about that.

11    Q.  You said you after Varvatos, you worked for a real estate

12    company; correct?

13    A.  Yes.

14    Q.  Did you buy any clothes to wear at that real estate company

15    when you worked there?

16    A.  No.  Not specifically to wear to work.

17    Q.  Did you buy any clothes at all when you worked for the real

18    estate company?

19    A.  Yes.

20    Q.  But you wore that clothes both at work and not at work?

21    A.  Yes.

22    Q.  Who decided whether you would wear clothes just at work or

23    not at work?

24    A.  Myself.

25    Q.  No one told you you had to do that; correct?

1  A.  Correct.

2  Q.  Now, you are working at a charter school; correct?

3  A.  Correct.

4  Q.  Have you bought any clothes whatsoever during the time

5  you've been working at the charter school?

6  A.  Yes.

7  Q.  For what purpose?  To wear where?

8  A.  I think I bought something to wear to someone's wedding.  I

9  bought a dress to wear to someone's wedding.

10  Q.  Have you bought any clothes while working at the charter

11  school to wear at the charter school?

12  A.  No.

13  Q.  Is that a dress you are wearing right now?

14  A.  Yes.

15  Q.  It is a pretty dress.

16        Could you have worn that dress while working at

17  Varvatos?

18  A.  This I don't think would comply with the dress code because

19  of the pattern and the color.

20  Q.  So now that you are not working at Varvatos you are free to

21  wear that dress?

22  A.  Yes.

23  Q.  When did you buy that dress?

24  A.  Maybe a year ago.

25  Q.  After you left Varvatos?

1   A.  Yes.  I left Varvatos in 2015.

2   Q.  You testified that you complained in a number of instances

3   about not getting the clothing allowance; correct?

4   A.  Yes.

5   Q.  Did you ever ask human resources at Varvatos about that?

6   A.  I did not.

7   Q.  Why not?

8   A.  Well, for starters they are not in our store.  They are at

9   corporate headquarters.  So I feel like it would have to be --

10  I felt like an elevation.  Like, I would typically if I had an

11  issue, I would go to my manager and he like I said was very

12  dismissive about it so I kind of stopped there.

13  Q.  Did you have a Varvatos email when you worked at Varvatos?

14  A.  I did.

15  Q.  Do you know whether Varvatos human resources had a Varvatos

16  email?

17  A.  They did.

18  Q.  So if you wanted to complain to human resources while at

19  Varvatos, couldn't you have sent them an email?

20  A.  I could have.

21  Q.  But you didn't?

22  A.  I did not.

23  Q.  You said that you -- please correct me if I am wrong --

24  joined this lawsuit because it is unfair that male are being

25  compensated more than women; correct?

K2P6VAR5                          Romero - cross

1    A.   Correct.

2    Q.   What is the compensation that the males got more than the

3    women?

4    A.   Specifically the clothing allowance.

5    Q.   Did the allowance involve compensation?

6    A.   Well, it has a value.

7    Q.   Was it money?

8    A.   There is a monetary value.

9    Q.   Is clothing money?

10   A.   No, clothing is not money.

11   Q.   So is clothing compensation?

12           MR. WEISS:  Objection, your Honor.

13           THE COURT:  Sustained.  Let's move on.

14   Q.   You said you worked with someone whose name is -- a males

15   sales professional Ruby Dontes?

16   A.   Rudy Dontes.

17   Q.   Do you know how much Rudy Dontes was paid by Varvatos per

18   hour?

19   A.   I don't know that.

20   Q.   How much were you paid by Varvatos per hour?

21   A.   Honestly I don't remember.  Maybe 18 or $19 an hour.

22   Again, this was also five, six, seven years ago.  I don't

23   really recall.

24   Q.   Now, you said that you said the males sales professionals

25   received $12,000 worth of clothes per year; correct?

1    A.  Yes.

2    Q.  12,000 based on what?

3    A.  Retail value.

4    Q.  Full retail value?

5    A.  Full retail value.

6    Q.  Isn't it a fact that those same male professionals could

7    have bought that clothing on their own at a 65 percent

8    discount?

9    A.  Correct.  Every may and female employees received a 65

10   percent employee discount.

11   Q.  So if the male equivalent were not getting equivalent of

12   12,000, they would have only had to spend 4200 for the same

13   clothing; correct?

14   A.  Yes.

15   Q.  So how is it that they got $12,000 worth of clothing?

16           MR. WEISS:  Your Honor, this is argument.

17           THE COURT:  I agree.

18           Next question.

19   Q.  You also worked at Saks, did you not?

20   A.  I did.  Many, many years ago in Santa Barbara.  Probably

21   2005, 2006.

22   Q.  Did you work with something known as BCGB?

23   A.  Yes.

24   Q.  What is BCGB?

25   A.  They are a contemporary lifestyle brand.

K2P6VAR5                         Romero - cross

1   Q.  What did you have to do with BCGB?

2   A.  I was their clothing specialist at Saks.

3   Q.  Were you required to wear the BCGB clothing?

4   A.  No, I was not required to wear it.

5   Q.  Did you get a clothing allowance when you were dealing with

6   BCGB clothing?

7   A.  They gave me a bonus in the form of clothing when I made my

8   sales quota.

9   Q.  They did not give you clothes for free?

10  A.  They -- I would earn clothes by making my sales goal.

11  Q.  Then you got clothes for free; correct?

12  A.  Yes.

13          MR. WEISS:  Objection, your Honor.  This is the same

14  argument about free clothing.

15          THE COURT:  Now, I guess Mr. Bassen you are using the

16  term free.  Why don't you specify what you mean by it and ask a

17  question and I will see how I will rule on it or you can move

18  on.

19          MR. BASSEN:  I will move on.

20  BY MR. BASSEN:

21  Q.  Is it correct that you wore Helmut Lang in the store?

22          THE COURT:  Which store?

23          MR. BASSEN:  The store when you worked at Helmut Lang?

24          THE COURT:  Varvatos?

25          MR. BASSEN:  No, not Varvatos.  Varvatos does not sell

```
 1    Helmut Lang.
 2    Q.   There was a time that you testified that you were involved
 3    with Helmut Lang; right?
 4    A.   Yes, at Barneys.
 5    Q.   At Barneys.
 6              At that time did wear the Helmut Lang clothes?
 7    A.   Yes.
 8    Q.   Can you tell us whether or not you think wearing the Helmut
 9    Lang clothes helped you sell them?
10    A.   Yes.
11    Q.   Do you agree that wearing the Helmut Lang clothes created
12    visibility for the Helmut Lang brand?
13    A.   Yes.
14    Q.   Now, when you worked at Theory, am I correct that you were
15    required to wear only seasonal Theory clothes?
16    A.   Yes.
17    Q.   Theory where you worked only had women's clothes; is that
18    correct?
19    A.   In the story was in, yes.
20    Q.   The particular store.
21              But Theory had both male and female sales associates;
22    correct?
23    A.   Yes.
24    Q.   With respect to Theory, am I correct that both men and
25    women selling Theory got a clothing allowance?
```

K2P6VAR5                        Romero - cross

 1   A.  Yes.

 2   Q.  Am I also correct that in order for the men to use that

 3   clothing allowance, the men working with you in your particular

 4   Theory store in order for the men to use it, they would have to

 5   go to another Theory store?

 6   A.  Not necessarily.

 7   Q.  I thought your Theory store only sold women's clothing?

 8   A.  Yes.  But if the men wanted something from the women's

 9   line, they could take it from the women's line.

10   Q.  How often did that happen?

11   A.  Pretty regularly.

12   Q.  Does Theory make men's clothes?

13   A.  They do.

14   Q.  Did some men want Theory men's clothes?

15   A.  A few of them.

16   Q.  Where would they have go to get the Theory men's clothes

17   for their clothing allowance?

18   A.  From a separate store.

19   Q.  From where they worked?

20   A.  Yes.

21   Q.  There came a time when you left working for Varvatos;

22   correct?

23   A.  Yes.

24   Q.  Why?

25   A.  I no longer wanted to work in retail.

1  Q.  Have you ever referred to Varvatos as a men's clothing

2  brand?

3  A.  Yes.

4  Q.  Under what circumstances?

5  A.  I think when describing it to my friends or family.

6  Q.  You had clients when you were working at Varvatos; is that

7  correct?

8  A.  Yes.

9  Q.  Were most of them men or women?

10  A.  Most of them were men.  I did have a few female clients.

11  Q.  Do you agree that is it important for a sales professional

12  to accurately represent the brand while at work?

13  A.  How so?

14  Q.  I am asking you if you agree.

15  A.  Represent it in what way?

16  Q.  Should we go to your deposition?

17          MR. BASSEN:  Mr. Bassen, no need to say that.  Why

18  don't you just clarify the question.

19  Q.  When there are sales professionals working at Varvatos, can

20  you tell us whether or not during the course of their job they

21  are representing the brand?

22  A.  Yes.

23  Q.  Do you think that is important?

24  A.  Yes.

25  Q.  As part of that because the clothing items are expensive?

Case 1:17-cv-00772-GWG   Document 340   Filed 07/07/20   Page 183 of 242
Case 1:17-cv-00772-GWG   Document 341   Filed 08/05/20   Page 182 of 241        240
K2P6VAR5                         Romero - cross

1   A.  Yes.

2   Q.  Now, I think you testified -- please correct me if I am

3   wrong -- that male sales professionals while working at

4   Varvatos were required to wear the Varvatos brand; correct?

5   A.  Yes.

6   Q.  Is it also correct that female sales professionals while

7   you were working there were not required to wear the Varvatos

8   brand?

9   A.  Correct.

10  Q.  Is it also correct that female sales professionals at

11  Varvatos could wear clothes they previously owned as long as it

12  fell within the dress code?

13  A.  As long as it fell within the dress code, yes.

14  Q.  Now, is it also correct that Varvatos required its male

15  sales professionals to only wear Varvatos seasonal clothes, the

16  clothes of that season?

