# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re                                              :     Chapter 11
John Varvatos Enterprises, Inc. *et al.*,          :     Case No. 20-11043 (MFW)
:     (Joint Administration)
Debtors.                   :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
Tessa Knox, individually and as the                :
Certified Representative of the Class of           :
Judgment Creditors,                                :
:
Plaintiff,              :
:     Adv. Proc. 20-50623-MFW
v.                   :
:
Lion/Hendrix Cayman Limited,                       :
:
Defendant.             :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF FILING OF ADDITIONAL TRANSCRIPT OF
## KNOX V. JOHN VARVATOS ENTERPRISES, INC.

**PLEASE TAKE NOTICE** that, on July 7, 2020, Defendant Lion/Hendrix Cayman

Limited filed a notice [Adv. Docket No. 10] attaching certain transcripts of the proceedings held

on February 24, 2020 through February 28, 2020, which are found on the ECF docket in <u>Knox v.</u>

<u>John Varvatos Enterprises, Inc.</u>, Case No. 17-CIV-772 (GWG), S.D.N.Y. (the "<u>Knox Matter</u>").

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit A is a further transcript of proceedings held on March 2, 2020 in the Knox Matter.

Dated:  July 8, 2020

/s/ Sean T. Greecher
Pauline K. Morgan, Esq. (No. 3650)
Sean T. Greecher, Esq. (No. 4484)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Email:  pmorgan@ycst.com
        sgreecher@ycst.com

and

James L. Bromley, Esq. (*pro hac vice*)
Jonathan M. Sedlak, Esq. (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone:  (212)-558-4000
Email:  bromleyj@sullcrom.com
        sedlakj@sullcrom.com

*Attorneys for Defendant Lion/Hendrix Cayman Limited*

# <u>EXHIBIT A</u>

**March 2, 2020 Transcript**

K32AAKNO1                         Jury Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   TESSA KNOX, *et al.*

4                   Plaintiffs,              New York, N.Y.

5           v.                               17 Civ. 772 (GWG)

6   JOHN VARVATOS ENTERPRISES,
    INC.,
7
                    Defendant.
8
    -------------------------------x
9
                                            March 2, 2020
10                                          9:00 a.m.

11  Before:

12                  HON. GABRIEL W. GORENSTEIN,

13                                          Magistrate Judge

14

15                          APPEARANCES

16

17  DUNNEGAN & SCILEPPI, LLC
        Attorneys for Plaintiffs
18  BY:   WILLIAM I. DUNNEGAN
        RICHARD WEISS
19

20  HUGHES HUBBARD & REED, LLP
        Attorneys for Defendant
21  BY:   NED H. BASSEN
        AMINA HASSAN
22      JOANNE LIU

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Continuing on the record, we confirm that

3   the jury verdict form was OK with the parties and then

4   Mr. Dunnegan raised an issue regarding insurance.

5          Go ahead.

6          MR. DUNNEGAN:  Yes, your Honor.  For the record, the

7   motion in limine that we made was limited to can we use the

8   insurance policy in order to increase the amount of punitive

9   damages that would otherwise be awarded, your Honor, would --

10  we understand that the issue that I had raised was what happens

11  in terms of impeachment opening the door and rebuttal depending

12  on what the witness says.  For example, if the witness says we

13  don't have any insurance at that point can the insurance issue

14  be raised in order to at least impeach his credit.

15         THE COURT:  Just hold on one second.  Let me find out

16  a proffer from them as to what exactly was going to be asked

17  about insurance and what he is going to say.

18         MS. HASSAN:  Your Honor, this might be a matter of

19  getting some clarification on ruling on the motion in limine.

20  One thing that we are going to be bringing up is the financial

21  status of the company, right?  If we do not open the door into

22  insurance then would Mr. Dunnegan still be allowed to raise the

23  insurance issue because if he can't then we're not interested

24  in bringing it up.

25         THE COURT:  OK.  So, your plan would be to not mention

1   insurance and if your assumption is he will not mention

2   insurance unless there's some other ruling about what

3   Mr. Dunnegan can do.

4           MS. HASSAN:  Correct.  Then if there's a different

5   ruling then we might need to bring up insurance informatively.

6   That's, I think, where we are.

7           THE COURT:  So, if there is zero mention of insurance,

8   what's your application?

9           MR. DUNNEGAN:  Our application will be if the witness

10  says we have no idea how we could possibly pay a judgment more

11  than five dollars, at that point it would seem necessary to

12  rebut that testimony by saying well, sir, don't you believe you

13  have insurance coverage?

14          THE COURT:  OK.  Just since your hypothetical is a

15  little extreme, I think your point is if he says they don't

16  have the money to cover some amount.

17          MR. DUNNEGAN:  Some amount.

18          THE COURT:  That's the whole point of his testimony, I

19  assume, is to talk about their financial resources.  So, your

20  real point is they are going to put on any evidence of

21  financial resources, you want to put on evidence regarding

22  insurance.

23          MR. DUNNEGAN:  Yes, your Honor.

24          THE COURT:  OK.  So, and what's your view on that.

25          MS. HASSAN:  Your Honor, I think our view is the same

1   as before.  It's a disputed issue.  So, it's prejudicial to

2   come in because once the idea of insurance something being out

3   there comes in, the jury can easily assume oh, they'll figure

4   it out.  Insurance will cover it but it is disputed in very

5   real terms.  The insurance company said no, no coverage or

6   damages.  Then you get into complicated issues, is there

7   estoppel or not and all of that can't be presented to the jury

8   to just speculate about.

9           MR. DUNNEGAN:  Let me just point out a sentence from

10  Matthews v. Friez, 121 F.3d at 808, 816.  And the sentence just

11  is, "It would be entirely inappropriate for a defendant to

12  raise the issue of his limited financial resources if there

13  existed an indemnity agreement placing the burden of paying the

14  award on someone else's shoulders."

15          Now, I understand that this does not squarely address

16  the issue of whether or not the insurance coverage is disputed

17  but it seems to me we shouldn't have a rule which would allow

18  the insurance company to in any circumstance say, well, I just

19  dispute it and therefore, allow the insurance policy to be

20  excluded for that very reason.  In this situation we have a

21  witness who would say, yes, we think that if the world is a

22  just place, we will have insurance coverage.

23          THE COURT:  OK.  So, I am going to exclude the

24  questioning about the insurance coverage and the reason is that

25  in this case it is so obviously disputed there is absolutely no

1  reason to believe that this is a ploy by the insurance company

2  to manipulate me into the ruling that I am making right now.

3  It's obviously a real dispute.  I've already refused to put

4  this dispute into front of the jury.  I don't see a reasonable

5  method to get the matter adjudicated before the jury makes a

6  decision.  And given the very serious dispute about the

7  coverage, I don't see there's any way that I can have the jury

8  start speculating about whether there might or might not be

9  coverage.

10          Also, the defendant is put in a very difficult

11  situation because they obviously may have to take the position

12  with the insurance company that they very obviously cover and

13  so forth.  And this should not play on the crucibles of the

14  punitive damages phrase of this trial.

15          So, your application is denied.

16          MR. DUNNEGAN:  Thank you, your Honor.  I just wanted

17  to make sure it was reserved for appeal.

18          THE COURT:  I feel like there were other exhibits we

19  put off now, 101-H, things like that.

20          MR. DUNNEGAN:  There was HH where I believe your Honor

21  said if Dunnegan wants to use it to impeach, if he can figure

22  out how to do that, he can do it.

23          THE COURT:  OK.  And you are satisfied with that?

24          MR. DUNNEGAN:  Yeah, sure.

25          THE COURT:  OK.

K32AAKNO1                         Jury Trial

1              MR. BASSEN:  In connection with the Exhibits HH and I

2      think it's II, we had made a motion to seal those and you had

3      granted that motion.  It's document number 319 sealing the

4      document showing the financial condition of the company.

5              THE COURT:  OK.  I am prepared to say right now no

6      because the exhibits aren't being filed obviously yet.  So,

7      when the time comes to file the exhibit -- give me the

8      reference on my ruling.

9              MR. BASSEN:  It's docket number 319.

10             THE COURT:  And page.

11             MR. BASSEN:  There is no document attached.  It just

12     says "order granting motion to seal" and then there are --

13             THE COURT:  But no, I was granting a motion to seal

14     specific letter on the docket.  I was not making a motion to

15     seal an exhibit for all time.  So, I think they actually still

16     have to deal with it.  I don't know if we have to deal with it

17     before the jury gets in because there's going to have to be

18     evidence about it and the jury will have to hear it.  So, I

19     think the thing to do -- I have absolutely no doubt that motion

20     to seal was the motion to seal the very application regarding

21     all these issues so that I could be filed on to the docket

22     sheet.

23             The question of how we are going to treat that exhibit

24     for purposes of it being filed on the record on appeal or filed

25     here, whatever it is, we're going to have to have a discussion

K32AAKNO1                    Jury Trial

1    about that.

2            MR. BASSEN:  Your Honor, thank you.  In this

3    connection we also would like to make a motion to the testimony

4    of Mr. Zorda, the chief financial officer, on the financial

5    condition of the company be sealed.

6            THE COURT:  This is what happens with the transcript.

7    It gets filed on the record.  It's sealed for 90 days to allow

8    you to make such an application.  I am going to need a written

9    application as soon as you can get to it and agree on a motion

10   schedule will allow me plenty of time before the 90 days in

11   order to make a decision about what can be sealed.  And

12   obviously, you should address a specific page and line in the

13   transcript.  I'm not going to seal his whole testimony.  You

14   have to point to specific things.  There is very clear case law

15   about this and a very hard burden to overcome.  There's right

16   of public access and so forth.  You are going to have to make a

17   very strong showing as to why that should be overcome.

18           MR. BASSEN:  Thank you, your Honor.

19           THE COURT:  Anything else before we bring in the jury,

20   assuming they're here?

21           MR. DUNNEGAN:  I can't think of anything, your Honor.

22           MS. HASSAN:  Your Honor, may we have a couple of

23   minutes.

24           THE COURT:  Sure.

25           (Pause)

K32AAKNO1                    Jury Trial

1          MS. HASSAN:  Thank you, your Honor.

2          THE COURT:  Are you ready?

3          MS. HASSAN:  Yes, your Honor.

4          THE COURT:  Are you ready?

5          MR. DUNNEGAN:  Yes, your Honor.

6          (Jury present)

7          THE COURT:  Please be seated.

8          Welcome, members of the jury.  We are, of course,

9    continuing with the same trial as before.  We're just in the

10   second and last phase where we address certain damages issues.

11         We collected your notebooks and I think now would be a

12   simpler time to distribute them.  I hope you recognize your own

13   notebooks.  It occurs to me this may not be that obvious.

14         (Pause)

15         THE COURT:  OK.  I am actually going to ask you to

16   close the notebooks because we're doing a little bit of a

17   repeat of what we did before which is we're going to have some

18   very brief opening statements.  We're going to have some

19   testimony, all very brief and then some closings.  And of

20   course, if you remember the opening statements are not

21   evidence.  The first time around you didn't even have your

22   notebooks for that.  So, I think it's better if you don't take

23   notes for the opening statements.  You can absolutely take

24   notes when the witness testifies and I will allow you to take

25   notes during the closing arguments reminding you that it's not

1    evidence.

2           So, I'll now turn to counsel for plaintiff to give any

3    opening statement.

4           MR. DUNNEGAN:   Thank you, your Honor.

5           We've already presented evidence that allowed you to

6    decide that Varvatos' conduct was willful and that punitive

7    damages are appropriate.  But before you determine the amount

8    of liquidated and punitive damages we need to present some

9    additional evidence about Varvatos' finances that we couldn't

10   present during the prior phase of the trial.  In making your

11   awards of liquidated and punitive damages, we want you to

12   consider the evidence that you've already heard and the

13   evidence which is going to be presented today.

14          Today's evidence is going to prove that Varvatos has

15   the financial ability to pay any amount of liquidated and

16   punitive damages that you could reasonably award.  This is an

17   overview of what the evidence is going to show about Varvatos'

18   financial condition.  Varvatos has a balance sheet like most

19   companies.  It's a one-page document and it lists all of

20   Varvatos' assets and Varvatos' liabilities.

21          Now, assets are things like cash or accounts

22   receivables or inventory or trade fixtures in stores that

23   Varvatos owns or has an expectation that it will be receiving.

24   Liabilities are obligations that Varvatos owes to other people.

25   Varvatos owes money to its banks.  Varvatos owes money to some

of its related companies.  Varvatos also has a profit and loss

statement which you'll see as the second page of the exhibit

which is handed out to you.  The profit and loss statement

shows Varvatos' income and its expenses.  Most of those are in

cash but some of them are on what's called an accrual basis to

show what's happening to expenses or liabilities with the

passage of time which don't actually manifest themselves in

cash.

        Now, the document that you will see has information

about Varvatos' balance sheet and profit and loss statement for

the years 1996, 1997, 1998 and 1999 until November 23rd of

1999.  That's when the information cut off.  That's before

Black Friday in 2019.  And by Black Friday, I mean the day of

the year where retailers say that they have gone from red ink

on their books, meaning losses, to black ink on their books,

meaning profits.  That's usually the day after Thanksgiving.

        Now, the balance sheet on its face shows that Varvatos

has $47.4 million in assets.  Now, at least for our purposes at

this trial, that number is going to be very misleading.  It

shows that as of November 23rd of last year Varvatos had

inventory of $22 million.  But here's what you have to look out

for when you hear the evidence.

        The evidence is going to show that that $22 million is

listed at Varvatos' costs of manufacturing the clothing.  The

clothing are valued, in other words, at the cost of production.

1   Because Varvatos' cost of production, you will see, is about

2   20 percent of the value of the clothes, it means that at retail

3   value, Varvatos has inventory of about $110 million in clothes.

4   So, if Varvatos ran a sale of 50 percent off it should be able

5   to raise about $55 million before it starts paying off debt.

6   Varvatos does have debt.  It has about $35 million in bank

7   loans and it owes money to some of its affiliates, as well as

8   trade creditors.

9            Now, the income statement shows that Varvatos is not

10  profitable at this moment.  But it also shows that Varvatos has

11  had a dramatic reduction in its losses in the last four years.

12  And the last four years revenue has been up substantially and

13  expenses have been down substantially.  And while Varvatos is

14  not the strongest of companies, the evidence will show that

15  Varvatos has plenty of assets from which to pay any liquidated

16  and punitive damages that you could reasonably award.

17           I'm not sure that Varvatos is going to argue

18  otherwise.  In addition to the information on the balance sheet

19  and the profit and loss statement we're going prove to you some

20  additional facts that may influence your thinking.  The

21  significance of those facts is going to be pretty obvious once

22  you hear them.

23           Now, let me explain to you how we're going to prove

24  that there will be one witness in this phase of the trial.

25  That's Mr. Joseph Zorda who is sitting in the back of the

1    courtroom.  He's the Chief Financial Officer of Varvatos.  He's

2    going to testify about Varvatos' financial condition.  It's

3    somewhat unusual but the parties have agreed that Varvatos will

4    conduct his direct examination and that we will conduct his

5    cross-examination.  After the witness has finished testifying,

6    Varvatos will give its closing.  I will give my closing and the

7    Court will give you another charge that will help you in

8    determining the amount of liquidated and punitive damages to

9    award in this case.

10           Thank you.

11           THE COURT:  Counsel for defendant.

12           MS. HASSAN:  Ladies and gentlemen, of the jury, good

13   morning.

14           Last week you heard a lot of evidence.  Part of that

15   evidence was that Varvatos had a belief that its clothing

16   assistance policy was lawful, that it was compliant with U.S.

17   law.  On Friday you delivered a verdict which said it is not.

18   Varvatos has heard you loud and clear.  Varvatos takes that

19   verdict very seriously.  As part of that verdict you also

20   awarded certain compensatory damages to the plaintiffs and you

21   awarded those damages in the maximum amount.  Today you are

22   here to determine the amount of punitive and liquidated damages

23   that should be awarded against Varvatos.  The Court will be

24   instructing you and giving you instruction and guidance on how

25   to determine that amount.

1          The Court will also be telling you that the purposes

2     of liquidated and punitive damages is not to compensate the

3     plaintiffs but it is to punish a defendant and to deter a

4     defendant and others.  It is to punish and deter.

5          Ladies and gentlemen, we will be presenting to you

6     some additional evidence on top of the evidence that you've

7     already heard.  That additional evidence and some of the facts

8     that you already know from last week we believe will show two

9     things.  Number one, there is no additional punishment or

10    deterrence required here.  Number two, you will also hear that

11    any additional punishment or deterrence that may award today

12    could have unintended and serious consequences.

13         You will hear evidence that Varvatos is in serious

14    financial conditions.  It has been experiencing consistent and

15    significant loss over the last few years.  It is still

16    experiencing consistent and serious losses.  If punitive

17    damages and liquidated damages are awarded in addition to the

18    compensatory damages award on Friday, that could pull the plug

19    on Varvatos and force it into bankruptcy.

20         Now, what is the evidence that you will be hearing or

21    the additional evidence will you be hearing today?  As

22    Mr. Dunnegan indicated, there is one witness today, Mr. Joseph

23    Zorda.  He is the chief financial officer at Varvatos.  You

24    will hear that he was brought in last year in order to help

25    right the ship.  He will tell you about the financial status of

1   Varvatos today.  He will tell you that Varvatos had been

2   struggling to operate on a day-to-day basis, that the only

3   reason it is kind of staying afloat is because of a very

4   limited loan.  You will hear that Varvatos has been struggling

5   to make parole.  So, that is its one priority, that it has been

6   struggling to make rent for its stores, that it's struggling to

7   make payments that become due.  Any additional punitive and

8   liquidated damages could simply push Varvatos into further

9   financial jeopardy and bankruptcy.

10          Ladies and gentlemen, that is not the purpose of

11   punitive and liquidated damages.

12          The evidence that will be presented to you will show

13   that Varvatos will be struggling in order to pay the

14   compensatory damages that were awarded on Friday.  Any

15   additional damages again, would make Varvatos' financial even

16   worse pushing it towards a possible bankruptcy.  After the

17   evidence is in, I will be coming back to you and asking you to

18   exercise your discretion today, to award the minimum possible,

19   the nominal punitive damages and liquidated damages in this

20   case.  You have already decided on Friday that punitive and

21   liquidated damages should be awarded but it is within your

22   discretion to award the minimum most nominal damages, even a

23   dollar above.

24          Thank you, ladies and gentlemen.

25          THE COURT:  OK.  I'll now turn to the defendant to

K32AAKNO1                      Jury Trial

1   call the witness.

2              MS. HASSAN:  You Honor, we call Joseph Zorda.

3              THE COURT:  Mr. Zorda you are going to be asked

4   questions by the attorneys.  Take a moment before you answer.

5   If you hear the word "objection", just wait and I'll tell you

6   whether to answer or not.

7              THE WITNESS:  OK.

8              MS. HASSAN:  May we distribute the exhibit binder?

9              THE COURT:  Yes.  This is new exhibit binder?

10             MS. HASSAN:  Yes.  And it actually just has one

11  exhibit in it.

12             THE COURT:  OK.  What is the exhibit?

13             MS. HASSAN:  Your Honor, the exhibit is Defendant's

14  Exhibit JJ.  It is John Varvatos Enterprises, Inc., and

15  Subsidiaries' Consolidated Balance Sheet and Consolidated

16  Profit and Loss Statement.

17             THE COURT:  Do you have an extra one?

18             (Pause)

19             THE COURT:  Has this already been offered in evidence?

20             MS. HASSAN:  We are offering it now.

21             MR. DUNNEGAN:  No objection, your Honor.

22             THE COURT:  It's admitted.

23             (Defendant's Exhibit JJ received in evidence)

24   JOSEPH ZORDA,
          called as a witness by the Defendant,
25        having been duly sworn, testified as follows:

1   DIRECT EXAMINATION

2   BY MS. HASSAN:

3   Q.   Good morning, Mr. Zorda.

4   A.   Good morning.

5   Q.   Could you tell us whether you live.

6   A.   New York City.

7   Q.   Where do you work?

8   A.   John Varvatos Enterprises.

9   Q.   Since when have you been working at John Varvatos

10  Enterprises?

11  A.   August 2019.

12  Q.   And just for convenience, we have been referring to

13  defendants as "Varvatos".  So, when I refer to "Varvatos" will

14  you understand that I am referring to "John Varvatos

15  Enterprises"?

16  A.   Yes.

17  Q.   What is your position at Varvatos?

18  A.   Chief financial officer.

19  Q.   Was there a chief financial officer at Varvatos when you

20  joined?