17  A.  Yes.  However, there are some timeless pieces that you

18  could use all year around.

19  Q.  A male could use?

20  A.  Yes.  Like a white dress shirt, black pants.  Anything that

21  is a neutral, I believe you could wear that all year around.

22  Q.  Would you tell us whether Varvatos female sales

23  professionals were required to wear seasonal clothing?

24  A.  They had to comply with the dress code.

25  Q.  Did the dress code require the wearing of seasonal

1    clothing?

2    A.  No.

3    Q.  Now, isn't one of the stores where you bought clothing for

4    working for Varvatos Zara?

5    A.  Yes.

6    Q.  Is Zara a high-point clothing store or a low-point clothing

7    store?

8    A.  I think it depends on your relationship with money.

9    Q.  Compared to Varvatos, is it high or low?

10   A.  It's a lower price point than Varvatos.

11            THE COURT:  Mr. Bassen, this is about the time I would

12   normally take the midafternoon break; but if you were going to

13   finish soon, I would much rather finish it up.

14            MR. BASSEN:  I am going to finish soon.

15            THE COURT:  Okay.

16   Q.  Can you tell us whether or not you still have some All

17   Saints clothing to this day?

18   A.  I have one or two pieces from All Saints still, yes.

19   Q.  You said that the men got 3,000 retail worth of clothing

20   per pull; correct?

21   A.  Correct.

22   Q.  Was that enough to buy a outfit, single outfit?

23            MR. WEISS:  Objection.

24            THE COURT:  Overruled.

25   A.  I believe so.

K2P6VAR5                         Romero - cross

```
 1    Q.  Was it enough to buy more than a single outfit?

 2    A.  I think it depends on how long you have worked there.  If

 3    you already had staples like enough pants that you could wear

 4    all the time and shoes that you could wear all the time, enough

 5    basic colored shirts that you could wear all the time, then

 6    yes, you could get several new items.

 7    Q.  Do you know whether any the male sales professionals who

 8    you worked with bought Varvatos clothing out of their own

 9    pocket aside from the clothing allowance?

10    A.  I have seen male associates buy clothing out of their own

11    pockets.

12    Q.  Do you know whether the clothing they bought out of their

13    own pocket at work at sometimes?

14    A.  I am sure they specifically purchased it to wear to work

15    sometimes.

16              MR. BASSEN:  Nothing further.

17              THE COURT:  Ladies and gentlemen, we'll take a

18    15-minute break.  Do not discuss the case.

19              Do not discuss your testimony.

20              We'll come back in 15 minutes.

21              You can step off the stand.

22              (Recess)

23

24

25
```

```
1            THE COURT:  We'll bring the jury in.

2            Ms. Romero, you may resume your seat.

3            MR. DUNNEGAN:  Your Honor, there will not be any

4    questions for this witness.  The next witness is Ms. Crouchen.

5    Will you please tell the jury we will take her out of order and

6    we'll have Mr. Harris tomorrow.

7            THE COURT:  If I don't remember, remind me.

8            How long is the direct do you think?

9            MR. BASSEN:  About an hour.

10           THE COURT:  Doesn't sound like it.

11           MR. DUNNEGAN:  Sorry.

12           THE COURT:  It depends what your cross is.

13           MR. DUNNEGAN:  I don't think I will have very much.  I

14   am going to hope to get done before 5:00.

15           THE COURT:  Otherwise, we have to go tomorrow.

16           MR. DUNNEGAN:  I don't want to be responsible for

17   bringing her back tomorrow.

18           THE COURT:  You both share responsibility depending on

19   how long Mr. Bassen goes.  One of you may be the responsible

20   one.  We'll see.

21

22

23

24

25
```

  1                 (In open court; jury present)

  2                 THE COURT:  Please be seated.

  3                 Any recross for this witness?

  4                 MR. WEISS:  No, your Honor.  Nothing further.

  5                 THE COURT:  Does any of the jurors have questions for

  6      this witness?  Raise your hand.

  7                 No questions.

  8                 Ms. Romero, you may step down.  Thank you very much

  9      for coming.

 10                 (Witness excused)

 11                 THE COURT:  Normally I would turn to the plaintiff

 12      next for their next witness, but there is a witness who we're

 13      trying to squeeze in today that the defendant wanted to call.

 14      So as an accommodation to the witness, we're going to call her

 15      out of order.  This is part of the defendant's case, not part

 16      of the plaintiff's case.  It is just coming earlier than it

 17      otherwise normally would have.

 18                 I will turn to the defense.

 19                 (Continued on next page)

 20

 21

 22

 23

 24

 25

 1              MR. BASSEN:  Sheryl Crouchen.

 2              THE COURT:  Come and stand in front of this chair and

 3    be sworn-in.

 4     SHERYL CROUCHEN,

 5          called as a witness by the Defendant,

 6          having been duly sworn, testified as follows:

 7    DIRECT EXAMINATION

 8    BY MR. BASSEN:

 9    Q.  Good afternoon, Ms. Crouchen?

10    A.  Good afternoon.

11    Q.  Is it correct that you are a plaintiff in this lawsuit?

12    A.  Yes, sir.

13    Q.  Do you know what kind of a plaintiff you are in this

14    lawsuit?  Can I give you further clarification if it's

15    confusing?

16    A.  No.  I understand, sir.

17    Q.  What kind of plaintiff are you?

18    A.  I am a member of a class action but not the part where you

19    opted-in.

20    Q.  Great.  Thank you.  So you are not an opt-in plaintiff.

21    You're a class member.

22    A.  Correct.

23    Q.  Are you represented here today by the plaintiff's counsel?

24    A.  Yes, sir.

25    Q.  Did the plaintiff counsel meet with you to prepare you for

K2PAAKNO6                    Crouchen - Direct

1    your deposition?

2    A.  I was sick.  So, we were unable really to meet.  So, it was

3    by phone.

4    Q.  OK.  So, just that we're clear, you're here today because

5    the defendant, John Varvatos Enterprises, subpoenaed you to be

6    here, correct?

7    A.  That's my understanding.

8    Q.  OK.  Well, thank you for coming.

9    A.  Thank you, sir.

10   Q.  Now, you had a deposition taken in this case on August 25,

11   2017.  Do you recall that?

12   A.  Yes.

13   Q.  Now, at that deposition you were questioned by the

14   plaintiff's counsel; is that correct?

15   A.  Yes.

16   Q.  In other words, you were not questioned by me or a lawyer

17   for Varvatos, correct?

18   A.  Correct.

19   Q.  What I am going to do is basically track your questions and

20   answers to the deposition and get through it as quickly as I

21   can.

22   A.  Thank you.

23   Q.  I understand that you have worked in retail pretty much

24   your whole life; is that correct?

25   A.  Yes.

```
1    Q.  And there was a time when you worked at the SoHo store of

2    John Varvatos?

3    A.  Correct.

4    Q.  And you worked there as a sales professional?

5    A.  Correct.

6    Q.  And there was also a time when you worked at the Woodbury

7    commons.  Is that an outlet?

8    A.  Yes.

9    Q.  Of Varvatos, correct?

10   A.  Correct.

11   Q.  And at that time you were what's called a key holder,

12   right?

13   A.  Correct.

14   Q.  Could you tell us what a key holder is?

15   A.  A key holder is somebody who holds a key who has the duties

16   of opening a store, closing the store, doing the paperwork.

17   That's it.

18   Q.  OK.

19   A.  In addition to selling.

20   Q.  Thank you.  Did you work at the Woodbury Commons Outlet

21   before, at the same time or after you worked at the SoHo retail

22   store.

23   A.  I worked at the Woodbury Commons prior to going to SoHo.

24   Q.  OK.  Now, am I correct that you applied for a job at

25   Varvatos through someone called Virginia is it Pracus?
```

1   A.   Pracus.

2   Q.   Was Virginia Pracus a manager at Varvatos?

3   A.   Correct, she was a general manager.

4   Q.   You knew her from before?

5   A.   Correct.

6   Q.   Now, when you -- did you speak to Virginia Pracus when with

7   you applied for the job?

8   A.   Correct.

9   Q.   When you spoke to her did she say anything or not to you

10  about whether you would be required to wear Varvatos clothes

11  while at work?

12  A.   No, not that I recall.

13  Q.   Do you think that she should have?

14  A.   I mean, women couldn't wear -- they could but I wouldn't

15  wear the clothes.  So, I mean I always, it was always my

16  understanding that I had a responsibility to dress in line with

17  the brand.  So that would have been our discussion is, Sheryl,

18  you need to dress a certain way.

19  Q.   Rather than you need to wear John Varvatos clothes?

20  A.   Correct.

21  Q.   Because John Varvatos clothes is for men, correct?

22  A.   Correct.

23  Q.   Thank you.

24        Is it correct, Ms. Crouchen, that before your

25  deposition in this case you never saw the job description for

K2PAAKNO6                      Crouchen - Direct

1    John Varvatos sales professional?

2    A.  I would have seen what I got in the packet that, you know,

3    the hand that, whatever packet they give you but I never saw a

4    job description.  I never went and physically applied for the

5    job.  I had known Virgina from before.

6    Q.  OK.  Thank you.

7         Do you know what the Varvatos clothing allowance was

8    when you worked there?

9    A.  At the outlets or in SoHo?

10   Q.  Let's start at the outlet first.

11   A.  I knew they had one.  I didn't really know the monetary

12   value to it.

13   Q.  Did you know what the clothing allowance was at the retail

14   store?

15   A.  Yes.

16   Q.  What was that?

17   A.  It was three thousand dollars per season, 1,000 per year of

18   clothing.

19   Q.  And was that based on a full retail price?

20   A.  Yes.

21   Q.  And if someone wanted to buy that clothing who was a

22   Varvatos employee, couldn't they have used their discount?  In

23   other words, if they weren't getting the clothes but if they

24   were buying the clothes, wasn't there a discount?