21  A.   There was a CFO/COO.

22  Q.   And what is your understanding on why you were brought in

23  at Varvatos?

24  A.   He was leaving and the business needed a CFO imminently.

25  So, I joined.

K32AAKNO1                    Zorda - Direct

1   Q.  Could you tell us before you joined Varvatos, please, could
2   you tell us about your work experience?
3   A.  So, I started my career at the Gucci Group, spent the first
4   couple of years in supply chain management and operations, then
5   moved to the treasury department as the manager where I was
6   responsible for the credit facilities and cash management and
7   forecasting for all of Gucci Group North America.  I then
8   became the controller responsible for the full PNL and balance
9   sheet for two of the subsidiaries of Gucci Group.  I then left
10  when I was recruited to become the controller of a private
11  equity business.  I was there for one year until I was
12  recruited to become the USCFO of another private equity
13  business which was a company that owned three consumer products
14  companies.  That was a turnaround situation, three companies on
15  the verge of bankruptcy.  The turnaround was successful and we
16  were able to sell the most challenged business.  After selling
17  that business I went to the new private equity owners to
18  continue working for that business.  We had just sold to
19  platform it for further growth and investment.  I was there for
20  approximately two to two and a half years.  Before leaving to
21  look for an opportunity at a larger organization I found an
22  opportunity at company called Perricone M.D.  That role was in
23  San Francisco, California, as the CFO and COO.  I moved out
24  there in September of 2014.  I was there for several years.  I
25  left and started up my own consulting practice doing M and A

and some other larger operational projects.  My wife and I had

the opportunity to return to New York for an incredible career

opportunity for her.  So, we took that opportunity.  I was then

contacted by Lyon Capital for the opportunity at Varvatos and

after meeting a number of people and learning about the job and

the challenges ahead, I accepted the opportunity and started

within about two weeks.

Q.  I have two follow-up questions.  Just so that we have an

idea of timeframe, can you tell us when you started at Gucci

Group?

A.  That was in 2000.

Q.  You also mentioned Lyon Capital in connection with your job

at Varvatos.  Could you tell us what Lyon Capital is?

A.  Lyon Capital is a private equity investment firm.

Q.  And what is its connection or relationship to Varvatos?

A.  So, Lyon Capital is an investment fund that owns Varvatos.

Q.  Just so that we understand, what does that mean, "an

investment fund three" or "investment fund" or anything else?

A.  Sure.  So, private equity companies don't actually per se

themselves own any particular business.  They're in the

business of setting up investment funds and seeking investors

to invest in those funds.  The investors in those funds are

people who are looking for more diverse returns than they could

normally get in the stock market or in the bonds or other

capital markets and looking for a higher return on investment

1    than they would typically be able to find in a more public

2    market.  Those types of people range from small family offices,

3    to large family offices, to unions, to pension funds, to

4    insurance companies.  All of those people who are putting money

5    into that investment fund are considered limited partners of

6    the fund.  When the fund reaches a certain target size and the

7    cash commitments have been culled, a typical fund could be a

8    couple hundred million dollars for a very small PE firm.  It

9    could be in the tens of billions for some of the more massive

10   private equity companies.

11          Regardless of the size once they've reached the

12   desired level of funding, they then go out and deploy that

13   capital to invest in businesses, primarily full acquisition of

14   companies, different private equity companies specialize in

15   different industries.  Lyon Capital's specialty is investing in

16   consumer products companies and they have, I believe, now four

17   investment funds.  The first two investment funds I understand

18   are closed out and the returns have been returned to the

19   limited partners in those funds.

20          The fund that John Varvatos Enterprises is held in is

21   Fund Three.  And Fund Four I believe has just been opened or is

22   just starting to make acquisitions.

23   Q.  And to be clear, Fund Four has nothing do with Varvatos?

24   A.  That's correct.

25   Q.  Let me talk to you a little bit about the financial

1  condition of Varvatos.  Is Varvatos a profitable business?

2  A.  It is not.

3  Q.  Was it a profitable business last year?

4  A.  No.

5  Q.  Did it break even last year?

6  A.  No.

7  Q.  So did it experience a loss last year?

8  A.  Yes.

9  Q.  Can you give us an estimate of that loss?

10  A.  So, the overall net loss of John Varvatos Enterprises is in

11  the neighborhood of $27 million.  We'll have final, final

12  numbers when the audit is complete which is currently underway

13  but I don't expect any material adjustments from that number.

14  Q.  So, the $27 million loss number is as of what date?

15  A.  As of the end of December, 2019.

16          MR. DUNNEGAN:  Objection, your Honor.

17          THE COURT:  What's the objection?

18          MR. DUNNEGAN:  He is testifying about documents which

19  are not in evidence and which have not been produced.  Best

20  evidence rule.

21          THE COURT:  Is the problem beyond 2019?

22          MR. DUNNEGAN:  Yes, it is, your Honor, coupled with

23  the fact that the witness doesn't have personal knowledge as to

24  what those numbers are.  He's reading them off a piece of paper

25  which he has not brought with him to see or disclosed to

1    counsel for the plaintiffs.

2                THE COURT:  Well, the November number is not a

3    problem.

4                MR. DUNNEGAN:  No, it's not.

5                THE COURT:  Can we just make this through November

6    maybe.  I think the problem is he's added --

7                MS. HASSAN:  Well, your Honor, one, Mr. Zorda is the

8    CFO.  So, he knows what the loss numbers will look like without

9    reference to an actual document.  But I am happy to pick the

10   November numbers as long as we can show that the trend is the

11   same.

12               THE COURT:  He has to testify about where we are today

13   to some degree.  I am overruling the objection but let's ask

14   him about this document that is in front of us through

15   November.

16               MS. HASSAN:  OK.

17   Q.  Mr. Zorda, you have a binder in front of you.  There is one

18   document in there.  It's marked Defendant's Exhibit JJ.

19               MS. HASSAN:  It might be helpful if the jury can look

20   at the document as well.

21   A.  I don't know that I have JJ in here.

22               THE COURT:  It's the wrong binder.

23               (Pause)

24               THE WITNESS:  Thank you.

25   Q.  Mr. Zorda, do you recognize this document?

1    A.  Yes.

2    Q.  Can you please tell us what that document is?

3    A.  This is the financial statements of John Varvatos

4    Enterprises and subsidiaries as of the end of November 2019,

5    our fiscal November 2019.

6    Q.  And can you tell us why there are as of November 19 rather

7    than a later date?

8    A.  This was prepared for my deposition in January.  The

9    December numbers were not yet final.

10   Q.  And to clarify, that deposition was for this case?

11   A.  Correct.

12   Q.  And it was in January 2020?

13   A.  Correct.

14   Q.  Now, Mr. Zorda, can you tell us where on the document it

15   shows where Varvatos was profitable or money losing business as

16   of November 2019?

17   A.  On page two there are several lines.  There's a line called

18   "Operating Income" which is negative 7.8 million.  There's a

19   foreign currency adjustment and then there's a line called

20   "Earnings Before Income Taxes" and that's really earnings

21   before interests and income taxes.  That's 7.7 million.  There

22   is a line called "Adjusted Earnings Before Income Taxes".

23   Interest, depreciation and amortization or EBITA.  That's a

24   common measure of the operating profitability of a business and

25   it is a normal profit KPI or key performance indicator for

1   private companies but also public companies.  And then finally,

2   there's a net income which is the total loss for the year.

3   Q.  Now, Mr. Zorda, you went over a number of numbers with us.

4   Can you explain like what's an easy way for somebody to think

5   about what's the cash in/cash out loss that a business is

6   experiencing?

7   A.  So, the best way to look at that is the EBITA number or the

8   adjusted earnings before income taxes interests depreciation

9   and amortization because that is beginning to backout a number

10  of noncash items.  But you'll also see in that line

11  extraordinary or nonoperating expenses.  This is a non-gap or

12  generally accepted accounting principles adjustment but that's

13  an adjustment that is used to backout expenses that are

14  considered extraordinary or not relating to the regular

15  day-to-day operations of the business.

16          So, you would have an initial operating profit that

17  you would be looking at of minus 3.2 million.  But the reality

18  of that 3.8 million extraordinary expense is that it is a cash

19  related item or will be become as those bills are paid.  So, I

20  would look at this and calculate the 3.2 million dollar loss,

21  plus the 3.8 million in expenses and I would see a seven

22  million dollar cash related loss and that would be before

23  interest expense being paid to banks and any taxes being paid

24  to any government authorities.

25  Q.  And then what does the last number on that column "net

1   income loss" which shows a loss of 18 million; what does that

2   represent?

3   A.   So, that represents the addition of interest expense and

4   tax expense to the operating loss.

5   Q.   And are those real expenses as well?

6   A.   They are real expenses.  But I would note that the interest

7   expense of approximately 10.3 million has a substantial portion

8   of noncash expense in there.  That particularly is the interest

9   expense on the loans from Lyon Capital.

10  Q.   But is that an expense that Varvatos is incurring or has

11  incurred?

12  A.   Absolutely.

13  Q.   Now, Mr. Zorda, there is information about the profit and

14  loss of Varvatos on this document for December 2016,

15  December 2017, December to 2017 and November 2019.  Do you see

16  that?

17  A.   Yes.

18  Q.   And if we look at overall bottom line lost number, was

19  Varvatos making a profit or a loss for all of these years?

20  A.   Making a loss.

21  Q.   Bringing November 2019 to the present, has the trends

22  changed?

23  A.   It has not.

24  Q.   Now, Mr. Zorda, could you tell us a little bit about what

25  are the main categories of expenses that Varvatos has?

1   A.   Sure.  So, the company's largest expense is payroll.  And

2   for the business our payroll expense inclusive of payroll taxes

3   is in the neighborhood of $1.1 million every other week.  Our

4   next largest expense is rent on our stores which is

5   approximately $2.1 million per month.  After that we have other

6   operating expenses which are necessary for the day-to-day

7   running of the business.  The most significant ones, there are

8   warehousing and operations and that can be in the neighborhood

9   of 300 to $400,000 a month including freight charges.  It also

10  includes other operating expenses in the business are the costs

11  necessary for running the website platform which is also in the

12  neighborhood of several hundred thousand dollars a month.

13          Another significant expense after that is our health

14  benefits and general insurance expense.  That's also several

15  hundred thousand dollars a month.  Then there's a variety of

16  other smaller ones but those are the most significant ones.

17  Q.   Now, you referred to "payroll".  How many employees does

18  Varvatos have?

19  A.   Over three hundred.

20  Q.   And what number out of these are what proportion out of

21  these are people who work in the stores?

22  A.   Approximately, two thirds.

23  Q.   Now, Zorda, can Varvatos make payments as they become due?

24  A.   It cannot.

25  Q.   Since when has that been the case?

K32AAKNO1                        Zorda - Direct

1    A.  For the last several years.

2    Q.  Can you provide us some examples of where Varvatos has not

3    been able to make payments as they become due?

4    A.  Sure.  So, the best way to look at the payables that a

5    company owns are within the accounts payable line in the

6    liability section of the balance sheet.

7    Q.  Could you point us to where that is on Defendant's Exhibit

8    JJ?

9    A.  Yep.  It is in the total "current liability section".  The

10   amount is $10.7 million.

11   Q.  So, are you on page one of the document?

12   A.  Yes, I am.

13   Q.  And could you situate us?

14   A.  So, again, in the November 2019 column in the "liabilities

15   and stockholders equity" section above the section called

16   "total current liabilities" there is a line called "accounts

17   payable" in the amount of $10.7 million.  And just below that

18   is a line called "accrued expenses" which is $5.3 million.

19   Combined, those are the current liabilities of the business and

20   really should be being paid in current terms.  And when I say

21   "current terms" your payment terms differ with your suppliers.

22   Sometimes you have net 30 days.  Sometimes you have net 60 days

23   meaning, have you to pay within 30 days from receipt of the

24   invoice or within 60 days.  Sometimes you have net 15.  It

25   could vary significantly.

1          The best way to look at the status of a company's

2     ability to pay its accounts payables is called the "aging of

3     the accounts patient payable".  And if you could envision a

4     chart that says how many days late you are behind terms, the

5     typical classification are the amount that's current, the

6     amount that's 30 days late.  The amount that's 60 days late.

7     The amount that's 90 days late and the amount that is 90 days

8     late or greater.  For the business, when we look at this total

9     of 10.7 million, plus 5.3 million, the 16 million there,

10    approximately, six to seven million dollars of that is over 90

11    days late.  "We" meaning, we are not paying our bills on time

12    because we're not able to.

13    Q.  That's helpful.  Can you give us some actual examples so we

14    understand what kind of bills is Varvatos not able to pay right

15    now at the appropriate time?

16    A.  So, one of the largest is our inventory suppliers and we're

17    typically 30 to 60 days late with them.  That's better than it

18    was last summer when I joined.  And when I joined we were well

19    beyond 90 days late with them.  We owe well over a million

20    dollars to our warehouse and logistics provider and more than

21    half of that is over 90 days late.  We also owe a number of

22    professional fees and legal fees.  We owe our firm in the

23    neighborhood of $1 million.  We owe our auditors money for even

24    the 2018 audit which was completed early in 2019.  And we are

25    now just embarking on the audit for the 2019 numbers to give

1    you an idea of how late we are on our audit fees.

2    Q.  What could be the result of being late on some of these

3    payments on a day-to-day basis?

4    A.  The main reason we're late on these payments obviously is

5    lack of liquidity.  And what I mean by liquidity is actual cash

6    available to make payments with.  And the reason that we are so

7    late with these payments, not only are the operating losses but

8    the lack of liquidity and the lack of capital to support the

9    business.  So, when we make our decisions on a weekly basis of

10   how we're going to use the cash that comes in, that is based on

11   prioritization of what is most important to the business.

12   Above all else we prioritize payroll.  We will never miss a

13   payroll and we don't miss payrolls because that impacts the

14   ability of every employee in the company to obviously live

15   their life, to pay their rent, to have their health insurance,

16   to do the things that they need do, to live and expect as

17   having a job that the employer is able to pay the payroll.

18        After that we're obligated to prioritize our rent

19   payments which as I mentioned is $2.1 million per month.  We're

20   supposed to be paying our rent on or before the first of the

21   month.  Sometimes we have five to ten days to make those

22   payments before we're considered in default of our lease.  We

23   have paid of our approximately 30 stores, we have paid our rent

24   late for the past two years.

25        After that we look at what is absolutely business

1   critical to keep the operations going.  So we're focusing on

2   things like our E-Commerce suppliers, setting up payment plans

3   with our professional advisers, setting up payment plans with

4   our inventory supplies, setting up payment plans with our

5   logistics provider.  And fortunately with their support they're

6   not suspending their services to us.  But many people do

7   suspend services and that causes us to go out and have to find

8   our suppliers and/or suffer the business disruption of the

9   suspension of services until we can cure than.  Typically, we

10  cure those every other week once we get out of a payroll week.

11  Q.  You mentioned that you have been making sure that you make

12  payroll?

13  A.  Yep.

14  Q.  What about rents, have you been able to consistently keep

15  up with your rents?

16  A.  No.  They're all behind and actually, in January the laws

17  are different by every state.  What measures landlords can take

18  against tenants who don't pay their rents on time, Texas is a

19  state that is very landlord friendly and for reason of not

20  paying our rent on time they actually padlocked our store in

21  Houston.

22  Q.  Mr. Zorda, you know that a verdict was delivered in this

23  case on Friday?

24  A.  I do.

25  Q.  Do you understand that that verdict included an amount of

1   compensatory damages for the plaintiff?

2   A.  Yes.

3   Q.  I realize it was on Friday and today is Monday morning but

4   do you have an estimate of how much those compensatory damages

5   might add up to?

6           MR. DUNNEGAN:  Objection; foundation.

7           THE COURT:  Can you find out how to calculate it?

8           MS. HASSAN:  Sure.

9   Q.  Have you made any attempt to estimate the amount of

10  compensatory damages the verdict on Friday would translate

11  into?

12  A.  Yes.

13  Q.  What did you do to estimate?

14  A.  So, we looked at the number of employees in the class.  We

15  took the number of polls or clothing allowance awards and we

16  extrapolated those out at the costs that I believe was the cost

17  basis that I believe was used for the value of that clothing

18  allowance, applied interests where appropriate, applied other

19  multipliers where appropriate, based on the calculations set by

20  the different New York State and federal laws and came up with

21  a certain number.

22  Q.  And what was -- now, that number was an estimate?

23  A.  Correct.

24  Q.  What was your estimate?

25  A.  Somewhere between 2.6 and three million at the highest

1   award.

2              THE COURT:  Can I just ask you, you said the cost

3   basis that you believed was used for the value of that clothing

4   allowance.  What figure are you talking about?

5              THE WITNESS:  $12,000.

6              THE COURT:  Thank you.

7   Q.  Now, I am going to ask you a few questions about where

8   Varvatos is going to look to find this.  You said around 2.6

9   million to three million dollars.  Now, you just testified that

10  Varvatos is a making a loss.

11             Does Varvatos have the funds available to pay these

12  compensatory damages?

13  A.  It does not.

14  Q.  Does Varvatos have the funds available to pay any

15  additional damages that might be awarded today?

16  A.  It does not.

17  Q.  Now, where is Varvatos getting the funding to operate on a

18  day-to-day basis?

19  A.  We have a revolver or credit facility from Wells Fargo bank

20  which is called an ABL or asset based loan.  And we can borrow

21  certain amounts of money that is calculated according to the

22  value of assets on our balance sheet that the bank is willing

23  to loan against.

24  Q.  OK.  So, let me break that down.  You mentioned there's a

25  loan from Wells Fargo?

1    A.  Correct.

2    Q.  You called it the "asset based loan"?

3    A.  Correct.

4    Q.  I believe you also used the term "revolver credit

5    facility". can you explain what means?

6    A.  So, the way an asset based loan or revolver works is you

7    draw cash from that to fund your operations but you're also

8    paying your cash back against that on a daily basis.  So, in

9    the morning when we receive the proceeds from credit card sales

10   from one to two days prior which is the typical lag time

11   sometimes three/four Amex.  As soon as we receive that cash in

12   the morning we transfer or the terminology is "sweep" that cash

13   to the Wells Fargo revolver or credit facility.  Then later in

14   the day when we're preparing to make payments, we draw on the

15   revolver or borrow the money back.  So, on any given day we

16   could transfer several hundred thousand dollars back to the

17   revolver to pay down part of that facility and then several

18   hours later reborrow the same amount of money to make payments

19   with.

20   Q.  Does this loan have a maximum limit?

21   A.  It does.

22   Q.  What is that limit?

23   A.  Right now it is 17 and a half million dollars of

24   availability that we can access.

25   Q.  Has Varvatos borrowed any amounts against the $17.5 million

1   limit?

2   A.   Yes.

3   Q.   How much has Varvatos already borrowed?

4   A.   Approximately, 1 and a half million.

5   Q.   So, those 15 and a half until million are availability for

6   Varvatos to borrow any more?

7   A.   Yes.

8   Q.   What is the maximum amount left in lending facility that

9   Varvatos can actually borrow?

10  A.   Two million dollars today.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K326VAR2                    Zorda - direct

1   BY MS. HASSAN:

2   Q.  Can you simply borrow against this facility to pay the

3   compensatory damages that were awarded on Friday?