25   A.  Correct.

1   Q.  And wasn't that discount 65 percent?

2   A.  Yes.

3   Q.  So, couldn't a male sales professional buy $12,000 worth of

4   clothes for 4200?

5   A.  But they didn't need to.

6           THE COURT:  Just answer the question.

7           THE WITNESS:  Oh, sorry, sir.

8   A.  Yes, they could have.

9   Q.  OK.  You said they didn't need to why?

10  A.  Because they were given the clothing allowance.

11  Q.  Did some of them buy clothes beyond the clothing allowance?

12  A.  Randomly, here and there.

13  Q.  OK.  Did women participate in the clothing allowance at

14  John Varvatos?

15  A.  No, sir.

16  Q.  Why not?

17  A.  They had no clothing allowance.

18  Q.  Do you know why?

19  A.  I know that they couldn't give you clothing because there

20  were no women's clothing but there was no monetary compensation

21  either.

22  Q.  Was there an AllSaints discount?

23  A.  Yes, sir.

24  Q.  What was that?

25  A.  50 percent.

Case 1:17-cv-00072-GWG   Document 340   Filed 03/05/20   Page 203 of 241
Case 7:20-50623-MFW   Doc 10-2   Filed 07/07/20   Page 194 of 242

251

1    Q.  OK.  Thank you.

2            Would you call the clothing that the male sales

3    professionals got at Varvatos, free clothing?

4    A.  It was -- I don't know that -- it was clothing that they

5    were given but it was basically compensation that they were

6    taxed on to their income.

7    Q.  Thank you.

8            Now, you had previously worked at Michael Kors; is

9    that correct?

10   A.  Yes, sir.

11   Q.  Now, when you worked at Michael Kors, did you have a dress

12   code?

13   A.  Yes.

14   Q.  Did you have a clothing allowance?

15   A.  Yes, sir.

16   Q.  And did you like that?

17   A.  I was forced to wear the clothes.  So, it was better to be

18   given clothes that I had to wear than have to buy clothes that

19   I didn't want to wear.

20   Q.  Did you like wearing the Michael Kors clothes?

21   A.  No.

22   Q.  Will you tell us whether or not the male sales

23   professionals were required to wear Varvatos clothing while at

24   work?

25   A.  Yes, sir.

K2PAAKN06                    Crouchen - Direct

1   Q.  And what did "wear" mean as you understood it?

2   A.  It meant that they were given a clothing allowance that

3   they had to wear, seasonal clothing or whether it was, if they

4   had linen T-shirts they could wear those for 12 months a year.

5   Certain pieces could be worn all the time but current

6   merchandise, as well.

7   Q.  And is it correct that female sales professionals were not

8   required to wear Varvatos clothing while at work?

9   A.  We were required to dress in a style that represented the

10  brand.  It was impossible for us to wear Varvatos clothes but

11  we had to be in line with the brand.

12  Q.  Why was it impossible to you wear Varvatos clothes?

13  A.  Because they're men's clothes and women don't really fit

14  the same.

15  Q.  Was it harder -- so, both men and women had a

16  responsibility to comply with the Varvatos dress code, correct?

17  A.  Correct.

18  Q.  Was it harder for men to comply than women?

19  A.  No, not in my opinion, no.  Easier.

20  Q.  OK.  Do you remember having a deposition taken in this

21  case?

22  A.  Yes, sir.

23           MR. BASSEN:  Going to page 28 of the deposition.  I'll

24  start with an answer so it's not out of context.

25           MR. DUNNEGAN:  I'm going to object on the ground that

1   there's no inconsistency here because at page 60 she gives a

2   clarification of this.

3            MR. BASSEN:  Well, your Honor, that's for him to ask

4   afterwards.

5            THE COURT:  Well, let me hear.

6            MR. BASSEN:  I will go directly to it.  Let's go to

7   page 28 of your deposition, line 13.

8            Question to you:

9   "Q.  Is it harder for women to fulfill that responsibility or

10  harder for men?

11  "A.  I think it's harder for men.

12  "Q.  Can you explain why?

13  "A.  Because they could only have one pot to pick from.  I have

14  a hundred."

15           THE COURT:  Hold on.  He hasn't asked you question.

16           THE WITNESS:  Thank you.

17  Q.  Were you asked those questions and given those answers?

18  A.  Yes, but --

19           THE COURT:  That's it.  That's all for right now.

20  Let's see if he wants to ask another question.

21           MR. BASSEN:  You want to say "but".  I don't want to

22  stop you.

23  Q.  But what?

24  A.  I think that I misunderstood the word "harder".  Women did

25  have a bigger pool to pick from but if you have vie things to

K2PAAKNO6                    Crouchen – Direct

1    choose from it's easier to dress from those five things than if

2    you have two thousand.  So I think I misunderstood the easier

3    part where I miss-answered it.

4    Q.  OK.  Thank you.

5          When you worked for Varvatos you were selling

6    clothing, correct?

7    A.  Correct.

8    Q.  Was it helpful to you in selling clothing that the men were

9    wearing the clothing?

10   A.  At times, yes.

11   Q.  And why was that helpful to you?

12   A.  Because if say I had a client that was trying on a pair of

13   shoes and they maybe felt they were a little tight or whatever,

14   I could turn to a colleague and say do you have those shoes?

15   Do they stretch?  How do they feel?  So, that is always

16   helpful.

17   Q.  OK.  Thank you.

18         When you worked for Varvatos did you buy any clothing?

19   A.  Occasionally, for my son.

20   Q.  Did you buy anything other than non-Varvatos clothing when

21   you worked for Varvatos?

22   A.  Yes.

23   Q.  And did you wear that the clothing we're talking about

24   other than John Varvatos clothing that you bought?  Did you

25   wear that ever to work?

1    A.  Yes, I had to buy clothes for work.

2    Q.  Well, couldn't you dress out of your own wardrobe for work?

3    A.  I needed to dress in a sense that represented the brand.

4    So I needed, and I needed to look professional and I needed to

5    look on top of my game.  So I needed clothes to wear to do my

6    job.

7    Q.  And isn't it a fact that you own some of those clothes

8    without having to buy them?

9           THE COURT:  Do you mean before she started working at

10   Varvatos?

11          MR. BASSEN:  Yes.

12   A.  Michael Kors is not in line with the John Varvatos brand

13   and that's where I worked before.

14   Q.  But didn't you have clothes other than Michael Kors?

15   A.  When you work full-time that's where those are the clothes

16   you wear most of the time.  So, that's my wardrobe that I would

17   wear to work.

18   Q.  Well, isn't it correct, Ms. Crouchen, that you could wear

19   any of your own clothes to work at Varvatos except for your

20   Taekwondo clothes and your sweatpants?

21   A.  Clothes that I had acquired over the years working for John

22   Varvatos, yes, those were the clothes.

23   Q.  Would you like to have had a clothing allowance at John

24   Varvatos if it was not restricted to John Varvatos clothing?

25   A.  I think I would never have wanted the clothing for sure.  I

1   think that to be compensated the way my colleagues were

2   compensated, I would not have complained about that.  I would

3   have thought that was fair.

4   Q.  Did you think it was fair that John Varvatos did not give

5   you a clothing allowance?

6   A.  You know, I think that fair is a funny thing and when time

7   goes by at the time that I was deposed and the time I was

8   there, you know, I'm almost 62.  So I feel almost in a

9   generation way I felt when I worked at Michael Kors oh, it's OK

10  that girls got clothes and guys didn't.  And then I worked at

11  John Varvatos and I thought oh, that's OK and then this whole

12  thing happened.

13          And you know then I in talking with my daughter and

14  her saying, mom, when I was in middle school I knew it was

15  unfair.  I don't know why you didn't.  And then I found out

16  that they gave the women in the London store monetary value and

17  now two years later, yeah, I do think it's unfair.

18          MR. BASSEN:  Your Honor, I would like either a

19  limiting instruction or the testimony stricken about what

20  happened in the London store.

21          THE COURT:  I'll give a limiting instruction.

22          So, there's a reference to something that happened in

23  the London store.  It'll be the same instruction I gave you

24  before.  You should not use that information to in any way

25  judge what should have happened in the United States or that it

1  relates in any way to the law of the United States.  And you

2  shouldn't use it to make any determination about what Varvatos

3  chose to do in this case.

4        Go ahead.

5  Q.  When you had your deposition taken you testified under

6  oath; is that correct?

7  A.  Correct.

8  Q.  And I am going to read you a question and an answer that

9  you gave under oath and then I'll follow-up.  It's on page 44

10 of your deposition of August 25, 2017.

11 "Q.  Do you think it's fair that John Varvatos doesn't give you

12 clothing allowance?

13 "A.  I do think it's fair?  I could tell you a lot of things I

14 think are unfair in my life.  That's not one of them.  I think

15 that I am a woman working in a men's store.  I think it only

16 makes sense that men have to wear the clothes, just like when I

17 was at Michael Kors, I had to wear the women's clothes."

18 Q.  You gave that answer to that question?

19 A.  Correct, I did.

20 Q.  And now you are saying you you've changed your mind?

21 A.  I'm saying that thinking about it and speaking about it, I

22 do think that when I think about it from a monetary value and I

23 think that I did the same job, as my male colleagues and they

24 were compensated more than me and in 2020 that's not fair.

25 Q.  Did the male colleagues get a AllSaint discount?

K2PAAKNO6                    Crouchen - Direct

1    A.  No.

2    Q.  Did you get one?

3    A.  No, they didn't get it but --

4    Q.  Was that fair?

5    A.  Was that fair?  No.

6    Q.  OK.  AllSaints sells both men and women's clothes?

7    A.  Correct.

8    Q.  The men were not provided with an AllSaints discount and

9    you are saying that wasn't fair either, correct?

10   A.  Correct.

11   Q.  OK.

12   A.  But they also got a clothing allowance.  So, I think at the

13   time in retrospect that was Varvatos' way of compensating the

14   women and not the men.  So, I don't know.