4   A.  Theoretically, yes.

5   Q.  What would be the maximum amount that you could borrow?

6   A.  $2 million.

7   Q.  What about the rest the compensatory damages award?

8   A.  We only have $2 million of availability on the revolver.

9   Q.  If you use these $2 million to pay the verdict from Friday,

10  what happens to Varvatos?

11  A.  Renders us unable to pay payroll, benefits, rents or any

12  other operating expenses for a period of several weeks at least

13  until the proceeds from the sales of the business are used to

14  pay back the credit facility and restore our availability to

15  borrow again.

16  Q.  If you are not making payroll, Mr. Zorda, do you get to

17  keep the employees?

18  A.  I wouldn't expect, no.

19  Q.  Now, Mr. Zorda, I would like to go back to Exhibit JJ.  On

20  the first page it shows some assets and I want to discuss some

21  of these line items with you.

22  A.  Sure.

23  Q.  So the first line item under "Assets" is "Cash and Cash

24  Equivalence"?

25  A.  Yes.

K326VAR2                        Zorda - direct

1    Q.  Which for November 2019 is 3.87 million?

2    A.  Yes.

3    Q.  Do you see that?

4    A.  I do.

5         THE COURT:  Just for the jury's benefit, you folks are

6    rounding so there is a different number there they are looking

7    at, which is 3,873,803; right?

8         MS. HASSAN:  Correct.  I will be rounding unless there

9    is an issue.

10        THE COURT:  I just want to make sure the jury follows.

11   BY MS. HASSAN:

12   Q.  So I am looking at the first item cash and cash

13   equivalence, which are rounding in November 2019 to 3.87

14   million.

15        That is the number as of November 2019?

16   A.  Yes.

17   Q.  Is that number significantly different as of today?

18   A.  No.  Today or at least as of the end of January.  I haven't

19   looked at the end of February because that month just ended for

20   us so we haven't started the closing process.  It begins today.

21   It was about the same, in the neighborhood of $4 million.

22   Q.  What does this line item represent, cash and cash

23   equivalence?

24   A.  So cash is obviously cash, and the terminology cash

25   equivalence means assets or receivables that will imminently

1   become cash.  So that specifically references our credit card

2   receivables, which as I mentioned before usually take two to

3   three days to settle.

4   Q.  You mentioned previously when we were talking about the

5   Wells Fargo loan that Varvatos' cash gets swept to the credit

6   facility?

7   A.  Correct.

8   Q.  Is that the same cash that we're looking at here, the 3.7

9   million?

10  A.  Correct.  So that 3.87 million includes credit card

11  receivables of about approximately 1.2 million.  That means

12  over the course of two to three days $1.2 million of credit

13  card receivables should be coming into the business; but as

14  soon as it comes in, it is immediately swept to pay down the

15  credit facility with Wells Fargo and then reborrowed to make

16  payments with.

17          There is in addition to that 1.2 million ballpark of

18  credit card receivables approximately $500,000 of what is

19  called restricted cash.  Meaning, it is cash but we cannot

20  touch it under any circumstances.  The reason for that is

21  because it is being used as collateral for a letter of credit

22  for a security deposit for one of our stores.  So it is kind of

23  like when you pay a security deposit for rent, you give your

24  security deposit or your cash to the landlord to hold onto.

25  For this particular landlord, they did not want to hold the

1  cash.  They simply wanted a letter of credit, which is an

2  absolute promise to pay them the security deposit in the event

3  of any default lease termination or typical types of things

4  that a security deposit would be used for by a landlord.

5           Then the remaining is approximately $1 million of

6  cash, but that $1 million of cash again is a number that is

7  really based on cash that is imminently going out the door.

8  We're not sitting on that cash because we want it in the bank

9  account.  We've borrowed that cash against the revolver and the

10  payments that we're intending to pay with that cash will be

11  going out the door in within one to two days.

12 Q.  Those are the various payments you talked about when you

13 were talking about the main expenses that Varvatos has?

14 A.  Correct.

15 Q.  So, Mr. Zorda, could Varvatos simply deep into that 3.87

16 million in order to pay the compensatory damages that were

17 awarded on Friday?

18 A.  No.  The $500,000 of cash we cannot touch.  The 1.2 million

19 of cash equivalence is not actual cash.  We don't have one $2

20 million that we can just write a check against.  The $1 million

21 ballpark of actual cash in the business about 50 to $60,000 of

22 that cash is sitting in a cash registers and petty cash funds

23 across our various stores.  The rest is only in our bank

24 account because a payment is going to be going out and needs

25 that cash to be able to be settled with our suppliers

1  landlords, employees, etc.

2  Q.  The 1.2 million in credit card receivables, when you do get

3  the cash, the cash gets swept to the Wells Fargo loan?

4  A.  Immediately.

5  Q.  Now, Mr. Zorda, I would like to move on to the next line

6  item.  It says, "Accounts Receivable Net."

7  A.  Yes.

8  Q.  The number for November 2019 rounded off is 6.95 million.

9        Do you see that?

10  A.  Yes.

11  Q.  Now, that is the number as of November 29.

12        That number has significantly changed up to the

13  present?

14  A.  Yes, it has.

15  Q.  Can you tell us what the change is?

16  A.  It is -- we have accounts receivables of approximately $2

17  million as of the end of January closing.

18  Q.  Let me take that in steps.

19        First, can you explain to us what accounts receivable

20  represents?

21  A.  So accounts receivable is the monies that are owed to us

22  from our department store customers from any other non-retail

23  customers.  All of our retail customers who are shopping with

24  our John Varvatos stores or online are receivable from them.

25  Obviously it is from the credit card companies.  This line

1  represents shipments of goods to other people who are selling

2  our products.

3  Q.  Could you just give an example so we can have an actual --

4  A.  Sure.  So Bloomingdale's is a customer of ours.  So

5  Bloomingdale's buyers place orders or buys with us for our

6  products.  We ship them those products and they pay us within

7  30 to 60 days typically.

8  Q.  You mentioned earlier that the number that 6.95 million

9  rounded off as of November 2019 looks more like $2 million

10  today?

11  A.  Approximately.

12  Q.  Why the difference?

13  A.  Partly because we've collected some of that cash.  Partly

14  because of the time of year that we're in.  And the business

15  that we're in, the business of fashion, is set up on season.

16  The spring season obviously is underway.  But what happens

17  every six months with our department store customers, we reset

18  the season.  So, for example, our fall goods ship starting in

19  the summer so that they are on shelf and able to be sold.  By

20  the end of January, the fall goods need to be marketed down or

21  discounted and sold through to make room for the spring

22  merchandise.  So at the end of every January for fall goods and

23  at the end of July for spring goods, we write mark-down

24  allowance returns and other financial support to the department

25  stores.  The reason we do that is to ensure that they purchase

 1   goods from us in the future and to support them in their sales

 2   of our goods.

 3   Q.  So, Mr. Zorda, the accounts receivable net number as of

 4   today is approximately 2 million?

 5   A.  As of the end of January it was approximately 2 million.  I

 6   am not quite sure what it is today.

 7   Q.  Thank you for the correction.

 8          So that is accounts receivable as of end of

 9   January 2020 was approximately 2 million.  Can Varvatos simply

10   take this and pay the compensatory damages that were awarded on

11   Friday?

12   A.  No.

13   Q.  Why not?

14   A.  It's not cash.  It's a promise to receive cash.

15   Q.  When would you be receiving that cash?

16   A.  Depending on the payment terms and how much a particular

17   customer owes us and if they are paying their bills on time.

18   Q.  Once that accounts receivable becomes cash, is that cash

19   earmarked for any particular expenses that Varvatos has?

20   A.  It is swept to the revolver and then we manage our payments

21   from the revolver.

22   Q.  So to clarify, Mr. Zorda, you might already have answered

23   that are the accounts receivable for Varvatos are they secured,

24   are they collateral?

25   A.  Can you clarify, ma'am?

1    Q.  So you mentioned any cash coming out then gets swept to the

2    Wells Fargo loan.

3    A.  Yes.

4    Q.  So wells Fargo has certain rights over --

5    A.  Yes.  It it's an asset-based revolver.  So the security for

6    the bank making a loan of that size is rights to our accounts

7    receivable and to our inventory.

8    Q.  Thank you.

9           Which the next line item on Exhibit JJ, Inventory, and

10   as of November 2019, it has a number $24,226,251.

11          Do you see that?

12   A.  Yep.

13   Q.  So approximately 24 million in inventory?

14   A.  Correct.

15   Q.  Now, has that number changed significantly if you talk

16   about the present?

17   A.  I believe at the end of January that number was

18   approximately $30 million.

19   Q.  Now, can you explain to us what that line item represents,

20   Inventory?

21   A.  Sure.  So that represents the cost of goods of our

22   inventory.  The reason we value the inventory at cost is

23   because that is what we paid for it.  We cannot inflate that

24   number ourselves and attribute any potential profit or sale

25   equivalent value to that company.  It includes inventory in our

1    stores, it includes inventory in our warehouse and it includes

2    inventory that is considered in transit.  Meaning, inventory

3    that is either on a vessel crossing the ocean or on a plane on

4    its way to us.

5    Q.  So we basically are talking about the clothes that Varvatos

6    sells?

7    A.  That's correct.

8    Q.  Now, Mr. Zorda, you mentioned that the inventory is 24

9    million and if you look at Exhibit JJ is based on cost?

10   A.  Correct.

11   Q.  If all of this inventory was to sell at full retail price,

12   what would that translate into in terms of money?

13   A.  So were we able to sell all of that inventory at retail,

14   that would be worth approximately $100 million.

15            MR. DUNNEGAN:  Objection.  His math is way off.

16            THE COURT:  Well, what mark-up are you using?

17            THE WITNESS:  So that would be at 75 percent.  So the

18   24 million being sold for 100 million would have a cost of

19   goods of 25 percent.

20            THE COURT:  You can cross on it.

21            Go ahead.

22   Q.  Is the 25 percent, 75 percent basis that you are using is

23   that something commonly used at Varvatos?

24   A.  Yes.

25   Q.  Is that common for the industry?

1   A.  Yes.

2   Q.  Mr. Zorda, how long would it take Varvatos to actually sell

3   all of this inventory at full retail price?

4   A.  So that is approximately nine months' worth of inventory

5   right there.

6   Q.  Now, does that inventory include all the new stuff?

7   A.  Correct.

8   Q.  How much old inventory is Varvatos holding onto at this

9   point in time?

10  A.  There is approximately $3 million in that number that would

11  be from 2017, maybe 2018 and prior.

12  Q.  Is that 3 million number again at cost?

13  A.  Correct.

14  Q.  Now, could you sell all of that 3 million in order to

15  satisfy the judgment that was delivered on Friday?

16  A.  Possibly.

17  Q.  How would you sell that?  At cost?  More than cost?

18  A.  So again if we could move that inventory more quickly, we

19  would be very happy to and that would be great for the

20  business; but the only way to move inventory at volume is to

21  discount it.  So while we are selling the product at full

22  retail initially, within several months we start to mark it

23  down.  The first mark-down very typically and common in the

24  industry is 40 percent.  Then the second mark-down is down to

25  60 percent from the suggested retail price.  So when you look

1   at your actual selling price and your period of selling

2   products, you are selling it at full retail for maybe half of

3   the season.  After that it is mark-downs.  If you walked into

4   any department store, any retail store there is always the sale

5   rack and those are the prior season's goods.

6          When you are talking about the inventory as we sell it

7   to our wholesale partners -- to Bloomingdale's, to Saks, to

8   Nordstrom -- we obviously can't sell it to them at full retail

9   because they have to make a profit to help run their business.

10  So typically we're selling it to them at approximately

11  50 percent off of suggested retail price.

12         In order to move aged inventory, it has to be at a

13  price that is interesting for someone who is in that business.

14  So when you look at off-price markets, say, the TJ Maxxes of

15  the world, they are buying not even at that 50 percent discount

16  from retail that Bloomingdale's is buying it from because the

17  TJ Maxx is looking for a deal and they are expecting to be

18  purchasing retail minus 40 or minus 60 from the very instant

19  they walk in the store.  Everything is marked down.

20         So in order to move inventory like that, the best case

21  scenario that you have would be to sell it at cost.  The reason

22  I say that it is the best case is because you are unlikely to

23  make any significant profit clearing old inventory or prior

24  season's merchandise because it is just not interesting to

25  people and the ability to get back at cost means that you

K326VAR2                    Zorda - direct

1   recovered the money that you invested in that.  And even if you

2   didn't make a profit, you at least didn't make a loss on it.

3   Q.  So the $3 million at cost of all inventory that Varvatos

4   has, what is the best that you expect you could get for it if

5   you were to find a customer for it?

6   A.  The absolute best that I would expect to get for it would

7   be at cost.  Maybe at 5 percent if we can negotiate a deal.

8   But, again, in volumes of inventory like that, trying to move

9   that much product you have to give a discount and you are going

10  to be very lucky to be able to get at least cost back.

11          So I would say it could be cost.  Maybe it could be

12  cost plus five or 10 percent.  It could be cost minus

13  20 percent.  It really depends on the appetite for the buyer

14  and the freedom that you give them to turn around and then sell

15  that product that they have just purchased.

16  Q.  Would it also depend on whether or not you can find that

17  interested buyer?

18  A.  That's correct.

19  Q.  In the ideal situation let's say you did find the buyer and

20  you were able to get cost for it, would that take care of what

21  your estimate of the compensatory damages is?

22  A.  It would.

23  Q.  Would it take care of any additional damages that are

24  awarded today?

25  A.  No.

K326VAR2                        Zorda - direct

1    Q.  What about the new inventory, couldn't Varvatos simply sell

2    some of the new inventory in order to generate the money to

3    take care of any additional damages that may be awarded today?

4    A.  Theoretically we could wrap that new inventory up into a

5    stock offering or product offering to that hypothetical

6    customer; but in doing so, we would lose all of that profit

7    that we're expecting to make on it.  So let's just use easy

8    round numbers.  Let's say it is $2.5 million of current

9    inventory at cost that has a suggested retail value of

10   approximately $10 million.  That is inventory that we're

11   expecting to sell at or close to, hopefully, full suggested

12   retail price.  So in doing so that gives us the profit

13   difference between the $10 million retail value and the $2.5

14   million cost value that we purchased it at.  That $7 million is

15   what helps us pay rent, operating expenses, payrolls, and

16   otherwise run a profitable business.  But if we're selling

17   current inventory at cost and just getting back the money that

18   we invested in it, that strips out the future profits of the

19   business and leaves us completely unable to pay any bills.

20   Q.  What is the consequence of that?

21   A.  If we can't pay bills?

22         Well, our inventory suppliers will stop shipping us

23   additional product.  Without additional product, we know longer

24   have anything to sell and it creates a whiplash effect that

25   makes it impossible for us to then pay rents, payrolls, and any

1   other operating expenses that are coming due.

2   Q.  Now, if Varvatos is forced to do that, what would be the

3   potential financial -- if Varvatos was forced to sell new

4   inventory for instance in order to pay any additional damages

5   that might be awarded today, what could be the different

6   financial consequences of scenarios that Varvatos is looking at

7   given their current status?

8   A.  Sure.  So just to kind of put it into as simple terms as

9   possible, our budget this year we are expecting to make a

10  profit of $1.1 million.  So if he were to take this

11  hypothetical forced sale of $2.5 million of current inventory

12  and we lose the $7.5 million of profit from that, obviously we

13  would be unable to make our budgeted profit, our hopeful profit

14  of $1.1 million and it would become a loss of, call it, $6

15  million.

16  Q.  Mr. Zorda, you already mentioned Lion Capital and you

17  mentioned that Varvatos is owned by an investment fund that is

18  managed by Lion Capital?

19  A.  Correct.

20  Q.  Now, do you know when the Lion Capital investment fund

21  acquired Varvatos?

22  A.  April 2012.

23  Q.  Did it initially lend any money to Varvatos?

24  A.  I am not sure if at acquisition -- when you say

25  "initially" -- they capitalized the business.  I imagine maybe

1    they did.  But by the time I had joined, Lion Capital had put

2    an additional $40 million into the business since 2012.  Loaned

3    money at certain interest rates to the business from 2012

4    through the time that I arrived.

5    Q.   This is prior to your joining Varvatos last year?

6    A.   Correct.

7    Q.   Now, Mr. Zorda, given the verdict delivered in this case,

8    and the potential of additional damages that could be awarded

9    today, have you considered what options Varvatos has in terms

10   of how it moves forward?

11   A.   Yeah.

12   Q.   What are those options?

13   A.   There is really only a handful of options.  Go to our bank

14   and see if they would be willing to give us more money, go to

15   Lion Capital and see if they would be willing to give us more

16   money, reach a settlement somehow or file or bankruptcy.

17   Q.   I will take the bank first.

18        You said go to the bank and see if they will give more

19   money.  Were you talking about Wells Fargo?

20   A.   Correct.

21   Q.   What are the chances they will give you more money to

22   settle a judgment in this case?

23        MR. DUNNEGAN:  Objection.

24   Q.   Pay a judgment.  I apologize.

25        THE COURT:  Can you lay a foundation for how he might

1   know that?

2   Q.  Are you the person who interacts with Wells Fargo as far as

3   Varvatos is concerned?

4   A.  Yes.

5   Q.  Do you know what the terms of their loan are?

6   A.  Yes.

7   Q.  Have you had prior discussions with them about increasing

8   the loan amount?

9   A.  Yes.

10  Q.  Given all of that, what is your expectation if you were to

11  ask Wells Fargo to fund the judgment in this case, to help you,

12  to give you an additional loan to pay the judgment in this

13  case, what would you expect the answer to be?

14  A.  I would expect them to say no.

15  Q.  Why is that?

16  A.  They already considered the business insolvent and are

17  looking to Lion Capital to figure out something with the

18  business to get them out of the loan.

19  Q.  Now, you also mentioned Lion Capital.  Since the verdict

20  was delivered on Friday, have you asked Lion Capital whether

21  they will give you the money in order to pay the judgment?

22  A.  Yes, I did.

23  Q.  Did you get a response?

24  A.  I got a response.

25  Q.  What was that response?

1   A.   They said no.

2   Q.   Would Lion Capital rather just put Varvatos into bankruptcy

3   than simply pay the money for the judgment?

4   A.   I don't know if I would say would they rather, but it is

5   not uncommon for businesses to be restructured through

6   bankruptcy.  And if Lion Capital let John Varvatos Enterprises

7   go into bankruptcy, it wouldn't be the first business that they

8   let do so.

9   Q.   Can you explain that?

10  A.   Earlier last year Lion Capital one of the other companies

11  in the Investment Fund III was Bumblebee Tuna and that was, I

12  think, about a one-and-a-half-billion-dollar business and Lion

13  Capital permitted that company to go bankrupt rather than

14  continue funding that business.

15  Q.   Now, you are a numbers person.  Why would a private equity

16  investment manager like Lion Capital let businesses it has lent

17  money to go into bankruptcy?

18  A.   Two reasons.  The first is we'll call it the quantitative

19  reason and by quantitative I mean numerical or financial.  And

20  they would look at it and say, Will we get a return on this

21  additional investment?  If the answer is no or if the return on

22  that additional investment is not -- is neither negative or not

23  significant enough to make the investment risk worth it, they

24  are going to say no.

25          The second reason is more qualitative.  That is It is

1    not financial in nature from a numbers standpoint, but it is

2    their fiduciary duty to the limited partners, to the people who

3    are investing in their funds, to the insurance companies,

4    pensions, to the unions, to whomever that they are making wise

5    financial decisions with the money that those limited partners

6    have put into the fund.

7            So it is not a question of would Lion rather.  I am

8    sure they would rather put the money in; but if they were to

9    put money into the business, that is the investors, and it is

10   clear that there wouldn't be a return on that investment or

11   that the risk was too great that is not something they can do

12   without risk of being sued or having their reputation in the

13   industry ruined and unable to continue running their business.