15   Q.  You also said that the men had to pay income tax on the

16   clothes they got, correct?

17   A.  I don't know how the tax works but I know that they pay

18   some type of tax.  I imagine it's tacked on as their income.

19   Q.  Do you think it was a good thing that Varvatos required the

20   men to wear Varvatos clothing while at work?

21            MR. DUNNEGAN:  Objection; "good thing".

22            THE COURT:  Just specify what you meant by "good

23   thing", good for Varvatos?  Good for selling?

24            MR. BASSEN:  I'll put it a different way.

25   Q.  What is your opinion on Varvatos requiring the men to wear

1   Varvatos clothes while at work?

2              MR. DUNNEGAN:  Objection.

3              THE COURT:  You can answer it if you can.

4   A.  I mean, I don't have opinion on how they should run their

5   business.

6   Q.  I think you said it did help you with your sales, didn't

7   it?

8   A.  It absolutely did but I promise you I could have done it

9   without, as well.

10  Q.  Well, when you were at Michael Kors you had to wear the

11  clothes, correct?

12  A.  Correct.

13  Q.  And so how do you know you could have done it?

14  A.  I don't.  You're right.  I don't have an opinion on it.  I

15  don't know.

16             MR. BASSEN:  OK.  Nothing further.  Thank you.

17             MR. DUNNEGAN:  Can I have two minutes?

18             THE COURT:  Two minutes.  Let's all stand and stretch

19  or sit and stretch.

20  CROSS-EXAMINATION

21  BY MR. DUNNEGAN:

22  Q.  Ms. Crouchen, I am going to pick up on a couple things

23  Mr. Bassen left open.

24  A.  OK.

25  Q.  Do you remember he asked you a question about what takes

1    more effort for the men or is it more effort for the women; do

2    you remember those questions?

3    A.  Yes, sir.

4    Q.  OK.  Now, he read a passage from your deposition, right?

5    A.  Correct.

6    Q.  I would like to ask you if you remember giving the

7    following testimony in response to the following questions and

8    I am going to be reading from page 59, beginning at line 25.

9    "Q.  Would you say that it takes men more effort to comply with

10   their clothing requirements than it does women?

11   A.  I think they don't have choices.  They have to wear what's

12   there.  So I don't know if there's really more or less effort.

13   I really don't know.

14   Q.  You gave those answers, right?

15   A.  Correct.

16   Q.  OK.  And are those accurate?

17   A.  Yeah.  I mean you -- I really don't know.

18   Q.  OK.  Now, I want to go back and I want to fill-in some

19   background so that we can understand your testimony, OK?  You

20   used to work in Varvatos?

21   A.  Yes.

22   Q.  When did you leave?

23   A.  July 9, 2019.

24   Q.  OK.  So, about six/seven months ago?

25   A.  Correct.

1   Q.  And when did you start at Varvatos?

2   A.  For the company?

3   Q.  Yes, for the company?

4   A.  I think it's like the end of March in 2011.

5   Q.  Now, when you left Varvatos can you tell us why you left?

6   A.  I left for a good opportunity.

7   Q.  Did you have any ill will toward the people at Varvatos

8   when you left?

9   A.  Not at all.

10  Q.  OK.  To the best of your knowledge, did they have any ill

11  will toward you?

12  A.  I hope not.

13          MR. BASSEN:  Objection, your Honor.  I think it might

14  call for a side bar.

15          THE COURT:  Is this the end of it or are we done?

16          MR. DUNNEGAN:  I have one more similar question but

17  it's pretty innocuous.

18          MR. BASSEN:  This has to do with other witnesses and

19  other exclusions you've made.

20          THE COURT:  Are you going to mention our witnesses?

21          MR. DUNNEGAN:  Not by name.

22          MR. BASSEN:  But he's opened the door for what you've

23  already ruled against.

24          MR. DUNNEGAN:  I'm lost.

25          THE COURT:  Hold on.  I'm lost too.

K2PAAKNO6                        Crouchen - Cross

1            MR. BASSEN:  That's why I asked for a side bar.

2            THE COURT:  OK.  Try to make it quick.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K2PAAKNO6                           Crouchen - Cross

```
1            (side bar)
2            MR. BASSEN:  We had previously raised with your Honor
3    and you ruled that we could not show a bias, ill will of Tessa
4    Knox in bringing this lawsuit because of many, many different
5    things that happened.
6            THE COURT:  Only one reason, cause she wasn't
7    testifying.  That's why I wouldn't let you do it.  She wasn't a
8    witness.  I said you can't start with evidence --
9            MR. BASSEN:  Because she's outside of the territorial
10   jurisdiction of the court and she is the representative
11   plaintiff.  Is that fair?
12           THE COURT:  I don't even know what you are talking
13   about any more.  What is the application?
14           MR. BASSEN:  He is asking that she's got no bias or
15   ill will in bringing the lawsuit and Knox does.
16           THE COURT:  Are you bringing up Knox?
17           MR. DUNNEGAN:  No.  He was implying somehow she
18   changed her testimony over time and I want to just establish
19   that she left on very good terms and has friends there.
20           THE COURT:  I don't see any problems with that.
21           MR. DUNNEGAN:  I don't either.  Thank you.
22           (Continued on next page)
23
24
25
```

K2PAAKNO6                          Crouchen - Cross

 1              (In Open Court)

 2    BY MR. DUNNEGAN:

 3    Q.   Ms. Crouchen, do you still have friends that work at

 4    Varvatos?

 5    A.   Yes.

 6    Q.   Now, I believe Mr. Bassen asked you question to which you

 7    responded you didn't want physical Varvatos clothes as a

 8    benefit, correct?

 9    A.   Correct.

10    Q.   OK.  I believe you also told Mr. Bassen that you would have

11    no objection if the company gave you some sort of financial or

12    monetary compensation in some way for the clothing?

13    A.   Correct.

14    Q.   OK.  And do you think it would be fairer if they gave you

15    some compensation than if he didn't?

16              MR. BASSEN:  Objection.

17              THE COURT:  I believe you opened the door to this line

18    of questioning.  So, I am going to allow it for that reason.

19    Go ahead.

20    A.   Yes.  I think both male and female should be compensated

21    equally for the same job.

22    Q.   Now, I believe when Mr. Bassen was asking you questions you

23    said that men and women sales associates had the same job; is

24    that correct?

25    A.   Yes, that's correct.

K2PAAKNO6                    Crouchen - Cross

1    Q.  OK.  Now, I am going to ask you some questions to provide a

2    little bit of foundation for that, OK, and I don't want to take

3    up too much time.

4    A.  Yes, sir.

5    Q.  While you worked at Varvatos you worked with other women

6    sales professionals, right?

7    A.  Yes.

8    Q.  About how many?  Let's take a retail store.

9    A.  I mean probably three or four, maybe five.  You know

10   different people changed all the time.

11   Q.  Exactly.  And how many male professionals did you work with

12   while you were at Varvatos retail store in SoHo?

13   A.  More men than women.

14   Q.  OK.  Now, did you watch both men and women do their job as

15   sales professionals at Varvatos?

16   A.  Yes.

17   Q.  Now, based upon what you observed, were the men sales

18   professionals and the women sales professionals doing the same

19   job?

20            MR. BASSEN:  Objection.

21            THE COURT:  What's the objection?

22            MR. BASSEN:  Calls for a legal conclusion.

23            THE COURT:  Overruled.  You can answer that.

24   A.  Yes, we did the same job.

25   Q.  OK.  Now, did the women sales professionals and mens sales

```
 1   professionals have exactly the same job?
 2   A.  Yes.
 3   Q.  OK.  You know they had different dress codes?
 4   A.  But the job -- I mean what you had to do for your job was
 5   the same.
 6   Q.  OK.  Now, Mr. Bassen asked you question about whether
 7   having men's sales professionals in the store wearing the
 8   Varvatos clothes assisted you in making sales to your customers
 9   in the store?
10   A.  At times, yes.
11   Q.  OK.  And it did at times?
12   A.  At times, yes.
13   Q.  OK.  Now, did it make any difference to you if the men were
14   wearing the Varvatos clothes whether the women -- excuse me
15   whether the men owned the Varvatos clothes?
16   A.  Really, no.  Because if you go back to what Ms. Romero said
17   or not --
18            THE COURT:  Let's not go back.
19   A.  You don't have to but --
20            THE COURT:  You answered the question when you said
21   no.  See if there's another question.
22   Q.  OK.  Now, if the men had been required to pull the clothes
23   out of the store, wear them for the season and then give them
24   back at the end of the season to Varvatos, do you see any
25   reason why that would hurt the sales that you were attempting
```

 1   to make on the sales of Varvatos stores?

 2   A.  No.

 3          MR. DUNNEGAN:  No further questions from this witness,

 4   your Honor.

 5          THE COURT:  Mr. Bassen, anything?

 6          MR. BASSEN:  Just a few.

 7          THE COURT:  OK.

 8   REDIRECT EXAMINATION

 9   BY MR. BASSEN:

10   Q.  Do you know why Varvatos let the men keep the clothes

11   rather than just lend them the clothes?

12   A.  I do not, sir.

13   Q.  OK.  Am I correct that you were not, that you and the other

14   female sales professionals were not required to wear John

15   Varvatos clothes at work?

16   A.  We were required to dress in line with the, you know --

17          THE COURT:  Just answer his question, if you can.

18   A.  No.

19   Q.  Am I correct that the male sales professionals were

20   required to wear John Varvatos clothes at work?

21   A.  That is my understanding.

22   Q.  Now, you said just now that men and women need to be

23   compensated the same for the same job, correct?

24   A.  Correct.

25   Q.  When you worked at Varvatos retail you made $22 base pay an

K2PAAKNO6                        Crouchen - Recross

1    hour, correct?