14   Q.  So does a private equity investment manager like Lion

15   Capital, would it let a business which is making money go into

16   bankruptcy?

17   A.  There wouldn't be a need.

18   Q.  Is Varvatos making money?

19   A.  It's not.

20   Q.  Mr. Varvatos --

21           THE COURT:  You did it again.

22   Q.  Mr. Zorda.  Very much Mr. Zorda.  We're talking about

23   Varvatos but talking to Mr. Zorda.

24           Mr. Zorda, do you know if a company goes into

25   bankruptcy whether there is sometimes prioritization in terms

K326VAR2                          Zorda - direct

 1  of who gets the money?

 2              MR. DUNNEGAN:  Objection.

 3              THE COURT:  Give me the specific objection.

 4              MR. DUNNEGAN:  He is giving a legal lecture.

 5              THE COURT:  Yes.

 6              MR. DUNNEGAN:  I don't know the answer.

 7              MS. HASSAN:  If I may, your Honor.

 8              THE COURT:  Do you want to talk about it at side bar

 9  or what do you want to do?

10              MS. HASSAN:  Well, Mr. Zorda testified that he had

11  experience in one of his prior jobs in helping pull a company

12  or three companies through a bankruptcy and then ending up with

13  one.  So I would think he would know something about bankruptcy

14  from that.

15              THE WITNESS:  That's not correct.

16              THE COURT:  Hold on.  Hold on.  Let's talk at side

17  bar.

18              (Continued on next page)

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  What are you trying to elicit from him?

3              MS. HASSAN:  I just want to elicit what the

4      priorities -- who will be first.  Wells Fargo will be first in

5      line if--

6              THE COURT:  Why does any of this matter?

7              MS. HASSAN:  Well, your Honor, it matters in terms of

8      what happens to the judgment if Varvatos goes into bankruptcy.

9              THE COURT:  I can't think of why it should affect the

10     jury's -- it's totally established that bankruptcy is one of

11     his four options or whatever it was; but then what happens in

12     the bankruptcy, why is that relevant?  Try me again.

13             MS. HASSAN:  Well, your Honor, they awarded a judgment

14     in this case and if Varvatos ends up going to bankruptcy, those

15     judgments get at the end of the line after Wells Fargo, which

16     is a priority over everyone else.

17             MR. DUNNEGAN:  In other words, they will get nothing.

18             THE COURT:  Go ahead, Mr. Dunnegan.

19             MR. DUNNEGAN:  I think that's our risk if we want to

20     take it; but the specific question was directed to elicit

21     expert testimony, which borders on what is the law.  I just

22     don't think that this witness has established sufficient

23     expertise, hasn't provided an expert report.

24             THE COURT:  Your objection is not relevance.  It is

25     whether this is the witness to testify to that fact; is that

1    right?

2                   MR. DUNNEGAN:  Yes.

3                   THE COURT:  I think if you can lay a foundation as to

4    his knowledge of what happens in a bankruptcy.  Do you want me

5    to instruct the jury that secured creditors -- would you

6    prefer, Mr. Dunnegan, that I instruct the jury that secured

7    creditors get priority over unsecured creditors and that a

8    judgment of this kind is unsecured?

9                   MR. DUNNEGAN:  That seems to be pretty basic.

10                  THE COURT:  Do you think it is better for me to do

11   that?

12                  MR. DUNNEGAN:  I would prefer that.  Because I don't

13   know what he is going to say.

14                  MR. BASSEN:  The same thing.

15                  THE COURT:  I think if he knows that from his prior

16   experience, he can say it.  I will let you lead a little about

17   secured versus unsecured and is this judgment secured or not.

18   If he knows the answers based on his prior experience, I will

19   let him give it.

20                  (Continued on next page)

21

22

23

24

25

1        (In open court)

2        THE COURT:  Go ahead, Ms. Hassan.

3    BY MS. HASSAN:

4    Q.  Mr. Zorda, when you were telling us earlier about your work

5    experience before you came to Varvatos --

6    A.  Yes.

7    Q.  -- you mentioned that you did some work that involved

8    bankruptcy filings?

9    A.  No.  A turnaround.  So it was businesses that were

10   distressed and on the verge of bankruptcy and turned them

11   around before they went into bankruptcy.

12   Q.  Are you familiar with the loan documents in this case for

13   instance with Wells Fargo?

14   A.  Yes.

15   Q.  Do you understand what the difference between a secured

16   creditor and unsecured creditor is in a bankruptcy?

17   A.  Yes, I do.

18   Q.  Do you know whether any judgment awarded in this case,

19   whether it is related to the verdict delivered on Friday or any

20   additional amounts today, would those be characterized as

21   secured or unsecured?

22   A.  It would be an unsecured claim.

23   Q.  Do you know in a bankruptcy what the priority is, who gets

24   paid first, secured claims or unsecured claims?

25   A.  Secured claims.

1   Q.  In this case, who would be the secured claims if Varvatos

2   had to file a bankruptcy?  Would there be any secured claims?

3   A.  Yes.

4   Q.  Who would that be?

5   A.  First would be Wells Fargo, our lender.  Second would be

6   Lion Capital.  Third would be the federal government, state

7   governments, basically anyone who we owe sales tax or payroll

8   tax or any other statutory monies due.  And then after that

9   there may be certain landlords who have maybe some priority of

10  security in their security deposit.  Not with their rent.

11  Their rent would be unsecured, but they would at least have a

12  claim to a security deposit potentially.  Depends on what is

13  written in the lease.

14  Q.  Where would any judgment in this case fall?

15  A.  It would basically fall in line with the other

16  approximately $15 million of unsecured creditors in our

17  accounts payable.

18  Q.  So if Varvatos files for a bankruptcy and there is any

19  money that can be obtained, during that bankruptcy who gets

20  first dibs on that?

21  A.  Wells Fargo.

22  Q.  And is it possible that everybody who is in the creditor

23  line actually doesn't get to share in any money that may be

24  obtained through a bankruptcy?

25  A.  It is very normal possibility.  That is the way a

1    bankruptcy works.

2    Q.  Mr. Zorda, last topic to cover with you.  There was a

3    verdict given by this jury on Friday.

4              Are you aware of that?

5    A.  Yes, I am aware of that.

6    Q.  What is Varvatos doing about that?

7    A.  We respect the decision.  We're taking it very seriously

8    and we're working with our legal advisers to determine what our

9    next steps are going to be.  Obviously today plays an important

10   part in all of that decision-making process.

11             MS. HASSAN:  Thank you, Mr. Zorda.

12             MR. DUNNEGAN:  I can start or we can take a break,

13   your Honor.  I don't care.

14             THE COURT:  We're close to our normal breaktime.

15             Members of the jury, let me tell you a little about

16   where we are.

17             Do you know how much time you will be spending?

18             MR. DUNNEGAN:  More than I thought.  I would think I

19   am looking at 45 minutes to an hour and 15 minutes.

20             THE COURT:  This is what we're going to do:  We're

21   going to take our 15-minute break now.  We'll give you the

22   lunch order forms because we'll be taking you into the lunch

23   hour for purposes of deliberation or at least close to it.  The

24   instructions are very short.  So that is not going take much

25   time.  We'll have some closing arguments that I don't expect

K326VAR2                      Zorda - direct

1   will be lengthy.

2           We'll give you the lunch order forms.  We'll have the

3   break.  We will collect them and the lunch will probably get

4   here in the 12:00, 12:30 range.  We'll come back from the

5   break.  We'll hear from Mr. Dunnegan on cross, any redirect,

6   recross, closings as to punitive damages and very brief

7   instructions and then you get the case for deliberations.

8           We'll take the 15-minute break.

9           (Jury excused)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

K326VAR2                        Zorda - direct

1          THE COURT:  Anything we need to do during the break?

2          MR. DUNNEGAN:  Not from us.

3          THE COURT:  Anything from you before the break?

4          MS. HASSAN:  Nothing from us.

5          THE COURT:  You can take a, break but don't talk to

6     the attorneys about your testimony.

7          THE WITNESS:  Can I go outside?

8          THE COURT:  Yes.

9          (Recess)

10         THE COURT:  Are you ready?

11         MR. DUNNEGAN:  I am ready.

12         THE COURT:  Are you folks ready?

13         MR. BASSEN:  Yes.

14         THE COURT:  Bring in the jury.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  You may be seated.

 3              Mr. Dunnegan, whenever you are ready to proceed with

 4    the cross-examination.

 5    BY MR. DUNNEGAN:

 6    Q.  Mr. Zorda, I would like to ask you some questions about the

 7    inventory position of Varvatos; okay?

 8    A.  Okay.

 9    Q.  Now, did you tell the jury on your direct examination that

10    right now Varvatos had about $100 million of inventory at full

11    retail value?

12    A.  That would be the retail value of the inventory, yes,

13    approximately.

14    Q.  That's not right; is it?

15    A.  Why do you say so?

16    Q.  Didn't you tell us that Varvatos at end of January had

17    approximately $30 million of inventory at Varvatos cost?

18    A.  Okay.  So if we're going to go on those numbers, then that

19    would be 120 million.  I was doing the mark-up based on the $25

20    million, $24 million number there.

21    Q.  Okay.

22    A.  I apologize.  It was not intended to mislead.  We were

23    specifically referring to the value of this inventory on this

24    column, the November number.

25              THE COURT:  For the record, the column you are

1   referring to is a column in Exhibit JJ?

2            THE WITNESS:  JJ.

3            THE COURT:  Headed what?  Is there a date?

4            THE WITNESS:  November 2019.

5            THE COURT:  Go ahead.

6   CROSS-EXAMINATION

7   BY MR. DUNNEGAN:

8   Q.  Let me just recap the colloquy.  It is your understanding

9   that Varvatos has $30 million at cost of inventory?

10  A.  Approximately at the end of January; correct.

11  Q.  And that in your testimony from a moment ago, you said that

12  the retail value of that inventory was approximately $120

13  million.  That's what you said; right?

14  A.  That's what I just said, yes.

15  Q.  That is not right either; is it?

16  A.  You can tell me.

17           THE COURT:  You can ask him a question.  He already

18  gave his answers.

19  Q.  You multiplied that by four; right?

20  A.  Yes.

21  Q.  Because you are working on the assumption that Varvatos

22  cost is 25 percent of the retail value; right?

23  A.  Correct.

24  Q.  Isn't Varvatos cost simply 20 percent and not 25 percent of

25  the full retail value?

K326VAR                    Zorda - cross

A.   No.   It varies.   So I think the average margin in our full

price stores is in the neighborhood of 77 percent and in our

outlets at 60 percent ballpark.   So, again, ballpark it would

be in the neighborhood of 25 percent cost or 75 percent average

margin.   It's rounding.

            (Continued on next page)

1   BY MR. DUNNEGAN:

2   Q.  Do you remember your deposition being taken in this case?

3   A.  Yes.

4   Q.  And it was taken at my law office?

5   A.  Yep.

6   Q.  On January 10th of this year?

7   A.  Yes.

8   Q.  And I'm going to be reading from page 32 lines beginning at

9   lines nine.

10         Do you remember being asked the following questions

11   and giving the following answers?

12   "Q.  Looking at the balance sheet of John Varvatos and the

13   income sheet to some extent marked as exhibit -- it was 104.

14   Now the same exhibit is marked JJ.

15         Do you see any opportunity to raise additional cash

16   your answer,

17   "A.  Yes.

18   "Q.  Where?

19   "A.  Inventory.

20   "Q.  .If you sell your inventory you raise cash, right?

21   "A.  Correct.

22   "Q.  Your inventory number as of November 23rd or so of 2019

23   was $24,266,000 correct?

24   "A.  226 million, yes.

25   Q.  Now, continuing at line 24:

1   "Q.  Our IMU, our internal markup is in the neighborhood of

2   80 percent.  So, $20 million at cost would have an approximate

3   MSRP of one hundred million, correct?

4              You gave that testimony?

5   A.  OK.

6   Q.  So, in that testimony you multiplied the costs by five in

7   order to get the retail value, correct?

8   A.  Yes.

9   Q.  OK.  So, if we take the $30 million or so of Varvatos

10  inventory which is at Varvatos cost and we multiply it by five,

11  we would get $150 million at retail costs, correct?

12  A.  Using those numbers, correct.

13  Q.  And those numbers are consistent with your prior testimony,

14  sir, right?

15  A.  Correct.

16  Q.  Just to get back and talk about some small numbers, you

17  testified on your direct that Varvatos had approximately as of

18  today two million dollars of additional borrowing it could do

19  on its revolver, right?

20  A.  Correct.

21  Q.  And just so that everybody understands what a revolver is,

22  it's kind of like a home equity line of credit, right?

23  A.  I think so, yeah.

24  Q.  OK.  You take money out and you pay it back.  You take

25  money out.  You pay it back when you can.  OK?

1        THE COURT:  Hold on.  Is there a question?

2        MR. DUNNEGAN:  Right?

3        THE COURT:  Is what he said correct?

4   A.  Not when you can.  When we have money we pay it back

5   against the revolver.

6   Q.  OK.  Now, on the Exhibit JJ I believe your attention was

7   called to the cash and cash equivalence line from November of

8   2019 and it was 3.873 million.

9        Do you see that?

10  A.  Yes.

11  Q.  Now, you testified about the components of that 3.87

12  million, correct?

13  A.  Yes.

14  Q.  Couldn't some of that 3.87 million be used to pay any

15  judgment that was rendered in this case?

16  A.  Again, theoretically, yes.

17  Q.  How much?

18  A.  So, the approximately $1 million in cash could be but then

19  we would have to avoid those checks and the payments that that

20  approximate million dollars of cash relates to wouldn't be

21  available to pay those bills.  The 1.2 million approximately of

22  credit card receivables could theoretically be used to pay a

23  judgment.  Again, it would be paying down the revolver, draw

24  that money and then use it to pay a judgment, at which point we

25  would have no availability in our borrowing and be unable to

1   pay bills, payrolls, rent, sales tax, whatever is coming due

2   during that week.

3   Q.  And the people that you would be paying do not have a

4   judgment against Varvatos, correct?

5   A.  Correct.

6   Q.  Let me go back to one thought concerning the inventory.

7   Sales professionals have books of clients; do you understand

8   that?

9   A.  I do.

10  Q.  And they have a list of people and phone numbers that they

11  can call to say, hey, new merchandise is in.  Why don't you

12  come in and look at it; you understand that, right?

13  A.  I do.

14  Q.  OK.  So, if Varvatos has roughly I think you said two

15  hundred or so sales professionals?

16  A.  Approximately, yes.

17  Q.  So, if each of those two hundred or so sales professionals

18  got out their little book and said our new season merchandise,

19  Varvatos is having a sale of 30 percent off, they could sell a

20  lot of merchandise, couldn't they?

21  A.  Possibly, yes.

22  Q.  And if it was 40 percent off, they could sell even more

23  merchandise, right?

24  A.  Possibly, yes.

25  Q.  And the same is true for 50 percent off?

1    A.  Sure.  All the way down to a hundred percent off, yes.

2    Q.  Well, if we just stop at 50 and if on average Varvatos was

3    able to sell it's $150 million worth of merchandise at retail

4    value at 50 percent off, that would raise $75 million, right?

5    A.  Theoretically, if it could do that, yes.

6    Q.  You would expect that to be able to pay any judgment

7    rendered in this case obviously, right?

8    A.  So, to do that there would be zero inventory left in the

9    business and there would be no ongoing operations possible

10   because there would be nothing available to sell any longer

11   were we to do that.

12   Q.  But there would be at that point $75 million in cash

13   subject to Varvatos' debts?

14   A.  Correct.

15   Q.  Now, I would like to ask you some questions about Varvatos

16   earnings, OK.  Do you understand that earnings are set forth on

17   the profit and loss statement which is the second page of

18   Exhibit JJ?

19   A.  I do.

20   Q.  Now, I want to make sure that we all understand what the

21   columns are.  The columns on the right-hand side beginning with

22   December 16, 17 and 18, those are all full year numbers,

23   correct?

24   A.  Correct.

25   Q.  OK.  And then when we look at the column under

1    November 2019, those are only the numbers for up until about

2    November 23rd of 2019?

3    A.   Right.

4    Q.   So, to some extent we're comparing apples to oranges?

5    A.   Correct.

6    Q.   Now, hasn't Varvatos financial performance generally

7    improved from the calendar years 2016 to 2018?

8    A.   Yes.

9    Q.   OK.  Now, just so that we can follow through with that

10   improved performance, what does the term "gross profit" mean?

11   A.   "Gross profit" is the net proceeds from your sales, less

12   the cost of goods of your inventory.

13   Q.   And from, well, in December of 2016 the gross profit of

14   Varvatos was about $64 million, right?

15   A.   Correct.

16   Q.   And by December of 2018 the gross profit of Varvatos had

17   increased by roughly $13 million dollar to $77 million,

18   correct?

19   A.   Correct.

20   Q.   And we really can't compare that based upon this sheet to

21   the November 2019 number because the last approximately five or

22   six weeks of the year are not covered?

23   A.   That's correct.

24   Q.   Now, I believe you told us but what does "EBIT" stand for?

25   A.   "Earnings before interest and income taxes".

K32AAKNO3                         Zorda - Cross

1    Q.  And that's more or less halfway down two thirds of the way

2    down on the page, correct?

3    A.  Correct.

4    Q.  And isn't it accurate that Varvatos' EBIT has improved

5    dramatically since 2016?

6    A.  That's correct.

7    Q.  In 2016 there was a loss of $21.9 million in EBIT?

8           THE COURT:  Yes or no?

9    A.  Yes.

10   Q.  And by December of 2018 that loss was down to $3.2 million

11   of EBIT, correct?

12   A.  That's correct.

13   Q.  That's a substantial improvement, isn't it?

14   A.  It is.

15   Q.  Now, I believe you may have told us but what is the acronym

16   EBITA that stand for?

17   A.  "Earnings before interest and income tax and amortization".

18   Q.  And EBITA that has improved dramatically from 2016 to 2018,

19   correct?

20   A.  Correct.

21   Q.  OK.  Now, for 2016 the EBITA was a loss of over $14

22   million, correct?

23   A.  Correct.

24   Q.  And by December of 2018 there was a profit measured in

25   terms of EBITA of over $1.6 million, correct?

1    A.   Correct.

2    Q.   Again, a dramatic improvement?

3    A.   From 2016 to 2018, yes.

4    Q.   Now, I believe you told us that you started with Varvatos

5    in August of last year?

6    A.   That's correct.

7    Q.   And I believe you also told us that your accounts payable

8    position or the accounts payable position for Varvatos has

9    improved since you started being the chief financial officer

10   last summer, right?

11   A.   I said that, specifically, in reference to the age of our

12   payables outstanding to our inventory suppliers.  It's

13   otherwise stayed approximately the same.

14   Q.   But it has improved since you have been there?

15   A.   Just for our inventory suppliers but because cash is finite

16   it's improved with our inventory suppliers to the detriment of

17   our other suppliers.

18   Q.   Now, I believe you told us on your direct-examination that

19   the company, Varvatos, is budgeting to make a profit of $1.1

20   million this calendar year; is that correct?

21   A.   Of the adjusted earnings before income tax interest, income

22   taxes depreciation and amortization, that's what our expected

23   budget is, yes.

24   Q.   So, it would be even, it would be comparable to what was

25   going on last year, correct?

1    A.  No.  Do you want me to tell you what the adjusted EBITA

2    that number was for the year ending December 2019, just to put

3    the numbers under context?

4    Q.  I really don't because those numbers were prepared in

5    anticipation of this trial, correct?

6    A.  No.  We prepare our financial statements and publish them

7    to our lenders and our shareholders and internally to the rest

8    of the sales and marketings product development, all the teams

9    within the business.

10   Q.  All of whom were aware of this case, right?

11   A.  I don't know who is and who is not aware of this case.

12   Q.  Slightly different question.  Varvatos has stores in the

13   United States?

14   A.  Yes, it does.

15   Q.  And Varvatos is opening more stores as we speak, correct?

16   A.  There's one store that is opening this month based on a

17   lease that was signed approximately two years ago.