2    A.  Towards the end, yes.

3    Q.  Did you know any male who made that much money per hour?

4    A.  I know people that made more.

5    Q.  Do you know men who made less?

6    A.  Well, it's against policy to talk about what you made.  So,

7    really my understanding is, yes, people made more.  People made

8    less.  I don't know exactly what people made.

9    Q.  For the same job, correct?

10   A.  Correct.

11   Q.  Well, how is that not unfair or unlawful?  It's the same

12   job.  Why did you make more than someone else?

13   A.  Why did I produce more than somebody else?

14        MR. BASSEN:  No further questions.

15   RECROSS-EXAMINATION

16   BY MR. DUNNEGAN:

17   Q.  Now, I just want to follow-up on that line about how many

18   sales you were producing.  Can you take a time period like

19   maybe a calendar year 2017/18 and tell us how many sales you've

20   actually made of John Varvatos clothing?

21   A.  I think in 2017 I did a million 750, something like that.

22   Q.  1.7 million plus of John Varvatos clothing.

23   A.  Correct.

24   Q.  That you personally sold?

25   A.  Correct.

1   Q.  OK.  And how did that compare to 2018?

2   A.  I think I did maybe a million seven or a million six

3   something.

4   Q.  You were slacking off?

5   A.  I was.

6   Q.  How did that rank you to the best of your understanding in

7   terms of productivity of sales associate?

8   A.  Company-wide I was number two.

9   Q.  In the whole United States?

10  A.  In the whole entire company.

11  Q.  OK.  And Mr. Mayorga was first?

12  A.  Yes, sir.

13          MR. DUNNEGAN:  I don't have anything further.

14          MR. BASSEN:  Just a couple.

15          THE COURT:  Almost unprecedented to rerecross -- I

16  mean reredirect.  Is it within the scope of what he just said?

17          MR. BASSEN:  Yes.

18          THE COURT:  Just one or two.

19          Rerecross.

20          MR. BASSEN:  Thank you, your Honor.

21  RECROSS EXAMINATION

22  BY MR. BASSEN:

23  Q.  Is it not correct that you received the base pay meaning

24  hourly pay and a commission?

25  A.  Yes, sir.

K2PAAKNO6                    Crouchen - Re-recross

1  Q.  So, if you sold a lot you would have made a lot on

2  commission, correct?

3  A.  Correct.

4  Q.  What does any of that have to do with your base pay?

5          MR. DUNNEGAN:  Objection.

6          THE COURT:  Sustained.  Next question.

7  Q.  How was base pay determined at Varvatos?

8  A.  I think by productivity and longevity.

9  Q.  When you started at Varvatos you had no productivity

10  because you hadn't worked there, correct?

11  A.  Correct and I didn't make $22 an hour either.

12  Q.  When you started it, isn't it correct that you made more

13  than certain male professionals?

14  A.  I don't know but I didn't make $22 an hour.

15  Q.  Isn't how much you sell related to your commission?

16  A.  What do you mean?

17  Q.  You get commission.  You get money based on how much you

18  sell?

19  A.  Correct.

20  Q.  Plus you get base pay?

21  A.  Correct.

22  Q.  I'm not understanding how your base pay is related to your

23  being a big producer?

24          MR. DUNNEGAN:  Objection to the --

25          THE COURT:  I don't know what the question is.  So let

K2PAAKNO6                        Crouchen - Re-recross

1    me hear a question.

2    Q.  How was your base pay related --

3              THE COURT:  Let's start with this.

4              Was your base pay related to the volume of sales you

5    did?

6              THE WITNESS:  I think that may hourly pay was related

7    to what they thought was my talent.

8    Q.  OK.  And if they thought that a male sales professional had

9    less talent, the male sales professional would be given less

10   pay, correct?

11   A.  I don't do hiring and I don't give people money.  I can't

12   answer that.  I really can't answer you.  I don't know.

13   Q.  But then how do you know what they thought about you?  You

14   don't know what they thought about the men but somehow you know

15   what they thought about you?

16   A.  I know that they wanted me.  So, I know that Virginia

17   wanted me to come there.  So when somebody wants you to come

18   someplace, they're usually willing to pay for it.

19   Q.  Did anyone else tell you the factors that went into

20   determining your base pay?

21   A.  I think that they paid me what I was being paid before.

22   Q.  That wasn't the question.  Did anyone tell you the factors

23   that determined your base pay at Varvatos?

24   A.  Explained it like that?  No.

25              MR. BASSEN:  Thank you.

K2PAAKNO6                    Crouchen - Re-recross

1              THE COURT:  Are you done?

2              MR. DUNNEGAN:  Yes, we are, your Honor.

3              THE COURT:  Any questions for this witness from the

4    jury?  Raise your hand.

5              OK.  Ms. Crouchen, you are now excused.  Thank you so

6    much for coming.  I appreciate it.

7              THE WITNESS:  Thank you so much.

8              THE COURT:  All right.  I assume we should not start

9    another witness.

10             MR. DUNNEGAN:  We don't have one.  We planned to go up

11   to the limit today.  We did more work in less time and we're

12   going to, I suggest, adjourn for the day.

13             THE COURT:  OK.  Any problem with adjourning,

14   Mr. Bassen?

15             MR. BASSEN:  No.  And we have a witness we're

16   producing first thing tomorrow.

17             THE COURT:  As do you, right?

18             MR. DUNNEGAN:  Yes.  I am going to cross-examine

19   Mr. Harris first thing tomorrow.  I'm sorry.  It's direct,

20   although leading questions.

21             THE COURT:  All right.  This is not something the jury

22   needs to hear right now.

23             Members of the jury, you are being excused once again

24   for the evening.  Let me remind you not to form any opinions

25   about the case.  Don't talk to anyone about the case.  We'll

1   start, our goal is to start, to have you get here by nine.

2   We'll open up the doors at a quarter of.  Once all eight are

3   here we'll get going.  I don't want to go any later than 9:15.

4   So, try to get here as close to nine.  Leave your notebooks,

5   the big books and the pencils on the chair.  We are going to

6   have some sharp ones there tomorrow if you want to trade in

7   your pencil.

8          Thank you, everyone.

9          (Jury not present)

10         THE COURT:  OK.  I have one item.  Do you folks have

11  any items?

12         MS. HASSAN:  I have one.  So Exhibit 16 I think

13  Mr. Dunnegan used that with Ms. Chang and our understanding was

14  that you were going to clarify the UK package in it but that

15  never came up.

16         MR. DUNNEGAN:  No.

17         MS. HASSAN:  It seems to me that in the record it is

18  in evidence but without a limiting instruction at some point.

19         THE COURT:  I gave it to one of them.  It was not 16.

20  It was something else.

21         MS. HASSAN:  It wasn't 16.  I think 16 we were waiting

22  to see if Ms. Dunnegan gets to the paragraph.

23         THE COURT:  That's right.  He never got to the

24  paragraph.  So, someone needs to remind me.  Are you ever going

25  to get to it and with a witness?

1          MR. DUNNEGAN:  I honestly don't know.  Probably, not.

2     I haven't gotten to it already, probably not.

3          THE COURT:  All right.

4          MS. HASSAN:  Your Honor, could we I guess at end of

5     our witnesses we will be just moving to admit all the under

6     objected to Defendant's Exhibits and maybe at that point.

7          THE COURT:  As long as you remind me, I'll give it.

8          MS. HASSAN:  Objection.

9          THE COURT:  Anything else from anybody?

10         MR. DUNNEGAN:  I have a question about the jury

11    charges and how those are going to get distributed.

12         THE COURT:  That was my item but before I get to that,

13    let me just go over what's going on tomorrow.  There's a single

14    witness we have been talking about that's going first.

15         MR. DUNNEGAN:  Ben Harris, our witness, going first.

16    Don't know how long he is going to take but not long.  Ben

17    Harris is the former director of retail at Varvatos, fairly,

18    senior person.

19         THE COURT:  OK.  Everyone's calling the opposite

20    witness.  It's very confusing.  So you are going to lead?

21         MR. DUNNEGAN:  Yes.  I'll do what I did with Ms.

22    Chang.

23         THE COURT:  OK.  So you call Harris.  Then what

24    happens?

25         MR. DUNNEGAN:  Ms. Bassen will redirect.

K2PAAKNO6                    Crouchen - Re-recross

 1           THE COURT:  After Harris?

 2           MR. DUNNEGAN:  Then we are going to put in the

 3    deposition pages from Mr. Mayorga which we're just going to

 4    dump them into the record, not going to read them.

 5           THE COURT:  OK.  And you know what you could do.  You

 6    could three hole punch them and add them to their books.

 7           MR. DUNNEGAN:  That works.  We'll do that if we could

 8    find somebody to punch.

 9           THE COURT:  I have one if you really want it.

10           Go ahead.

11           MR. DUNNEGAN:  Then after we're done with Mr. Mayorga

12    except in terms of maybe like admitting --

13           THE COURT:  Did you say "Mayorga"?

14           MR. DUNNEGAN:  In terms of his deposition testimony.

15    There may be some clean-up in terms of, I offer a document, I

16    offer a stipulation or something but we don't have any more

17    witnesses.  Then they are, my understanding is they are going

18    to call Byron.

19           THE COURT:  Let me hear from them what they are going

20    to do.

21           MS. HASSAN:  Your Honor, we would have Ms. Byron, then

22    Mr. Shears and then we will, S-h-e-a-r-s, Steven Shears, OK.

23    Those are the only witnesses that we have.  And after that we

24    have Ms. Pam Kasin's deposition designation.

25           THE COURT:  The same thing he's doing?

1       MS. HASSAN:  Yes.  We will do the same thing and we

2  will just move to admit our exhibits in.

3       THE COURT:  OK.  So it's possible we'll get through

4  these people tomorrow?

5       MS. HASSAN:  I think so, unless like, unless there's

6  an inordinate amount of time taken with Mr. Harris.  I don't

7  think Ms. Barren and Mr. Shears will take too long.