18   Q.  And that would be San Jose, California?

19   A.  That's correct.

20   Q.  Now, is there any truth that John Varvatos himself was

21   walking around Nashville, Tennessee, looking for the location

22   for a new store in the last couple of months?

23   A.  I don't know about the last couple months.  I do know that

24   it is a location that we believe would be good for the business

25   to have a store located in.

K32AAKNO3                         Zorda - Cross

1   Q.  And John Varvatos personally was out there looking for

2   location in Nashville?

3   A.  I have no idea what he has personally done.

4   Q.  Now, you talked a lot about bankruptcy during your direct

5   testimony, correct?

6   A.  A little bit I think but we spoke about it.

7   Q.  How long has Varvatos been talking to the plaintiffs about

8   the possibility that it's going to go bankrupt?

9   A.  I don't know.  Since I have been here in August, certainly.

10  I don't know what conversations were held before my arrival in

11  the business.

12  Q.  OK.  You don't know anything about a conversation with John

13  Varvatos himself in May of 2019?

14          MS. HASSAN:  Objection.

15          THE COURT:  Hold on.

16          You're asking about a conversation with Varvatos in

17  May of 2019 about bankruptcy.  What's the objection.

18          MS. HASSAN:  Your Honor, we may need a side bar for

19  this.

20          MR. DUNNEGAN:  Your Honor, I'll withdraw it.

21          THE COURT:  OK.

22  Q.  Now, Exhibit JJ is not the first balance sheet and income

23  statement that John Varvatos, the company, has prepared in

24  connection with this case, right?

25  A.  That's right.

1   Q.  There was a prior balance sheet that was prepared, right?

2   A.  Yes.

3   Q.  And that was given to the plaintiffs and filed with the

4   Court in or about April of 2019, correct?

5   A.  If you say so.  I don't know when it was.

6          MR. DUNNEGAN:  Your Honor, may I approach to hand the

7   witness a copy of exhibit JJ -- I'm sorry.  "HH".  My

8   apologies.

9          THE COURT:  Yes.

10         (Pause)

11  Q.  Now, you've seen Exhibits HH before today, correct?

12  A.  Yes.

13  Q.  And Exhibit HH was prepared by the comptroller of John

14  Varvatos, correct?

15  A.  Correct.

16  Q.  Now, could you just tell us what the job of a comptroller

17  at John Varvatos involves?

18  A.  So, at a very high level responsible for all of the

19  accounting and reporting of the business.

20  Q.  So, that's a numbers person?

21  A.  It is.

22  Q.  And do you know when Exhibit HH was actually prepared by

23  your comptroller?

24  A.  I do not know when.

25  Q.  It was before you joined the company though, right?

K32AAKNO3                        Zorda - Cross

1    A.   Correct.

2    Q.   Was Exhibit JJ prepared by the same individual who prepared

3    Exhibit HH?

4    A.   Yes.

5              MR. DUNNEGAN:   Now, your Honor, at this point I would

6    move for the admission of Exhibit HH?

7              THE COURT:   Any objection?

8              MS. HASSAN:   Objection, your Honor.   What is the basis

9    of bringing this document in?

10             THE COURT:   OK.   Let's just have a side bar.

11             (Continued on side bar)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (side bar)

2        THE COURT:  It seems like it's your document.  What's

3   the problem?

4        MS. HASSAN:  My understanding was that Mr. Dunnegan

5   could only use this document for impeachment purposes.

6        THE COURT:  I thought you agreed to that, that you

7   were going to use it for impeachment.

8        MR. DUNNEGAN:  Well, impeachment in the sense that the

9   company presented this document.  The company is trying to

10  mislead me.

11        THE COURT:  Well --

12        MR. DUNNEGAN:  I'm not sure that's actually as to

13  credibility.

14        THE COURT:  My understanding was literally that you

15  had agreed that you would use it for impeachment and to use

16  something for impeachment means you can say to someone, didn't

17  you in fact -- didn't the company on a prior occasion say this

18  number or whatever and then he would say yes.  And then he

19  would either explain it or not but the document itself wouldn't

20  come in.  I mean, I'm not sure it makes that much difference

21  but I thought --

22        MR. DUNNEGAN:  I did not intend to agree with that

23  because I always knew that some other individual at the company

24  prepared the document.  So, it doesn't go to his individual

25  credibility but what it does go to is this theme the company is

1    just trying to claim poverty.  They put $30 million into that

2    document.

3              THE COURT:  Which one?

4              MR. DUNNEGAN:  "HH", which was a raw mistake.  There

5    was no way any numbers person --

6              THE COURT:  Is this JJ or HH?

7              MS. HASSAN:  "HH".

8              THE COURT:  "JJ" is the one that is in.

9              MR. DUNNEGAN:  Yes.

10             MS. HASSAN:  Yes.

11             THE COURT:  What's the big difference?

12             MR. DUNNEGAN:  In this line which is the $52 million

13   that contains roughly $30 million which is owed to the

14   subsidiary of John Varvatos.

15             THE COURT:  Did all these numbers change?

16             MR. DUNNEGAN:  Yes, I think so.

17             THE COURT:  Intercompany liabilities?

18             MR. DUNNEGAN:  Yes.  In other words, they wrote down

19   their liability to their subsidiary of $30 million and they

20   didn't put on the balance sheet that they owned a subsidiary.

21             MR. BASSEN:  But your Honor was corrected in the

22   subsequent exhibit.

23             MS. HASSAN:  If I may explain, this exhibit represents

24   just Varvatos, the entity right, their balance sheet.  Varvatos

25   also has two subsidiaries.  And when this document was

K32AAKNO3                      Zorda - Cross

1  prepared, the comptroller by mistake didn't include the two

2  subsidiaries.  As soon as we down found out that mistake we

3  prepared and provided the updated Exhibit JJ.  Our

4  understanding is that this doesn't come in.  We, actually,

5  removed this from your exhibit list.  That was our application.

6  We don't think it should be in the record and the only reason

7  was kind of still in the record was because our understanding

8  that Mr. Dunnegan would use it to impeach but who is he

9  impeaching?

10             THE COURT:  You are right.

11             MR. DUNNEGAN:  -- probative.

12             THE COURT:  The person who you are impeaching is not

13  here.  The impeachment basis is not really --

14             MR. DUNNEGAN:  See, I think when you ask that question

15  I understood impeachment to include rebuttal.

16             MS. HASSAN:  That's kind of like the same issue that

17  we had with some documents related to Ms. Knox.  She wasn't

18  here.  So, we couldn't use them because we couldn't ask or

19  attack her credibility.  So, now Mr. Dunnegan wants to attack a

20  comptroller who isn't here.

21             THE COURT:  What prevents them from just offering the

22  document as a Varvatos document and then he's gotten whatever

23  he's gotten out of the guy out of it and then making whatever

24  arguments he wants to make?  Why isn't it just admissible on

25  the theory as a statement of a party opponent?

1          MS. HASSAN:  That was never where the parties had

2    landed.  If I known I would have raised this and frame this

3    document with our witness.  At that point Mr. Dunnegan is going

4    to be framing this in the worst possible light.

5          THE COURT:  I could give you a chance to raise it on

6    redirect, right?

7          MS. HASSAN:  Correct.  After Mr. Dunnegan has already

8    framed it in the way he wants to frame it.

9          THE COURT:  I could make him wait and then on redirect

10   you could raise the document and then he could recross what

11   would seem to solve the problem.

12         MR. DUNNEGAN:  I'll do that.

13         THE COURT:  So, don't talk about it any more.  The

14   thing is on.  Someone has to put it in.  You can ask him about

15   it.

16         MS. HASSAN:  We never wanted to put this in.

17         THE COURT:  You don't have to put it in.  But if you

18   felt that you wanted a chance to bring it up with him first if

19   you'd known there was this lack of clarity in the ruling, I am

20   willing to give you the chance.  But how are you -- you'll have

21   to ask him about it without it being in evidence and then he'll

22   offer it into evidence and then it's going to get admitted

23   because it's a statement of a party opponent.  So, if you want

24   to do it that way, that's fine.

25         MS. HASSAN:  OK.

K32AAKNO3                    Zorda – Cross

1           THE COURT:  OK.  So, stop your questioning on it now.

2           (Continued on next page)

1          (In Open Court)

2          MR. DUNNEGAN:  Now, let's look to another line in the

3   document "JJ".

4   Q.  In the profit and loss statement which is the second page

5   do you see the line that says about three quarters of the way

6   down "extraordinary/nonoperating expenses"?

7   A.  Yes.

8   Q.  What does "extraordinary/nonoperating expenses" mean?

9   A.  So, as I explained earlier, this is a quality a management

10  judgment of items and it could be income related items.  It

11  could be expense related items that aren't perceived to be part

12  of the ongoing operations of the business.  So, when you think

13  about the business of John Varvatos it's in the business of

14  selling clothes.  If there are expenses related to things that

15  are not directly the selling of clothes, a decision is made to

16  either make an adjustment below the line or to keep that

17  expense in operating expenses.

18  Q.  Just to make sure I am reading this carefully, for time

19  period December 2018 Varvatos had extraordinary nonoperating

20  expenses of $1.1 million?

21  A.  Correct.

22  Q.  And for the same category of extraordinary nonoperating

23  expenses for the period ending about November 23, 2019,

24  Varvatos had 3.8 million dollars in that category; do you see

25  that?

1    A.   Yes.

2    Q.   Is that correct?

3    A.   Correct.

4    Q.   So that was a jump of about $1.7 million?

5    A.   From period to that period, yes.

6    Q.   And isn't it correct that over $1 millions of that $3.8

7    million for 2019, represented costs of defending this lawsuit?

8    A.   So, I would agree with you that the books and records for

9    the full year of 2019 probably represent about a million

10   dollars of, probably include about a million dollars of legal

11   fees associated with that case.  I cannot say definitively that

12   the 3.8 million includes that million dollars.  It could only

13   include a part of it.

14   Q.   And the another part of it would be somewhere else?

15   A.   Recorded in December.

16   Q.   OK.  Now, the 1.9 -- excuse me -- the million dollars that

17   was spent by Varvatos during 2019 in defense of this lawsuit,

18   that was cash that Varvatos actually paid out, right?

19   A.   No.  To my knowledge, no payments were made to our counsel

20   for this case.  Prior to my arrival, possibly, even for longer,

21   we put ourselves on a payment plan with them in December paying

22   approximately 75,000 per week.  We continued doing so until

23   sometime in early January when due to liquidity issues and a

24   shortage of availability on our revolver, we were unable to

25   make those payments along with other payments such as payroll,

1    rent, sales taxes, et cetera, that we needed to prioritize.  So

2    we, stopped making those payments.  We recently resumed those

3    payments in February and I believe we may have paid

4    approximately three payments of 75,000 over the course of

5    February, if not three, then four.

6    Q.  OK.  And you acknowledged the debt to them?

7    A.  Yes.

8    Q.  And you intend to pay them in full?

9    A.  If we're able to, yes.

10   Q.  Now, for the years 2018, do you know how much you have the

11   $1.14 million represents the defense of this lawsuit?

12   A.  Sorry.  I do not.

13   Q.  What about the 1.954 million for December of '17; do you

14   know how much of that represents the defense of this lawsuit?

15   A.  I do not.

16   Q.  Some of it probably does, right?

17   A.  Probably.

18   Q.  Now, you told us some information about Lyon Capital in

19   your direct-examination, right?

20   A.  Yes.

21   Q.  Now, you've said that Lyon Capital doesn't want to put up

22   any money to pay the judgment which the, pay the award that the

23   jury has already made, correct?

24   A.  I would state it more broadly.  Lyon Capital want to put

25   any more money into the business period regardless what it's

1   for.

2   Q.  And Lyon Capital when it said that knew that you were going

3   to be testifying today, correct?

4   A.  I'm sure, yes.

5   Q.  And if Lyon Capital would have told you look we've got to

6   save the business, we've got to do what's right.  We will pay

7   the judgment.  That would be a horrible negotiating position

8   for line, wouldn't it?

9   A.  I don't understand the statement.

10  Q.  The conversation that you had with Lyon in which it said it

11  doesn't want to put any more money into Varvatos was very

12  recent, right?

13  A.  It was an e-mail, not a conversation.

14  Q.  Was it over the weekend?

15  A.  Yes.

16  Q.  So, when Lyon said it doesn't want to put in any money to

17  Varvatos, it knew what the jury's verdict from last Friday was?

18  A.  Yes.

19  Q.  And Lyon has known for three years that this case is going

20  on, right?

21  A.  I'm sure, yes.

22  Q.  So, if Lyon were to say, we are willing to put in the money

23  to pay the judgment, to make it right, you wouldn't be

24  testifying today, would you?

25  A.  I don't imagine so.

K32AAKNO3                          Zorda - Cross

1   Q.  So Lyon has every incentive to sit back and say no pay,

2   right?

3   A.  Sure.

4   Q.  And do you know how much money this fund three of line has

5   on hand at this time?

6   A.  I have absolutely no idea.

7   Q.  Tens of millions?

8   A.  I have absolutely no idea.

9   Q.  And I believe you told the jury that Varvatos takes the

10  verdict very seriously?

11  A.  Yes.

12  Q.  OK.  Is Varvatos going to appeal from the verdict?

13  A.  I don't know what the board's decision is going to be.

14  Q.  So, in other words, Varvatos takes it very seriously but

15  Varvatos hasn't decided one way or another whether it's going

16  to continue to either upset it in this court or take it to a

17  higher court?

18  A.  I have never not been part of those conversations.

19  Q.  Let me ask you a question about some of the general

20  expenses of Varvatos, OK.  Varvatos has salaries, right?

21  A.  It does.

22  Q.  And salaries would be in the line of general and

23  administrative, right?

24  A.  Yes.

25  Q.  Now, at your deposition in January do you remember that I

1  asked you the question of how much Mr. John Varvatos personally

2  made in salary?

3  A.  I remember that, yes.

4  Q.  Do you remember you gave me an answer to that question

5  about how much money John Varvatos personally made each year in

6  salary?

7  A.  Yes.

8  Q.  And do you remember telling me that John Varvatos made

9  $980,000 a year in salary?

10  A.  Yes.

11  Q.  During the course of this case, Mr. John Varvatos has taken

12  out of the company roughly three million dollars, fair

13  statement?

14  A.  So, as an employee of the business and the creative

15  director he earned a salary of, if you say it's three million

16  dollar, that's it but I wouldn't look at it as taking money out

17  of the business.  I wouldn't say a salesperson is taking money

18  out of the business.

19  Q.  OK.  I will accept your rephrasing.  Let me ask a better

20  question.  Since this case started back in February of 2017,

21  John Varvatos has received salary in the approximate amount of

22  three million dollars, correct?

23  A.  Approximately, yes.

24  Q.  And is it fair to say that John Varvatos had some decision

25  with respect to whether or not this case would precede to

1  trial?

2  A.  I don't know.

3         MR. DUNNEGAN:  No further questions at this time, your

4  Honor.

5         THE COURT:  Ms. Hasan, are you ready?

6         MS. HASSAN:  Just a minute, your Honor.

7         THE COURT:  Do you want to take five minutes?

8         MS. HASSAN:  Sure.

9         THE COURT:  Go back in the jury room or stay here.

10  We'll just take five minutes.

11         (Jury not present)

12         (Recess)

13         THE COURT:  You can be seated.

14         Ms. Hassan, whenever you're ready.

15  REDIRECT EXAMINATION

16  BY MS. HASSAN:

17  Q.  Mr. Zorda, I am going to be asking you few questions about

18  some of the topics that Mr. Dunnegan raised with you and then

19  I'd like to discuss the document with you.

20         OK.  So, Mr. Dunnegan asked you about how you were

21  getting the inventory number based on the cost number that is

22  on Exhibit JJ and then how were you calculating the full retail

23  market price of that inventory; do you remember that?

24  A.  Um-hmm.

25  Q.  OK.  And earlier today that you had testified that you were

1  using 75 percent markup to go from cost of inventory to full

2  market or retail price?

3  A.   75 percent margin, yes.

4  Q.   And Mr. Dunnegan referred to your deposition testimony in

5  which you had referred to an 80 percent number.  Do you

6  remember that?

7  A.   Yes.

8  Q.   And in your deposition you had stated that our internal

9  markup is in the neighborhood of 30 percent?

10 A.   Yes.

11 Q.   Is 75 percent in the neighborhood of 80 percent?

12 A.   Yes.

13 Q.   Is your 75 percent a more accurate or specific number?

14 A.   Yes.

15 Q.   Why is that?

16 A.   Because that's our IMU or internal markup but we have more

17 than just our inventory in inventory and there is inventory

18 that we purchase from our licensed partners.  For example,

19 Revlon makes the John Varvatos clothes, just as we sell our

20 products to resellers or retailers such as Bloomingdales for

21 about 50 percent off of retail or suggested retail price.

22 That's, basically, the price that we're purchasing that

23 merchandise from Revlon at.

24         Same thing with our leather goods.  Those are

25 outsourced and made by a licensed partner.  Same for our

1   jewelry.  Same for our eyewear.  So overall when I look at it

2   as a blend, you know 75, 77 percent is the neighborhood.  If

3   we're looking at just what we're absolutely manufacturing

4   ourselves it's probably closer to 80 percent.  But when I look

5   at inventory and aggregate I am thinking about all of our

6   inventory.  And you know 75, 77 it's all in the ballpark.  And

7   it doesn't change the practicality or feasibility to just pick

8   up the phone and turn all of that inventory.  If we could do

9   that just by picking up the phone, we'd be a billion dollar

10   business, not a $100 million business.  It's not, retail is the

11   hardest business right now and if we could do that, we'd have

12   already done it.  It's just not as easy as it's sounds.  The

13   only way we're going to be able to raise a real amount of money

14   in inventory is selling it at cost.  That's the only way.

15          People aren't going to come in and pay full retail for

16   it because we need them to.  They are not going to pay

17   50 percent off.  Anyone who is going to be buying that

18   inventory from us is going to be buying it to resell it at an

19   extreme discount.  Best case scenario, we would turn some of

20   that inventory at cost but we couldn't pick up the phone and

21   sell it at 50 percent off tomorrow just because we denied

22   that's what we're going to do with our business model.  It

23   doesn't work that way.

24   Q.  Now, Mr. Zorda, Mr. Dunnegan also asked you some questions

25   about Defense Exhibit JJ.  Could you take a look at that?

1    A.  Yep.

2    Q.  I am looking at the second page which is the profit and

3    loss statement.

4            Mr. Dunnegan referenced that comparing the

5    December 2016, 2017, 2018 numbers versus the November 2019

6    numbers might be comparing apples to oranges?

7    A.  Um-hmm.

8            THE COURT:  Yes or no.

9    A.  Yes.

10   Q.  I would like you to help us bring some of the 2019 numbers

11   to December 2019, if you can and I'll ask you about specific

12   numbers here.

13   A.  Sure.

14   Q.  OK.  So, Mr. Dunnegan spoke to you about the earnings

15   before income taxes EBIT number which on Exhibit JJ is a 7.68

16   million loss number.

17   A.  Um-hmm.

18           THE COURT:  Yes or no, sir.

19   A.  Yes.

20   Q.  And December 2019, what did that number look like?

21   A.  So, that number was approximately and again, it can be con

22   fusing because of the adjustments for extraordinary expenses

23   and non cash or appreciation, amortization, et cetera, but that

24   number was approximately minus ten million dollars.

25   Q.  And that number is bigger than the EBIT number for

1    December 2018 which is minus 3.27 million?

2    A.   Yes.

3    Q.   Next, let's move onto the EBIT number, adjusted earnings

4    before income taxes which for November 2019 is a loss of 3.21

5    million.