8       MR. DUNNEGAN:  With Byron I see us having some

9  30(B)(6) issues which resulted in those side bars.

10       THE COURT:  Great.  So here is where we are.  I have a

11  draft jury charge which I will e-mail to you in the next hour

12  or so.  Here is what you need to know about it.  I have not yet

13  decided, believe it or not, whether I am giving any of the

14  affirmative defense.  Right now they are in the jury charge

15  because I'd rather have your comments on it in case I do decide

16  to give it.  But that is by no means absolutely decided.

17  Nonetheless, I am going to expect you to make whatever comments

18  you want to make about it.  I think I am going to need you

19  unfortunately to read it tonight so we can talk about it.

20  Conceivably, we may have to talk about.  If we're done with

21  witnesses tomorrow I'd like to have the charging conference if

22  we are done tomorrow because the next day is going to be

23  summations and instructions and we have to have that resolved

24  by tomorrow night.  So, I'll e-mail it to you within the next

25  hour so you'll have it.

1          Maybe while I have you here, we should talk about

2     things.  Here is my issue.  We're starting with the Equal

3     Payout.  And to get past that the plaintiff has to prove

4     substantial legal jobs and they have prove that the women were

5     paid less than men and defendants want me to charge that the

6     reason they were paid less than men was due to the factor other

7     than sex.  Right?  Who is arguing the charges here?

8          MS. HASSAN:  I guess, I am.

9          THE COURT:  I hate too spring this on you.  We are

10    going to have to have this discussion either now or tomorrow

11    and maybe both is what's going to happen.

12         So, what is it that the jury could find assuming the

13    jobs are substantially similar they find substantially similar

14    and the women are being paid less.  What is the factor other

15    than sex that they could find will explain the difference in

16    the compensation?

17         MS. HASSAN:  Your Honor, I think reasonably they could

18    find that's based on job responsibility and not on sex.  Even

19    though they've decided substantially similar jobs but they do

20    have an extra something that needs to be done.  So I think I

21    realize that it's a factor other than sex.  Men are getting

22    something.  Women are not.  But we've also produced evidence of

23    facts such as all men at Varvatos don't get the allowance,

24    right.  So, it's not purely gendered.  It may end up that way

25    but it's purely not gender.  There are considerations going to

1    that the jury could purely find based on a marketing strategy,

2    based on the dress code requirements, whether they are

3    considering the dress code requirement as responsibilities the

4    job to find unsubstantially un-similar that he could find that.

5         THE COURT:  OK.  Let me try to articulate that and you

6    tell me whether this is what you are saying or not.  The jury

7    has found the jobs are substantially similar but they haven't

8    found they are identical because they don't have to.  They

9    could conceivably find that they're not identical but

10   substantially similar, that the difference between the two jobs

11   is this burden of dressing up everyday and that -- finish.

12   What else?  What could they find about the jobs that make them

13   different knowing that the only way we're going to be talking

14   about this is if they also found them substantially similar?

15        MS. HASSAN:  So, I think, your Honor, there might be a

16   distinction between what you have to come and do everyday at

17   work versus the burden, the financial burden of the dress code

18   because if there was no clothing allowance, then the

19   out-of-pocket expense for the male sales professionals would be

20   thousands of dollars.

21        THE COURT:  Here is my problem.  I've already asked

22   them to do that math to weigh what the men benefit, if there is

23   a monetary benefit to the men versus women.  And they have

24   found in order for to us get here absolutely there was a

25   monetary benefit to men.  So, we're already accounting for the

1  monetary benefit.  It's not as -- whatever needed to be

2  compensated to men whatever detriment that had to them, they've

3  subtracted from it.  They've done all that.  All we're left is

4  with is substantially similar jobs and a finding that the men

5  are being compensated more than the women.

6          MS. HASSAN:  I think, your Honor, the idea is the

7  issue should be able to go to the jury.

8          THE COURT:  Unless you can tell me what it is I, am

9  going to tell the jury and/or you are going to argue to the

10  jury is the thing that they have to find.  What facts -- you

11  have to marshal facts.  I am supposed to marshal facts.  What

12  am I supposed to marshal that is the factor other than sex?

13          We're getting the second string answer.  Go ahead.

14          MR. BASSEN:  It can't be, the factor cannot be sex

15  because if the factor was sex, all men would be getting the

16  clothing allowance.  It is not sex.  It is based on the

17  requirement to have to wear and therefore buy the clothing.

18          THE COURT:  But why are they being -- I am already

19  asking the jury to subtract out the burden of the tax and

20  whatever else you're talking about if they buy extra clothing

21  whatever it is.  They're already being asked to do that

22  calculus and they've now found that the men are being paid

23  more.

24          MR. BASSEN:  But why?  Why are the men being paid

25  more?  It has to be because of intentional sex discrimin --

K2PAAKNO6                    Crouchen - Re-recross

 1              THE COURT:  No.  No.  Please.  There is no requirement

 2     of intent of Equal Pay Act.

 3              MR. BASSEN:  We're only on the Equal Pay Act?

 4              THE COURT:  Yes.

 5              MR. BASSEN:  So, why is because of a factor other than

 6     sex.

 7              THE COURT:  Which is the buying of the clothing?

 8              MR. BASSEN:  Having to wear and having to buy the

 9     clothing.

10              THE COURT:  Which is one hundred percent correlated

11     with sex.

12              MR. BASSEN:  Then you are saying that you can't have a

13     men's retailer in the United States.  That's the bottom line.

14              THE COURT:  No.  No.

15              MR. BASSEN:  Oh, yes, it is.

16              THE COURT:  You're not understanding me, Mr. Bassen.

17     If you don't want to understand me, sit down.  What would you

18     like to do.

19              MR. BASSEN:  I guess we can't have a discussion.

20              THE COURT:  You have to let me speak then.  If you

21     want to stand up and say whatever you want without listening to

22     me, that's not going to help your client.  So you have to

23     listen to me so you understand my problems and not be

24     aggressive with me and tell me there's some problem on my end.

25     Do you understand that?

K2PAAKNO6                    Crouchen - Re-recross

1          MR. BASSEN:  I understand that but that doesn't mean I

2     have to agree with your analysis.

3          THE COURT:  I'm not trying to get you to agree with

4     it.  I am trying to get you to explain what's going on.  Let me

5     try again.  The factor you are talking about that you are

6     saying is other than sex is one that is one hundred percent

7     correlated with sex.  So that's why I don't understand how a

8     jury could find it's a factor.  It's not.  That it's anything

9     but a factor related to sex.

10          Now your answer to that is you can't have a men's

11     clothing store.  You can't have a men's clothing store where

12     you pay men and women differently if in fact the men and women

13     are given some extra compensation.  That's what the jury would

14     have found if we get to the stage of the Equal Pay Act claim.

15          So I'll try again.  If the only factor you are telling

16     me is other than sex, is they get, they have to wear the

17     clothes and therefore, they have to be compensated, that seems

18     to me is the factor since you only allow men or require men to

19     do this or to get the clothing allowance, that is a factor that

20     seems to be one hundred percent correlated with sex.  I don't

21     know how the jury finds that's a factor other than that.

22          MR. BASSEN:  Very easily.  If the factor was sex, all

23     male employees at Varvatos would get the clothing allowance.

24     They do not even though they're males.

25          THE COURT:  None of the other job titles are an issue

```
 1   under the Equal Pay Act claim.
 2            MR. BASSEN:  That's not true at all.
 3            THE COURT:  Well, then I am ruling now that the only
 4   two jobs that are being compared are the male sales
 5   professional jobs and the female sales professional jobs.
 6            MR. BASSEN:  Well --
 7            THE COURT:  Let me finish.  For purposes of Equal Pay
 8   Act claim, that's all the plaintiffs are seeking to compare
 9   themselves to.
10            MR. BASSEN:  Then how do you deal with the factor
11   other than sex?
12            THE COURT:  Well, that's -- exactly.
13            MR. BASSEN:  By excluding the comparator.  You're
14   excluding the comparator and saying it's the factor based on
15   sex.
16            THE COURT:  They are pointing to and I think the
17   plaintiffs have the right to point at the male comparator in an
18   Equal Pay Act case.  That's the whole point of.  One person
19   comes in and says this other person is doing the same job as me
20   and they're getting paid more and they're a different sex than
21   me.  They get to choose who they want to compare to.  And the
22   other people you are talking about have no relation to their
23   jobs anyway.
24            MR. BASSEN:  May I speak?
25            THE COURT:  Sure.
```

1          MR. BASSEN:  So far, so good.  Except the fact that we

2     have an affirmative defense.  And the affirmative defense is

3     that it's based on a factor other than sex.  Why is it based on

4     a factor other than sex for two reasons?  It's based on the

5     requirement to wear and buy the clothes and not all males

6     whether in their comparator or not get it.  That is part of the

7     affirmative defense.  The affirmative defense is not limited to

8     who they choose to compare to.

9          THE COURT:  Well, maybe it's not that they get to

10    choose but it has to be someone in a comparable position.  So

11    whoever these males are who are, they're not comparing

12    themselves to males who are executives or something like that.

13         MR. BASSEN:  Well, then what you are saying your Honor

14    is it's wholly irrelevant to this case that Varvatos does not

15    give a clothing allowance to men who do not represent the brand

16    or sell the brand.  It's got nothing to do with the case.

17         THE COURT:  I believe it has to do with the Title VII

18    claim.  I think that's fair game for you to argue about lack

19    after intent, I suppose.  That's a possibility.  But for Equal

20    Pay Act, I do not see the relevance at all.

21         MR. BASSEN:  To me it goes to a factor other than sex.

22         THE COURT:  I'm just trying to understand first of all

23    because, one, I certainly don't understand the second one.

24         So the requirement to wear and buy the clothes is a

25    factor other than sex.  And my problem with that there got me

1    going in circles is that that requirement is one that which the

2    exclusively given to the male sales associates and Tessa

3    exclusively given to them because they are men which seems to

4    me makes it impossible for a jury to find it's a factor other

5    than sex.  That's my problem there.