6    A.   Yes.

7    Q.   Could you help us bring that to December --

8              THE COURT:   You said November 209; I am not sure.

9              MS. HASSAN:   November 2019.

10   A.   So, and again, this is, I would say the more accurate way

11   to look at the operations of the business than the previous

12   number that you stated which obviously was a deepening loss.

13   But from looking at it on an operating standpoint, obviously,

14   the business that we're in is incredibly seasonable and we're

15   making the of our profits from the end of November through the

16   end of December.  And that figure of minus 3.2 million is minus

17   1.4 million at the end of the year.  So, in December we made

18   essentially an operating profit of approximately, call it 1.8

19   million to bring that number to minus 1.4.  But included in

20   there is an adjustment for additional expenses incurred, and as

21   I mentioned, we, the November numbers did not reflect the full

22   billings from counsel or other expenses that were incurred that

23   we looked at as nonoperating and those extraordinary or

24   nonoperating expenses increased to approximately five million

25   dollars.

1   Q.  So, Mr. Zorda, the EBITA number for December 2019, is a

2   loss of 1.4 million?

3   A.  That's correct.

4   Q.  And that number is worse off than the same number for

5   December 2018 which was a profit of 1.67 million?

6   A.  That's correct.

7   Q.  The final --

8           THE COURT:  1.678, right?

9           MS. HASSAN:  1.678 rounded off, yes.

10          THE COURT:  OK.

11  Q.  The last number I would like you to look at is the net

12  income loss number which is the last line.

13  A.  Um-hmm.

14  Q.  For November 2019, that number is rounded off approximately

15  18 million?

16  A.  Yes.

17  Q.  What would that number look like at the end of

18  December 2019?

19  A.  So, it's not -- that number would be approximately minus 26

20  million.

21  Q.  And is that worse off or better off the net income loss

22  number for December 2018?

23  A.  It's worse.

24  Q.  Now, Mr. Zorda, Mr. Dunnegan asked you about Lyon Capital's

25  willingness to lend more money to Varvatos.  Do you remember

1   that?

2   A.   Yes.

3   Q.   And you have testified that since the verdict was issued in

4   this case on Friday you have asked Lyon Capital for additional

5   lending and they have said no?

6   A.   That's correct.

7   Q.   Has Varvatos in the past ever asked Lyon Capital for money

8   and they have said no?

9   A.   I don't know in the past.  I mean, I asked in August and

10  got a little bit of money to bridge us through a challenging

11  time but I don't remember being told no.

12  Q.   Are you aware of any other instance where Lyon Capital has

13  refused to put more money into an entity that it owns?

14  A.   Yes.

15  Q.   And what is that example?

16  A.   Bumble Bee Tuna.

17  Q.   What happened to Bumble Bee Tuna?

18  A.   It went bankrupt.

19  Q.   So, Mr. Zorda, Mr. Dunnegan also asked you about John

20  Varvatos's salary; do you remember that?

21  A.   Yes.

22  Q.   And you testified that Mr. Varvatos's salary is $980,000

23  annually?

24  A.   Correct.

25  Q.   Do you know how that compares to the market salary of

1  somebody who is a creative direct director in the same position

2  as Mr. Varvatos?

3  A.  Yes.

4  Q.  How does it compare?

5  A.  It's on par possibly even a little bit lower when you look

6  at larger companies.  If you look at typical companies our

7  size, that is the normal salary, maybe sometimes a little but

8  more.  If you look at the larger companies, if you look at

9  Gucci, if you look at companies that Gucci Group or now --

10 owns, if you look at Louis Vuitton or the company that LVMH

11 owns the creative directors of those companies make for more

12 than a million dollars a year.

13 Q.  Mr. Zorda, Mr. Dunnegan gave you document marked

14 Defendant's Exhibit HH, I believe?

15 A.  Yes.

16 Q.  Now that hasn't been introduced into evidence but I would

17 like to ask you a few questions about that.

18 A.  OK.

19 Q.  Have you seen this document before?

20 A.  Yes.

21 Q.  And when did you see this?

22 A.  When you had sent it to me asking that the company provide

23 updated financials for my deposition in January of this year.

24 Q.  OK.  So, when did I get in touch with you asking for the

25 updated financials?

1   A.  I think right before the deposition.  Maybe week before,

2   two weeks before.

3   Q.  And the deposition was in January?

4   A.  I think it was in January.

5   Q.  OK.  Now were any updated financials actually prepared?

6   A.  Yes.

7   Q.  And have we been -- are those in the record?

8   A.  The financials labeled "JJ" that we have been talking about

9   today.

10  Q.  Going back to Defendant's Exhibit HH, when you looked at

11  it, what was your reaction it?

12  A.  That it wasn't the full representation of the business's

13  financials that should have been looked at.

14  Q.  Why is that?

15  A.  Because it was only showing the financial statements for

16  John Varvatos Enterprises Inc. and not John Varvatos

17  Enterprises and its subsidiaries.

18  Q.  Now, does John Varvatos Enterprises Inc. have any

19  subsidiaries?

20  A.  Yes.

21  Q.  How many does it have?

22  A.  Two.

23  Q.  And those subsidiaries were not included on Defendant's

24  Exhibit HH?

25  A.  That's correct.

1          THE COURT:  Are they included in JJ?

2          THE WITNESS:  They are.

3   Q.  So, what did you do when you realized that the two

4   subsidiaries information was not included in Defendant's HH?

5   A.  I asked the comptroller why we had only provided financial

6   statements for John Varvatos Enterprises Inc.

7   Q.  And what was the response?

8   A.  She sent me an e-mail that she had received from my

9   predecessor, the then CFO/COO at the time requesting financial

10  statements for company number two.

11  Q.  And what does that mean?

12  A.  So, in accounting everything is assigned to code.  So,

13  sales have a numerical code.  Expense haves a different

14  numerical code.  Assets have a different numerical code.

15  There's many layers to that.  And you have the general code for

16  sales.  Then you'll have another code for the type of sales and

17  you'll have another code for the store that those sales relate

18  to.  So, you can run your reporting based on these codes ands

19  classifications.  Even at the highest level there are still

20  codes that are used.  And the code for the company John

21  Varvatos Enterprises Inc. is company code number two.

22          If we look at John Varvatos Mexico which is a

23  subsidiary of John Varvatos Enterprises Inc. that's company

24  code number 25.  If we look at the company code for the other

25  subsidiary of John Varvatos Enterprises which is named John

1   Varvatos apparel Corp, that's company code number nine.

2   Q.  So, Mr. Zorda, when you realized that the information about

3   two of Varvatos subsidiaries wasn't included on Defendant's

4   Exhibit HH, did you correct for that?

5   A.  I did.

6   Q.  How did you correct for that?

7   A.  I asked the comptroller to run the current financials

8   through November at the subsidiary level.  So, the full

9   consolidation of John Varvatos Enterprises Inc. company code

10  two, plus John Varvatos Apparel Corp, company code number nine,

11  plus John Varvatos Mexico, number 25, as well as Canada which

12  is John Varvatos, company code number 15 but it's not really a

13  separate company.  It's a division of John Varvatos Enterprises

14  doing business in Canada.

15  Q.  And was the product of that exercise the document

16  Defendant's Exhibit JJ that we have been looking at?

17  A.  That's correct.

18  Q.  And does defendant's JJ include all subsidiaries and

19  divisions of Varvatos?

20  A.  That's correct of John Varvatos Enterprises Inc. to be

21  clear.

22  Q.  Thank you.

23       Mr. Zorda, the kind of documents that are at

24  Defendant's Exhibit JJ or HH which you're looking at and the

25  jury doesn't have, are these documents that Varvatos produces

1    on a regular bases in the ordinary course of business?

2    A.   Yes.

3    Q.   Now, again, looking at Defendant's Exhibit HH, if the two

4    subsidiaries were to be added, would that make any difference

5    to the bottom line shown on this document i.e. whether Varvatos

6    was making a profit or loss in December 2018?

7    A.   It would like make a difference but there would still be a

8    loss.

9    Q.   So, just for the record, the document marked Defendant's HH

10   shows on the second page that for December 2018 the net income

11   loss number is negative 16.548 million rounded up or rounded

12   off.

13   A.   That's correct.

14   Q.   How would that number change if the two subsidiaries in the

15   Canadian division had also been included in defendant's Exhibit

16   HH?

17   A.   Can I give you an approximate number?  There would be

18   virtually zero impact I believe from JV Canada and JV Mexico

19   because those were stores that were just opening.  So, there

20   was no significant income or loss associated with those.

21   However, John Varvatos Apparel Corp which is a separate company

22   that we use to do our licensing.  So, as I had mentioned

23   before, Revlon is the manufacturer of John Varvatos colognes.

24   We buy those products from Revlon but Revlon also sells them to

25   different department stores and retailers around the world.  In

K32AAKNO3                        Zorda – Redirect

1  exchange for the right to manufacture cologne with John

2  Varvatos brand name on it and sell it and make profits around

3  the world selling it, they pay us a royalty.

4          Other licensors who I had mentioned, the leather goods

5  licensor and the eyewear, swimwear, a couple of others that are

6  smaller, all pay us royalties to be able to use the John

7  Varvatos brand name.  The average income in that business from

8  those royalties and that's really all there is in that

9  business, there's maybe a very small amount of expenses, but

10  that would represent an additional income of positive four

11  million dollars.

12         So, the difference between this exhibit minus 16

13  million dollars versus our JJ would be four million dollars.

14  The JJ being minus 12,405,000.

15  Q.  So, just to clarify, Mr. Zorda, Exhibit HH shows a net loss

16  of 16 million, 16.548 million or December 2018?

17  A.  Yep.

18  Q.  If the two subsidiaries of Varvatos and Canadian Division

19  are included, that number would change to what, approximately?

20  A.  Two 12,405,000 as on Exhibit JJ.

21         (Continued on next page)

22

23

24

25

1   BY MS. HASSAN:

2   Q.  And that would still be a loss?

3   A.  Yes.

4   Q.  Mr. Zorda, do you understand that Exhibit HH was provided

5   to plaintiffs in this case?

6   A.  Yes.

7   Q.  And do you also understand that the document that you were

8   involved in producing, Defendant's Exhibit JJ was provided to

9   plaintiffs in this case?

10  A.  Yes.

11  Q.  Do you have any reason to believe that anyone at Varvatos

12  including the controller had any intent to mislead plaintiffs

13  by providing them a document that initially did not include the

14  subsidiaries of Varvatos?

15  A.  Absolutely not.

16          MS. HASSAN:  Thank you.

17          THE COURT:  Mr. Dunnegan, whenever you are ready.

18  RECROSS EXAMINATION

19  BY MR. DUNNEGAN:

20  Q.  Let's go back and talk about inventory.

21  A.  Okay.

22  Q.  If we use the 25 percent cost number, the current inventory

23  at retail value of Varvatos is $120,000; right?

24          Excuse me.  $120 million; right?

25  A.  If we're using the 75 percent margin, it would be $100

 1    million.

 2            THE COURT:  Current, you meant what month.?

 3            MR. DUNNEGAN:  Let me start again, your Honor.  I

 4    don't want there to be any confusion here.

 5    Q.  You told us that there were today approximately $30 million

 6    of inventory clothes at cost.

 7            Do you remember that?

 8    A.  At the end of January.  I would not definitively say today.

 9    Q.  You are correct.  You are correct.  I will say as of the

10    end of January.

11            As of the end of January if we used the 75 percent

12    margin number, we would take the $30 million number and

13    multiply it by four; right?

14    A.  Correct.

15    Q.  And you get $120 million of inventory at retail value;

16    right?

17    A.  That would be the suggested retail value of that inventory,

18    yes.

19    Q.  Now, I believe you gave some testimony on redirect about

20    finding a customer to pay you 50 percent of retail; right?  Do

21    you remember that?

22    A.  No.  So if we're talking about a --

23    Q.  Well, if the answer is no, let me try again.

24    A.  Okay.

25    Q.  Now, if Varvatos were to run 50 percent off sales at its

K326VAR3                        Zorda - recross

1   retail stores, do you think it would find customers to pay

2   50 percent off of retail?

3   A.  Yes.

4   Q.  Thank you.

5           Now, looking at the EBITDA in Exhibit JJ, I believe

6   you were seeking -- I am sorry.  not EBIT?

7   A.  Yes.

8   Q.  You were trying to update the 7680 number for November of

9   2019 and bring it current?

10  A.  Correct.

11          THE COURT:  Current or end 2019?

12          THE WITNESS:  I understand the question.

13          THE COURT:  Current or end of 2019?

14          MR. DUNNEGAN:  Current.

15  A.  So the January -- I don't know what the -- I don't remember

16  off the top of my head what the January EBIT number is, but the

17  January EBITDA is minus 1.4.

18  Q.  Now, let's go to the end of 2019 for the EBIT number.  I

19  believe you testified that the EBIT went from a loss of 7.6

20  million in November of 2019 to a loss of 10 million at the end

21  of the year; correct?

22  A.  Approximately, correct.

23  Q.  But, see, that takes into account more of these

24  extraordinary expenses; right?

25  A.  It does.

1    Q.  And those extraordinary expenses include the cost of

2    defending this case; correct?

3    A.  That's correct.

4    Q.  Now, I believe you attempted to compare the salary of

5    Mr. John Varvatos to the salary of the chief creative officer

6    at companies such as Louis Vuitton?

7    A.  I wasn't comparing his specifically other than to say that

8    at comparable companies our size, his salary is with market.

9    At other larger companies, the salary for creative director is

10   substantially higher.

11   Q.  And you understand that Louis Vuitton is a multibillion

12   dollar company; correct?

13   A.  Yes, I do.

14   Q.  They makes lots and lots of money; right?

15   A.  Yep.

16   Q.  Varvatos is a much smaller company; right?

17   A.  It is.

18   Q.  Under John Varvatos stewardship and your testimony, the

19   company is yet to turn a profit; right?

20   A.  That's correct.

21   Q.  Now, if I can take you back to HH, and this is a document

22   which you have testified about on redirect exam; correct?

23   A.  Yes.

24   Q.  It was prepared by the controller of Varvatos for purposes

25   of this case and it contains financial information from

1  Varvatos computer system; right?

2  A.  Correct.

3        MR. DUNNEGAN:  Your Honor, I offer Exhibit HH into

4  evidence.

5        THE COURT:  Any objection?

6        MS. HASSAN:  No, your Honor.

7        THE COURT:  It's admitted.

8        (Defendant's Exhibit HH received in evidence)

9  BY MR. DUNNEGAN:

10  Q.  Now, there is a problem with HH; right?

11  A.  Yes.

12  Q.  And I am going to simplify this, but isn't generally

13  correct that the problem with HH is that it includes the

14  liabilities of John Varvatos to its own subsidiary but it

15  doesn't include the value of the subsidiary on the balance

16  sheet?

17  A.  I disagree.

18  Q.  Well--

19  A.  The problem --

20        THE COURT:  Wait for a question.

21        THE WITNESS:  Sure.

22  Q.  Let's break that up into pieces.

23        Isn't it correct that the balance sheet set forth as

24  Exhibit HH does not contain information concerning the

25  ownership by John Varvatos Enterprises, the defendant in this

1  case, of its subsidiaries?

2  A.  I would say that is not correct.

3  Q.  Well, doesn't JJ, which is the new income statement,

4  contain an adjustment to the intercompany liabilities?

5  A.  Yes.  That would be in the balance sheet, though.

6  Q.  I am sorry.  You are correct.

7       How much was the balance sheet off once the

8  intercompany liabilities were corrected?

9  A.  So HH shows intercompany liabilities of 53 million and

10  Exhibit JJ as of the period ending November 2019 showed

11  intercompany liabilities of 14.95 million.

12  Q.  That's a different of approximately?

13  A.  45 million ballpark.

14  Q.  Okay.  So Exhibit HH was wrong by ballpark $45 million?

15  A.  It's not really the way I would look at it.  HH is correct

16  for company John Varvatos Enterprises, Inc.  It's absolutely

17  correct.

18  Q.  Okay.  But if we're trying to assess for settlement

19  purposes what John Varvatos can pay including an additional

20  45 --

21       MS. HASSAN:  Objection, your Honor.

22  Q.  -- $45 million is relevant; isn't it?

23       THE COURT:  Mr. Dunnegan, I don't know what settlement

24  has to do with this jury.

25       Why don't you try another question.

1                MR. DUNNEGAN:   Okay.

2    Q.  You told us in your prior testimony that Varvatos was

3    telling people since you joined the company last summer that it

4    was going bankrupt, right, or it could be going bankrupt?

5    A.  I would say could be at least since I joined, yes.

6    Q.  That may have been going on since before you joined;

7    correct?

8    A.  Correct.

9    Q.  And during that time period, Varvatos was trying to

10   persuade the people that it was telling that to that it was

11   serious; right?

12   A.  Yes.

13   Q.  And one of the ways it was trying to persuade people that

14   it was serious was to put the worse financial condition in

15   front of those people; correct?

16   A.  I don't -- I don't agree with that.  The company would have

17   put together -- put forward the financial statements.  The

18   difference in liabilities and we're starting to get into a bit

19   more complex accounting terminology, but the subsidiaries that

20   were not included in here while John Varvatos Enterprises,

21   Inc., Company II would have a liability or payable to some of

22   its subsidiaries, those same subsidiaries would have a

23   receivable in an equal amount.  So when you combine John

24   Varvatos Enterprises, Inc., the parent, and its two

25   subsidiaries, the term is elimination and the intercompany

1   receivable of the subsidiaries will eliminate with the

2   intercompany liability of John Varvatos Enterprises, Inc.

3           So while there is a difference in intercompany

4   liabilities between the two, when you look at the actual

5   liabilities of the business that would be secured or more

6   important in terms of ranking them, what hasn't changed is the

7   promissory notes and the revolver credit line.  Those are the

8   liabilities that would be senior to anything else.  So even

9   before the conversation went to "what happens with the $15

10  million of intercompany liabilities" there really isn't a

11  conversation anymore.

12  Q.  Well, sir, if someone saw just Exhibit HH, the conversation

13  would be that there are roughly $53 million in intercompany

14  liabilities owned by the defendant in this case; correct?

15  A.  I would say the average layperson, yes.  A financial

16  professional assessing the health of a business would look at

17  the intercompany liabilities and essentially disregard them.

18  They would know very, very, very reasonably that the senior

19  liabilities of the business would be the revolver or credit

20  line and potentially promissory notes and that the intercompany

21  liabilities are due to related parties and therefore maybe

22  secured, maybe not but not as important as the other

23  liabilities of the business.

24  Q.  Which shows the stronger company, Exhibit JJ or Exhibit HH?

25  A.  Exhibit JJ.

K326VAR3                        Zorda - recross

1   Q.  Clearly; right?

2   A.  Clearly.

3   Q.  Now, I just want to take a minute and try to understand

4   what these notes are, these promissory notes at the last line

5   before total liabilities under JJ.  If I described these as

6   payment in kind notes, would you understand what that is?

7   A.  Yes, I would.

8   Q.  Would you please explain to the jury is what a

9   payment-in-kind note is?

10  A.  Sure.  So a payment-in-kind note is a particular type of

11  loan where you do not need to make a cash payment for the

12  interest expense.  So if you're familiar with having a loan,

13  you know that you're responsible for making a monthly payment.

14  That monthly payment is primarily comprised of mostly interest

15  at first and then a little bit of principal.

16          These promissory notes or payment-in-kind means that

17  there is no expectation to repay the interest expense on a

18  monthly or even annual basis; but what happens is that the

19  interest expense then becomes part of the note and that

20  interest itself begins to accrue interest.

21  Q.  These promissory notes, they are owned to Lion Capital;

22  right?

23  A.  Essentially, yes.

24  Q.  And could you tell us what the interest rate on those notes

25  is?

1   A.   There is four I believe different notes there.  The

2   interest rates range anywhere from, I think, 10, 12, 14,

3   20 percent.

4   Q.   This is a way to make sure that as Lion is keeping money in

5   the Varvatos business that it gets a guaranteed return off of

6   that money; correct?