6              MR. BASSEN:  Well, to me it's a legal issue.  It's not

7    even a factual issue for the jury.

8              THE COURT:  Well, it's a legal issue then the jury

9    shouldn't be getting it at all.

10             MR. BASSEN:  That's what we tried to tell you and you

11   disagreed.

12             THE COURT:  Well, we're in a trial now.  So, I don't

13   what you are talking about.

14             MR. BASSEN:  We have a problem here.  What I'm talking

15   about is we have a problem here because you're having a jury

16   decide factual issues that are in reality legal issues.

17             THE COURT:  What is the legal issue you're telling me

18   I am having them decide?

19             MR. BASSEN:  Whether it is based on facts other than

20   sex is a legal issue.  It is not a factual.  What is the fact?

21   What is the disputed fact?

22             THE COURT:  Well, I mean jurors decide facts and they

23   apply law to facts.  So, I am trying to figure out what fact

24   they could find that would allow you to apply the law about the

25   defense of on basis other than sex that would allow to you

1    succeed on that defense.

2              MR. BASSEN:  The fact is that the men and not the

3    women are required to wear the clothes.  They're therefore

4    required to buy the clothes.  The clothes are expensive and not

5    all men working there get a clothing allowance.

6              THE COURT:  What are your folks thoughts on all of

7    this?  We have to think about, be careful what you wish for in

8    a sense because if someone upstairs thinks I should have

9    charged it then we're all back here again.  I would always

10   rather charge something and then we can deal with it later if

11   it was wrong.

12             MR. DUNNEGAN:  This one I think could be confusing

13   because it seems to me the key to understanding this issue of

14   factor other than sex is being able to read the cases which I

15   believe are cited in our trial memorandum for the proposition

16   that if you have sex classification or responsibility and then

17   compensation and sex is one hundred percent correlated with

18   this intermediate factor which is then one hundred percent

19   correlated with getting the compensation, then you collapse the

20   picture and you say the compensation is based upon sex and

21   there is no issue there.  I mean, we move for summary judgment

22   on that too.  We think we're entitled -- we think that this

23   should not go to the jury not because there's a failure of

24   evidence.  But on the undisputed facts it's sex supposed job

25   responsibility which the jury would have found is not enough to

1    create a substantially different job and then compensation.

2               THE COURT:  Well, it is those cases that are making me

3    nervous about all this.  Agree with you.

4               What I thought they might argue and apparently, won't

5    being answered is that there was some difference -- let me ask

6    you about that in case your position changes -- was that the

7    jobs are not identical.  The jobs are substantially similar.

8    What's different is whatever burden comes with having to wear

9    this clothing everyday to work and that somehow that explains

10   the difference in compensation that if the jury finds, well,

11   that's why the men are being paid something more.  It may be

12   the jury finds that the actual net compensation difference is

13   some small number, a few hundred dollars.  There are ways they

14   could do that and it may be because they think it's a pain in

15   the neck for men to have to do this.  They were taxed on it,

16   none of them particularly want.  That's what the -- seems to be

17   but there are inferences to being drawn both ways which is why

18   I didn't grant summary judgment even if some facts were

19   undisputed.  And that somehow whatever extra burden there was

20   that made the jobs not identical but substantially similar that

21   that was a factor other than sex.

22               MR. DUNNEGAN:  I think we have two concepts there.

23   The first one as I understand it is that the jobs are not

24   identical but there is some small difference in compensation.

25   Does that result in a verdict for the defendant?  I think the

K2PAAKNO6                    Crouchen - Re-recross

1    answer is no because the standard is if you have substantially

2    the equal work, there must be equal pay.

3              THE COURT:  Hold on a second.  I just want to read

4    what you just said.  I think you're mixing substantially

5    similar jobs and compensation.

6              MR. DUNNEGAN:  Well, the rule of law as I understand

7    it is that the jobs are substantially similar than the

8    compensation or wages must be identical and that --

9              THE COURT:  Yes.

10             MR. DUNNEGAN:  OK.  So this small variance --

11             THE COURT:  But they might find the men's pull was

12   worth an extra two hundred a quarter.

13             MR. DUNNEGAN:  That goes to the issue damages.  The

14   issue of it is this job responsibility in between sex and

15   compensation I think cannot as a matter of law be an

16   affirmative --

17             THE COURT:  Because it's always going to be correlated

18   with sex.

19             MR. DUNNEGAN:  One hundred percent.

20             THE COURT:  That's my problem too.

21             MR. DUNNEGAN:  Your Honor, I think we've cited cases

22   in our jury instruction which says it doesn't have to be a

23   hundred percent correlation.  This catchall factor other than

24   sex is something is that somebody would think of in the

25   ordinary course of their specific business different than

K2PAAKNO6                    Crouchen - Re-recross

1   seniority or merit or productivity but it's got anything to do

2   with sex, it doesn't count, as I understand those cases.

3          THE COURT:  That's my problem.  Anything else to add?

4          MS. HASSAN:  No.

5          THE COURT:  OK.  So now when we get to Title VII

6   defenses, let me just take business necessity out of the

7   picture because obviously in my view only -- concept.  Now

8   we're left with a factor other than sex and the FLQ.  So for a

9   factor other than sex, we're in the same land, right?

10         MR. DUNNEGAN:  Exactly.  It's the same carryover from

11  Title VII to the EPA.

12         THE COURT:  All right.  And it's even worse because

13  for Title VII you specifically have to find that sex was a

14  motivating factor.  So, I don't know how you're going to factor

15  other than sex -- they've already found sex as a motivating

16  factor.  How can they also find that the distinction of pay was

17  a factor other than sex?

18         MR. BASSEN:  It is my understanding, your Honor, in

19  Title VII in order for therm to win they have to prove that

20  it's intentional sex discrimination.  Intentional.

21         THE COURT:  My question is they have to find that sex

22  what's a motivating factor, right?  In the difference in pay,

23  right?

24         MR. BASSEN:  Yes.

25         THE COURT:  OK.  Finding that, how could they possibly

Case 1:17-cv-00772-GWG   Document 341   Filed 03/05/20   Page 231 of 241
Case 20-50623-MFW   Doc 10-2   Filed 07/07/20   Page 232 of 242

289
K2PAAKN06                     Crouchen - Re-recross

1    find that the reason for the difference in pay was a factor

2    other than sex when we just found that sex was a motivating

3    factor?

4              MR. BASSEN:  Because there are also other motivating

5    factors that's not intentional.  "A motivating" factor is not

6    the same as "the motivating" factor which equates to

7    intentional.

8              THE COURT:  Interesting.

9              Does the factor other than sex defense completely pull

10   the rug out from the law that says sex has to be a motivating

11   factor?  So that if you find, so there's some other non sex

12   motivating factor your case gets destroyed?  Do you see

13   inconsistency?

14             MR. DUNNEGAN:  I think so.

15             THE COURT:  Your case gets destroyed.

16             MR. DUNNEGAN:  No, no, no.  I think I see.

17             THE COURT:  Do you see the problem?

18             MR. DUNNEGAN:  I see the problem he is raising but it

19   seems to me that this has got to be something which arises in

20   virtually every one of these Equal Pay Title VII cases and

21   there's got to be an answer.  I just off the top of my head

22   can't think of what it is.

23             MR. WEISS:  The question is in order to find --

24             THE COURT:  These Equal Pay defenses for some reason

25   apply to Title VII, right?  That's why we're here.

1    MR. WEISS:  First of all, there's a possible

2    resolution is that it's also disparity impact case.  You don't

3    need to prove intent.

4         THE COURT:  So that might have been the reason.

5         MR. WEISS:  That could be it and I just wanted to

6    clear something up.  Under Title VII disparate treatment case,

7    you just have to prove that sex is a motivating factor, not

8    the.  So if in fact we've proven that sex is a motivating

9    factor --

10        THE COURT:  You win up to then.  But if the defense

11   literally applied and all they had to do was say that there was

12   some factor other than sex, it would completely take out the a

13   motivating factor benefit that you get.

14        MR. WEISS:  That's why you don't get the instruction

15   on it.

16        THE COURT:  In your view it would be in say case of

17   Equal Pay under Title VII.  You would net never get the other

18   than sex instruction as long as it wasn't disparate --

19        MR. WEISS:  The factor other than sex has to explain

20   completely the pay differential.  So you could come up with

21   some sort of like, some aspect of it was not based on sex but

22   it actually has to completely explain it in order for it to be

23   a valid factor other than sex at least in the Second Circuit.

24        THE COURT:  I see.

25        Mr. Bassen.

1        MR. BASSEN:  I think we discussed a previous

2    conference, your Honor, a recent Second Circuit case.

3        THE COURT:  Linsy.

4        MR. BASSEN:  And I think there the Second Circuit said

5    it was talking about the comparison of Equal Pay Act in Title

6    VII and what I took away from that case is that the Second

7    Circuit said the difference is that in for Title VII the

8    plaintiffs must prove intentional discrimination.

9        THE COURT:  I think its holding was many more things

10   than that but certainly no one was disputing that.

11       OK.  Now, so what's left now is the FLQ.  And my

12   problem on that is it's very hard, this is the thing I asked

13   you to research; do you remember?  Are there any pure

14   compensation cases that allow the FLQ defense?

15       MS. HASSAN:  Your Honor, we didn't find one but it

16   just hasn't arisen in this context.

17       THE COURT:  Did you find of any of the other ones?

18       MR. WEISS:  Yes.  Your Honor, we provided you a Ninth

19   Circuit case.

20       THE COURT:  Which one was that?

21       MR. WEISS:  I think it's EEOC versus.  It was quoting

22   a treatise by Larson.  Hang on.

23       (Recess)

24       THE COURT:  The FLQ, who wants to talk?

25       MR. BASSEN:  May I say something, your Honor?  It was

K2PAAKNO6                         Crouchen - Re-recross

 1    omitted in previous discussion.