7   A.   That's correct.

8   Q.   And it is a way for it to try to get priority over other

9   creditors; correct?

10  A.   As a lender, yes, it has that right.

11             MR. DUNNEGAN:  Nothing further, sir.

12             THE COURT:  Ms. Hassan, since we did Exhibit HH a

13  little differently, I would let you do some redirect as to HH

14  only.  Otherwise, I think I will turn to the jury for

15  questions.

16             MS. HASSAN:  Your Honor, I will take a minute to see

17  if I have anything on HH.

18             THE COURT:  Okay.  If the jurors would like to prepare

19  any questions, it would be a good time to do it.

20             MS. HASSAN:  Thank you, your Honor.  I have no

21  questions on HH.

22             THE COURT:  Do any of the jurors have any questions?

23  If so raise, your hand.

24             I will give you a moment to write them.

25             (Continued on next page)

 1                (At side bar)

 2                THE COURT:  Question 1:  How much did you ask Lion

 3     Capital to lend in August 2019 when you joined to get the

 4     company out of a tough spot?

 5                Any objections?

 6                MR. DUNNEGAN:  Excellent question.

 7                THE COURT:  I am asking if there is objections, Mr.

 8     Dunnegan.

 9                MR. DUNNEGAN:  No.

10                MS. HASSAN:  No, your Honor.

11                THE COURT:  Did they honor that full amount?

12                Any objection?

13                MR. DUNNEGAN:  No.

14                MS. HASSAN:  No objection.

15                THE COURT:  There were four options to how John

16     Varvatos Enterprise handles the damages moving forward that you

17     covered:  Wells Fargo long, Lion Capital loan, a third option,

18     and filing for bankruptcy.  What was the third option?

19                Any objection?

20                MR. DUNNEGAN:  No.

21                MS. HASSAN:  No objection.

22                THE COURT:  What is the answer by the way?

23                MR. DUNNEGAN:  Settlement.

24                THE COURT:  If he doesn't remember, what I am going to

25     ask you to do is I will say the attorneys will remind you in

1  argument; is that all right?

2            MR. DUNNEGAN:  Shall we have a readback of that

3  question and answer?  Is that possible?  It was asked and

4  answered.

5            THE COURT:  It will be a little hard to find.  I think

6  it will be faster if you would stipulate.  Just argue it.

7            MR. DUNNEGAN:  Okay.

8            THE COURT:  It's in the record.

9            Is this option which she doesn't remember what it is.

10  Feasible to cover the currently allotted compensatory damages.

11            If he knows it is settlement, the question doesn't

12  make sense.

13            MS. HASSAN:  Right.

14            MR. DUNNEGAN:  Agreed.

15            THE COURT:  Either way I will not ask it.

16            Maybe I will just say what it was since I am just

17  repeating what is in the record.

18            MR. DUNNEGAN:  No problem with that.

19            MS. HASSAN:  That's fine.

20            THE COURT:  I will not ask that question.

21            Then she asks:  Is this option feasible to cover the

22  additional punitive damages.

23            Again, it doesn't really make sense.

24            we'll go back out.

25            (Continued on next page)

1          (In open court)

2          THE COURT:  Sir, when you joined in August 2018, how

3     much did you ask Lion Capital to lend to get the company out of

4     a tough spot?

5          THE WITNESS:  So it was in 2019.

6          THE COURT:  I meant August 2019.  Sorry.  My mistake.

7          THE WITNESS:  I asked for $3 million.  I received 1.3

8     million.

9          THE COURT:  That answers the second question, which

10    was whether you got the full amount.

11         In your testimony, sir, you mentioned four options to

12    how John Varvatos Enterprises could handle the damages moving

13    forward -- Wells Fargo loan, Lion Capital loan, filing for

14    bankruptcy, and the juror asked to recall what the other option

15    was?

16         THE WITNESS:  Settlement.

17         THE COURT:  So it is clear because the other two

18    questions don't really apply in this context, I am not going to

19    ask them.

20         By settlement you meant negotiating with the very

21    people sitting here, the plaintiffs, for a lesser amount if

22    that were possible?

23         THE WITNESS:  That's correct.

24         THE COURT:  Anything further from the attorneys before

25    I excuse the witness?

K326VAR3                        Zorda - recross

1          MR. DUNNEGAN:  I wanted to publish HH and I can do

2    that any time, but didn't want to waive it.

3          THE COURT:  Okay.  Is there any reason just sending it

4    to the jury room?

5          MR. DUNNEGAN:  No.

6          THE COURT:  We'll send in both exhibits when the jury

7    deliberates, JJ and HH.

8          You can step down, sir.  You are free to stay or leave

9    or whatever you want to do.  You can leave all that.

10          THE WITNESS:  Yup.

11          (Witness excused)

12          THE COURT:  Are you ready to start on the closing?

13          MS. HASSAN:  Sure, your Honor.

14          THE COURT:  Let me address the jury for a moment.

15          I am just going to very briefly summarize what I said

16    yesterday, which is closing arguments are not evidence.  It's

17    the attorneys taking their opportunity to suggest to you the

18    inferences and conclusions that they suggest you draw from the

19    evidence.  So if you don't mind once again if you are taking

20    notes, note prominently Closing is Not Evidence so that you

21    don't confuse this for actual evidence in the case.

22          Whenever you are ready.

23          MS. HASSAN:  Ladies and gentlemen, I think this will

24    be the last time I will be talking to you.

25          So you heard the additional evidence that we put

1     before you.  You heard from the Varvatos CFO, Mr. Zorda, and

2     you either have gotten a chance to see additional documents or

3     you will be getting a chance to see those additional documents

4     as you deliberate.

5            I am going to review the evidence really quickly, the

6     highlights of what we think show that you shouldn't be awarding

7     any or any significant liquidated or punitive damages today.

8     Before that, I would like to clarify or review the evidence on

9     the two documents that you will be looking at while you

10    deliberate.  So two financial statements or financial records

11    of Varvatos have been put into the record, Exhibit JJ and

12    Exhibit HH.

13           So going alphabetically Exhibit HH was prepared by

14    Varvatos and produced to plaintiffs as part of this litigation.

15    It did not include information regarding the two subsidiaries

16    and a Canadian division of Varvatos.  What happened next?  When

17    Varvatos was updating these financials to produce updated

18    financials to the plaintiff, Mr. Zorda, Varvatos realized that

19    a mistake had been made, that certain information regarding the

20    subsidiaries and the Canadian division was not included in

21    Exhibit HH.  So that did Varvatos do.  Varvatos did not hide

22    that information.  Instead, in Exhibit JJ, which is the next

23    one which is the more recent one, Varvatos actually included

24    that information.

25           Ladies and gentlemen, if Varvatos had tried to dupe

1    anyone or mislead anyone there would have been no reason for

2    Varvatos to go ahead and correct this mistake in Exhibit JJ,

3    but that is what Varvatos did.  Varvatos did that because there

4    was never any intent to mislead anyone.  There was a mistake

5    made in the early financial statement.  The mistake was

6    corrected in the later financial statement.

7          Now, when you get a chance to look at the earlier

8    financial statement during your deliberations, please also note

9    any line item that Mr. Dunnegan was talking about, like the

10   intercompany liabilities, at the end of the day whether they

11   are 53 million, which Mr. Zorda testified was actually

12   corrected in the context of the document, or whether it is 14

13   million as it was corrected by including the subsidiaries in

14   the later financial statement, it does not make any difference

15   in the bottom line.  At the end of the day, the profit and loss

16   statements show a steep loss for Varvatos.

17         Ladies and gentlemen, I would ask that you focus on

18   the facts, not on any insinuations of anyone trying to mislead

19   anyone.  No one was trying to do that.  Varvatos was not trying

20   to mislead anyone.

21         Now, when we started today I told you that we would

22   present evidence to show two things.  One, no further

23   punishment and deterrence is required in this case and to

24   remind you the Court will be instructing you on how to assess

25   how liquidated and punitive damages should be awarded here.  In

1   doing so, you need to think what the purpose of liquidated and

2   punitive damages is, which to punish and deter.  It is our

3   position, and we believe that the evidence shows, that no

4   additional punishment and deterrence is required here.

5         So why do I say that and what the evidence of that?

6   Number one, as the Court will instruct you, one of the things

7   that you should keep in mind as you determine the amount of

8   punitive damages is how much of compensatory damages have

9   already been awarded.  You heard from Mr. Zorda that Varvatos's

10   rough estimate over the weekend is that the jury's verdict on

11   Friday given compensatory damages to the plaintiffs translates

12   approximately into 2.6 million to three million of compensatory

13   damages.  Those were at the full or maximum amount of

14   compensatory damages that could have been awarded.

15         The jury awarded $3,000 per each pull for a female

16   sales professional of plaintiff who worked at retail store and

17   the jury awarded $1,500, again the maximum amount, per pull per

18   plaintiff who worked in an outlet store.  Compensatory damages

19   in this case have been awarded to the full or maximum amount.

20   That amount when added up is a big number.  It is a 2.6 million

21   to 3 million number.  I will remind you from you last week that

22   there are little over 70 plaintiffs in this case.  So whether

23   you look at the compensatory damages number in full, 2.6

24   million to 3 million, or whether you look at it on average what

25   each plaintiff is going to get, that is a big substantial

1   number.  It sends a message and Varvatos has heard that

2   message.  There is no additional reason to deter and there is

3   no reason to deter and there is no additional punitive and

4   liquidated damages as to why that the jury is sending.

5          The second issue that I raised earlier today was that

6   the evidence will show that Varvatos is in serious financial

7   jeopardy.  Any kind of additional damages awarded today in

8   addition to the very high number of compensatory damages

9   awarded on Friday could potentially push Varvatos into

10  bankruptcy.  We believe that the evidence that has been put

11  before you -- Mr. Zorda's testimony and the updated financials

12  of Varvatos as of at least November 2019 -- all of them confirm

13  that Varvatos for years has experiencing steep losses.  You

14  heard Mr. Zorda.  Varvatos is struggling to make payroll and

15  that is its one priority.  It is struggling to stay current

16  with rent and has not been able to do so.  It is struggling to

17  pay its vendors and other partners.  It is struggling to

18  operate on a day-to-day basis.

19         Now, a number of options were raised during the course

20  of my cross-examination and Mr. Dunnegan's cross-examination.

21  Ideas were thrown out.  How about if Varvatos put a 50 percent

22  sale on all its inventory and try to get it out?  That sounds

23  good sure.  But what did Mr. Zorda, who is experienced in this

24  area, tell us?  Retail is not that easy.  You cannot simply

25  move inventory out at even 50 percent.  Even if Varvatos some

1  how successfully did that, it leaves them with no inventory and

2  it leaves them with no profits which would have actually helped

3  them operate the next day, the next day and the next week.  So

4  we can push the inventory out.  We can push the inventory out

5  at cost if possible, but there is no business left.  That

6  cannot be the purpose of punitive and liquidated damages.

7         Now, you've also heard testimony regarding Lion

8  Capital.  Lion Capital as Mr. Zorda explained to us is an

9  investment manager.  It is a private equity investment manager.

10 It has a bunch of funds and one of the funds owns Varvatos.

11 Varvatos does not control Lion Capital.  If Lion Capital is

12 saying know, we're not going to lend you money, then that's

13 that.  Varvatos has no control over Lion Capital.  Mr. Zorda

14 also told us this is not new for Lion Capital.  They have said

15 no to other entities they have owned such as Bumblebee.

16 and what happened to Bumblebee?  They went into bankruptcy.

17        Now, I would also like you to think about what it

18 practically means if Varvatos is further crippled financially,

19 if it has to curtail its business or if it has to file for

20 bankruptcy.  There are actual people who will be affected.

21 Now, we heard from two plaintiffs last week, Ms. Ruby Romero

22 and Ms. Cheryl Crouchen.  Neither of them work at Varvatos

23 anymore.  We also know from last week that the majority of

24 plaintiffs are former employees.  They do not work at Varvatos.

25 There day-to-day lives may not be affected by what happens to

1   Varvatos financially even if Varvatos were to go into

2   bankruptcy.  However, the lives of the people who do work at

3   Varvatos will be affected and that includes, I believe, at

4   least nine plaintiffs.  If Varvatos is forced to further cut

5   down its business or if Varvatos is forced to go into

6   bankruptcy, some of these people or many of these people might

7   lose their jobs, might lose their livelihood.  It is not an

8   abstract company, ladies and gentlemen.  It would be actual

9   people punished.

10          I would also ask that you keep in mind something else

11  Mr. Zorda told us.  There is a line in bankruptcy; right?

12  Wells Fargo is going to be number one in line if Varvatos goes

13  into bankruptcy to collect on any debt it can get out of the

14  bankruptcy entity.  Then comes Lion Capital that Mr. Zorda told

15  us.  That is just the way these things are structured.  At some

16  point along with the other unsecured creditors would come the

17  plaintiffs in this case who you have given a judgment to.  So

18  by forcing Varvatos into a bankruptcy, which any kind of

19  punitive or liquidated damages awarded today could very

20  realistically do, plaintiffs in this case might not be able to

21  collect on the very judgment that you have awarded them.

22          Ladies and gentlemen, you decided on Friday that

23  punitive and liquidated damages should be awarded against

24  Varvatos.  However, it is in your discretion how much.  It

25  could be a nominal amount.  It could be a one dollar amount for

1   plaintiff.  It could be a one dollar amount per pull.  We ask

2   you that based on the evidence that has been put before you, it

3   is unnecessary to award anything other than extremely nominal

4   amounts of liquidated and punitive damages today and it could

5   also lead to some in unintended and adverse consequences for

6   Varvatos as a business and for its employees who work for that

7   business.

8           Thank you.

9           THE COURT:  Mr. Dunnegan, if you are ready.

10          MR. DUNNEGAN:  Let's start with what the evidence

11  proves.  The chief financial officer of Varvatos testified that

12  Varvatos has $30 million as of the end of January of inventory

13  at Varvatos cost.  At Varvatos retail selling price that is

14  going to be approximately a $120 million.  Now, Varvatos may

15  not be able to sell $120 million of clothes later this

16  afternoon, but Varvatos has very skilled sales professionals

17  who have books of people who regularly buy Varvatos clothes

18  that they can call and say, *Look, we're running a sale.  Why

19  don't you come in and look.  It's the sale and the in-season*

20  *merchandise.*

21          Now, we can't predict it based upon the evidence of

22  what ever exists, but how long is it going to take the Varvatos

23  sales professionals to raise the money that is going to be

24  necessary to pay off any judgment that you reasonably render?

25  Not long.  Yes, it that going to leave them with less

1    inventory?  Of course.  But it is going to leave them with more

2    cash and it is going allow them to stop paying their lawyers

3    millions of dollars a year to defend this case.

4              In addition to the inventory, you heard testimony that

5    Varvatos has an additional $2 million to borrow on its line of

6    credit from Wells Fargo.  You heard testimony that some portion

7    of the $3.8 million in cash on its books could reasonably be

8    used to pay down any judgment in this case.  If you put all

9    those factors together, it is obvious that the financial

10   condition of Varvatos is no reason to award any amount less

11   than what you think is necessary to deter Varvatos and to

12   punish Varvatos as the law requires.

13             Now, the questions that you have to answer in this

14   case concern an appropriate award of liquidated damages and an

15   appropriate award of punitive damages.  Just two questions this

16   time.  The Court is going to give you instructions on the

17   purpose of each of those so please listen carefully.

18   Liquidated damages may be a novel concept, but the Court will

19   explain it to you.

20             Now, in determining the amounts of liquidated and

21   punitive damages, it is important to remember that the evidence

22   shows the different plaintiffs have different claims.  Ruby

23   Romero, she was the first sales professional who testified.

24   She was an opt-in plaintiff and a member of the class.  Cheryl

25   Crouchen, the second sales professional to testify, she was not

1    an opt-in plaintiff but she was a member of the class.  There

2    is no evidence that all of the members of the class have

3    exactly the same type of claims.  So just because someone is a

4    member of the class doesn't mean that they stand in the same

5    position as someone else in the class.

6           The bottom line and the point of that is that you

7    should answer each of these questions about liquidated damages

8    and punitive damages independently of your answer to the other

9    question.  In other words, if you determine to award a large

10   amount of liquidated damages, you shouldn't necessarily reduce

11   the amount of punitive damages that you award because you are

12   impacting different people to some extent with different

13   awards.

14          Now, you have to give an answer on a per-pull,

15   per-person basis.  No one is asking you to pull out a fixed

16   number of total punitives or liquidated damages to award to

17   Varvatos.  You may be tempted to say, *Well, how much do we want*

18   *to award?  Let's try do some arithmetic to work backwards to*

19   *see what that amount to per person per-pull basis.*  You don't

20   have enough evidence in the record to do that so please don't

21   attempt to do.  Instead what we're asking you to do is

22   determine the proper relationship between the compensatory

23   damages that you awarded last Friday and the liquidated and the

24   punitive damages that you are going to award today.

25          Now, the concepts of liquidated and punitive damages,

1   as Ms. Hassan told you, involve deterrence and punishment.  I

2   would like to take them separately.  Let's start with

3   deterrence.  The first fact that you have to consider is that

4   Varvatos is a long-term discriminator.  Varvatos has

5   discriminated in its clothing allowance policy for the better

6   part of the last decade.  It ahs engaged in that discrimination

7   even though it knew about the Equal Pay Act.

8          The second fact that you should consider on the issue

9   of deterrence is this lawsuit has not deterred Varvatos.  As I

10  said in my closing, we started this case with Tessa Knox back

11  in February 2017.  The discriminatory policy continued.  Then

12  in the later half of 2017, 13 opt-in plaintiffs signed the

13  papers to join the case.  The discriminatory clothing allowance

14  policy continued.  Then we certified a class in February of

15  2018, 70 or so female sales professionals.  The discriminatory

16  clothing allowance policy continues.  Varvatos continues to

17  spend money defending the case.  This trial starts.  The

18  discriminatory policy continued.

19         Now, the third fact that you have to consider or that

20  we're asking you to consider is that your verdict from last

21  Friday hasn't had anymore affect on Varvatos that my three

22  years of litigation.  I asked the witness from the stand:

23         Are you going to appeal this?

24         I don't know.

25         Are you going to continue defending it?

1        Beyond my pay grade.

2        What Varvatos is telling you and their lawyer is

3   telling you, Oh, we respect the jury's verdict; but is Varvatos

4   going to pay any award voluntarily that the jury makes?  I

5   didn't hear that.  Did anyone hear that Varvatos is going to

6   change its clothing allowance policy -- men get it; women

7   don't -- as a result of your verdict last Friday?

8        The closest they got was the hint from counsel's

9   argument that they were reconsidering what they were going to,

10  but you've heard reconsidering for a long time now.  You heard

11  it from Ben Harris back in 2015.  You heard we're thinking

12  about doing something from Nicole Chang back in 2016.  I think

13  it is fair to say that Varvatos is just up to its old tricks

14  today.

15       Now, putting aside the need to deter Varvatos with a

16  meaningful award, we have to think about other companies that

17  are doing the same thing that Varvatos is doing.  They need to

18  be deterred as well.  During the first phase of the trial, you

19  heard testimony about what Stewart Weitzman is doing.  You

20  heard testimony about what a company called La Perla is doing.

21  The award that you make in this case should be substantial

22  enough for those companies in the industry to hear it as well.

23       The award has to be large enough so that Varvatos and

24  those other companies realize the discrimination is not

25  financially feasible.

1          Now, let's turn to the question of punishment.  Let's

2     focus on Varvatos's state of mind.  It is not pretty.  When we

3     started this lawsuit back in February of '17, Exhibit 45, which

4     is in evidence, demonstrates that Varvatos had 30 women sales

5     professionals in the United States.  Now, you can do the

6     arithmetic for Exhibit 45 and conclude that if Varvatos paid

7     all of them the $12,000 a year cloth allowance, that would be

8     $360,000.  If you take into considering the fact that there

9     were people working at outlet stores at that point, the

10    arithmetic will come down to $288,000 to give the women

11    clothing professionals a clothing allowance.  By refusing to

12    take $288,000 a year and pay the women what the law required,

13    Varvatos thought it was doing something that was financially

14    feasible.  It is not financial feasibility.  It's greed.