 2              THE COURT:  OK.

 3              MR. BASSEN:  I don't want to throw a monkey wrench

 4    into everything but we were talking about, you were talking

 5    about a factor other than sex and that whole discussion and I

 6    neglected to mention, I apologize, the double asterisk footnote

 7    exception for gender identity and an accommodation to the dress

 8    code and clothing allowance based on gender identity, I am just

 9    throwing that out there.

10              THE COURT:  What does that have to do with anything?

11              MR. BASSEN:  Well, you said sex was a -- the question

12    is is sex a hundred percent correlation here?

13              THE COURT:  I said it seemed to be a hundred percent

14    here and certainly that's enough.  I am not saying you have to

15    have a one hundred percent sex to have the problem with --

16    correlation with sex to have the problem that we're

17    experiencing here.

18              Go ahead.

19              MR. BASSEN:  OK.  I am saying that to be factored in

20    there somehow is the exception that people who have a gender

21    identity issue.  They'll get the clothes allowance or at least

22    there's some evidence about that.  So technically you could

23    have a woman who is getting the clothing allowance under this

24    exception.

25              THE COURT:  OK.  But if every single man is getting

1    the clothing allowance, I don't think that helps.

2            MR. BASSEN:  OK.  I am just mentioning it.  I forgot

3    to mention it.

4            THE COURT:  Thank for give bringing it up.

5            MR. WEISS:  Your Honor asked if we had found any cases

6    that had come our way that said at FLQ is not available on a

7    pure compensation.  So, a case that we are cited in our trial

8    memo and I believe also in our summary judgment memo docket

9    258.

10           THE COURT:  I've read your trial memorandum maybe 20

11   times each.  So hopefully this will refresh my recollection,

12   258.

13           MR. WEISS:  Page 24 of 39.  Yes.  I remember that this

14   was from treatise.  I don't think it's in a case, EEOC v.

15   Freemont Christian School.

16           THE COURT:  Oh, I didn't see that.  The parenthesis

17   had closed.  I thought it had closed.  That is Ninth Circuit C.

18   Larson.

19           MR. WEISS:  Yes.  The holding of the Court begins,

20   accordingly, we conclude at --

21           THE COURT:  Right.  It's dicta but it's certainly

22   positive citation to the precise proposition you are making.

23           MR. WEISS:  Right.  And the next case also just

24   underneath from the Ninth District of Illinois.  I would just

25   note if you look at the language of the statute which is

K2PAAKNO6                      Crouchen - Re-recross

1    2000E2E, it very specifically says it shall not be unlawful

2    employment practice for an employer to hire an

3    employer/employees -- and I am cutting some out -- on the basis

4    of religion, sex or national origin, certain instances is a

5    bona fide occupational, qualification reasonably necessary --

6    So it only talks about hiring employment.  Whereas, the

7    beginning of 2000E2 talks about discrimination and basic hiring

8    employment compensation or any other terms of employment.

9          I would also note that there is a separate -- well

10   scratch that.  But when this statute wants to talk about

11   compensation it knows how to do it.  And when it wants to talk

12   about hiring an employee, it knows how to do that as well.

13             THE COURT:  Anything your want to add?

14             MS. HASSAN:  It's a little dangerous applying that

15   statement which is dicta too broadly because that seems to

16   suggest that in no pay discrimination case can you have a PFLQ

17   defense.

18             THE COURT:  How do you have pay discrimination?  Let's

19   pretend that I reject the statutory argument which I am not

20   sure I am.  It doesn't even apply under the terms of the

21   statute of compensation or only to hiring employment, continued

22   employment.  How do you cram the words of the statute which is

23   that sex is a bona fide occupational qualification?  What is

24   the occupation?

25             MS. HASSAN:  It's the occupation of the male sales

1    professional who has to wear and model those clothes.

2              THE COURT:  OK.  And they are not disputing that it's

3    OK to have just men -- I thought they were at the beginning but

4    they are not.  They are not disputing that it's OK to have a

5    system where men are required to wear the clothing and that is

6    essentially a separate job, that men have to be on the job

7    wearing the clothing at Varvatos.  They are not disputing that.

8    OK?  So, it's not a problem.  Not disputing that.

9              What is they are saying is the men were being -- the

10   women were not getting as much pay as they should have compared

11   to the men because the men were getting this benefit, this

12   special benefit that was worth more than what the women were

13   getting.  OK?  That's the only way we are going to get there.

14             What is the occupation?  How do you fit that -- if the

15   only discrimination is not the wearing of clothes but the extra

16   compensation, how do you fit the language into it?

17             MS. HASSAN:  Your Honor, how can we slice apart

18   obligation to wear these clothes?  So, I guess is their entire

19   case that they shouldn't be left with the clothing and that the

20   worn clothing is the issue here?

21             THE COURT:  Well, it would solve the problem if the

22   men didn't keep the clothing, we would not be here.  If they

23   picked it up everyday and left it because they would be getting

24   no -- you disagree that?

25             MR. DUNNEGAN:  Yes, I do.  First question in the

1    summary judgment argument was, would that eliminate the case

2    and answer I think we gave and your Honor agreed with at the

3    time was the women still have to buy their clothes.  Now, if

4    the men are getting all the clothes they need to wear for free

5    and the women have to buy their clothes, that's still a case.

6    It may not be as big a case but it's still a case.

7              THE COURT:  I'm sorry.  You're right about that.  It's

8    not necessary in my argument anyway.  So, what I'm trying to

9    get at is the thing that they are complaining about is not that

10   only the men were wearing the clothing.  The thing they're

11   complaining about is the net result is that they got more

12   compensation than the women did, which is the only way we get

13   your affirmative defense.  The jury is going to have to find

14   the women were paid less than the men.  That is the only way we

15   get to the affirmative defense.  What the occupational

16   qualification for getting more money not for wearing the

17   clothes, for getting more money?

18             MS. HASSAN:  For the additional wealth of modeling the

19   clothes?  It seems like there's something --

20             THE COURT:  That we could talk about but that wasn't

21   the way you were framing things before.  The additional -- let

22   me think about that.  The addition work of modeling the

23   clothes.  OK.  Well, if you limited yourself to arguing only

24   that, I would have to rethink about it but that's not what I

25   heard before.  So you would have to show what whatever the

K2PAAKNO6                    Crouchen - Re-recross

1   thousands of dollars or hundreds of dollars, whatever the

2   difference is that the jury finds, that was in fact payment to

3   them for having to wear these clothes.  Is that how you want to

4   limit yourself?  I know they are not agreeing yet but I want to

5   know where you are on that.  Maybe you don't want to limit

6   yourself right now.

7          MS. HASSAN:  I think that would be one of our

8   arguments but, no, we don't wish to limit ourselves.

9          THE COURT:  Well, let's assume for the moment that is

10  one of the arguments.  So, let's go now to you and say, well,

11  and let's assume I reject your statutory argument.  Does that,

12  does the BFLQ defense get that?

13         MR. DUNNEGAN:  No.  Because I think what you are

14  trying to turn into a BFLQ defense really has nothing to do

15  with BFLQ defense.  It's a damage defense.  It goes to the

16  amount of damage that the women may have sustained, if any, as

17  a result of the men having duties which imposed obligations on

18  them which were commensurate to the amount --

19         THE COURT:  The problem is that in order for the jury

20  to find the women were being paid less than men, they are going

21  to have to factor in whatever additional job responsibilities,

22  if any, they found the men had and make It a judgment about

23  whether there was intentional discrimination.  So, that's

24  already going to have been dealt with by the jury.  They are

25  going to find the women were paid less than men and that the

1    women's sex was a motivating factor in making decisions to pay

2    the amount that they were paid.  That's my problem there.

3              OK.  Look, I will have to take this up tomorrow.  I am

4    going to e-mail you a charge that has these defenses sitting

5    there.  Do not think that means I am going to give them.  You

6    need to be prepared to pivot.  I'll make a final decision

7    tomorrow night and we'll have to be prepared to have a charge

8    that has none of the affirmative defenses or some or whatever

9    ones I have in there.

10             Anything else from your?

11             MR. DUNNEGAN:  Just scheduling, your Honor.  As we

12   proceed, we proceed under the assumption that we finish the

13   witnesses, the live witnesses tomorrow and I guess all the

14   evidence is in by the end of the day, then we are going to

15   complete whatever charging issues that we have on Wednesday

16   evening and Thursday morning we will come in and the defendant

17   will sum up, I will sum up and your Honor will charge.

18             THE COURT:  That's the theory.

19             MR. BASSEN:  Same issue.

20             THE COURT:  Good.  So the question's been answered.

21             Any other issues from anybody?

22             MR. DUNNEGAN:  Can we go home now?

23             THE COURT:  Yes, can you go home.

24             (Adjourned to February 26, 2020 at nine a.m.)

25

                    INDEX OF EXAMINATION

Examination of:                                    Page

 NICOLE CHANG

Direct By Mr. Dunnegan . . . . . . . . . . . .66

Cross By Mr. Bassen  . . . . . . . . . . . . 162

Redirect By Mr. Dunnegan . . . . . . . . . . 191

Recross By Mr. Bassen  . . . . . . . . . . . 195

RUBY ROMERO

Direct By Mr. Weiss  . . . . . . . . . . . . 198

Cross By Mr. Bassen  . . . . . . . . . . . . 227

SHERYL CROUCHEN

Direct By Mr. Bassen . . . . . . . . . . . . 246

Cross By Mr. Dunnegan  . . . . . . . . . . . 260

Redirect By Mr. Bassen . . . . . . . . . . . 268

Cross By Mr. Dunnegan  . . . . . . . . . . . 269

Recross By Mr. Bassen  . . . . . . . . . . . 270

                    PLAINTIFF EXHIBITS

Exhibit No.                               Received

 1, 2, 2A, 2B, 3-20, 35, 35 A, 35 B, 35 C   . .64