15         Then we have to examine what Varvatos is doing with

16    its money.  The chief financial officer of Varvatos told you

17    that the chairman of the board of Varvatos, Mr. John Varvatos,

18    has a salary of $980,000 a year.  So doing some quick

19    arithmetic during the course of this lawsuit, Mr. Varvatos

20    himself has taken checks from the company in the range of $3

21    million.  A million dollars a year for John Varvatos when he is

22    probably the one making the ultimate decision that paying women

23    sales professionals $288,000 a year is not financially

24    feasible.  That is greed on steroids.  Mr. Varvatos hasn't even

25    bothered to show up in the courtroom.

1          Now, you have to take these facts about deterrence and

2     these facts about the need to punish Varvatos and turn them

3     into a number of liquidated damages and punitive damages.  Now,

4     there is no reason why those numbers have to be different and

5     for the rest of my argument I am just going to assume it is

6     going to be the same number.

7          Obviously your answers have be on a per-pull basis.

8     You found that damages of $3,000 per pull were appropriate for

9     retail stores.  You found that damages of $1,500 per pull at

10    outlet stores was appropriate to compensate the plaintiffs.

11    You need to pick a multiple of those amounts that you have

12    already awarded and ask whether it is too much or too little to

13    deter Varvatos from engaging in this conduct and whether it is

14    enough to punish Varvatos from engaging in this conduct.

15         Now, let me just take a moment and respond to Ms.

16    Hassan's argument that you should award a nominal amount, a

17    dollar.  What she is really asking you to do is two things.

18    First, she is asking you to say although Varvatos willfully

19    violated the law, there shouldn't be any consequence other than

20    how Varvatos do what it should have done in the first place.

21    That's just not wrong.  Otherwise, if you had a different rule,

22    you are merely encouraging people to violate the law because if

23    they do violate the law and if they do get caught, well,

24    nothing happens to them worse than what would have happened to

25    them if they followed the law in the first place.

1          The second thing I wanted to get across to you is that

2     the idea that you would be doing the plaintiff's a favor by

3     awarding a nominal amount of punitive damages and liquidated

4     damages because they wouldn't be at the end of this line in the

5     bankruptcy court, well, that borders on ridiculous.  If there

6     is going to be a bankruptcy, the plaintiffs that were involved

7     in this case are entitled to the strongest position that you

8     think is reasonably appropriate.  Because if there is a

9     bankruptcy, there is going to be a negotiation and there is a

10    chance and as Mr. Zorda said there will be a settlement

11    discussion even after a judgment and the plaintiffs may have to

12    take less.  Take that into consideration in determining what an

13    appropriate amount of liquidated and punitive damages is in

14    this case.

15         Now, our position is that you should award liquidated

16    and punitive damages of at least two times the compensatory

17    damages that you've already awarded.  The legal terms for this

18    is called treble damages.  It means that the final result is

19    three times of the compensatory damages.  It means for pulls

20    and a retail store the liquidated or punitive damages would be

21    $6,000 per pull.  For pulls at outlet stores, it would mean

22    that the liquidated or punitive damages would be $3,000 per

23    pull.

24         I want to thank you for your time and your attention.

25    I want to thank you for deciding to come back today because it

1   was the right thing to do.  I want to thank you because I think

2   you are going to do the right thing one more time on behalf of

3   all the women sales professionals and on behalf of our legal

4   team.

5          We wish you the very best.  thank you.

6          THE COURT:  Any applications with respect to closings

7   before I give the charge?

8          MR. DUNNEGAN:  No.

9          MS. HASSAN:  No.  Thank you, your Honor.

10          THE COURT:  Ladies and gentlemen, as you can see this

11  is very brief.  I am not repeating any of the charges I gave

12  earlier.  So I am now going to ask you to give the amount of

13  award you are making for any liquidated damages for the Equal

14  Pay Act claims and punitive damages for the Employment

15  Discrimination claims.  All the instructions I previously gave

16  you on Friday regarding the role of the jury and your

17  evaluation of the evidence and the conduct of your

18  deliberations as expressed in Parts 1 and Part 3 of the

19  instructions I gave you, they continue to apply.

20          *Liquidated Damages*

21          We will start with liquidated damages for the Equal

22  Pay Act claims.  Because you found that Varvatos acted

23  willfully in violating the Equal Pay Act, you must determine if

24  plaintiffs are entitled to a certain additional damages called

25  liquidated damages, which you already decided.  The purpose of

1    these liquidated damages is not to compensate the plaintiffs

2    but the harm done to them, but to punish Varvatos for wrongful

3    conduct and to deter similar wrongful conduct from Varvatos and

4    others.  We are asking you to calculate liquidated damages on a

5    per-quarter basis per employee just as you were asked to

6    calculate compensatory damages on a per-quarter basis per

7    employee bearing in mind the purpose of the award you shall

8    deliberate to determine the appropriate liquidated damages to

9    award for Varvatos's willful conduct.

10              *Punitive Damages*

11              As you may recall, the purpose of punitive damages is

12   to punish Varvatos for what it did and to deter its repetition

13   by Varvatos and others.  In determining the amount of punitive

14   damages, you should consider all relevant factors such as the

15   impact or severity of the defendant's conduct and the amount of

16   compensatory damages.  Also, any award of punitive damages must

17   be proportionate to the plaintiffs' actual injury.

18              The purposes of punitive damages should be kept in

19   mind as you determine the appropriate sum of money to be

20   awarded as punitive damages.  That is, in fixing the sum to be

21   awarded, you should consider the degree to which Varvatos

22   should be punished for its wrongful conduct and the degree to

23   which an award of one sum or another will deter Varvatos and

24   others like it from committing wrongful acts in the future.

25   We're asking you to calculate punitive damages on a per-quarter

K326VAR3                        Zorda - recross

1    basis per employee just as you were asked to calculate

2    compensatory damages on a per-quarter basis per employee.

3           Next what follows is the form that I am going ask you

4    to use.  I will ask the clerk to give the original form to the

5    foreperson.  Once again the form tracks the instructions that I

6    just read to you.  There is a question regarding liquidated

7    damages.  It asks you the amount you are awarding per employee

8    per quarter separated by retail stores and outlet stores.

9           For punitive damages it is asking the same question

10   for punitive damages.  Again, per employee per quarterly pull

11   for retail stores and for outlet stores.

12          Are there any applications with respect to the charge

13   I just gave, Mr. Dunnegan?

14          MR. DUNNEGAN:  No.

15          THE COURT:  Ms. Hassan?

16          MS. HASSAN:  No, your Honor.

17          THE COURT:  I am now going to ask the clerk to swear

18   in the marshal.

19          THE DEPUTY CLERK:  Marshal.

20          (Marshal sworn)

21          THE COURT:  One again, jurors, I will remind you that

22   you have been given a weighty responsibility.  Your verdict is

23   of the highest responsibility to both sides in this lawsuit.  I

24   am excusing you to begin your deliberations on this question.

25   I ask that you take these questions and in the fulfillment of

K326VAR3                        Zorda - recross

1    your oath and in accordance of my instructions render a true

2    and impartial verdict.

3              (At 1:00 p.m., the jury retired to deliberate)

4              THE COURT:  Where is the originals of HH JJ?  Who has

5    them?  I think this was the only HH.

6              MR. DUNNEGAN:  I have the copies that we said would go

7    to the jury room.

8              THE COURT:  Of which?

9              MR. DUNNEGAN:  HH.

10             THE COURT:  I didn't realize you were going to put

11   that in the books.  I am sorry.  We'll send the copies of the

12   originals.  They can put them in the books if you want.

13             Do I need to initial something?

14             MS. HASSAN:  Yes.  I think you also have to initial

15   JJ.

16             THE COURT:  Check them.

17             MR. DUNNEGAN:  Those are good.

18             THE COURT:  Those are the copies.

19             MR. DUNNEGAN:  These are the copies of HH.  JJ are in

20   their books.

21             THE COURT:  Can you give this to the marshal and ask

22   him to give it to the jury.

23             We have your phone numbers, folks.  Don't go too far.

24             (Recess pending verdict)

25             THE COURT:  You can be seated.

K326VAR3                         Zorda - recross

1        Madam Foreperson, is it correct you have reached a

2   verdict?

3        THE FOREPERSON:  We have.

4        THE COURT:  I am going to examine this for form.

5        I am going to ask the foreperson to read the jury's

6   answers to the verdict.

7        Under the category liquidated damages, what amount

8   does the jury award in liquidated damages per employee per

9   quarterly pull of Varvatos clothing for retail stores?

10        THE FOREPERSON:  $2,500 per employee per quarter.

11        THE COURT:  For outlet stores.

12        THE FOREPERSON:  $1,250 per employee per quarter.

13        THE COURT:  Punitive damages, what amount does the

14   jury award punitive damages per employee per quarterly pull of

15   Varvatos clothing for retial stores?

16        THE FOREPERSON:  $2,500 per quart.

17        THE COURT:  Per outlet stores.

18        THE FOREPERSON:  $1,250 per employee per quarter.

19        THE COURT:  Thank you.  You can put the verdict down.

20        I am just going to ask each juror whether the verdict

21   reached today and the verdict reached Friday was their verdict

22   and what I read into the record on Friday was your verdict.

23        Juror No. 1, was that your verdict?

24        JUROR:  Yes.

25        THE COURT:  Juror No. 2?

1          JUROR:  Yes.

2          THE COURT:  Juror No. 3?

3          JUROR:  Yes.

4          THE COURT:  Juror No. 4?

5          JUROR:  Yes.

6          THE COURT:  Juror No. 5?

7          JUROR:  Yes.

8          THE COURT:  Juror No. 6?

9          JUROR:  Yeah.

10          THE COURT:  Juror No. 7?

11          JUROR:  Yes.

12          THE COURT:  Juror No. 8?

13          JUROR:  Yes.

14          THE COURT:  Is there any application before I

15   discharge the jury from plaintiff's side?

16          MR. DUNNEGAN:  No, your Honor.

17          THE COURT:  Defendants?

18          MS. HASSAN:  None, your Honor.  Thank you.

19          THE COURT:  Ladies and gentlemen, at this moment in

20   the trial some judges thank jurors for serving on the jury.  In

21   keeping with the practice of some other judges who have served

22   in this court, I am actually not going thank you and let me

23   tell you why.  At the beginning of this case you took a solemn

24   oath to try this case truly and fairly and to render justice.

25   During the course of this trial, you each did what you were

1   required to do as you understood your duty.  In my experience

2   those two faithfully and conscientiously discharged their

3   responsibilities expect no thanks.  Anyone who observed this

4   trial, knows that you used all your powers to follow any

5   instructions and to act with the highest mindfulness in full

6   filling your responsibilities.  In other words, you each

7   responded as a citizen of this country to the call of duty and

8   you were reach privileged to play an important part in the

9   administration of justice.

10         What you have done in this trial is to perform one of

11   the highest and noblest obligations citizenship.  You have

12   acted as finders of fact and rendered a verdict in a trial.  In

13   my view you performed a public service equal to that of any

14   judge or other public servant.  For performing the public

15   service, you are entitled to a deep personal satisfaction of

16   knowing that you have fulfilled a duty without which our system

17   of justice could not exist.  Given the attention that I have

18   seen that you gave this trial and your conscientiously and

19   faithful attendance that feeling of satisfaction that you have

20   is richly deserved.  Any thanks that I can offer you would be

21   insignificant in comparison.

22         You are now free for talk about this case to others or

23   not talk about this case as you wish.  I ask only that you not

24   divulge to anyone of the vote or statements deliberations of

25   any juror by name.  It is my practice go to the jury room to

1   see if the jurors have any questions about the process or wish

2   to share anything about their experience.  You do not have to

3   stay with this.  I will be in the jury room for a minute or

4   two.

5            You may now return to the jury room to collect your

6   things.  I will follow momentarily.  As you exit, I ask that

7   everyone in the courtroom stand one final time as a sign of our

8   respect for all of you.

9            Ritchlin, they don't need to report anywhere, do they?

10           THE DEPUTY CLERK:  Yes, they do.  These are your

11   cards.  Go back to the jury room, all of you.  You hold on to

12   the cards.  Take them downstairs and give them to the jury

13   room.  They will instruct you on how you are going to get your

14   information.

15           THE COURT:  Just go to the jury room and I will be

16   back in a moment.

17           (Pause)

18           THE COURT:  You can be seated.

19           We still have Phase III of this trial.  What is the

20   plan for that?

21           MR. DUNNEGAN:  Your Honor, in Phase III there are two

22   issues that we have identified.  One is we would ask that the

23   Court double for the federal EPA the amount of the jury's

24   findings from last Friday with respect to retail and outlet

25   pulls.

1            THE COURT:  Hold on.  I imagine something was coming

2       ahead of that, but maybe not.  Don't I have to decide the total

3       number of pulls?

4            MR. DUNNEGAN:  That we envisioned as being Phase IV.

5            THE COURT:  Oh.

6            MR. DUNNEGAN:  Phase III as I understand it is limited

7       to two issues, both of which applied to some extent.  The first

8       is your Honor is charged with determining the liquidated

9       damages under the federal EPA.  We think that that should be

10      decided as a matter of collateral estoppel because the jury

11      found that there was no good faith and in fact there was

12      willfulness.  So we would think that the amount of the federal

13      EPA liquidated damages would be equal to 100 percent of the

14      compensatory damages.

15           THE COURT:  Okay.  Go ahead.

16           MR. DUNNEGAN:  The second issue, which needs to be

17      resolved would be in the event that any of these amounts of

18      punitive damages or liquidated damages exceed what would be

19      allowed under the statute.  Then there would be a cutback or

20      reduction to make it conform to the statute.  A quick look

21      doesn't look like we have anything here.  I can't tell you with

22      100 percent certainty, but I don't think we have anything here.

23           THE COURT:  And then?

24           MR. DUNNEGAN:  That's Phase III.

25           THE COURT:  Phase IV?

K326VAR3                        Zorda - recross

1              MR. DUNNEGAN:  Phase IV is number you crunching.  This

2      is what we had discussed or what I had discussed with Ms.

3      Hassan.  By the end of business tomorrow, we will present the

4      defendants' counsel with a spreadsheet which identifies the

5      amount of damages that we think are awardable on a per-pull

6      basis showing all work as if they were in third grade.  If I

7      can do it before the close of business tomorrow, we will.  We

8      don't have any interest in delaying this.

9              Before the close of business on Wednesday, defense

10     counsel will get back to us with any objections, corrections,

11     changes, deletions, editions.  We will then attempt to confer

12     on Thursday and file with the Court by the end of the day on

13     Thursday either an agreed upon spreadsheet or if there are any

14     issues, which are not agreed upon a statement of each side as

15     to what the issues are and how they believe they should be

16     resolved.

17             THE COURT:  Okay.

18             MR. DUNNEGAN:  Then at that point it is in the Court's

19     court.

20             THE COURT:  Go back to Phase III.  I understood your

21     argument about liquidated damages and estoppel.

22             What is the determination of punitive damages?  What

23     was the second one?

24             MR. DUNNEGAN:  The second one was the jury wasn't

25     given any limits for --

1              THE COURT:  No, the maximums.  That's math.

2              MR. DUNNEGAN:  I don't think any of that math applies

3       because these numbers are so low.

4              THE COURT:  But if there was anything, it was math?

5              MR. DUNNEGAN:  Yes.

6              THE COURT:  If you folks don't agree, I will deal with

7       in Phase IV as it were.

8              MR. DUNNEGAN:  I think that is absolutely correct.

9              THE COURT:  Now, I remember reading about this issue

10      when we first got the proposed jury instructions.  I remember

11      thinking that it would be better to have the jury decide it if

12      I good it wrong and then we have their answer and I can always

13      do my own answer.

14             Is it now fully briefed or is there more say?

15             MR. DUNNEGAN:  The facts have been presented, your

16      Honor.

17             THE COURT:  On the issue I am bound by the jury's

18      determination?

19             MR. DUNNEGAN:  That would seem to be a question of raw

20      law.

21             THE COURT:  Yes.

22             MR. DUNNEGAN:  We put in I think what we had to put in

23      in our trial memoranda.  I don't think we have anymore law to

24      say.

25             THE COURT:  How about you, folks, anything more on

1    that?

2              MS. HASSAN:  Your Honor, I know that we did include it

3    in our trial memorandum.  I don't know if we addressed the

4    specific issue of this particular situation where the jury has

5    made a decision on good faith and it's coming to you.  I think

6    the way we briefed it was the Court should make the good-faith

7    determination even before sending it to the jury because that

8    would be the most consistent way of reading the New York and

9    federal EPA together.  That is what we were addressing.

10             THE COURT:  I can't believe it matters that I sent it

11   to the jury.  I did it only as a prophylactic measure.

12             MS. HASSAN:  Right.  My answer being I don't think we

13   addressed the very specific issue at this point given that

14   there is a jury decision on good faith whether the Court can

15   still --

16             THE COURT:  Once again I don't think that could have

17   made a difference.  I remember the law being a little light on

18   this.  Were there cases going both ways or what was it?  There

19   have been 500 issues in this case and I can't remember all of

20   them.

21             MR. DUNNEGAN:  Your Honor, from our perspective it is

22   collateral estoppel.  The jury finds no good faith.

23             THE COURT:  No.  Is there cases specifically on point

24   on this?

25             I rather have a letter in a few days.  The decision

K326VAR3                          Zorda - recross

1  about whether to do it or not, I don't need anything more on.

2  I heard all the evidence.  Whether I have the power to do it,

3  is a different question which is what the collateral estoppel

4  issue addresses.  I hate to put anything off, but we have to

5  put off Phase IV anyway.  This should be easy.

6          MR. DUNNEGAN:  I agree.

7          THE COURT:  That should stop Phase IV.

8          MR. DUNNEGAN:  No.

9          THE COURT:  Put it together and give alternatives

10  depending upon what I decide.

11          MR. DUNNEGAN:  Right.  I would expect that we can get

12  this letter in by the close of business on Thursday so it is

13  all hitting your Honor at the same time.

14          THE COURT:  I might have you in just to give an oral

15  decision on this some time next week.  We'll see.

16          I think that's it from my end.

17          You are rising, Mr. Bassen.

18          MR. BASSEN:  While we're doing all this is without

19  prejudice or waiver after your Honor enters a judgment for our

20  moving for a JNOV within 28 days and briefing it?

21          THE COURT:  Correct.  You can't do that until I enter

22  a judgment and you can't enter a judgment until I do this

23  stuff.

24          MR. BASSEN:  Thank you.

25          I am ready to discharge you folks.

K326VAR3                          Zorda - recross

1          MR. DUNNEGAN:  Just to state the obvious that I think

2    we'll have an attorney's fee application within 15 days or so

3    under 54.

4          THE COURT:  Of the judgment, though, not of anything

5    that happened today.

6          MR. DUNNEGAN:  Agreed.

7          THE COURT:  If you need an extension, let me know.

8          Anything else from this end?

9          MS. HASSAN:  No.  Thank you, your Honor.

10          THE COURT:  Thank you, everyone.

11          MR. DUNNEGAN:  Thank you, your Honor.

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                              Page

3    JOSEPH ZORDA

4    Direct By Ms. Hassan . . . . . . . . . . . . 679

5    Cross By Mr. Dunnegan  . . . . . . . . . . . 724

6    Redirect By Ms. Hassan . . . . . . . . . . . 749

7    Recross By Mr. Dunnegan  . . . . . . . . . . 762

8                    DEFENDANT EXHIBITS

9    Exhibit No.                              Received

10    JJ   . . . . . . . . . . . . . . . . . . . 678

11    HH   . . . . . . . . . . . . . . . . . . . 766

12

13

14

15

16

17

18

19

20

21

22

23

24

25